```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2
         - - - - - - - - - - - - - - - x
 3       UNITED STATES OF AMERICA,
                                            Criminal Action No.
 4                     Plaintiff,          No. 16-059
                                            March 7, 2018
 5       vs.                                1:53 p.m.

 6       DAVID BOWSER,                      Washington, D.C.

 7                     Defendant.
         - - - - - - - - - - - - - - - x
 8                    DAY 6 - AFTERNOON SESSION

 9       _____

10                      TRANSCRIPT OF JURY TRIAL
               HELD BEFORE THE HONORABLE EMMET G. SULLIVAN
11                    UNITED STATES DISTRICT JUDGE
         _____
12
         APPEARANCES:
13
         For the United States:        TODD WILLIAM GEE, ESQ.
14                                      SEAN F. MULRYNE, ESQ.
                                        U.S. DEPARTMENT OF JUSTICE
15                                      PUBLIC INTEGRITY SECTION
                                        1400 New York Avenue, NW
16                                      Washington, D.C.  20005
                                        (202) 514-9751
17                                      todd.gee2@usdoj.gov

18       For the Defendant:            LESLIE S. McADOO GORDON, ESQ.
                                        McADOO GORDON & ASSOCIATES
19                                      1140 19th Street, NW
                                        Washington, D.C.  20036
20                                      (202) 293-0534
                                        leslie.mcadoo@mcadoolaw.com
21
         Court Reporter:               Lisa A. Moreira, RDR, CRR
22                                      Official Court Reporter
                                        U.S. Courthouse, Room 6718
23                                      333 Constitution Avenue, NW
                                        Washington, DC  20001
24                                      202-354-3187

25       Proceedings recorded by mechanical stenography; transcript
         produced by computer-aided transcription
```

```
1                        I N D E X

2
     WITNESS                                          PAGE
3
     CHRISTINE HARDMAN, Resumed
4          (By Ms. Gordon)................................  3
           (By Mr. Gee)................................... 31
5          (By Ms. Gordon)............................... 50

6    JOSHUA FINDLAY
           (By Mr. Gee)................................... 53
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S

2              THE COURT:  We have a note from one of the jurors,

3     Juror No. 1, who has travel plans from the 15th through the

4     18th.

5              Right?

6              THE COURTROOM DEPUTY:  That's correct, Your Honor.

7              THE COURT:  So, you know, I don't -- you can think

8     about it.  I don't plan to say anything to her other than

9     "Thank you for your note" right now, so we'll deal with that

10    later.

11             We may have to have a talk with Juror No. 8, I

12    think, about a delay in starting his job.  I don't know.

13    I'll just throw it out to you.  He's been very attentive,

14    but he's supposed to start, I think, on the 13th.

15             Right?

16             THE COURTROOM DEPUTY:  That's correct; yes.

17             THE COURT:  So all right.  Okay.  Are we ready?

18             (Jury enters courtroom)

19             THE COURT:  Okay.  You can have a seat.

20                      CHRISTINE HARDMAN, Resumed

21                      CROSS-EXAMINATION, Continued

22    BY MS. GORDON:

23    Q.  Good afternoon, Ms. Hardman.

24    A.  Good afternoon.

25    Q.  All right.  So now I would like to ask you some
```

```
1    questions about the OCE investigation.  All right?

2    A.  Okay.

3    Q.  So you told us that in April, you think, of 2014

4    Mr. Bowser showed you a letter that indicated to you that

5    the OCE was conducting a review, right?

6    A.  Yes.

7    Q.  Okay.  And that review was of the Congressman's office?

8    A.  Yes.

9    Q.  It wasn't about you personally, right?

10   A.  No.

11   Q.  Okay.  It's different from the letter that you looked at

12   with Mr. Gee this morning, right?

13   A.  Yes.

14   Q.  Okay.  Did you ever read the whole letter, the first one

15   that Mr. Bowser showed you?

16   A.  I skimmed it.

17   Q.  Okay.  And then the decision was made to not answer that

18   letter until after the primary was over, right?

19   A.  Yes.

20   Q.  Then in June, the early part of June, pretty much

21   everyone in the office got letters directly to them from OCE

22   also, right?

23   A.  Yes.

24   Q.  And we looked at the one that's yours, right?

25   A.  Yes.
```

1    Q.  Okay.  So let's look at it then.

2              MS. GORDON:  I think it is Government's Exhibit

3    OCE 110?  Do I have it right?

4              MR. GEE:  Yes.

5              THE COURT:  Mark, can I ask you something?

6              (Discussion off the record)

7              THE COURT:  Thank you.

8              Go right ahead, Counsel.

9    BY MS. GORDON:

10   Q.  Okay.  This is the letter, right?

11   A.  Yes.

12   Q.  Okay.  And it's to you, right?

13   A.  Yes.

14   Q.  Okay.  And so do you remember how you actually got it?

15   A.  No.

16   Q.  All right.  Do you remember how anyone else in the

17   office actually received their letters?

18   A.  No.

19   Q.  So do you remember whether Mr. Bowser distributed them?

20   A.  I can't remember.  I just know it was sitting on my

21   desk.

22   Q.  Okay.  So it's not directed to Mr. Bowser to distribute

23   to the staff members though, is it?

24   A.  Not from what I can tell.

25   Q.  Okay.  So the obligations in this letter, whatever they

1    are, were yours, right?

2    A.  Yes.

3    Q.  And then Mr. Gee showed you that you had an obligation

4    to give your records, right?

5    A.  Yes.

6    Q.  Okay.  And then if we look at the second page --

7          MS. GORDON:  If we can see this part here a little

8    bit bigger.

9    Q.  -- the OCE wanted to interview you also, right?

10   A.  Yes.

11   Q.  Okay.  Now, this section says, "The OCE requests the

12   opportunity to interview you at a mutually convenient time.

13   Please contact Bryson Morgan, Investigative Counsel" -- it

14   gives his work number, right? -- "no later than June 11,

15   2014 to arrange an interview," right?

16   A.  Yes.

17   Q.  And you didn't do that, did you?

18   A.  No.

19   Q.  Okay.  Who arranged the interviews?

20   A.  David.

21   Q.  He talked to Mr. Morgan on everyone's behalf, right?

22   A.  Yes.

23   Q.  And then Ms. Norton actually scheduled the interviews,

24   right?

25   A.  I believe so.

1    Q.  Okay.  Let's go back to the first page of this letter,

2    and let's look at this section.  And this section says,

3    "This Request for Information is pursuant to a second-phase

4    review authorized by the Board of the Office of

5    Congressional Ethics that commenced on April 28, 2014."  Do

6    you see that?

7    A.  Yes.

8    Q.  So they're saying it was a second-phase review, which

9    implies there was a first phase, right?

10   A.  Yes.

11   Q.  And that makes sense given that Mr. Bowser had already

12   showed you a previous letter, right?

13   A.  Yes.

14   Q.  Which you said was in April, and this sentence is

15   telling us that the review commenced in April, right?

16   A.  Yes.

17   Q.  Okay.  So does it actually say what they're looking into

18   though?

19   A.  No.

20   Q.  It tells you when the review's going to end though,

21   doesn't it here?

22   A.  Yes.

23   Q.  June 25th, right?

24   A.  Yes.

25   Q.  And the letter is dated June 3rd?

1    A.  Yes.

2    Q.  All right.  So that gave you three weeks to collect all

3    the documents and do the interviews, right?

4    A.  Yes.

5    Q.  Now, what I'd like you to do, please -- it's a two-page

6    letter, right?  If we can look at the second page, would you

7    read the letter, please, and tell us, does it say anything

8    about campaign in it?

9            MS. GORDON:  Ms. Diggs, let her look at the first

10   page first.

11   A.  (Witness reviews document) No.

12   Q.  Okay.  The first page doesn't say anything about

13   campaign, right?

14   A.  Correct.

15   Q.  Let's look at the second page.

16   A.  (Witness reviews document) No.

17   Q.  Okay.  So the word "campaign" doesn't appear in this

18   letter anyplace, right?

19   A.  Correct.

20   Q.  Let's look at the first page again.

21           MS. GORDON:  Can we blow up this part, please?

22   Q.  Okay.  So the letter is from the Office of Congressional

23   Ethics, right?

24   A.  Yes.

25   Q.  And you understood that they had the authority to

1    conduct reviews, right?

2    A.  Yes.

3    Q.  Okay.  Did you think they had the authority to conduct

4    reviews of anything on the campaign side?

5    A.  I didn't think so.

6    Q.  They're not the Federal Election Commission, right?

7              MR. GEE:  Objection.

8              THE COURT:  Sustained.

9    Q.  Okay.  Let's go back to the second page.  I want to look

10   at this paragraph here.

11             Now, this paragraph says they may make additional

12   information requests, as warranted by the facts and

13   circumstances of the review, right?

14   A.  Yes.

15   Q.  So they're leaving open the possibility that they might

16   ask you for more, right?

17   A.  Yes.

18   Q.  Did they ever do that?

19   A.  No.

20   Q.  And then the second sentence says, "In addition, we will

21   review any additional information you feel is relevant that

22   we have not requested," right?

23   A.  Yes.

24   Q.  So they're saying they'll take information if you give

25   it to them also though, right?

```
1     A.  Yes.

2     Q.  And I want to look at this paragraph, too.  Mr. Gee

3     asked you about this paragraph.

4           It says, "Please note that under House Resolution

5     895 of the 110th Congress, as amended, and OCE Rule 6, the

6     Board may draw a negative inference from any refusal to

7     cooperate and may include a statement to that effect in any

8     referral to the Committee on Ethics," right?

9     A.  Yes.

10    Q.  Mr. Gee asked you about that this morning.

11          Do you know what a negative inference is?

12    A.  No.

13    Q.  Did you have any idea what that meant?

14    A.  No.

15    Q.  It doesn't sound good though, does it?

16    A.  No.

17    Q.  "Refusal to cooperate" doesn't sound good either, does

18    it?

19    A.  No.

20    Q.  So you weren't sure exactly what could happen if you

21    didn't participate; am I right?

22    A.  That it would be negative.

23    Q.  Whatever it is, it would be negative.  It would be bad.

24    Right?

25    A.  Yes.
```

1    Q.  But did you understand that overall the whole process is

2    voluntary?

3    A.  No.

4    Q.  You didn't think that it was voluntary?

5    A.  At the time, no.

6    Q.  Okay.  Why not?

7              THE COURT:  Why don't you refine that, when you

8    say "the whole process."  Why don't you ask another

9    question.

10             MS. GORDON:  Okay.  I'd be happy to.

11   Q.  Did you think that you had a choice about whether or not

12   to respond to this letter?

13   A.  No.

14   Q.  Why not?

15   A.  It didn't clearly state that it was voluntary.

16   Q.  This request scared you, didn't it?

17   A.  Yes.

18   Q.  And you went to Mr. Bowser and Ms. Norton for advice

19   about how to respond to it, right?

20   A.  Yes.

21   Q.  You weren't sure what was being requested; am I right?

22   A.  I asked for clarity.

23   Q.  You asked because you didn't know.

24   A.  Yes.

25   Q.  Now, you told us that you were concerned because you

1    knew that campaign work had been being done in the office,

2    right?

3    A.  Yes.

4    Q.  Okay.  So you thought that that was something that might

5    be part of the review?

6    A.  Yes.

7    Q.  Okay.  It doesn't say that either in the letter, right?

8    A.  Sorry.  Can you repeat that?

9    Q.  Yes.  It doesn't say in the letter that that's what

10   they're looking into.

11   A.  It says they're looking into anything regarding Brett.

12   Q.  Right.  Okay.  But in terms of doing campaign work in

13   the office, the letter doesn't say that that's their focus,

14   right?

15   A.  No.

16   Q.  But you were worried that that would be something that

17   would come up?

18   A.  Yes.

19   Q.  Okay.  And did you share that concern with Mr. Bowser?

20   A.  Yes.

21   Q.  And what was his response?

22   A.  He said, "Don't lie."

23   Q.  Now, you told us then what steps you took to manage the

24   email request, and you said that Mr. Bowser did not

25   distinguish between personal and official emails when he

1    told you what he thought you were supposed to provide,

2    right?

3    A.  Yes, at first.

4    Q.  Okay.  So that means he didn't --

5              THE COURT:  I'm sorry, your answer was what?

6              THE WITNESS:  Yes, at first.

7              THE COURT:  At first?

8              MS. GORDON:  At first, yes.  That's what she said.

9    Q.  That's right.  You're saying at first he didn't say.

10   A.  Yes.

11   Q.  So when he told you the first time, he did not say,

12   "Hold back the personal.  Only give them the official."

13   A.  Correct.

14   Q.  And not the other way either.  He didn't say, "Hold back

15   the official.  Only give them the personal."

16   A.  Correct.

17   Q.  He just said, "You're going to have to give them your

18   emails."

19   A.  Yes.

20   Q.  And then you're saying that later you went back to him

21   and asked, "Do we have to give them the personal ones?"

22   Right?

23   A.  Yes.

24   Q.  Mr. Bowser didn't come to you and say, "Oh, wait.  Never

25   mind.  Don't give them the personal ones."

```
1    A.  Correct.

2    Q.  You initiated that question.

3    A.  Yes.

4    Q.  Why did you ask him that?

5    A.  I wasn't sure and just wanted clarity.

6    Q.  Even though --

7              MS. GORDON:  Can we put the letter back up again.

8    First page.

9              THE COURT:  Would you like to have the letter in

10   front of you?

11             MS. GORDON:  Yes.  I'm pulling it up.

12             THE COURT:  A paper copy?

13             THE WITNESS:  This is fine.

14   Q.  You're all right with the computer?

15   A.  Yes.

16   Q.  So here's what the request was.

17             MS. GORDON:  Ms. Diggs, can we blow that up for

18   her.  Maybe not that big.

19   Q.  Okay.  So the letter says, "All files, records, notes,

20   communications," right?

21   A.  Yes.

22   Q.  But you still had a question in your mind about whether

23   that included the personal, right?

24   A.  Yes.

25   Q.  You'd never been involved in anything like this OCE
```

```
 1    review before, right?

 2    A.  No.

 3    Q.  Okay.  Had you ever been questioned in any other sort of

 4    legal proceeding?

 5    A.  No.

 6    Q.  Okay.  Then you told us that a little bit later you

 7    became concerned because when you looked through the emails

 8    some of them were about campaign work being done in the

 9    office?

10    A.  Or using our official emails for campaign-related items.

11    Q.  I see.  So you're looking at them, and you're seeing

12    this is from the House.gov address, and it's about the

13    campaign.

14    A.  Yes.

15    Q.  And you were concerned about that.

16    A.  Yes.

17    Q.  Okay.  So you went back to Mr. Bowser and asked him

18    about that specific issue?

19    A.  Yes.

20    Q.  And you told us this morning that he said to use your

21    discretion about that?

22    A.  Yes.

23    Q.  Doesn't that mean make your own decision?

24    A.  Yes.

25    Q.  Then you told us that "I removed the ones that looked
```

1    bad for the office," right?

2    A.  Yes.

3    Q.  You decided to do that, right?

4    A.  Yes.

5    Q.  Mr. Bowser didn't ask you to do that?

6    A.  No.

7    Q.  And he didn't tell you to do that?

8    A.  No.

9    Q.  So you decided to take them out, and it sounded like you

10   put them in a drawer of your desk?

11   A.  I put them in the recycling.

12   Q.  Oh, you put them in the recycling, okay.

13        You didn't tell Mr. Bowser that you'd done that

14   though, did you?

15   A.  I don't recall, no.

16   Q.  All right.  Then, with respect to the interview,

17   Mr. Bowser told you not to lie to the OCE.

18   A.  Yes.

19   Q.  You were feeling, you said, anxious and nervous still

20   and conflicted, I think was the word you used, because you

21   thought that Mr. Bowser telling you that Mr. O'Donnell was a

22   volunteer might not coincide with the amount of work that

23   you saw Mr. O'Donnell doing on the campaign.  Is that a fair

24   statement of what your concern was?

25   A.  Yes, that and just not acknowledging the campaign

1   discussions that took place in the official office.

2   Q.  As I wrote it down you had two concerns, so we'll do

3   them one at a time.

4           MR. GEE:  Objection; misstates the evidence.

5           MS. GORDON:  I'd be happy to ask her if there are

6   any others.

7   Q.  I took down two, but I'll be happy to ask you if there

8   were any others?

9           THE COURT:  Rephrase that, Counsel.

10  Q.  So one of the concerns that you had was this idea about

11  whether Mr. O'Donnell was volunteering or not really, right?

12          MR. GEE:  Objection.

13          THE COURT:  Let me ask you that.  What were your

14  concerns?

15          THE WITNESS:  I was concerned because I knew

16  campaign activity took place in the office when Brett was

17  there, and I was concerned because it didn't seem to be that

18  the office was acknowledging that and acting like everything

19  was fine.

20  Q.  Okay.  Just on that one issue, on the campaign work

21  being done in the office, or are there more?

22  A.  Yes.

23  Q.  Yes, there are more?

24  A.  I believe that's it.

25  Q.  You believe that's it?

1    A.   That idea, yes.

2    Q.   Okay.   But you just told us that when you asked

3    Mr. Bowser about telling the OCE that the campaign work had

4    been going on in the office, he told you not to lie about

5    it, right?

6    A.   Yes.

7    Q.   The other point that I thought you testified that you

8    had concerns about was about the issue of Mr. O'Donnell

9    volunteering because you said you thought the narrative in

10   the office was different from what you had observed.

11               MR. GEE:   Objection; misstates the evidence.

12               THE COURT:   Let me speak with counsel.

13               (The following is a conference held at the

14                bench outside the hearing of the jury)

15               MS. GORDON:   That's not the second issue?   What's

16   the second issue?

17               MR. GEE:   Your Honor, the testimony was about

18   Mr. -- was about what Mr. Bowser told her.   The defense --

19               MS. GORDON:   I'm happy to say it that way.

20               MR. GEE:   It may be unintentional, but the

21   questions are phrasing it as though she brought these

22   matters up with Mr. Bowser.

23               THE COURT:   Right.   Right.

24               MR. GEE:   And that's misstating the evidence in

25   the question.

1          THE COURT:  I think that's correct.

2          MS. GORDON:  I'm not intending to imply it.  I'd

3     be happy to say it that way.

4          THE COURT:  All right.

5          (This is the end of the bench conference)

6          THE COURT:  Counsel's going to rephrase.

7     BY MS. GORDON:

8     Q.  Okay.  Apparently I have to get closer to the mic here.

9          So the second issue seems to be that you were

10    concerned that Mr. Bowser had told you that Mr. O'Donnell

11    was a volunteer, and you thought that was inconsistent with

12    the work that Mr. O'Donnell had done on the campaign; is

13    that right?

14    A.  I thought that he was heavily involved in the campaign.

15    Q.  And so you were concerned that that was a conflict.

16    That was the word that you used, right?

17    A.  Yes.

18    Q.  Okay.  If Mr. O'Donnell was, in fact, a volunteer, there

19    wouldn't be any conflict, right?

20    A.  No.

21    Q.  You were very nervous about that OCE interview, weren't

22    you?

23    A.  Yes.

24    Q.  Okay.  And before the interview you talked to

25    Mr. O'Donnell.  You already told us about that, right?

1   A.  Yes.

2   Q.  You also talked to Ms. Norton.

3   A.  Yes.

4   Q.  And you actually called Ms. Griffanti, the person who

5   had had your job before, also, didn't you?

6   A.  Yes.

7   Q.  In your GChat that we looked at with your boyfriend,

8   your former boyfriend -- is he your husband now?

9   A.  Yes.

10  Q.  Yes, okay.  In the chat that you were having with him,

11  you mentioned that you hoped that Mr. Bowser would sit in

12  with you for your interview.

13  A.  Yes.

14  Q.  Okay.  You told us that that was for support.

15  A.  Yes.

16  Q.  Right?

17          Why would you think that Mr. Bowser sitting in on

18  the interview would be supportive?

19  A.  Because he had seen the situation unfold and, I don't

20  know, could offer help, if needed.

21  Q.  Yes, okay.

22          All right.  And then you talked with Mr. Gee about

23  during the interview you didn't tell the complete truth to

24  the OCE investigators, especially about having talked to

25  Mr. O'Donnell that morning, right?

```
1    A.   Yes.

2    Q.   After you left the interview, you went straight to

3    Mr. Bowser, right?

4    A.   Yes.

5    Q.   And you told him, "I didn't tell them the truth about

6    talking to Mr. O'Donnell," right?

7    A.   Yes.

8    Q.   And he told you to turn yourself right around and go

9    back in and talk to them, didn't he?

10   A.   Yes.

11   Q.   There was no question about -- let me rephrase.

12           How long a period of time passed between the time

13   you left the interview and when you went back?

14   A.   Probably a minute.

15   Q.   And then Mr. Gee read with you the statement that you

16   made after you went back into the interview, and you

17   described some of it as backpedaling, right?

18   A.   Yes.

19   Q.   Okay.  And, in fact, with respect to Mr. Bowser telling

20   you to go back in, you sort of backpedaled on that a little

21   bit, too, right?

22   A.   At the end of the interview?

23   Q.   At the end of the interview.

24   A.   Yes, possibly.

25              THE COURT:  What do you mean by that,
```

1    backpedaling?

2              THE WITNESS:  That's for me?

3              MS. GORDON:  Yes.  He's asking you.

4              THE WITNESS:  I was just kind of backing away from

5    confronting the issue.

6    Q.  All right.  And then after the OCE interviews were over,

7    they published a report, right?

8    A.  Yes.

9    Q.  Okay.  And there was some discussion amongst people who

10   had worked for Congressman Broun about the report, right?

11   A.  Yes.

12   Q.  Okay.  And you had a conversation by GChat also with a

13   former Congressman Broun staffer about the report, right?

14   A.  Yes.

15   Q.  It was big news in the world of Congressman Broun about

16   this report, right?

17   A.  Yes.

18   Q.  All right.  And you told this former staffer that

19   Mr. Bowser was --

20             MR. GEE:  Objection.

21             THE COURT:  Sustained.

22   Q.  Did you think that Mr. Bowser had asked anyone else to

23   interfere with the OCE report -- the OCE review?

24   A.  What do you mean by "interfere"?

25   Q.  Did you think Mr. Bowser had asked any other person to

```
1    be less than honest with the OCE?

2              MR. GEE:  Objection.

3              THE COURT:  What was your understanding about

4    Mr. Bowser's role or interaction with any other individual

5    interviewed by OCE or anyone asked to supply information?

6              THE WITNESS:  I believe Teddie was with me when we

7    had the conversation ahead of the OCE interview, and I

8    believe Teddie also supplied the same official emails as

9    well.

10   Q.  Okay.  What I'm asking you is, did you know of any other

11   instance in which Mr. Bowser asked someone else not to fully

12   cooperate with OCE?

13             MR. GEE:  Objection.

14             THE COURT:  Yes, I'm going to sustain that.

15             MS. GORDON:  I'm only asking if she knows.

16             MR. GEE:  Objection.

17             THE COURT:  I sustained the objection.

18             MS. GORDON:  May I know the basis of the

19   objection?  Perhaps I --

20             THE COURT:  I sustained it, Counsel.  I suggest

21   you move on.

22   Q.  Your work with Mr. -- with Congressman Broun came to an

23   end when?  When did you leave there?

24   A.  March of 2016.

25   Q.  I'm sorry, let me rephrase the question.
```

1          Your work for Congressman Broun came to an end

2     when?

3     A.  December of 2014.

4     Q.  Right.  So you stayed with the Congressman almost all

5     the way to the end of his term, right?

6     A.  Yes, all the way to the end.

7     Q.  Okay.  And then Mr. Bowser had secured a position with

8     another Congressperson, Congresswoman Walters, correct?

9     A.  Yes.

10    Q.  And you were looking for a new --

11         THE COURT:  Another thing; it's inappropriate to

12    ask for the basis for a legal ruling in front of the jury.

13         Counsel, approach, please.

14         (The following is a conference held at the

15          bench outside the hearing of the jury)

16         MS. GORDON:  Your Honor, I apologize.

17         THE COURT:  Just a minute.  No, you can make your

18    objection and state your reason.

19         MS. GORDON:  I wasn't asking for the basis of your

20    ruling.  I was --

21         THE COURT:  You were.

22         MS. GORDON:  No, sir.  Please let me finish.

23         I was asking for --

24         THE COURT:  Just focus on your objection.  If you

25    want to say anything else for the record, go ahead.

1          What's your basis?  What's your basis for asking

2     this information about what other information she knew?

3          MS. GORDON:  Oh, she's -- there's a GChat --

4     I'm sorry, I misunderstood you.  There's a GChat in which

5     she's telling Ms. Griffanti that someone else thought that

6     Mr. Bowser was asking him to obstruct -- and it's Mr. Heenan

7     who is going to come up --

8          THE COURT:  He's going to testify?

9          MS. GORDON:  He's going to testify on Monday.

10         THE COURT:  All right.

11         MS. GORDON:  And she tells --

12         THE COURT:  And you're going to get whatever

13    answers you want from him, right?

14         MS. GORDON:  But she tells the other person that

15    Mr. Bowser was only trying to protect him, not get him to

16    obstruct.  He's not going know that.  He's going to have no

17    knowledge of it, Mr. Heenan.

18         THE COURT:  Counsel.

19         MR. GEE:  So she has a GChat, a textual

20    communication, with another staffer who's not here.

21         THE COURT:  Right.

22         MR. GEE:  The GChat itself is an out-of-court

23    statement.  Within that statement she's repeating further

24    inside hearsay that she understands --

25         THE COURT:  It's at least twice removed.  At

1    least.

2              So the objection's sustained.

3              MS. GORDON:  All right.  May I address the Court?

4              I apologize.  I have no intention --

5              THE COURT:  That's fine.  That's fine.  I was

6    asking for what the basis was.

7              MS. GORDON:  No, sir, I wanted to know what the

8    basis of his objection was, because if it was a form one, I

9    could have --

10             THE COURT:  That's fine.  And that's why I'm

11   giving you an opportunity, and the objection's sustained.

12             MS. GORDON:  Well, I understand that.  I could

13   have rephrased --

14             THE COURT:  That's fine.  Well, it's more than --

15   Counsel, it's more than just a form objection.

16             MS. GORDON:  But I didn't know that.  That's what

17   I wanted to know.  If it was form, I could have rephrased.

18             THE COURT:  All right.

19             (This is the end of the bench conference)

20             THE COURT:  We'll move on.

21   BY MS. GORDON:

22   Q.  All right.  So where we left off, you were interviewing

23   for new jobs, right?

24   A.  Yes.

25   Q.  Okay.  And you interviewed with Mr. Bowser in

1     Congressman Walters's office?

2     A.   I don't know if I interviewed.

3     Q.   Oh, you said that he hired you.

4     A.   Yes.

5     Q.   Okay.  But you didn't interview with him first?

6     A.   Not that I remember.

7     Q.   Okay.  You knew he was the chief of staff there?

8     A.   Yes.

9     Q.   Okay.  And did you interview with the congresswoman?  Is

10    that what it was?

11    A.   I believe so.

12    Q.   Okay.  All right.  And then you worked with Mr. Bowser

13    in Congresswoman Walters's office from when to when?

14    A.   January 2015 to March of 2016.

15    Q.   And you told us that you're still social media friends

16    with Mr. Bowser, right?

17    A.   Yes.

18    Q.   Okay.  Not close friends --

19              THE COURT:  Just for clarity purposes, who

20    extended that job opportunity to you?  Was it the

21    Congresswoman, or was it Mr. Bowser?

22              THE WITNESS:  It was David.

23              THE COURT:  That's what I thought you said.

24    Q.   Mr. Bowser?

25    A.   Yes.

```
1              THE COURT:  But you did not interview with him?
2              THE WITNESS:  I don't think so.  I think he
3    already knew how I worked.
4    Q.  He didn't need to interview?
5    A.  Right.
6    Q.  Is that what you're saying?
7    A.  Yes.
8    Q.  You knew you were going there to work for him?
9    A.  Yes.
10   Q.  Same relationship that you would have had -- that you
11   had in Congressman Broun's office?
12   A.  Yes.
13              THE COURT:  But did you apply for that position,
14   or did he seek you out?
15              THE WITNESS:  He told me that there was a
16   possibility he would be working with her, if it was
17   something I'd be interested in.
18   Q.  And you were interested?
19   A.  Yes.
20   Q.  Okay.
21              MS. GORDON:  I will pass the witness.
22              THE COURT:  All right.  I'm sorry, you know,
23   pursuant to that other discussion we had, let me just ask
24   Mark.  It's not about you.
25              (Pause)
```

1          THE COURT:  Counsel, let me speak with Mrs. Gordon

2     and Mr. Gee at the bench.  It has nothing to do with this

3     witness.

4              (The following is a conference held at the

5               bench outside the hearing of the jury)

6          THE COURT:  So the nurse was on her way up, but

7     then she said -- but then I told Mark to tell her you're

8     comfortable.  Do you want her to come up?

9          MS. GORDON:  If you wouldn't mind.  You can tell

10    I'm not 100 percent on my game.  I'm a little off.

11         THE COURT:  You seem to be.  You seem to be.  But,

12    look, I want you to be comfortable.

13         MS. GORDON:  I would like to see what she has to

14    say.

15         THE COURT:  You want to talk to her?

16         MS. GORDON:  Yes.  I apologize.

17         THE COURT:  No, no, no.

18         MR. GEE:  That's fine.

19         THE COURT:  Don't apologize.

20              (This is the end of the bench conference)

21         THE COURT:  All right.  You can call.

22              Let's see, redirect.

23         MR. GEE:  Thank you, Your Honor.  The Court's

24    indulgence.

25         THE COURT:  Sure.

1          Let me just say something, ladies and gentlemen.

2     When we have these discussions, they're about legal issues.

3     Your job, as I said during the preliminary instructions, is

4     to determine the facts.  You're the judges of the facts.  So

5     don't draw any inferences or any conclusion just because we

6     have bench conferences.  We're just discussing the law, and

7     I'm allowing everyone to make his or her record.

8          So that's the reason why we keep some things from

9     you.  But it has nothing to do with your ultimate job, which

10    is to determine the facts in the case.  So I know it gets

11    confusing sometimes.

12         We're probably going to take a short recess

13    earlier than I had anticipated at 3:30 just to address a

14    collateral matter to this trial.  It has nothing to do with

15    the trial itself, but we'll probably need to take a recess

16    for five or ten minutes or so.

17         But I'll let you know when that happens.  It will

18    be before 3:30 though.

19         Counsel.

20         MR. GEE:  Thank you, Your Honor.

21         THE COURT:  Let me just say one other thing.  In

22    fairness to Mrs. Gordon, when she asked for the basis,

23    "What's the basis for that?" she wasn't asking the Court for

24    the basis of the Court's ruling because she knows and the

25    attorneys know it would be inappropriate for the Court to

```
1    state the legal basis for a ruling in front of the jury.

2           What she was asking, in fairness to her -- and I

3    understand it now, and I apologize to her -- was she was

4    asking Mr. Gee for the basis for his objection.

5           He knew what the basis was.  I knew what it was.

6    It was unclear to Mrs. Gordon, and she had every right to

7    ask her opposing counsel what the basis was for his

8    objection so she could respond.  So we explored that at the

9    bench.

10          So don't be unkind to Mrs. Gordon because of the

11   exchange the Court had with her.  She knows -- she's a

12   professional, and she was not asking the Court to explain to

13   the jurors what the legal basis for the Court's ruling was.

14   So I just want to make that clear as well.

15          MS. GORDON:  Thank you.

16          MR. GEE:  Should I proceed?

17          THE COURT:  Counsel.

18          MR. GEE:  Can we have Government's Exhibit 569,

19   please.

20          There we go.  All right.  Perfect.

21                       REDIRECT EXAMINATION

22   BY MR. GEE:

23   Q.  So good afternoon, Ms. Hardman.

24   A.  Good afternoon.

25   Q.  So there were some questions asked about official work
```

1    in Georgia and in Washington, D.C.  Do you remember those

2    questions?

3    A.  Yes.

4    Q.  And it was about -- it was asked after some questions

5    about a lot of those messaging calls we've looked at

6    involving campaign messaging calls.  Do you remember that?

7    A.  Yes.

8    Q.  Okay.  And there were some questions asked about how

9    official work gets done in Washington, D.C., right?

10   A.  Yes.

11   Q.  Even though it's nowhere near the 10th Congressional

12   District, right?

13   A.  Yes.

14   Q.  Where is the United States Congress?

15   A.  D.C.

16   Q.  So where is the official work done?

17   A.  D.C.

18   Q.  During the Congressman's campaign --

19            MR. GEE:  Can we see?

20   Q.  For example, Savannah, Georgia, is it in the 10th

21   Congressional District?

22   A.  No.

23   Q.  Tallahassee, Florida, is it even on this map?

24   A.  No.

25   Q.  During the Senate campaign, when there were media events

1    in places like Savannah, Tallahassee, like we saw in some of

2    those emails, is that for official work?

3    A.  No.

4    Q.  There were some questions asked --

5            MR. GEE:  Exhibit 298, can we have that, please?

6    Q.  There were some questions asked about this email, right?

7    Exhibit 298.  Do you remember those questions?

8    A.  Yes.

9    Q.  Okay.  And let's start at the back for a second.  The

10   end result of this email is Mr. Bowser is asking you to do

11   what the next day?

12   A.  Review the Tony Powers interview.

13   Q.  Okay.  And you're supposed to review it with who?

14   A.  Dr. Broun.

15   Q.  Okay.  And to review it to discuss what?

16   A.  His messaging on the Senate campaign.

17   Q.  Okay.

18           MR. GEE:  And can we go to the end of this one.  I

19   think -- I'm sorry, the next page.

20           Oh, sorry, one page up.  I apologize.

21   Q.  And so there were some questions asked about this part

22   of the interview, and do you remember in the questions there

23   were some -- the questions were asked to -- the questions

24   were asked in a way suggesting that you had said in the

25   trial yesterday that Mr. Bowser -- that this was an example

1    of Congressman Broun giving a radio interview in the

2    congressional office.  Do you remember those questions?

3    A.  Yes.

4    Q.  Okay.

5         MR. GEE:  We're going to mark for identification

6    as Government's Exhibit 586 the transcript from yesterday.

7         THE COURT:  All right.

8         MS. GORDON:  And the page and the line.

9         MR. GEE:  Page 157, Line 24.

10   Q.  Yesterday I said:  "Exhibit 298.  Can we go to the --

11   sorry -- the bottom of the first page and zoom in on the

12   first."  Same thing we just did.

13        "QUESTION:  This is Mr. Bowser.  You talked about

14   how Mr. Bowser's office -- where was it in relation to

15   Congressman Broun's office?

16        "ANSWER:  It was connected.

17        "QUESTION:  Did they have an actual door between

18   them?

19        "ANSWER:  Yes.

20        "QUESTION:  Could the door open?

21        "ANSWER:  Yes.

22        "QUESTION:  This email, December 10, 2013,

23   Mr. Bowser writes, 'He just started the Tony Powers

24   interview, and the first question is apparently about

25   endorsements because he opens with something about the

1    endorsements he's gotten, and within the first minute he's

2    saying my probable opponent in the runoff may have the

3    endorsement of the Chamber of Commerce,' and then he goes on

4    in the email to say other things.

5              "In general, what is it that you understood he was

6    doing when you got this email?

7              "ANSWER:  He was talking about Dr. Broun's

8    messaging in the interview.

9              "QUESTION:  And this is an interview in which the

10   first question was about endorsements.  That's what kind of

11   interview?

12             "ANSWER:  Campaign.

13             "QUESTION:  And when he said, 'He just started the

14   Tony Powers interview and the first question...,' what is it

15   you understood in terms of where Mr. Bowser is overhearing

16   this interview?

17             "ANSWER:  From his office."

18             Did you say in that testimony yesterday that

19   Congressman Broun is giving this interview in the office?

20   A.  No.

21   Q.  Now, there were also some questions asked about -- there

22   was a whole series of questions about these --

23             MR. GEE:  We can take this off.

24   Q.  There were a whole series of questions about these

25   newspaper articles in July 2013 of the *USA Today* article and

1    the ones in March.  Do you remember those questions?

2    A.  Yes.

3    Q.  And also about the talking points that went along with

4    the March ones.  Do you remember that?

5    A.  Yes.

6    Q.  And there were a lot of questions about whether those

7    articles were just asking and those reporters were just

8    asking about Brett O'Donnell's official services.  Do you

9    remember those questions?

10   A.  Yes.

11   Q.  Okay.

12           MR. GEE:  Let's take a look at -- and this one's

13   not admitted -- Government's Exhibit 194, so just on the

14   witness's screen, please.

15   Q.  Looking at Government's Exhibit 194, Ms. Norton, is that

16   a copy of the *USA Today* article?

17   A.  Ms. Hardman.

18   Q.  What's that?

19   A.  Ms. Hardman.

20   Q.  I'm sorry, Ms. Hardman.  I apologize.

21   A.  Yes.

22   Q.  Is that a copy of the *USA Today* article?

23   A.  Yes.

24           MR. GEE:  Can we go to the second page of the

25   article.

1              Scrolling down just a little bit -- sorry, scroll

2      up just a little, please.

3      Q.  Directing your attention to the first two paragraphs,

4      read those over to yourself.

5      A.  (Witness reviews document)

6      Q.  Just look up when you're ready.

7              (Pause)

8      Q.  Does that refresh your recollection about whether the

9      report back in July 2013 also discussed how Mr. O'Donnell

10     was not being paid by the campaign?

11     A.  Yes.

12     Q.  Did it discuss that?

13     A.  Yes.

14     Q.  Let's look at -- let's talk about March now.  So first

15     this starts with Government's Exhibit 451.  This is the

16     exhibit we've looked at, the door-slamming one, right?

17     A.  Yes.

18     Q.  First off, the headline is "Congressman Slams Door on

19     Channel 2 Reporter When Asked About Campaign Coach," right?

20     A.  Yes.

21     Q.  It does not say "when asked about official office

22     messaging coach," does it?

23     A.  Not in the headline.

24     Q.  Yes.  And let's look at some of the follow-ups.

25              So I'm going to show you Government's Exhibit --

1    and this one's by WSB, right?

2    A.  Yes.

3    Q.  Is that a -- what kind of thing was that down in

4    Atlanta -- down in Georgia?

5    A.  A TV outlet.

6    Q.  Okay.  I'm going to show what you we've marked as

7    Government's Exhibit 474A.

8              MR. GEE:  It's not admitted.

9              MS. GORDON:  I'm sorry?  474?

10             MR. GEE:  Yes, ma'am, 474A.

11   Q.  Government's Exhibit 474A --

12             MR. GEE:  You know what, I'll just -- can I

13   approach, Your Honor?

14             THE COURT:  Sure.

15             MR. GEE:  It will be easier for her.

16             THE COURT:  Excuse me one second.

17             (Pause)

18             THE COURT:  Sorry.  Go right ahead, Counsel.

19   BY MR. GEE:

20   Q.  Do you have 476A [sic] in front of you?

21   A.  Yes.

22   Q.  Did you have a chance to look at it?

23   A.  Yes.

24   Q.  476A, what is it?

25   A.  It's the WSB story.

1    Q.  Is it the main story, follow-up story?  What is it?

2    A.  The follow-up story.

3    Q.  Okay.  And who's actually forwarding it to you in 476A?

4    A.  David.

5    Q.  All right.  And what does Mr. Bowser say in his email

6    forwarding it?

7    A.  "WSB is up to still pushing that closing the door in the

8    guy's face BS though.  When Channel 2's Justin Gray went to

9    Rep Paul Broun's office to talk about the expenses, Broun

10   shut the door in his face."

11   Q.  And then within the article, take a look at the third

12   paragraph.  Do you see that?

13   A.  Yes.

14   Q.  Does that refresh your recollection about whether the

15   follow-up articles were about the -- how Mr. O'Donnell was

16   paid on the official side and not being paid on the campaign

17   side?

18   A.  Yes.

19   Q.  Was the follow-up article by WSB, the original door-

20   shutting company -- article, for example, was it about how

21   Brett was not being paid on the campaign side?

22   A.  I can't remember if that was in the original.

23   Q.  Well, no, I'm sorry, the follow-up.  The original's the

24   one that says "debate" -- "campaign debate coach" we just

25   looked at, right?

1    A.   Yes.

2    Q.   This follow-up you're looking at right now, 474A on

3    March 19th, two days later, is it also about how Brett

4    O'Donnell is not being paid on the campaign side?

5    A.   Wondering how taxpayer money can be used for a campaign

6    consultant, is what I see.

7    Q.   So is that part of the follow-up articles?

8    A.   Yes.

9    Q.   And Exhibit 464A --

10           MR. GEE:   This one's not admitted yet either.

11           THE COURT:   All right.

12   Q.   Is 464A another email you received?

13   A.   Yes.

14   Q.   Mr. Bowser also received it?

15   A.   Yes.

16   Q.   Who sends it to you?

17   A.   Brett.

18           MR. GEE:   Move to admit 464A.

19           THE COURT:   Any objection?

20           MS. GORDON:   No objection.

21           THE COURT:   Admitted.

22   Q.   This one's March 19th.   It's in that same time frame; is

23   that right?

24   A.   Yes.

25   Q.   Who is Justin Gray?

1    A.   The WSB reporter that broke the story.

2    Q.   So another follow-up part?

3    A.   Yes.

4    Q.   And he says, "We'd like to talk to you today about the

5    contract staff position" -- and this email is to who?

6    A.   Brett.

7    Q.   And just looking up a little bit, does Brett send it to

8    you and who?

9    A.   David.

10   Q.   And Mr. Bowser -- Mr. O'Donnell writes, "Not talking to

11   him"; is that right?

12   A.   Yes.

13   Q.   And the article says -- I'm sorry, the request from the

14   reporter says, "We'd like to talk to you about the contract

15   staff positions you have with members of Congress from their

16   official [sic] budgets.  You advertise your services on your

17   website at campaign consultation and campaign debate

18   preparation -- trying to understand how the work you do for

19   these members is not campaign related."  Did I read that

20   right?

21   A.   Yes.

22          MR. GEE:  Can we call up Exhibit 453A.  I got it.

23   Q.   So talking points are in this March time frame.

24   A.   Yes.

25   Q.   And these are the talking points that there were a lot

1    of questions about whether these were all just to refresh --

2    all to address articles that were about official things,

3    right?

4    A.  Yes.

5    Q.  And you also -- we also looked at some other notes you

6    took in another meeting with Mr. Bowser; is that right?

7    A.  Yes.

8    Q.  Okay.  So the reporters back in that March time frame,

9    were they interested in Mr. O'Donnell's work on the campaign

10   as well as the official side?

11   A.  Yes.

12   Q.  There were some questions about the briefing books for

13   the debate.  Do you remember those?

14   A.  Yes.

15   Q.  Okay.  And you talked about how you can't remember who,

16   if anyone, asked Mr. O'Donnell to make them; is that right?

17   A.  Yes.

18         MR. GEE:  Can we look at Government's Exhibit 309.

19   Q.  Regardless of who asked him to make them, who did he

20   send the final revised version to?

21   A.  Dr. Broun.

22   Q.  And who else?

23   A.  Josh, myself, and David.

24   Q.  There were some questions asked about --

25         MR. GEE:  Let's call up Exhibit 405 and go to the

1    last page, please.

2    Q.  So there were some questions asked about -- generally

3    about in the sessions in the office when campaign things

4    would come up, right?

5    A.  Yes.

6    Q.  Do you remember those questions?

7             Now, first off, to be clear, were there times

8    where Mr. Bowser asked you to talk about campaign things in

9    those messaging sessions in the office in advance of the

10   session?

11            MS. GORDON:  Asked and answered.  Objection; asked

12   and answered.

13            THE COURT:  There's a need for some clarity.

14            Do you understand the question?

15   A.  Can you clarify?

16   Q.  Yes.  In advance of the messaging sessions in the

17   office, would Mr. Bowser ever tell you campaign-related

18   things that he wanted covered in those sessions?

19   A.  Possibly reviewing a video or an interview.

20   Q.  Okay.

21   A.  I can't remember a specific instance.

22   Q.  Okay.  And then there were also times, as you talked

23   about, I think, on direct and cross, that Mr. Broun would

24   bring it up, right?

25   A.  Yes.

1    Q.   Congressman Broun would.

2         And here we have "PB, Brett, Christine and I just

3    met for nearly 2 hours on debate messaging," right?

4    A.   Yes.

5    Q.   And we've covered this conversation he's describing.  It

6    occurred where?

7    A.   In Dr. Broun's official office.

8    Q.   Now, how old are you in February of 2014?

9    A.   24.

10   Q.   And had you ever worked on a campaign before this?

11   A.   No.

12   Q.   Who do you rely on to tell you what you're doing on a

13   campaign is legal?

14   A.   David, Dr. Broun.

15   Q.   How old is the defendant, approximately, in February

16   2014?

17   A.   I don't know.

18   Q.   A lot older than you?

19   A.   Yes.

20   Q.   Who was your boss in that meeting?

21   A.   David and Dr. Broun.

22   Q.   At the time of that meeting or these other messaging

23   sessions when campaign stuff comes up, did you understand

24   there to be some sort of a general exception that let's

25   congressmen talk about campaign activity in congressional

1    buildings?

2    A.  No.

3    Q.  Do you understand there to be some kind of exception

4    that lets congressmen talk about legal things in

5    congressional buildings?

6    A.  What do you mean by "legal things"?

7    Q.  Is it okay to rob a bank just because a congressman asks

8    you in a congressional building to do it?

9           MS. GORDON:  Objection.

10          THE COURT:  Rephrase.  Rephrase your original

11   question, Counsel.

12          MR. GEE:  I think we got it.  We'll move on.

13          THE COURT:  Let me ask you this:  What was your

14   understanding about what congressmen could talk about in the

15   halls -- in the offices of the Rayburn building?  Political

16   matters or campaign matters?  Official matters?  What?

17          THE WITNESS:  Official matters.

18          THE COURT:  And not campaign matters?

19          THE WITNESS:  Correct.

20          THE COURT:  All right.

21          So what were the --

22          THE WITNESS:  It's a little bit gray just based

23   off --

24          THE COURT:  I'm sorry?  What was that?

25          THE WITNESS:  It was a bit of a gray area just,

1    you know, based off communications or scheduling people

2    being able to talk about both.

3    Q.  And who would you rely on to explain to you where the

4    gray area is okay?

5    A.  David and Dr. Broun.

6    Q.  There were some questions asked about --

7           MR. GEE:  Can we see OCE 110, please.

8    Q.  There were some questions asked about this letter and

9    the OCE interview.  Do you remember that?

10   A.  Yes.

11   Q.  And there were some questions asked about whether you

12   understood whether OCE could investigate campaigns or not.

13   Do you understand that?

14   A.  Yes.

15   Q.  Now, did you understand whether OCE could investigate

16   the use of House official funds?

17   A.  Yes.

18   Q.  Did you understand whether the OCE could investigate the

19   alleged misuse of House official funds?

20   A.  Yes.

21   Q.  Did you understand whether the OCE could investigate the

22   alleged misuse of House official funds on campaign activity?

23   A.  Yes.

24   Q.  There were --

25           MR. GEE:  You can take this one down.

1    Q.  There were some questions asked about during your

2    interview.  Do you remember that?  Well, there were some

3    questions asked in the cross-examination about that.  Do you

4    remember that?

5    A.  The OCE interview?

6    Q.  Yes.

7    A.  Yes.

8    Q.  Okay.  Now, we don't need to go through them all at

9    length as we did in direct, but is -- the statements that

10   you made to the OCE that were incomplete or misleading, were

11   they only about Brett calling you that morning, or did you

12   also make some misleading statements about things like his

13   importance to the debates?

14   A.  Also in relation to his importance to the debates.

15   Q.  Okay.  And when the interview initially ended and you

16   left the office, you went into the defendant's office, you

17   talked about.  Is that right?

18   A.  Yes.

19   Q.  And what is it that you told him you had just done wrong

20   in the OCE interview?

21   A.  That I had said I hadn't talked to Brett that morning

22   when I had.

23   Q.  And then his response was what?

24   A.  "Go back in there and tell them."

25   Q.  So it didn't come up -- he didn't tell you to go back

1    in -- you didn't tell him about all the other misleading or

2    incomplete statements you had made; is that right?

3    A.  No.

4              THE COURT:  When you say "No," explain.  I mean,

5    no what?

6              THE WITNESS:  We just talked for a minute --

7              THE COURT:  Did you understand the question?  Did

8    you understand the question?

9              The question was, "You didn't tell him about all

10   the other misleading or incomplete statements you had made;

11   is that right, or is that correct?"

12             THE WITNESS:  I only spoke to him about having

13   called Brett that morning.

14             THE COURT:  All right.

15             THE WITNESS:  It was, like, a very brief

16   conversation.

17             THE COURT:  Okay.

18   Q.  And there were some questions asked about --

19             MR. GEE:  Actually, we've already covered that.

20   The Court's indulgence.

21             THE COURT:  Sure.

22             MR. GEE:  I think that's it.

23             Thank you, Your Honor.

24             THE COURT:  All right.

25             MS. GORDON:  May we approach?  I have a question

1    about the exhibits.

2              THE COURT:  Sure, sure, of course.

3              (To the witness) You can stay there.

4              (The following is a conference held at the

5               bench outside the hearing of the jury)

6              MS. GORDON:  Were the transcript pages moved?

7    Were they moved in?

8              THE COURT:  Which ones?

9              MR. GEE:  The transcript from the trial.

10             MS. GORDON:  The transcript from the trial.  Did

11   you move those pages in?

12             MR. GEE:  No.  I just marked them for reference.

13             MS. GORDON:  Is there any reason why we can't move

14   them in?

15             MR. GEE:  The trial pages I read?

16             MS. GORDON:  Yes.

17             MR. GEE:  I have no objection.

18             MS. GORDON:  Okay.  Do you want to move them, or

19   do you want me to?  It's your exhibit.

20             MR. GEE:  We can move it in, I think, at a later

21   point.

22             MS. GORDON:  I wondered about the articles.  I

23   think they're going to be hopelessly confused.  Is there any

24   reason we can't move them in?

25             MR. GEE:  I think we will have to have a later

1    discussion.  I think at all -- I think at this stage we all

2    feel that the articles are hearsay.

3               MS. GORDON:  You just used them.  We just talked

4    about them, both of us, on and on.  I think the jury is

5    going to be confused.

6               THE COURT:  Is there a question you wanted to ask?

7               MS. GORDON:  I did want to ask about the one new

8    exhibit he put in, yes.

9               THE COURT:  What new exhibit?

10              MS. GORDON:  It's an exhibit he only just used on

11   redirect.  164 -- 146?  164?  It's the little news article

12   request.

13              THE COURT:  I don't think that was -- that was not

14   offered, I don't believe, was it?

15              MS. GORDON:  Yes, there was that was admitted.  It

16   was new.

17              THE COURT:  All right.  If you have a question, go

18   ahead.  That's fine.  That's fine.

19              MS. GORDON:  Yes, about that.

20              (This is the end of the bench conference)

21              MS. GORDON:  Just a few more questions.

22              THE COURT:  Sure.

23                        RECROSS-EXAMINATION

24   BY MS. GORDON:

25   Q.  All right.  So this is in evidence, and so we're going

```
 1     to look at it.

 2               MS. GORDON:  Well, I'm out of battery.  Can you

 3     hear me?

 4     Q.  So Mr. Gee showed you this email.

 5               THE COURT:  The microphone is not working.

 6               MS. GORDON:  It must be out of battery, I would

 7     think.  Yes, it's dead.

 8               (Pause)

 9     BY MS. GORDON:

10     Q.  Okay.  So Mr. Gee showed you this email, and it's from

11     Mr. O'Donnell to you saying he doesn't want to talk to this

12     reporter, right?

13     A.  Yes.

14               THE COURT:  I'm sorry, just so the record's clear,

15     what's that number, Counsel?

16               MS. GORDON:  Oh, it's Exhibit No. 464A.  It's the

17     newly admitted one.

18               THE COURT:  All right.

19     Q.  And the reporter -- what the reporter wanted to know is

20     about the staff position that Mr. O'Donnell had, right?

21     A.  Yes.

22     Q.  That's on the official side.

23     A.  Yes.

24     Q.  From the office budget, right?

25     A.  Yes.
```

```
1    Q.  On the official side.  He's saying to Mr. O'Donnell,
2    "You advertise on the campaign side," and so the reporter's
3    trying to understand how the work is not campaign related,
4    right?
5    A.  Yes.
6    Q.  So the question is about how is Mr. O'Donnell performing
7    work on the official side.
8    A.  Yes, and how it's not related to the campaign.
9    Q.  Right.
10            MS. GORDON:  That's all.  Thank you.
11            THE COURT:  All right.  Mr. Gee, Ms. Hardman is
12   your witness.  Do you want to close with your witness, or do
13   you have any other questions?
14            All right.  May the witness be excused?  May the
15   witness be excused?
16            MR. GEE:  Oh, yes.
17            MS. GORDON:  Yes.
18            THE COURT:  All right.  Thank you.
19            Be careful.  You may be excused.  I would still
20   ask you not to discuss your testimony with anyone.  Watch
21   your step stepping down there.
22            THE WITNESS:  Thank you.
23            THE COURT:  All right.  You're welcome.
24            Okay.  Mr. Gee, is your next witness available?
25            MR. GEE:  I believe so.
```

```
 1                    THE COURT:  All right.

 2                    And Mrs. Gordon, the person was -- we'll get the

 3        person back up.

 4                    MS. GORDON:  Okay.  I understand.

 5                    THE COURT:  We'll get her up now.

 6                    How are you today, sir?

 7                    THE WITNESS:  Fine, thank you.

 8                    THE COURT:  Good.

 9                         JOSHUA FINDLAY, Sworn

10                         DIRECT EXAMINATION

11        BY MR. GEE:

12        Q.  Good afternoon.

13        A.  Good afternoon.

14        Q.  Would you introduce yourself to the jury and spell your

15        name for the record, please.

16        A.  My name is Josh Findlay; J-o-s-h, F-i-n-d-l-a-y.

17        Q.  All right.  Mr. Findlay, can you tell us a little bit

18        about your educational background.

19        A.  Sure.  I attended Brigham Young University for my

20        undergrad.  I studied political science and Spanish.  And

21        then I attended the University of Georgia Law School.

22        Q.  Okay.  And are you a licensed attorney now?

23        A.  Yes.

24        Q.  Where do you work now?

25        A.  For the Republican party, Republican National Committee.
```

1   Q.  Now, Mr. Findlay, let's start back when you were still

2   in law school in about 2007 or so, I believe.

3   A.  Yes.

4   Q.  Did you come to know Congressman Paul Broun in that time

5   frame?

6   A.  Yes.

7   Q.  All right.  Can you tell us how -- what were you doing

8   in 2007?

9   A.  I was in law school.

10  Q.  Okay.  What year would you have been in back then?

11  A.  2007 was my second year.

12  Q.  Okay.  And how did you first get to know Congressman

13  Broun?

14  A.  As an intern in his congressional office in Athens,

15  Georgia.

16  Q.  How did you come about to be interning in his office?

17  A.  I attended a college Republicans meeting and met Jordan

18  Chinouth, who had just helped Paul Broun get elected, and I

19  asked if he needed help as an intern, and so I started

20  interning in his office.

21  Q.  And were you paid as an intern?

22  A.  No.

23  Q.  Approximately when did your internship go?

24  A.  Approximately from August or September of that year,

25  whenever the school year started, through December of that

1    year, when the semester ended.

2    Q.   Okay.  And when your internship ended in December, did

3    you have further involvement with Congressman Broun's office

4    after that?

5    A.   I did, yes.

6    Q.   How is that?

7    A.   So in either late January or February of that year

8    Jordan asked if I wanted to volunteer on the campaign or

9    intern on the campaign, and I said yes, and I started

10   interning on the campaign.

11   Q.   So approximately when is this that you started

12   working -- started interning on the campaign?

13   A.   I guess roughly January or February.  It wasn't right

14   when the semester started.  It was a little bit later, but

15   somewhere around that time.

16   Q.   And this would be January/February of which year?

17   A.   2008.

18   Q.   And were you still in law school then as you were

19   interning on the campaign?

20   A.   Yes.

21   Q.   Okay.  And when you started interning on the campaign,

22   were you paid at first?

23   A.   No.

24   Q.   Did you start getting paid by the campaign eventually?

25   A.   I did, yes.

1    Q.  How did that work?

2    A.  It was around the summer of that time.  I had been

3    volunteering, and I'd been putting in a lot of hours, and

4    they asked if I would like to start getting paid for my work

5    at that point.

6    Q.  Okay.  And what kinds of stuff -- and how long did you

7    continue working for the campaign?

8    A.  Through the general election in November.

9    Q.  So that would have been November of 2008?

10   A.  2008 still.

11   Q.  Okay.  And did Congressman Broun win that election?

12   A.  He did, yes.

13   Q.  Now, you talked a little bit about how you first started

14   interning with the office and then went to work for the

15   campaign after these conversations with Mr. Chinouth; is

16   that right?

17   A.  Right.

18   Q.  At the time, when you first started interning with the

19   office, what was Mr. Chinouth in relation to Congressman

20   Broun's office in 2007?

21   A.  When he first started -- I'm not sure what he started

22   as.  He might have been field director or something like

23   that.  But he was the one who was in charge of the office,

24   and we were literally setting up the office at that pint.

25   Q.  Okay.  What do you mean by "literally setting up the

1    office"?

2    A.  We were putting up shelves, putting in copiers,

3    organizing papers; things like that.

4    Q.  What had happened with -- such that the office was first

5    being set up?

6    A.  He had just won a special election.

7    Q.  So he'd just been elected office?

8    A.  Correct.

9    Q.  And then once you started working on the campaign was

10   Mr. Chinouth involved in the campaign?

11   A.  Yes.

12   Q.  What was his involvement in that 2008 campaign you

13   interned and then worked on?

14   A.  He was my direct point of contact.  I'm not sure what

15   his title was at that point.  Maybe it was campaign manager;

16   I'm not sure.  But he was kind of the direct point of

17   contact in Georgia.

18   Q.  Okay.  And what kind of stuff did you do on that

19   campaign?

20   A.  Put together lists.  I mean, who the county officials

21   were, the local elected officials, things like that.  I put

22   up signs, helped coordinate volunteers, a lot of phone-

23   banking and door-knocking, things like that.

24   Q.  Okay.  After the campaign ended in November 2008, where

25   did you go -- what did you do next?

1    A.   I finished law school and started practicing law.

2    Q.   All right.  And so let's fast-forward to 2012.  Did you

3    become involved with Congressman Broun again in 2012?

4    A.   I did, yes.

5    Q.   Had you had any involvement with his campaigns or his

6    office from that November '08 election ending until 2012?

7    A.   No.

8    Q.   You're just practicing law?

9    A.   Correct.

10   Q.   All right.  So what happens in 2012 that you got

11   involved again?

12   A.   They had a primary election coming up, and so Jordan

13   contacted me and asked if I would like to come help out with

14   the primary election.

15   Q.   All right.  And what did you -- did you end up working

16   on that 2012 race?

17   A.   I did, yes.

18   Q.   And were you paid?

19   A.   Yes.

20   Q.   What was your position on that 2012 race?

21   A.   I don't know that I had an official position.

22   basically -- it was either grass roots director or political

23   director.  Basically I was in charge of coordinating the

24   volunteers and some interns.

25   Q.   What do you mean by that, that you were in charge of

1    coordinating volunteers and interns?  What kind of stuff did

2    that entail?

3    A.  Sure.  So it was getting people into a phone bank,

4    organizing where they would be knocking doors, making sure

5    that we had signs put up, making sure that we had people

6    waving signs at events, things like that.

7    Q.  And these folks that you're coordinating, they're what

8    kind of people?

9    A.  Volunteers.

10   Q.  And these volunteers, where -- what state did most of

11   these folks live in that are volunteering for Congressman

12   Broun?

13   A.  Georgia.

14   Q.  And when did you start working on that 2012 primary

15   approximately?

16   A.  Two to three months before the primary election.

17   Q.  So the primary election is in May 2012.  Does that sound

18   about right?  I'm sorry --

19   A.  I think, so --

20   Q.  Let's see.  Make sure I got it right.  Do you remember

21   when it was?

22   A.  I don't.  They have since changed the primary election

23   dates in Georgia.

24            THE COURT:  Ladies and gentlemen, I think we're

25   going to have to take a short recess, maybe a ten-minute

1    recess.  Sorry.  I'm just trying to accommodate some people.

2              But we'll start right back in ten minutes.  I'm

3    sorry.  Can't avoid it though.  Thank you.

4              (Jury exits courtroom)

5              THE COURT:  (To the witness) Sorry to get you

6    started and have you start.  It's the nature of law

7    practice, right?

8              THE WITNESS:  Of course.

9              THE COURT:  You don't have to stay.  It will be

10   about ten minutes though.  You can step down.

11             Actually, I'm not going to go anywhere, Counsel.

12   I'm just going to stay here.

13             (Recess taken)

14             (Jury enters courtroom)

15             THE COURT:  All right, ladies and gentlemen.

16   Thank you.  So unfortunately and due to -- for reasons that

17   we don't need to discuss and because sometimes things just

18   happen unexpected, we're going to have to recess today.  I

19   know we started -- we had a plan to start at 9:00 and work

20   until 5:00, but we can't do it today.  So we're going to

21   recess now, and we're going to try again tomorrow.

22             I think I told you the Court's not available this

23   Friday, but we're going to start again tomorrow at 9:00, and

24   so that's about all I can tell you.

25             All right.  But there are good reasons for it, so

1     no one's done anything wrong or anything like that.  It's

2     just that we -- it's just that we can't proceed right now.

3              So enjoy your evening.  We'll start again promptly

4     at 9:00.  All right?  Thank you.

5              (Jury exits courtroom)

6              THE COURT:  All right.  You have a nice evening.

7              THE WITNESS:  Thank you.

8              THE COURT:  See you tomorrow.  We'll start at

9     9:00.

10             MS. GORDON:  Before we do go, I wasn't sure if the

11    record was reflecting that that one exhibit was admitted,

12    the transcript.  Was there a number?  We had that discussion

13    at the bench so I wasn't sure if it was on the record.

14             MR. GEE:  586.  I marked it as 586.

15             THE COURT:  There was no objection?

16             MS. GORDON:  No objection.

17             THE COURT:  They were pages of that.

18             MS. GORDON:  They were pages of the transcript.

19             THE COURT:  Right.  All right.  Admitted.

20             MS. GORDON:  Thank you.

21             MR. GEE:  We'll make an excerpt and prepare that

22    for you.

23             THE COURT:  That's fine.  Since we do have some

24    time, what about the juror issues?  Do you want to just wait

25    and see?

1      MS. GORDON:  May I ask the Court, what were the

2   dates that Juror No. 1 --

3      THE COURT:  Mark, what was the note?  Can you just

4   read the note for the record?

5      I think she said the 15th to the 18th.

6      THE COURTROOM DEPUTY:  It was the 15th through the

7   18th, Your Honor.

8      MS. GORDON:  So that's Thursday, Friday.

9      THE COURTROOM DEPUTY:  Yes.

10      "Mr. Coates, as discussed I have travel plans

11   starting Thursday, March 15th.  I will be out of the D.C.

12   area until Sunday, March 18th."

13      MS. GORDON:  Was the Court planning to sit that

14   Friday, the 16th?

15      THE COURT:  You know, I have that meeting, but I'm

16   going to -- I'm going to sit, yes.  I plan to.  Yes, I'm

17   hoping that we're in deliberations by then, but if not,

18   definitely.

19      MS. GORDON:  Okay.

20      THE COURT:  And I'll just have to deal with my

21   meeting, you know, hopefully at 8:00 that morning.  That

22   would be fine with me.

23      MR. GEE:  Your Honor, especially given that I

24   think we feel like it's likely we may lose another

25   alternate, which would leave us with no alternates, perhaps

1    we can ask Juror No. 1 some follow-up questions like -- I'm

2    not sure that it's clear from the note.  It sounds like it's

3    probably personal, but maybe this is professional.  How far

4    out -- is it something that could be delayed to Friday?

5    Maybe we could just ask some logistical questions and get a

6    better idea.

7              THE COURT:  Maybe we'll do that at the break

8    tomorrow, the first break -- I mean at the lunch break

9    tomorrow.

10             MR. GEE:  I think that would be fine, Your Honor.

11   Maybe Mr. Coates could just communicate to them we're going

12   to talk about it and talk to them tomorrow so they're not

13   worried overnight.

14             THE COURT:  What about No. 8?  We decided to let

15   him go because he's starting a new job.  I mean, he's been

16   very attentive.  I think he was nodding there for a while,

17   but what's your pleasure?  I don't have strong feelings, but

18   I don't like losing two jurors, you know.

19             MS. GORDON:  He did tell the Court that it would

20   be a financial hardship for him.

21             THE COURT:  He did.  This is his last week.

22             MS. GORDON:  He quit the old job, and this is the

23   new one.

24             THE COURT:  All right.  We'll just leave it as is,

25   then, for the time being.

 1              MS. GORDON:  Maybe decide tomorrow?

 2              MR. GEE:  Yes, I think maybe we would decide about

 3      Juror No. 8 tomorrow.

 4              THE COURT:  All right, okay.  That's fine.

 5              MR. GEE:  And we can figure out with Juror No. 1

 6      maybe a little bit later on.

 7              THE COURT:  Okay.

 8              MR. GEE:  And perhaps -- you know, obviously

 9      they're getting restless, but maybe towards the end of the

10      day tomorrow we can sort of give the jury a bit of an

11      estimate that we think that the case will be completed next

12      week.

13              THE COURT:  I think they'd appreciate that.

14      Right.  Right.

15              Mrs. Gordon, you made some representation to the

16      Court ex parte because I asked you and I know some things,

17      so I don't know how that factors into the delay as well.  I

18      mean, let me just follow up on that.  It has to do with your

19      witnesses.

20              Why don't you approach.  I don't think it's

21      appropriate to...

22              (The following is a conference held at the

23               bench outside the hearing of the gallery)

24      ████████████████████████████████████████

25      ████████████████████████████████████████████



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24      (This is the end of the bench conference)

25      THE COURT:  We're going to proceed fairly, as

1  always, but I think -- I agree with you, that giving them a

2  heads up tomorrow, especially since we're not sitting

3  Friday, I think they'd welcome that.

4          I think -- I have every reason to believe that

5  this jury is going to be deliberating by Thursday or Friday

6  of next week.  That's my -- unless I'm misreading strategy,

7  that's my best thought.

8          I can't imagine going into the -- well, I'm not

9  going to say that.  I mean, things happen, you know, but

10  that's my best thought right now.  Thursday or Friday.

11          MR. GEE:  I don't think -- from the government, I

12  don't think we have any objection to sort of giving them

13  that kind of an update tomorrow.

14          THE COURT:  Right.

15          MR. GEE:  That might make them -- and just letting

16  them know that maybe it could be a day or two extra or

17  something like that, but that they would hopefully be

18  deliberating by Friday.

19          THE COURT:  Right.

20          MR. GEE:  I don't think we have any problem giving

21  them that kind of update.

22          THE COURT:  Right, okay.  Fair enough.

23          Hope you feel better.  Bring whatever snacks you

24  want to bring in.

25          MS. GORDON:  I appreciate that.

1          THE COURT:  Again, there's plenty of peanut

2   butter.  It's vegan.

3               (Whereupon the hearing was

4               adjourned at 3:44 p.m.)

5

6          **CERTIFICATE OF OFFICIAL COURT REPORTER**

7

8               I, LISA A. MOREIRA, RDR, CRR, do hereby

9   certify that the above and foregoing constitutes a true and

10  accurate transcript of my stenographic notes and is a full,

11  true and complete transcript of the proceedings to the best

12  of my ability.

13      Dated this 7th day of March, 2018.

14

15                          /s/Lisa A. Moreira, RDR, CRR
                            Official Court Reporter
16                          United States Courthouse
                            Room 6718
17                          333 Constitution Avenue, NW
                            Washington, DC 20001
18

19

20

21

22

23

24

25

' [1]

**'08** [1] - 58:6
**'He** [2] - 34:23, 35:13

## /

/s/Lisa [1] - 67:15

## 1

**1** [4] - 3:3, 62:2, 63:1, 64:5
**10** [1] - 34:22
**100** [1] - 29:10
**10th** [2] - 32:11, 32:20
**11** [1] - 6:14
**110** [2] - 5:3, 46:7
**110th** [1] - 10:5
**1140** [1] - 1:18
**13th** [1] - 3:14
**1400** [1] - 1:13
**146** [1] - 50:11
**157** [1] - 34:9
**15th** [4] - 3:3, 62:5, 62:6, 62:11
**16-059** [1] - 1:4
**164** [2] - 50:11
**16th** [1] - 62:14
**18th** [4] - 3:4, 62:5, 62:7, 62:12
**194** [2] - 36:13, 36:15
**19th** [3] - 1:18, 40:3, 40:22
**1:53** [1] - 1:5

## 2

**2** [2] - 37:19, 44:3
**2's** [1] - 39:8
**20001** [2] - 1:23, 67:17
**20005** [1] - 1:15
**20036** [1] - 1:19
**2007** [4] - 54:2, 54:8, 54:11, 56:20
**2008** [5] - 55:17, 56:9, 56:10, 57:12, 57:24
**2012** [8] - 58:2, 58:3, 58:6, 58:10, 58:16, 58:20, 59:14, 59:17
**2013** [3] - 34:22, 35:25, 37:9
**2014** [6] - 4:3, 6:15, 7:5, 24:3, 44:8, 44:16
**2015** [1] - 27:14
**2016** [2] - 23:24, 27:14
**2018** [2] - 1:4, 67:13
**202** [2] - 1:16, 1:19
**202-354-3187** [1] - 1:23

## 3

**24** [2] - 34:9, 44:9
**25th** [1] - 7:23
**28** [1] - 7:5
**293-0534** [1] - 1:19
**298** [3] - 33:5, 33:7, 34:10

## 3

**3** [1] - 2:4
**309** [1] - 42:18
**31** [1] - 2:4
**333** [2] - 1:22, 67:17
**3:30** [2] - 30:13, 30:18
**3:44** [1] - 67:4
**3rd** [1] - 7:25

## 4

**405** [1] - 42:25
**451** [1] - 37:15
**453A** [1] - 41:22
**464A** [4] - 40:9, 40:12, 40:18, 51:16
**474** [1] - 38:9
**474A** [4] - 38:7, 38:10, 38:11, 40:2
**476A** [3] - 38:20, 38:24, 39:3

## 5

**50** [1] - 2:5
**514-9751** [1] - 1:16
**53** [1] - 2:6
**569** [1] - 31:18
**586** [3] - 34:6, 61:14
**5:00** [1] - 60:20

## 6

**6** [2] - 1:8, 10:5
**6718** [2] - 1:22, 67:16

## 7

**7** [1] - 1:4
**7th** [1] - 67:13

## 8

**8** [3] - 3:11, 63:14, 64:3
**895** [1] - 10:5
**8:00** [1] - 62:21

## 9

**9:00** [4] - 60:19, 60:23, 61:4, 61:9

## A

**ability** [1] - 67:12
**able** [1] - 46:2
**accommodate** [1] - 60:1
**accurate** [1] - 67:10
**acknowledging** [2] - 16:25, 17:18
**acting** [1] - 17:18
**Action** [1] - 1:3
**activity** [3] - 17:16, 44:25, 46:22
**actual** [1] - 34:17
**addition** [1] - 9:20
**additional** [2] - 9:11, 9:21
**address** [4] - 15:12, 26:3, 30:13, 42:2
**adjourned** [1] - 67:4
**admit** [1] - 40:18
**admitted** [9] - 36:13, 38:8, 40:10, 40:21, 50:15, 51:17, 61:11, 61:19, 65:18
**advance** [2] - 43:9, 43:16
**advertise** [1] - 41:16, 52:2
**advice** [1] - 11:18
**afternoon** [6] - 3:23, 3:24, 31:23, 31:24, 53:12, 53:13
**AFTERNOON** [1] - 1:8
**agree** [1] - 66:1
**ahead** [5] - 6:18, 23:7, 24:25, 38:18, 50:18
**aided** [1] - 1:25
**alleged** [2] - 46:19, 46:22
**allowing** [1] - 30:7
**almost** [1] - 24:4
**alternate** [1] - 62:25
**alternates** [1] - 62:25
**amended** [1] - 10:5
**AMERICA** [1] - 1:3
**amount** [1] - 16:22
**ANSWER** [6] - 34:16, 34:19, 34:21, 35:7, 35:12, 35:17
**answer** [2] - 4:17, 13:5
**answered** [2] - 43:11, 43:12
**answers** [1] - 25:13
**anticipated** [1] - 30:13
**anxious** [1] - 16:19
**anyplace** [1] - 8:18
**apologize** [7] - 24:16, 26:4, 29:16, 29:19, 31:3, 33:20, 36:20

**appear** [1] - 8:17
**APPEARANCES** [1] - 1:12
**apply** [1] - 28:13
**appreciate** [2] - 64:13, 66:25
**approach** [4] - 24:13, 38:13, 48:25, 64:20
**appropriate** [1] - 64:21
**April** [4] - 4:3, 7:5, 7:14, 7:15
**area** [2] - 45:25, 46:4, 62:12
**argue** [2] - 65:10, 65:11
**arrange** [1] - 6:15
**arranged** [1] - 6:19
**article** [9] - 35:25, 36:16, 36:22, 36:25, 39:11, 39:19, 39:20, 41:13, 50:11
**articles** [7] - 35:25, 36:7, 39:15, 40:7, 42:2, 49:22, 50:2
**ASSOCIATES** [1] - 1:18
**assumed** [1] - 65:12
**Athens** [1] - 54:14
**Atlanta** [1] - 38:4
**attended** [3] - 53:19, 53:21, 54:17
**attention** [1] - 37:3
**attentive** [2] - 3:13, 63:16
**attorney** [1] - 53:22
**attorneys** [1] - 30:25
**August** [1] - 54:24
**authority** [2] - 8:25, 9:3
**authorized** [1] - 7:4
**available** [2] - 52:24, 60:22
**Avenue** [3] - 1:15, 1:22, 67:17
**avoid** [1] - 60:3

## B

**background** [1] - 53:18
**backing** [1] - 22:4
**backpedaled** [1] - 21:20
**backpedaling** [2] - 21:17, 22:1
**bad** [2] - 10:23, 16:1
**bank** [2] - 45:7, 59:3
**banking** [1] - 57:23
**based** [2] - 45:22, 46:1
**basis** [15] - 23:18,

24:12, 24:19, 25:1, 26:6, 26:8, 30:22, 30:23, 30:24, 31:1, 31:4, 31:5, 31:7, 31:13
**battery** [2] - 51:2, 51:6
**became** [1] - 15:7
**become** [1] - 58:3
**BEFORE** [1] - 1:10
**behalf** [1] - 6:21
**bench** [4] - 18:14, 19:5, 24:15, 26:19, 29:2, 29:5, 29:20, 30:6, 31:9, 49:5, 50:20, 61:13, 64:23, 65:24
**best** [3] - 66:7, 66:10, 67:11
**better** [2] - 63:6, 66:23
**between** [3] - 12:25, 21:12, 34:17
**big** [2] - 14:18, 22:15
**bigger** [1] - 6:8
**bit** [12] - 6:8, 15:6, 21:21, 37:1, 41:7, 45:22, 45:25, 52:3, 53:17, 55:14, 56:13, 64:6, 64:10
**blow** [2] - 8:21, 14:17
**Board** [2] - 7:4, 10:6
**books** [1] - 42:12
**boss** [1] - 44:20
**bottom** [1] - 34:11
**Bowser** [45] - 4:4, 4:15, 5:19, 5:22, 7:11, 11:18, 12:19, 12:24, 13:24, 15:17, 16:5, 16:13, 16:17, 16:21, 18:3, 18:18, 18:22, 19:10, 20:11, 20:17, 21:3, 21:19, 22:19, 22:22, 22:25, 23:11, 24:7, 25:6, 25:15, 26:25, 27:12, 27:16, 27:21, 27:24, 33:10, 33:25, 34:13, 34:23, 35:15, 39:5, 40:14, 41:10, 42:6, 43:8, 43:17
**BOWSER** [1] - 1:6
**Bowser's** [2] - 23:4, 34:14
**boyfriend** [2] - 20:7, 20:8
**break** [3] - 63:7, 63:8
**Brett** [12] - 12:11, 17:16, 36:8, 39:21, 40:3, 40:17, 41:6, 41:7, 44:2, 47:11, 47:21, 48:13

brief [3] - 48:15, 65:7, 65:12
briefing [1] - 42:12
Brigham [1] - 53:19
bring [3] - 43:24, 66:23, 66:24
broke [1] - 41:1
brought [1] - 18:21
Broun [21] - 22:10, 22:13, 22:15, 23:22, 24:1, 33:14, 34:1, 35:19, 39:9, 42:21, 42:23, 44:1, 44:14, 44:21, 46:5, 54:4, 54:13, 54:18, 56:11, 58:3, 59:12
Broun's [7] - 28:11, 34:15, 35:7, 39:9, 44:7, 55:3, 56:20
Bryson [1] - 6:13
BS [1] - 39:8
budget [1] - 51:24
budgets [1] - 41:16
building [2] - 45:8, 45:15
buildings [2] - 45:1, 45:5
butter [1] - 67:2
BY [9] - 3:22, 5:9, 19:7, 26:21, 31:22, 38:19, 50:24, 51:9, 53:11

**C**

Campaign [1] - 37:19
campaign [59] - 8:8, 8:13, 8:17, 9:4, 12:1, 12:12, 15:8, 15:10, 15:13, 16:23, 16:25, 17:16, 17:20, 18:3, 19:12, 19:14, 32:6, 32:18, 32:25, 33:16, 35:12, 37:10, 39:16, 39:21, 39:24, 40:4, 40:5, 41:17, 41:19, 42:9, 43:3, 43:8, 43:17, 44:10, 44:13, 44:23, 44:25, 45:16, 45:18, 46:22, 52:2, 52:3, 52:8, 55:8, 55:9, 55:10, 55:12, 55:19, 55:21, 55:24, 56:7, 56:15, 57:9, 57:10, 57:12, 57:15, 57:19, 57:24
campaign-related [2] - 15:10, 43:17
campaigns [2] - 46:12, 58:5

careful [1] - 52:19
case [3] - 30:10, 64:11, 65:15
case-in-chief [1] - 65:15
CERTIFICATE [1] - 67:6
certify [1] - 67:9
Chamber [1] - 35:3
chance [1] - 38:22
changed [1] - 59:22
Channel [2] - 37:19, 39:8
charge [3] - 56:23, 58:23, 58:25
chat [1] - 20:10
chief [2] - 27:7, 65:15
Chinouth [4] - 54:18, 56:15, 56:19, 57:10
choice [1] - 11:11
Christine [1] - 44:2
CHRISTINE [2] - 2:3, 3:20
circumstances [1] - 9:13
clarify [1] - 43:15
clarity [4] - 11:22, 14:5, 27:19, 43:13
clear [4] - 31:14, 43:7, 51:14, 63:2
clearly [1] - 11:15
close [2] - 27:18, 52:12
closer [1] - 19:8
closing [1] - 39:7
Coach [1] - 37:19
coach [2] - 37:22, 39:24
Coates [2] - 62:10, 63:11
coincide [1] - 16:22
collateral [1] - 30:14
collect [1] - 8:2
college [1] - 54:17
COLUMBIA [1] - 1:1
comfortable [2] - 29:8, 29:12
coming [1] - 58:12
commenced [2] - 7:5, 7:15
Commerce [1] - 35:3
Commission [1] - 9:6
Committee [2] - 10:8, 53:25
communicate [1] - 63:11
communication [1] - 25:20
communications [2] -

14:20, 46:1
company [1] - 39:20
complete [2] - 20:23, 67:11
completed [1] - 64:11
computer [1] - 1:25, 14:14
computer-aided [1] - 1:25
concern [2] - 12:19, 16:24
concerned [7] - 11:25, 15:7, 15:15, 17:15, 17:17, 19:10, 19:15
concerns [4] - 17:2, 17:10, 17:14, 18:8
conclusion [1] - 30:5
conduct [2] - 9:1, 9:3
conducting [1] - 4:5
conference [10] - 18:13, 19:5, 24:14, 26:19, 29:4, 29:20, 49:4, 50:20, 64:22, 65:24
conferences [1] - 30:6
conflict [2] - 19:15, 19:19
conflicted [1] - 16:20
confronting [1] - 22:5
confused [2] - 49:23, 50:5
confusing [1] - 30:11
Congress [3] - 10:5, 32:14, 41:15
congressional [5] - 34:2, 44:25, 45:5, 45:8, 54:14
Congressional [4] - 7:5, 8:22, 32:11, 32:21
Congressman [20] - 22:10, 22:13, 22:15, 23:22, 24:1, 24:4, 27:1, 28:11, 34:1, 34:15, 35:19, 37:18, 44:1, 54:4, 54:12, 55:3, 56:11, 56:19, 58:3, 59:11
congressman [1] - 45:7
Congressman's [2] - 4:7, 32:18
congressmen [2] - 44:25, 45:4, 45:14
Congressperson [1] - 24:8
Congresswoman [3] - 24:8, 27:13, 27:21
congresswoman [1] - 27:9

connected [1] - 34:16
considering [1] - 65:16
constitutes [1] - 67:9
Constitution [2] - 1:22, 67:17
consultant [1] - 40:6
consultation [1] - 41:17
contact [3] - 6:13, 57:14, 57:17
contacted [1] - 58:13
continue [1] - 56:7
Continued [1] - 3:21
contract [2] - 41:5, 41:14
convenient [1] - 6:12
conversation [4] - 22:12, 23:7, 44:5, 48:16
conversations [1] - 56:15
cooperate [3] - 10:7, 10:17, 23:12
coordinate [1] - 57:22
coordinating [3] - 58:23, 59:1, 59:7
copiers [1] - 57:2
copy [3] - 14:12, 36:16, 36:22
correct [13] - 3:6, 3:16, 8:14, 8:19, 13:13, 13:16, 14:1, 19:1, 24:8, 45:19, 48:11, 57:8, 58:9
counsel [7] - 18:12, 24:13, 25:18, 29:1, 30:19, 31:7, 31:17
Counsel [9] - 5:8, 6:13, 17:9, 23:20, 26:15, 38:18, 45:11, 51:15, 60:11
counsel's [1] - 19:6
county [1] - 57:20
course [2] - 49:2, 60:8
Court [14] - 1:21, 1:21, 26:3, 30:23, 30:25, 31:11, 31:12, 62:1, 62:13, 63:19, 64:16, 65:5, 65:15, 67:15
COURT [123] - 1:1, 3:2, 3:7, 3:17, 3:19, 5:5, 5:7, 9:8, 11:7, 13:5, 13:7, 14:9, 14:12, 18:23, 19:1, 19:4, 19:6, 21:25, 22:21, 23:3, 23:14, 23:17, 23:20, 24:11, 24:17, 24:21, 24:24, 25:8,

25:10, 25:12, 25:18, 25:21, 25:25, 26:5, 26:10, 26:14, 26:18, 26:20, 27:19, 27:23, 28:1, 28:13, 28:22, 29:1, 29:6, 29:11, 29:15, 29:17, 29:19, 29:21, 29:25, 30:21, 31:17, 34:7, 38:14, 38:16, 38:18, 40:11, 40:19, 40:21, 43:13, 45:10, 45:13, 45:18, 45:20, 45:24, 48:4, 48:7, 48:14, 48:17, 48:21, 48:24, 49:2, 49:8, 50:6, 50:9, 50:13, 50:17, 50:22, 51:5, 51:14, 51:18, 52:11, 52:18, 52:23, 53:1, 53:5, 53:8, 59:24, 60:5, 60:9, 60:15, 61:6, 61:8, 61:15, 61:17, 61:19, 61:23, 62:3, 62:15, 62:20, 63:7, 63:14, 63:21, 63:24, 64:4, 64:7, 64:13, 64:24, 65:3, 65:8, 65:14, 65:20, 65:23, 65:25, 66:14, 66:19, 66:22, 67:1, 67:6
court [1] - 25:22
Court's [5] - 29:23, 30:24, 31:13, 48:20, 60:22
Courthouse [2] - 1:22, 67:16
courtroom [4] - 3:18, 60:4, 60:14, 61:5
COURTROOM [4] - 3:6, 3:16, 62:6, 62:9
covered [3] - 43:18, 44:5, 48:19
Criminal [1] - 1:3
CROSS [1] - 3:21
cross [2] - 43:23, 47:3
cross-examination [1] - 47:3
CROSS-EXAMINATION [1] - 3:21
CRR [3] - 1:21, 67:8, 67:15

**D**

D.C [7] - 1:6, 1:15, 1:19, 32:1, 32:9, 32:15, 32:17, 62:11
dated [1] - 7:25
Dated [1] - 67:13

**dates** [2] - 59:23, 62:2
**DAVID** [1] - 1:6
**David** [8] - 6:20, 27:22, 39:4, 41:9, 42:23, 44:14, 44:21, 46:5
**DAY** [1] - 1:8
**days** [2] - 40:3, 65:12
**DC** [2] - 1:23, 67:17
**dead** [1] - 51:7
**deal** [3] - 3:9, 62:20, 65:6
**debate** [5] - 39:24, 41:17, 42:13, 44:3
**debates** [2] - 47:13, 47:14
**December** [4] - 24:3, 34:22, 54:25, 55:2
**decide** [2] - 64:1, 64:2
**decided** [3] - 16:3, 16:9, 63:14
**decision** [2] - 4:17, 15:23
**decisions** [1] - 65:13
**defendant** [1] - 44:15
**Defendant** [2] - 1:7, 1:17
**defendant's** [1] - 47:16
**defense** [1] - 18:18
**definitely** [1] - 62:18
**delay** [2] - 3:12, 64:17
**delayed** [1] - 63:4
**deliberating** [2] - 66:5, 66:18
**deliberations** [1] - 62:17
**DEPARTMENT** [1] - 1:14
**DEPUTY** [4] - 3:6, 3:16, 62:6, 62:9
**described** [1] - 21:17
**describing** [1] - 44:5
**desk** [2] - 5:21, 16:10
**determine** [2] - 30:4, 30:10
**different** [2] - 4:11, 18:10
**Diggs** [2] - 8:9, 14:17
**direct** [4] - 43:23, 47:9, 57:14, 57:16
**DIRECT** [1] - 53:10
**directed** [1] - 5:22
**directing** [1] - 37:3
**directly** [1] - 4:21
**director** [3] - 56:22, 58:22, 58:23
**discretion** [1] - 15:21
**discuss** [4] - 33:15, 37:12, 52:20, 60:17

**discussed** [2] - 37:9, 62:10
**discussing** [1] - 30:6
**Discussion** [1] - 5:6
**discussion** [4] - 22:9, 28:23, 50:1, 61:12
**discussions** [2] - 17:1, 30:2
**distinguish** [1] - 12:25
**distribute** [1] - 5:22
**distributed** [1] - 5:19
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [2] - 32:12, 32:21
**document** [3] - 8:11, 8:16, 37:5
**documents** [1] - 8:3
**done** [9] - 12:1, 15:8, 16:13, 17:21, 19:12, 32:9, 32:16, 47:19, 61:1
**Door** [1] - 37:18
**door** [7] - 34:17, 34:20, 37:16, 39:7, 39:10, 39:19, 57:23
**door-knocking** [1] - 57:23
**door-slamming** [1] - 37:16
**doors** [1] - 59:4
**down** [8] - 17:2, 17:7, 37:1, 38:3, 38:4, 46:25, 52:21, 60:10
**Dr** [7] - 33:14, 35:7, 42:21, 44:7, 44:14, 44:21, 46:5
**draw** [2] - 10:6, 30:5
**drawer** [1] - 16:10
**due** [1] - 60:16
**during** [5] - 20:23, 30:3, 32:18, 32:25, 47:1

### E

**early** [1] - 4:20
**easier** [1] - 38:15
**educational** [1] - 53:18
**effect** [1] - 10:7
**either** [6] - 10:17, 12:7, 13:14, 40:10, 55:7, 58:22
**elected** [3] - 54:18, 57:7, 57:21
**Election** [1] - 9:6
**election** [5] - 56:8, 56:11, 57:6, 58:6, 58:12, 58:14, 59:16,

59:17, 59:22
**email** [11] - 12:24, 33:6, 33:10, 34:22, 35:4, 35:6, 39:5, 40:12, 41:5, 51:4, 51:10
**emails** [6] - 12:25, 13:18, 15:7, 15:10, 23:8, 33:2
**EMMET** [1] - 1:10
**end** [16] - 7:20, 19:5, 21:22, 21:23, 23:23, 24:1, 24:5, 24:6, 26:19, 29:20, 33:10, 33:18, 50:20, 58:15, 64:9, 65:24
**ended** [4] - 47:15, 55:1, 55:2, 57:24
**ending** [1] - 58:6
**endorsement** [1] - 35:3
**endorsements** [3] - 34:25, 35:1, 35:10
**enjoy** [1] - 61:3
**entail** [1] - 59:2
**enters** [2] - 3:18, 60:14
**error** [1] - 65:15
**especially** [2] - 20:24, 62:23, 66:2
**ESQ** [3] - 1:13, 1:13, 1:17
**estimate** [1] - 64:11
**Ethics** [3] - 7:5, 8:23, 10:8
**evening** [2] - 61:3, 61:6
**events** [2] - 32:25, 59:6
**eventually** [1] - 55:24
**evidence** [5] - 17:4, 18:11, 18:24, 50:25, 65:18
**ex** [1] - 64:16
**exactly** [1] - 10:20
**examination** [1] - 47:3
**EXAMINATION** [4] - 3:21, 31:21, 50:23, 53:10
**example** [3] - 32:20, 33:25, 39:20
**exception** [2] - 44:24, 45:3
**excerpt** [1] - 61:21
**exchange** [1] - 31:11
**excuse** [1] - 38:16
**excused** [3] - 52:14, 52:15, 52:19
**Exhibit** [17] - 5:2, 31:18, 33:5, 33:7, 34:6, 34:10, 36:13,

36:15, 37:15, 37:25, 38:7, 38:11, 40:9, 41:22, 42:18, 42:25, 51:16
**exhibit** [6] - 37:16, 49:19, 50:8, 50:9, 50:10, 61:11
**exhibits** [1] - 49:1
**exits** [2] - 60:4, 61:5
**expenses** [1] - 39:9
**experts** [1] - 65:6
**explain** [3] - 31:12, 46:3, 48:4
**explored** [1] - 31:8
**extended** [1] - 27:20
**extra** [1] - 66:16

### F

**F-i-n-d-l-a-y** [1] - 53:16
**face** [2] - 39:8, 39:10
**fact** [2] - 19:18, 21:19
**factors** [1] - 64:17
**facts** [4] - 9:12, 30:4, 30:10
**fair** [2] - 16:23, 66:22
**fairly** [1] - 65:25
**fairness** [3] - 30:22, 31:2
**far** [1] - 63:3
**fast** [1] - 58:2
**fast-forward** [1] - 58:2
**February** [4] - 44:8, 44:15, 55:7, 55:13
**Federal** [1] - 9:6
**feelings** [1] - 63:17
**few** [2] - 50:21, 65:12
**field** [1] - 56:22
**figure** [1] - 64:5
**file** [4] - 64:25, 65:5, 65:9, 65:11
**files** [1] - 14:19
**final** [1] - 42:20
**financial** [1] - 63:20
**FINDLAY** [2] - 2:6, 53:9
**Findlay** [3] - 53:16, 53:17, 54:1
**fine** [14] - 14:13, 17:19, 26:5, 26:10, 26:14, 29:18, 50:18, 53:7, 61:23, 62:22, 63:10, 64:4
**finish** [1] - 24:22
**finished** [1] - 58:1
**first** [32] - 4:14, 7:1, 7:9, 8:9, 8:10, 8:12, 8:20, 13:3, 13:6, 13:7, 13:8, 13:9, 13:11, 14:8, 27:5,

34:11, 34:12, 34:24, 35:1, 35:10, 35:14, 37:3, 37:14, 37:18, 43:7, 54:12, 55:22, 56:13, 56:18, 56:21, 57:4, 63:8
**five** [1] - 30:16
**Florida** [1] - 32:23
**focus** [2] - 12:13, 24:24
**folks** [2] - 59:7, 59:11
**follow** [11] - 37:24, 39:1, 39:2, 39:15, 39:19, 39:23, 40:2, 40:7, 41:2, 63:1, 64:18
**follow-up** [9] - 39:1, 39:2, 39:15, 39:19, 39:23, 40:2, 40:7, 41:2, 63:1
**follow-ups** [1] - 37:24
**following** [5] - 18:13, 24:14, 29:4, 49:4, 64:22
**FOR** [1] - 1:1
**foregoing** [1] - 67:9
**form** [3] - 26:8, 26:15, 26:17
**former** [2] - 20:8, 22:13, 22:18
**forward** [1] - 58:2
**forwarding** [2] - 39:3, 39:6
**frame** [1] - 40:22, 41:23, 42:8, 54:5
**Friday** [8] - 60:23, 62:8, 62:14, 63:4, 66:3, 66:5, 66:10, 66:18
**friends** [2] - 27:15, 27:18
**front** [4] - 14:10, 24:12, 31:1, 38:20
**full** [1] - 67:10
**fully** [1] - 23:11
**funds** [4] - 46:16, 46:19, 46:22

### G

**gallery** [1] - 64:23
**game** [1] - 29:10
**GChat** [5] - 20:7, 22:12, 25:3, 25:4, 25:19, 25:22
**GEE** [63] - 1:13, 5:4, 9:7, 17:4, 17:12, 18:11, 18:17, 18:20, 18:24, 22:20, 23:2, 23:13, 23:16, 25:19,

4

25:22, 29:18, 29:23, 30:20, 31:16, 31:18, 31:22, 32:19, 33:5, 33:18, 34:5, 34:9, 35:23, 36:12, 36:24, 38:8, 38:10, 38:12, 38:15, 38:19, 40:10, 40:18, 41:22, 42:18, 42:25, 45:12, 46:7, 46:25, 48:19, 48:22, 49:9, 49:12, 49:15, 49:17, 49:20, 49:25, 52:16, 52:25, 53:11, 61:14, 61:21, 62:23, 63:10, 64:2, 64:5, 64:8, 66:11, 66:15, 66:20
**gee** [12] - 4:12, 6:3, 10:2, 10:10, 20:22, 21:15, 29:2, 31:4, 51:4, 51:10, 52:11, 52:24
Gee)...........................
.............. [2] - 2:4, 2:6
**general** [3] - 35:5, 44:24, 56:8
**generally** [1] - 43:2
**gentlemen** [3] - 30:1, 59:24, 60:15
**Georgia** [8] - 32:1, 32:20, 38:4, 53:21, 54:15, 57:17, 59:13, 59:23
**given** [2] - 7:11, 62:23
**Gordon** [6] - 29:1, 30:22, 31:6, 31:10, 53:2, 64:15
**GORDON** [81] - 1:17, 1:18, 3:22, 5:2, 5:9, 6:7, 8:9, 8:21, 11:10, 13:8, 14:7, 14:11, 14:17, 17:5, 18:15, 18:19, 19:2, 19:7, 22:3, 23:15, 23:18, 24:16, 24:19, 24:22, 25:3, 25:9, 25:11, 25:14, 26:3, 26:7, 26:12, 26:16, 26:21, 28:21, 29:9, 29:13, 29:16, 31:15, 34:8, 38:9, 40:20, 43:11, 45:9, 48:25, 49:6, 49:10, 49:13, 49:16, 49:18, 49:22, 50:3, 50:7, 50:10, 50:15, 50:19, 50:21, 50:24, 51:2, 51:6, 51:9, 51:16, 52:10, 52:17, 53:4, 61:10, 61:16, 61:18, 61:20, 62:1,

62:8, 62:13, 62:19, 63:19, 63:22, 64:1, 65:2, 65:4, 65:10, 65:17, 65:22, 66:25
Gordon).....................
.............. [2] - 2:4, 2:5
**government** [1] -
66:11
**Government's** [10] -
5:2, 31:18, 34:6, 36:13, 36:15, 37:15, 37:25, 38:7, 38:11, 42:18
**grass** [1] - 58:22
**gray** [3] - 45:22, 45:25, 46:4
**Gray** [2] - 39:8, 40:25
**Griffanti** [2] - 20:4, 25:5
**guess** [1] - 55:13

**H**

**halls** [1] - 45:15
**happy** [5] - 11:10, 17:5, 17:7, 18:19, 19:3
**Hardman** [6] - 3:23, 31:23, 36:17, 36:19, 36:20, 52:11
**HARDMAN** [2] - 2:3, 3:20
**hardship** [1] - 63:20
**headline** [2] - 37:18, 37:23
**heads** [1] - 66:2
**hear** [1] - 51:3
**hearing** [6] - 18:14, 24:15, 29:5, 49:5, 64:23, 67:3
**hearsay** [2] - 25:24, 50:2
**heavily** [1] - 19:14
**Heenan** [2] - 25:6, 25:17
**HELD** [1] - 1:10
**held** [5] - 18:13, 24:14, 29:4, 49:4, 64:22
**help** [3] - 20:20, 54:19, 58:13
**helped** [1] - 54:18, 57:22
**hereby** [1] - 67:8
**hired** [1] - 27:3
**Hold** [2] - 13:12, 13:14
**honest** [1] - 23:1
**Honor** [10] - 3:6, 18:17, 24:16, 29:23, 30:20, 38:13, 48:23, 62:7, 62:23, 63:10

**HONORABLE** [1] -
1:10
**hope** [1] - 66:23
**hoped** [1] - 20:11
**hopefully** [2] - 62:21, 66:17
**hopelessly** [1] - 49:23
**hoping** [1] - 62:17
**hours** [2] - 44:3, 56:3
**House** [4] - 10:4, 46:16, 46:19, 46:22
**House.gov** [1] - 15:12
**husband** [1] - 20:8

**I**

**idea** [4] - 10:13, 17:10, 18:1, 63:6
**identification** [1] -
34:5
**imagine** [1] - 66:8
**implies** [1] - 7:9
**imply** [1] - 19:2
**importance** [2] -
47:13, 47:14
**IN** [1] - 1:1
**inappropriate** [2] -
24:11, 30:25
**include** [1] - 10:7
**included** [1] - 14:23
**incomplete** [3] -
47:10, 48:2, 48:10
**inconsistent** [1] -
19:11
**indicated** [1] - 4:4
**individual** [1] - 23:4
**indulgence** [2] -
29:24, 48:20
**inference** [2] - 10:6, 10:11
**inferences** [1] - 30:5
**Information** [1] - 7:3
**information** [6] - 9:12, 9:21, 9:24, 23:5, 25:2
**initiated** [1] - 14:2
**inside** [1] - 25:24
**instance** [2] - 23:11, 43:21
**instructions** [1] - 30:3
**INTEGRITY** [1] - 1:14
**intending** [1] - 19:2
**intention** [1] - 26:4
**interaction** [1] - 23:4
**interested** [3] - 28:17, 28:18, 42:9
**interfere** [2] - 22:23, 22:24
**intern** [4] - 54:14, 54:19, 54:21, 55:9

**interned** [1] - 57:13
**interning** [8] - 54:16, 54:20, 55:10, 55:12, 55:19, 55:21, 56:14, 56:18
**interns** [2] - 58:24, 59:1
**internship** [2] - 54:23, 55:2
**interview** [35] - 6:9, 6:12, 6:15, 16:16, 19:21, 19:24, 20:12, 20:18, 20:23, 21:2, 21:13, 21:16, 21:22, 21:23, 23:7, 27:5, 27:9, 28:1, 28:4, 33:12, 33:22, 34:1, 34:24, 35:8, 35:9, 35:11, 35:14, 35:16, 35:19, 43:19, 46:9, 47:2, 47:5, 47:15, 47:20
**interviewed** [3] - 23:5, 26:25, 27:2
**interviewing** [1] -
26:22
**interviews** [4] - 6:19, 6:23, 8:3, 22:6
**introduce** [1] - 53:14
**investigate** [4] - 46:12, 46:15, 46:18, 46:21
**investigation** [1] - 4:1
**Investigative** [1] - 6:13
**investigators** [1] -
20:24
**involved** [5] - 14:25, 19:14, 57:10, 58:3, 58:11
**involvement** [3] -
55:3, 57:12, 58:5
**involving** [1] - 32:6
**issue** [7] - 15:18, 17:20, 18:8, 18:15, 18:16, 19:9, 22:5
**issues** [2] - 30:2, 61:24
**items** [1] - 15:10
**itself** [2] - 25:22, 30:15

**J**

**January** [3] - 27:14, 55:7, 55:13
**January/February** [1]
- 55:16
**job** [7] - 3:12, 20:5, 27:20, 30:3, 30:9, 63:15, 63:22
**jobs** [1] - 26:23
**Jordan** [3] - 54:17,

55:8, 58:12
**JOSH** [1] - 53:16
**Josh** [2] - 42:23, 53:16
**JOSHUA** [2] - 2:6, 53:9
**JUDGE** [1] - 1:10
**judges** [1] - 30:4
**July** [2] - 35:25, 37:9
**June** [5] - 4:20, 6:14, 7:23, 7:25
**Juror** [6] - 3:3, 3:11, 62:2, 63:1, 64:3, 64:5
**juror** [1] - 61:24
**jurors** [3] - 3:2, 31:13, 63:18
**JURY** [1] - 1:9
**jury** [13] - 3:18, 18:14, 24:12, 24:15, 29:5, 31:1, 49:5, 50:4, 53:14, 60:4, 61:5, 64:10, 66:5
**Jury** [1] - 60:14
**JUSTICE** [1] - 1:14
**Justin** [2] - 39:8, 40:25

**K**

**keep** [1] - 30:8
**kind** [10] - 22:4, 35:10, 38:3, 45:3, 57:16, 57:18, 59:1, 59:8, 66:13, 66:21
**kinds** [1] - 56:6
**knocking** [1] - 57:23, 59:4
**knowledge** [1] - 25:17
**knows** [3] - 23:15, 30:24, 31:11

**L**

**ladies** [3] - 30:1, 59:24, 60:15
**last** [2] - 43:1, 63:21
**late** [1] - 55:7
**law** [9] - 30:6, 54:2, 54:9, 55:18, 58:1, 58:8, 60:6, 65:17
**Law** [1] - 53:21
**least** [2] - 25:25, 26:1
**leave** [3] - 23:23, 62:25, 63:24
**leaving** [1] - 9:15
**left** [5] - 21:2, 21:13, 26:22, 47:16
**legal** [8] - 24:12, 24:13, 30:2, 31:1, 31:13, 44:13, 45:4, 45:6
**length** [1] - 47:9

**lESLIE** [1] - 1:17
**leslie.mcadoo@**
  **mcadoolaw.com** [1]
  - 1:20
**less** [1] - 23:1
**letter** [21] - 4:4, 4:11,
  4:14, 4:18, 5:10,
  5:25, 7:1, 7:12, 7:25,
  8:6, 8:7, 8:18, 8:22,
  11:12, 12:7, 12:9,
  12:13, 14:7, 14:9,
  14:19, 46:8
**letters** [2] - 4:21, 5:17
**letting** [1] - 66:15
**licensed** [1] - 53:22
**lie** [3] - 12:22, 16:17,
  18:4
**likely** [1] - 62:24
**line** [1] - 34:8
**Line** [1] - 34:9
**Lisa** [1] - 1:21
**LISA** [1] - 67:8
**lists** [1] - 57:20
**literally** [2] - 56:24,
  56:25
**live** [1] - 59:11
**local** [1] - 57:21
**logistical** [1] - 63:5
**look** [18] - 5:1, 6:6,
  7:2, 8:6, 8:9, 8:15,
  8:20, 9:9, 10:2,
  29:12, 36:12, 37:6,
  37:14, 37:24, 38:22,
  39:11, 42:18, 51:1
**looked** [4] - 4:11, 4:24,
  15:7, 15:25, 20:7,
  32:5, 37:16, 39:25,
  42:5
**looking** [8] - 7:17,
  12:10, 12:11, 15:11,
  24:10, 36:15, 40:2,
  41:7
**lose** [1] - 62:24
**losing** [1] - 63:18
**lunch** [1] - 63:8

## M

**ma'am** [1] - 38:10
**main** [1] - 39:1
**manage** [1] - 12:23
**manager** [1] - 57:15
**map** [1] - 32:23
**March** [13] - 1:4,
  23:24, 27:14, 36:1,
  36:4, 37:14, 40:3,
  40:22, 41:23, 42:8,
  62:11, 62:12, 67:13
**mark** [1] - 34:5
**Mark** [4] - 5:5, 28:24,

29:7, 62:3
**marked** [3] - 38:6,
  49:12, 61:14
**matter** [1] - 30:14
**matters** [6] - 18:22,
  45:16, 45:17, 45:18
**McADOO** [2] - 1:17,
  1:18
**mean** [12] - 15:23,
  21:25, 22:24, 45:6,
  48:4, 56:25, 57:20,
  58:25, 63:8, 63:15,
  64:18, 66:9
**means** [1] - 13:4
**meant** [1] - 10:13
**mechanical** [1] - 1:24
**media** [2] - 27:15,
  32:25
**meeting** [6] - 42:6,
  44:20, 44:22, 54:17,
  62:15, 62:21
**members** [3] - 5:23,
  41:15, 41:19
**mentioned** [2] - 20:11,
  64:24
**messaging** [9] - 32:5,
  32:6, 33:16, 35:8,
  37:22, 43:9, 43:16,
  44:3, 44:22
**met** [2] - 44:3, 54:17
**mic** [1] - 19:8
**microphone** [1] - 51:5
**might** [5] - 9:15, 12:4,
  16:22, 56:22, 66:15
**mind** [3] - 13:25,
  14:22, 29:9
**mine** [1] - 65:12
**minute** [5] - 21:14,
  24:17, 35:1, 48:6,
  59:25
**minutes** [3] - 30:16,
  60:2, 60:10
**misleading** [4] - 47:10,
  47:12, 48:1, 48:10
**misreading** [1] - 66:6
**misstates** [2] - 17:4,
  18:11
**misstating** [1] - 18:24
**misunderstood** [1] -
  25:4
**misuse** [2] - 46:19,
  46:22
**MJOA** [2] - 65:9, 65:16
**Monday** [1] - 25:9
**money** [1] - 40:5
**months** [1] - 59:16
**Moreira** [1] - 1:21,
  67:15
**MOREIRA** [1] - 67:8
**Morgan** [2] - 6:13,

6:21
**morning** [8] - 4:12,
  10:10, 15:20, 20:25,
  47:11, 47:21, 48:13,
  62:21
**most** [1] - 59:10
**motion** [4] - 64:25,
  65:5, 65:9, 65:19
**move** [9] - 23:21,
  26:20, 40:18, 45:12,
  49:11, 49:13, 49:18,
  49:20, 49:24
**moved** [2] - 49:6, 49:7
**MR** [62] - 5:4, 9:7,
  17:4, 17:12, 18:11,
  18:17, 18:20, 18:24,
  22:20, 23:2, 23:13,
  23:16, 25:19, 25:22,
  29:18, 29:23, 30:20,
  31:16, 31:18, 31:22,
  32:19, 33:5, 33:18,
  34:5, 34:9, 35:23,
  36:12, 36:24, 38:8,
  38:10, 38:12, 38:15,
  38:19, 40:10, 40:18,
  41:22, 42:18, 42:25,
  45:12, 46:7, 46:25,
  48:19, 48:22, 49:9,
  49:12, 49:15, 49:17,
  49:20, 49:25, 52:16,
  52:25, 53:11, 61:14,
  61:21, 62:23, 63:10,
  64:2, 64:5, 64:8,
  66:11, 66:15, 66:20
**MS** [79] - 3:22, 5:2,
  5:9, 6:7, 8:9, 8:21,
  11:10, 13:8, 14:7,
  14:11, 14:17, 17:5,
  18:15, 18:19, 19:2,
  19:7, 22:3, 23:15,
  23:18, 24:16, 24:19,
  24:22, 25:3, 25:9,
  25:11, 25:14, 26:3,
  26:7, 26:12, 26:16,
  26:21, 28:21, 29:9,
  29:13, 29:16, 31:15,
  34:8, 38:9, 40:20,
  43:11, 45:9, 48:25,
  49:6, 49:10, 49:13,
  49:16, 49:18, 49:22,
  50:3, 50:7, 50:10,
  50:15, 50:19, 50:21,
  50:24, 51:2, 51:6,
  51:9, 51:16, 52:10,
  52:17, 53:4, 61:10,
  61:16, 61:18, 61:20,
  62:1, 62:8, 62:13,
  62:19, 63:19, 63:22,
  64:1, 65:2, 65:4,
  65:10, 65:17, 65:22,

66:25
**MULRYNE** [1] - 1:13
**must** [1] - 51:6
**mutually** [1] - 6:12

## N

**name** [2] - 53:15,
  53:16
**narrative** [1] - 18:9
**National** [1] - 53:25
**nature** [1] - 60:6
**near** [1] - 32:11
**nearly** [1] - 44:3
**need** [5] - 28:4, 30:15,
  43:13, 47:8, 60:17
**needed** [2] - 20:20,
  54:19
**negative** [4] - 10:6,
  10:11, 10:22, 10:23
**nervous** [2] - 16:19,
  19:21
**never** [2] - 13:24,
  14:25
**new** [7] - 24:10, 26:23,
  50:7, 50:9, 50:16,
  63:15, 63:23
**New** [1] - 1:15
**newly** [1] - 51:17
**news** [2] - 22:15,
  50:11
**newspaper** [1] - 35:25
**next** [6] - 33:11, 33:19,
  52:24, 57:25, 64:11,
  66:6
**nice** [1] - 61:6
**Norton** [4] - 6:23,
  11:18, 20:2, 36:15
**note** [6] - 3:2, 3:9,
  10:4, 62:3, 62:4,
  63:2
**notes** [3] - 14:19, 42:5,
  67:10
**nothing** [3] - 29:2,
  30:9, 30:14
**November** [4] - 56:8,
  56:9, 57:24, 58:6
**nowhere** [1] - 32:11
**number** [3] - 6:14,
  51:15, 61:12
**nurse** [1] - 29:6
**NW** [4] - 1:15, 1:18,
  1:22, 67:17

## O

**O'Donnell** [19] - 16:21,
  16:23, 17:11, 18:8,
  19:10, 19:12, 19:18,
  19:25, 20:25, 21:6,

37:9, 39:15, 40:4,
  41:10, 42:16, 51:11,
  51:20, 52:1, 52:6
**O'Donnell's** [2] - 36:8,
  42:9
**objection** [24] - 9:7,
  17:4, 17:12, 18:11,
  22:20, 23:2, 23:13,
  23:16, 23:17, 23:19,
  24:18, 24:24, 26:8,
  26:15, 31:4, 31:8,
  40:19, 40:20, 43:11,
  45:9, 49:17, 61:15,
  61:16, 66:12
**objection's** [2] - 26:2,
  26:11
**obligation** [1] - 6:3
**obligations** [1] - 5:25
**observed** [1] - 18:10
**obstruct** [2] - 25:6,
  25:16
**obviously** [2] - 64:8,
  65:10
**occurred** [1] - 44:6
**OCE** [28] - 4:1, 4:5,
  4:21, 5:3, 6:9, 6:11,
  10:5, 14:25, 16:17,
  18:3, 19:21, 20:24,
  22:6, 22:23, 23:1,
  23:5, 23:7, 23:12,
  46:7, 46:9, 46:12,
  46:15, 46:18, 46:21,
  47:5, 47:10, 47:20
**OF** [5] - 1:1, 1:3, 1:9,
  1:14, 67:6
**offer** [1] - 20:20
**offered** [1] - 50:14
**office** [43] - 4:7, 4:21,
  5:17, 12:1, 12:13,
  15:9, 16:1, 17:1,
  17:16, 17:18, 17:21,
  18:4, 18:10, 27:1,
  27:13, 28:11, 34:2,
  34:14, 34:15, 35:17,
  35:19, 37:21, 39:9,
  43:3, 43:9, 43:17,
  44:7, 47:16, 51:24,
  54:14, 54:16, 54:20,
  55:3, 56:14, 56:19,
  56:20, 56:23, 56:24,
  57:1, 57:4, 57:7,
  58:6
**Office** [2] - 7:4, 8:22
**offices** [1] - 45:15
**OFFICIAL** [1] - 67:6
**Official** [1] - 1:21
**official** [27] - 12:25,
  13:12, 13:15, 15:10,
  17:1, 23:8, 31:25,
  32:9, 32:16, 33:2,

36:8, 37:21, 39:16,
41:16, 42:2, 42:10,
44:7, 45:16, 45:17,
46:16, 46:19, 46:22,
51:22, 52:1, 52:7,
58:21, 67:15
**officials** [2] - 57:20,
57:21
**old** [3] - 44:8, 44:15,
63:22
**older** [1] - 44:18
**once** [1] - 57:9
**one** [19] - 3:2, 4:14,
4:24, 17:3, 17:10,
17:20, 26:8, 30:21,
33:18, 33:20, 37:16,
38:16, 39:24, 46:25,
50:7, 51:17, 56:23,
61:11, 63:23
**one's** [5] - 36:12, 38:1,
40:10, 40:22, 61:1
**ones** [6] - 13:21,
13:25, 15:25, 36:1,
36:4, 49:8
**open** [2] - 9:15, 34:20
**opens** [1] - 34:25
**opponent** [1] - 35:2
**opportunity** [3] - 6:12,
26:11, 27:20
**opposing** [1] - 31:7
**organizing** [2] - 57:3,
59:4
**original** [3] - 39:19,
39:22, 45:10
**original's** [1] - 39:23
**out-of-court** [1] -
25:22
**outlet** [1] - 38:5
**outside** [5] - 18:14,
24:15, 29:5, 49:5,
64:23
**overall** [1] - 11:1
**overhearing** [1] -
35:15
**overnight** [1] - 63:13
**own** [1] - 15:23

# P

**p.m** [2] - 1:5, 67:4
**Page** [1] - 34:9
**page** [16] - 6:6, 7:1,
8:5, 8:6, 8:10, 8:12,
8:15, 8:20, 9:9, 14:8,
33:19, 33:20, 34:8,
34:11, 36:24, 43:1
**PAGE** [1] - 2:2
**pages** [5] - 49:6,
49:11, 49:15, 61:17,
61:18

**paid** [10] - 37:10,
39:16, 39:21, 40:4,
54:21, 55:22, 55:24,
56:4, 58:18
**paper** [1] - 14:12
**papers** [1] - 57:3
**paragraph** [5] - 9:10,
9:11, 10:2, 10:3,
39:12
**paragraphs** [1] - 37:3
**part** [7] - 4:20, 6:7,
8:21, 12:5, 33:21,
40:7, 41:2
**parte** [1] - 64:16
**participate** [1] - 10:21
**party** [1] - 53:25
**pass** [1] - 28:21
**passed** [1] - 21:12
**Paul** [3] - 39:9, 54:4,
54:18
**Pause** [4] - 28:25,
37:7, 38:17, 51:8
**PB** [1] - 44:2
**peanut** [1] - 67:1
**people** [6] - 22:9, 46:1,
59:3, 59:5, 59:8,
60:1
**percent** [1] - 29:10
**perfect** [1] - 31:20
**performing** [1] - 52:6
**perhaps** [2] - 62:25,
64:8
**Perhaps** [1] - 23:19
**period** [1] - 21:12
**person** [5] - 20:4,
22:25, 25:14, 53:2,
53:3
**personal** [7] - 12:25,
13:12, 13:15, 13:21,
13:25, 14:23, 63:3
**personally** [1] - 4:9
**phase** [3] - 7:3, 7:8,
7:9
**phone** [2] - 57:22, 59:3
**phrasing** [1] - 18:21
**pint** [1] - 56:24
**place** [2] - 17:1, 17:16
**places** [1] - 33:1
**Plaintiff** [1] - 1:4
**plan** [4] - 3:8, 60:19,
62:16, 65:8
**planning** [2] - 62:13,
65:4
**plans** [2] - 3:3, 62:10
**pleasure** [1] - 63:17
**plenty** [1] - 67:1
**point** [6] - 18:7, 49:21,
56:5, 57:14, 57:15,
57:16
**points** [3] - 36:3,

41:23, 41:25
**political** [3] - 45:15,
53:20, 58:22
**position** [6] - 24:7,
28:13, 41:5, 51:20,
58:20, 58:21
**positions** [1] - 41:15
**possibility** [2] - 9:15,
28:16
**possibly** [2] - 21:24,
63:19
**Powers** [3] - 33:12,
34:23, 35:14
**practice** [1] - 60:7
**practicing** [2] - 58:1,
58:8
**preliminary** [1] - 30:3
**preparation** [1] - 41:18
**prepare** [1] - 61:21
**pretty** [1] - 4:20
**previous** [1] - 7:12
**primary** [7] - 4:18,
58:12, 58:14, 59:14,
59:16, 59:17, 59:22
**probable** [1] - 35:2
**problem** [1] - 66:20
**proceed** [4] - 31:16,
61:2, 65:15, 65:25
**proceeding** [1] - 15:4
**Proceedings** [1] - 1:24
**proceedings** [1] -
67:11
**process** [2] - 11:1,
11:8
**produced** [1] - 1:25
**professional** [2] -
31:12, 63:3
**promptly** [1] - 61:3
**protect** [1] - 25:15
**provide** [1] - 13:1
**PUBLIC** [1] - 1:14
**published** [1] - 22:7
**pulling** [1] - 14:11
**purposes** [1] - 27:19
**pursuant** [2] - 7:3,
28:23
**pushing** [1] - 39:7
**put** [8] - 14:7, 16:10,
16:11, 16:12, 50:8,
57:20, 57:21, 59:5
**putting** [3] - 56:3, 57:2

# Q

**QUESTION** [6] - 34:13,
34:17, 34:20, 34:22,
35:9, 35:13
**question..** [1] - 35:14
**questioned** [1] - 15:3
**questions** [35] - 4:1,

18:21, 31:25, 32:2,
32:4, 32:8, 33:4,
33:6, 33:7, 33:21,
33:22, 33:23, 34:2,
35:21, 35:22, 35:24,
36:1, 36:6, 36:9,
42:1, 42:12, 42:24,
43:2, 43:6, 46:6,
46:8, 46:11, 47:1,
47:3, 48:18, 50:21,
52:13, 63:1, 63:5
**quit** [1] - 63:22

# R

**race** [2] - 58:16, 58:20
**radio** [1] - 34:1
**Rayburn** [1] - 45:15
**RDR** [3] - 1:21, 67:8,
67:15
**read** [7] - 4:14, 8:7,
21:15, 37:4, 41:19,
49:15, 62:4
**ready** [2] - 3:17, 37:6
**really** [1] - 17:11
**reason** [5] - 24:18,
30:8, 49:13, 49:24,
66:4
**reasons** [2] - 60:16,
60:25
**received** [3] - 5:17,
40:12, 40:14
**recess** [6] - 30:12,
30:15, 59:25, 60:1,
60:18, 60:21
**Recess** [1] - 60:13
**recollection** [2] - 37:8,
39:14
**reconsider** [1] - 65:5
**record** [7] - 5:6, 24:25,
30:7, 53:15, 61:11,
61:13, 62:4
**record's** [1] - 51:14
**recorded** [1] - 1:24
**records** [2] - 6:4,
14:19
**RECROSS** [1] - 50:23
**RECROSS-
EXAMINATION** [1] -
50:23
**recycling** [2] - 16:11,
16:12
**redirect** [2] - 29:22,
50:11
**REDIRECT** [1] - 31:21
**reference** [1] - 49:12
**referral** [1] - 10:8
**refine** [1] - 11:7
**reflecting** [1] - 61:11
**refresh** [3] - 37:8,

39:14, 42:1
**refusal** [2] - 10:6,
10:17
**regarding** [1] - 12:11
**regardless** [1] - 42:19
**related** [5] - 15:10,
41:19, 43:17, 52:3,
52:8
**relation** [3] - 34:14,
47:14, 56:19
**relationship** [1] -
28:10
**relevant** [1] - 9:21
**rely** [2] - 44:12, 46:3
**remember** [22] - 5:14,
5:16, 5:19, 5:20,
27:6, 32:1, 32:6,
33:7, 33:22, 34:2,
36:1, 36:4, 36:9,
39:22, 42:13, 42:15,
43:6, 43:21, 46:9,
47:2, 47:4, 59:20
**removed** [2] - 15:25,
25:25
**Rep** [1] - 39:9
**repeat** [1] - 12:8
**repeating** [1] - 25:23
**rephrase** [6] - 17:9,
19:6, 21:11, 23:25,
45:10
**rephrased** [2] - 26:13,
26:17
**report** [6] - 22:7,
22:10, 22:13, 22:16,
22:23, 37:9
**reporter** [5] - 41:1,
41:14, 51:12, 51:19
**REPORTER** [1] - 67:6
**Reporter** [4] - 1:21,
1:21, 37:19, 67:15
**reporter's** [1] - 52:2
**reporters** [2] - 36:7,
42:8
**representation** [1] -
64:15
**Republican** [2] - 53:25
**Republicans** [1] -
54:17
**Request** [1] - 7:3
**request** [5] - 11:16,
12:24, 14:16, 41:13,
50:12
**requested** [1] - 9:22,
11:21
**requests** [2] - 6:11,
9:12
**Resolution** [1] - 10:4
**respect** [2] - 16:16,
21:19
**respond** [3] - 11:12,

11:19, 31:8
**response** [2] - 12:21, 47:23
**rest** [1] - 65:11
**restless** [1] - 64:9
**result** [1] - 33:10
**Resumed** [2] - 2:3, 3:20
**review** [13] - 4:5, 4:7, 7:4, 7:8, 7:15, 9:13, 9:21, 12:5, 15:1, 22:23, 33:12, 33:13, 33:15
**review's** [1] - 7:20
**reviewing** [1] - 43:19
**reviews** [5] - 8:11, 8:16, 9:1, 9:4, 37:5
**revised** [1] - 42:20
**rob** [1] - 45:7
**role** [1] - 23:4
**Room** [2] - 1:22, 67:16
**roots** [1] - 58:22
**roughly** [1] - 55:13
**Rule** [1] - 10:5
**ruling** [5] - 24:12, 24:20, 30:24, 31:1, 31:13
**runoff** [1] - 35:2

## S

**Savannah** [2] - 32:20, 33:1
**saw** [1] - 16:23, 33:1
**scared** [1] - 11:16
**scheduled** [1] - 6:23
**scheduling** [1] - 46:1
**School** [1] - 53:21
**school** [5] - 54:2, 54:9, 54:25, 55:18, 58:1
**science** [1] - 53:20
**screen** [1] - 36:14
**scroll** [1] - 37:1
**scrolling** [1] - 37:1
**SEAN** [1] - 1:13
**seat** [1] - 3:19
**second** [14] - 6:6, 7:3, 7:8, 8:6, 8:15, 9:9, 9:20, 18:15, 18:16, 19:9, 33:9, 36:24, 38:16, 54:11
**second-phase** [2] - 7:3, 7:8
**SECTION** [1] - 1:14
**section** [3] - 6:11, 7:2
**secured** [1] - 24:7
**see** [12] - 6:7, 7:6, 15:11, 29:13, 29:22, 32:19, 39:12, 40:6, 46:7, 59:20, 61:8,

61:25
**seeing** [1] - 15:11
**seek** [1] - 28:14
**seem** [3] - 17:17, 29:11
**semester** [2] - 55:1, 55:14
**Senate** [2] - 32:25, 33:16
**send** [2] - 41:7, 42:20
**sends** [1] - 40:16
**sense** [1] - 7:11
**sentence** [2] - 7:14, 9:20
**September** [1] - 54:24
**series** [2] - 35:22, 35:24
**services** [2] - 36:8, 41:16
**session** [1] - 43:10
**SESSION** [1] - 1:8
**sessions** [5] - 43:3, 43:9, 43:16, 43:18, 44:23
**set** [1] - 57:5
**setting** [2] - 56:24, 56:25
**share** [1] - 12:19
**shelves** [1] - 57:2
**short** [2] - 30:12, 59:25
**show** [2] - 37:25, 38:6
**showed** [6] - 4:4, 4:15, 6:3, 7:12, 51:4, 51:10
**shut** [1] - 39:10
**shutting** [1] - 39:20
**sic** [2] - 38:20, 41:16
**side** [10] - 9:4, 39:16, 39:17, 39:21, 40:4, 42:10, 51:22, 52:1, 52:2, 52:7
**signs** [3] - 57:22, 59:5, 59:6
**sit** [3] - 20:11, 62:13, 62:16
**sitting** [3] - 5:20, 20:17, 66:2
**situation** [1] - 20:19
**skimmed** [1] - 4:16
**slamming** [1] - 37:16
**Slams** [1] - 37:18
**snacks** [1] - 66:23
**so..** [1] - 65:13
**social** [1] - 27:15
**someone** [2] - 23:11, 25:5
**sometimes** [2] - 30:11, 60:17
**somewhere** [1] - 55:15

**sorry** [19] - 12:8, 13:5, 23:25, 25:4, 28:22, 33:19, 33:20, 34:11, 36:20, 37:1, 38:9, 38:18, 39:23, 41:13, 45:24, 51:14, 59:18, 60:1, 60:3
**Sorry** [1] - 60:5
**sort** [5] - 15:3, 21:20, 44:24, 64:10, 66:12
**sound** [3] - 10:15, 10:17, 59:17
**sounded** [1] - 16:9
**sounds** [1] - 63:2
**Spanish** [1] - 53:20
**special** [1] - 57:6
**specific** [2] - 15:18, 43:21
**spell** [1] - 53:14
**staff** [5] - 5:23, 27:7, 41:5, 41:15, 51:20
**staffer** [2] - 22:13, 22:18, 25:20
**stage** [1] - 50:1
**start** [12] - 3:14, 33:9, 54:1, 55:24, 56:4, 59:14, 60:2, 60:6, 60:19, 60:23, 61:3, 61:8
**started** [17] - 34:23, 35:13, 54:19, 54:25, 55:9, 55:11, 55:12, 55:14, 55:21, 56:13, 56:18, 56:21, 57:9, 58:1, 60:6, 60:19
**starting** [3] - 3:12, 62:11, 63:15
**starts** [1] - 37:15
**state** [4] - 11:15, 24:18, 31:1, 59:10
**statement** [5] - 10:7, 16:24, 21:15, 25:23
**statements** [4] - 47:9, 47:12, 48:2, 48:10
**STATES** [3] - 1:1, 1:3, 1:10
**States** [3] - 1:13, 32:14, 67:16
**stay** [3] - 49:3, 60:9, 60:12
**stayed** [1] - 24:4
**stenographic** [1] - 67:10
**stenography** [1] - 1:24
**step** [2] - 52:21, 60:10
**stepping** [1] - 52:21
**steps** [1] - 12:23
**still** [8] - 14:22, 16:19, 27:15, 39:7, 52:19, 54:1, 55:18, 56:10

**story** [5] - 38:25, 39:1, 39:2, 41:1
**straight** [1] - 21:2
**strategy** [1] - 66:6
**Street** [1] - 1:18
**strong** [1] - 63:17
**studied** [1] - 53:20
**stuff** [4] - 44:23, 56:6, 57:18, 59:1
**suggest** [1] - 23:20
**suggesting** [1] - 33:24
**SULLIVAN** [1] - 1:10
**summer** [1] - 56:2
**Sunday** [1] - 62:12
**supplied** [1] - 23:8
**supply** [1] - 23:5
**support** [1] - 20:14
**supportive** [1] - 20:18
**supposed** [3] - 3:14, 13:1, 33:13
**sustain** [1] - 23:14
**sustained** [10] - 9:8, 22:21, 23:17, 23:20, 26:2, 26:11
**Sworn** [1] - 53:9

## T

**Tallahassee** [2] - 32:23, 33:1
**taxpayer** [1] - 40:5
**Teddie** [2] - 23:6, 23:8
**ten** [4] - 30:16, 59:25, 60:2, 60:10
**ten-minute** [1] - 59:25
**term** [1] - 24:5
**terms** [2] - 12:12, 35:15
**testified** [1] - 18:7
**testify** [2] - 25:8, 25:9
**testimony** [3] - 18:17, 35:18, 52:20
**textual** [1] - 25:19
**THE** [148] - 1:1, 1:1, 1:10, 3:2, 3:6, 3:7, 3:16, 3:17, 3:19, 5:5, 5:7, 9:8, 11:7, 13:5, 13:6, 13:7, 14:9, 14:12, 14:13, 17:9, 17:13, 17:15, 18:12, 18:23, 19:1, 19:4, 19:6, 21:25, 22:2, 22:4, 22:21, 23:3, 23:6, 23:14, 23:17, 23:20, 24:11, 24:17, 24:21, 24:24, 25:8, 25:10, 25:12, 25:18, 25:21, 25:25, 26:5, 26:10, 26:14, 26:18, 26:20, 27:19, 27:22,

27:23, 28:1, 28:2, 28:13, 28:15, 28:22, 29:1, 29:6, 29:11, 29:15, 29:17, 29:19, 29:21, 29:25, 30:21, 31:17, 34:7, 38:14, 38:16, 38:18, 40:11, 40:19, 40:21, 43:13, 45:10, 45:13, 45:17, 45:18, 45:19, 45:20, 45:22, 45:24, 45:25, 48:4, 48:6, 48:7, 48:12, 48:14, 48:15, 48:17, 48:21, 48:24, 49:2, 49:8, 50:6, 50:9, 50:13, 50:17, 50:22, 51:5, 51:14, 51:18, 52:11, 52:18, 52:22, 52:23, 53:1, 53:5, 53:7, 53:8, 59:24, 60:5, 60:8, 60:9, 60:15, 61:6, 61:7, 61:8, 61:15, 61:17, 61:19, 61:23, 62:3, 62:6, 62:9, 62:15, 62:20, 63:7, 63:14, 63:21, 63:24, 64:4, 64:7, 64:13, 64:24, 65:3, 65:8, 65:14, 65:20, 65:23, 65:25, 66:14, 66:19, 66:22, 67:1
**third** [1] - 39:11
**three** [2] - 8:2, 59:16
**throw** [1] - 3:13
**Thursday** [2] - 62:8, 62:11, 66:5, 66:10
**title** [1] - 57:15
**to..** [1] - 64:21
**today** [4] - 41:4, 53:6, 60:18, 60:20
**Today** [1] - 35:25, 36:16, 36:22
**TODD** [1] - 1:13
**todd.gee2@usdoj. gov** [1] - 1:16
**together** [1] - 57:20
**tomorrow** [13] - 60:21, 60:23, 61:8, 63:8, 63:9, 63:12, 64:1, 64:3, 64:10, 65:5, 65:7, 66:2, 66:13
**Tony** [3] - 13:12, 34:23, 35:14
**took** [5] - 12:23, 17:1, 17:7, 17:16, 42:6
**towards** [1] - 64:9
**transcript** [9] - 1:24, 34:6, 49:6, 49:9, 49:10, 61:12, 61:18,

67:10, 67:11
**TRANSCRIPT** [1] - 1:9
**transcription** [1] -
1:25
**travel** [2] - 3:3, 62:10
**trial** [6] - 30:14, 30:15,
33:25, 49:9, 49:10,
49:15
**TRIAL** [1] - 1:9
**true** [2] - 67:9, 67:11
**truth** [2] - 20:23, 21:5
**try** [1] - 60:21
**trying** [4] - 25:15,
41:18, 52:3, 60:1
**turn** [1] - 21:8
**TV** [1] - 38:5
**twice** [1] - 25:25
**two** [8] - 8:5, 17:2,
17:7, 37:3, 40:3,
59:16, 63:18, 66:16
**two-page** [1] - 8:5

## U

**u.S** [1] - 1:14
**U.S** [1] - 1:22
**ultimate** [1] - 30:9
**unclear** [1] - 31:6
**under** [1] - 10:4
**undergrad** [1] - 53:20
**understood** [4] - 8:25,
35:5, 35:15, 46:12
**unexpected** [1] -
60:18
**unfold** [1] - 20:19
**unfortunately** [1] -
60:16
**unintentional** [1] -
18:20
**UNITED** [3] - 1:1, 1:3,
1:10
**United** [3] - 1:13,
32:14, 67:16
**University** [2] - 53:19,
53:21
**unkind** [1] - 31:10
**unless** [1] - 66:6
**up** [41] - 8:21, 12:17,
14:7, 14:11, 14:17,
18:22, 25:7, 29:6,
29:8, 33:20, 37:2,
37:6, 39:1, 39:2,
39:7, 39:15, 39:19,
39:23, 40:2, 40:7,
41:2, 41:7, 41:22,
42:25, 43:4, 43:24,
44:23, 47:25, 53:3,
53:5, 56:24, 56:25,
57:2, 57:5, 57:22,
58:12, 58:15, 59:5,

63:1, 64:18, 66:2
**update** [2] - 66:13,
66:21
**ups** [1] - 37:24
**USA** [3] - 35:25, 36:16,
36:22

## V

**vegan** [1] - 67:2
**version** [1] - 42:20
**video** [1] - 43:19
**view** [1] - 65:20
**voluntary** [3] - 11:2,
11:4, 11:15
**volunteer** [4] - 16:22,
19:11, 19:18, 55:8
**volunteering** [4] -
17:11, 18:9, 56:3,
59:11
**volunteers** [5] - 57:22,
58:24, 59:1, 59:9,
59:10
**vs** [1] - 1:5

## W

**wait** [2] - 13:24, 61:24
**Walters** [1] - 24:8
**Walters's** [2] - 27:1,
27:13
**warranted** [1] - 9:12
**Washington** [7] - 1:6,
1:15, 1:19, 1:23,
32:1, 32:9, 67:17
**watch** [1] - 52:20
**waving** [1] - 59:6
**website** [1] - 41:17
**week** [3] - 63:21,
64:12, 66:6
**weekend** [1] - 65:7
**weeks** [1] - 8:2
**welcome** [2] - 52:23,
66:3
**whole** [5] - 4:14, 11:1,
11:8, 35:22, 35:24
**WILLIAM** [1] - 1:13
**win** [1] - 56:11
**Witness** [3] - 8:11,
8:16, 37:5
**witness** [9] - 28:21,
29:3, 49:3, 52:12,
52:14, 52:15, 52:24,
60:5
**WITNESS** [21] - 2:2,
13:6, 14:13, 17:15,
22:2, 22:4, 23:6,
27:22, 28:2, 28:15,
45:17, 45:19, 45:22,
45:25, 48:6, 48:12,
48:15, 52:22, 53:7,

60:8, 61:7
**witness's** [1] - 36:14
**witnesses** [1] - 64:19
**won** [1] - 57:6
**wondered** [1] - 49:22
**wondering** [1] - 40:5
**word** [3] - 8:17, 16:20,
19:16
**world** [1] - 22:15
**worried** [2] - 12:16,
63:13
**writes** [2] - 34:23,
41:10
**written** [1] - 64:25
**wrote** [1] - 17:2
**WSB** [5] - 38:1, 38:25,
39:7, 39:19, 41:1

## Y

**year** [7] - 54:10, 54:11,
54:24, 54:25, 55:1,
55:7, 55:16
**yesterday** [4] - 33:25,
34:6, 34:10, 35:18
**York** [1] - 1:15
**Young** [1] - 53:19
**yourself** [3] - 21:8,
37:4, 53:14

## Z

**zoom** [1] - 34:11