```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
      - - - - - - - - - - - - - - - x
 3    UNITED STATES OF AMERICA,
                                         Criminal Action No.
 4                  Plaintiff,           No. 16-059
                                         March 8, 2018
 5    vs.                                2:09 p.m.

 6    DAVID BOWSER,                      Washington, D.C.

 7                  Defendant.
      - - - - - - - - - - - - - - - x
 8                  DAY 7 - AFTERNOON SESSION

 9    _____

10                      TRANSCRIPT OF JURY TRIAL
            HELD BEFORE THE HONORABLE EMMET G. SULLIVAN
11                   UNITED STATES DISTRICT JUDGE
      _____
12    APPEARANCES:

13    For the United States:        TODD WILLIAM GEE, ESQ.
                                    SEAN F. MULRYNE, ESQ.
14                                  U.S. DEPARTMENT OF JUSTICE
                                    PUBLIC INTEGRITY SECTION
15                                  1400 New York Avenue, NW
                                    Washington, D.C.  20005
16                                  (202) 514-9751
                                    todd.gee2@usdoj.gov
17
      For the Defendant:           LESLIE S. McADOO GORDON, ESQ.
18                                 McADOO GORDON & ASSOCIATES
                                   1140 19th Street, NW
19                                 Washington, D.C.  20036
                                   (202) 293-0534
20                                 leslie.mcadoo@mcadoolaw.com

21    Court Reporter:             Lisa A. Moreira, RDR, CRR
                                  Official Court Reporter
22                                U.S. Courthouse, Room 6718
                                  333 Constitution Avenue, NW
23                                Washington, DC  20001
                                  202-354-3187
24
      Proceedings recorded by mechanical stenography; transcript
25    produced by computer-aided transcription
```

1                              I N D E X

2

   WITNESS                                                    PAGE

3

   JASON MILLER, Resumed
4       (By Mr. Gee)........................................  3
        (By Ms. Gordon)..................................... 24
5

   BRYSON MORGAN
6       (By Mr. Mulryne).................................... 47

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        P R O C E E D I N G S
2              THE COURT:  We're going proceed with direct
3       examination.
4              MR. GEE:  Thank you.
5              THE COURT:  Sure.
6                        JASON MILLER, Resumed
7                   DIRECT EXAMINATION, Continued
8       BY MR. GEE:
9       Q.  Good afternoon, Mr. Miller.
10      A.  Hello.
11      Q.  Mr. Miller, just before we broke we were talking about
12      the debate sessions in your office.  Would -- and we were
13      talking about some of the attendees for the sessions.
14      would -- and we were talking about how you would pop into
15      these sessions; is that right?
16      A.  Correct.
17      Q.  When you would pop into these sessions, was Mr. Bowser
18      in attendance at the sessions sometimes?
19      A.  Sometimes.
20      Q.  And about how often were these debate prep sessions
21      occurring at your office involving Mr. O'Donnell and
22      Congressman Broun?
23      A.  Sometimes they'd be weekly.  Other stretches, it might
24      be more infrequent.
25      Q.  Okay.  And over what length of time were they occurring
```

1   approximately?

2   A.  Several months.

3   Q.  When you would pop into the sessions, what would you see

4   Mr. O'Donnell doing?

5   A.  Usually chatting through messaging, key messaging

6   points, maybe discussing with the Congressman what tack or

7   direction they might want to take in an upcoming debate.

8   General responses, usually more on targeted lines or key

9   messages that he wanted to drive and kind of taking the

10  Congressman's viewpoints and boiling down into shorter, more

11  concise sound bytes.

12  Q.  We'll talk more about this a few minutes, but was there

13  a point in late 2014 where Mr. O'Donnell left the campaign?

14  A.  Yes.  I don't remember the exact date, but that sounds

15  about right.

16  Q.  After Mr. O'Donnell left the campaign, were there any

17  more of these debate prep sessions at Jamestown?

18  A.  There were a few more meetings over at our townhouse.  I

19  don't recall the precise number.

20  Q.  Were there any more of these -- understanding there were

21  meetings, were there any more debate prep sessions that you

22  popped in on that you recall; someone else running a debate

23  prep session with the Congressman after Mr. O'Donnell left?

24  A.  I don't remember any specifically called debate

25  sessions, but there may have been times they used a

1  meeting -- or used my meeting space, and I didn't know the

2  exact reason for it.

3  Q.  All right.  Were you also on emails with Mr. O'Donnell

4  in which the debates were discussed?

5  A.  Yes.

6  Q.  Let's look, for example, at Exhibit 330.

7          MR. GEE:  Can we go to the bottom, please.  Bottom

8  of the second page.

9  Q.  This is an email, December 26, 2013, from Mr. O'Donnell

10  to you, Mr. Bowser, Mr. Tringali, and others; is that right?

11  A.  Yes.

12  Q.  And the subject is "Perdue Pulls Out the Knives."  Who

13  is Perdue?

14  A.  Primary opponent; eventual senator for Georgia.

15  Q.  All right.

16          MR. GEE:  Can we scroll up a little bit, please.

17  No, I'm sorry, scroll down a little bit to see the email.

18  Q.  What is it that Mr. O'Donnell -- what is it you

19  understood Mr. O'Donnell was providing you and the others in

20  his email?

21  A.  The key messaging contrast points for Congressman Broun

22  to use against primary opponents.  Yes.

23  Q.  Okay.

24          MR. GEE:  Scroll down.

25  A.  Debate strategy.

1    Q.   Okay.

2              MR. GEE:   Scrolling up.

3    Q.   Here we see Jordan responding.   In general, what's he

4    doing?   Is he providing input to that debate strategy?

5    A.   Can I see the top of the email, or top of his response?

6    Sorry.

7    Q.   Sure.

8    A.   Yes.   I'm not really sure what he was speaking to,

9    but ostensibly it was about the strategy laid out by

10   Mr. O'Donnell.

11   Q.   Okay.

12             MR. GEE:   Can you scroll up, please.

13   Q.   Mr. O'Donnell says, "Thank you.   Other comments?   I'd

14   like to give this to Dr. Broun tomorrow."

15             MR. GEE:   Can we scroll up a little more.   Keep

16   going.

17   Q.   Do you give some comments about it?

18   A.   Yes.

19   Q.   So in general what are you doing in your email with

20   respect to the attack grid that Mr. O'Donnell had provided

21   originally?

22   A.   Highlighting key areas that he should be focusing on.

23   Q.   I'm sorry?

24   A.   Highlighting key areas where the Congressman should be

25   focusing on.

1    Q.  For use in the...?  In what?

2    A.  In the debate, the upcoming debate.

3           MR. GEE:  Let's look at Exhibit 339.

4    Q.  This email chain starts off on January 7th with you

5    sending the initial email; is that right?

6    A.  Yes.

7    Q.  In general, you say -- well, not in general.  You say,

8    "Sure wouldn't want to be Jack Kingston defending his record

9    every Saturday night."  You provide a link to GOP Schedules

10   U.S. Senate Primary Debate, and then you say some more

11   things.

12          What are you doing here in your initial email?

13   A.  I'm rolling out the upcoming debate session for the

14   primary season as it was publicly reported in the journal

15   *Constitution* and then tying in where I thought I would be

16   able to demonstrate value with regard to what videos and

17   getting into the news cycle.

18          MR. GEE:  And scrolling up.

19   Q.  We can see that Mr. Bowser responds; is that right?

20   A.  Correct.

21   Q.  Now, the other folks that were on the email chain, why

22   would you have included them in the initial email about your

23   thoughts on the debate schedule?

24   A.  That was the group of people I typically would interact

25   with for campaign-related matters.

1    Q.  And was Mr. O'Donnell one of the folks on that email?

2    A.  Correct.

3    Q.  And one of the folks in that group you would interact

4    with?

5    A.  Yes.

6    Q.  Looking at Exhibit 341, this is an email, January 9,

7    2014, entitled "Adel Debate Open."  Did you receive this

8    email?

9    A.  It appears that I did, yes.

10   Q.  Okay.  And in general, what is it you understood you

11   were receiving here?

12   A.  It's the opening script that Mr. O'Donnell's put

13   together for the Congressman in advance of the debate.

14   Q.  All right.

15            MR. GEE:  And let's look at Exhibit 342.

16   Q.  This is January 9, 2014, also.  It says, "Same drill on

17   the close," and the subject of the email is "Adel Debate

18   Close."

19            And did you also receive this email?

20   A.  Yes.

21            MR. GEE:  And scrolling to the attachment to --

22   actually, I'm sorry, it would be 342a, the attachment.

23   Q.  What is it that you're being provided with a copy of

24   here?

25   A.  A proposed closing statement for the debate.

1    Q.  And going back to 342, who is it that's providing you

2    with this proposed statement?

3    A.  Mr. O'Donnell.

4            MR. GEE:  Looking at -- can we call up 347.

5    Q.  You respond to that email with a draft closing, and you

6    write, "This is strong."

7            What is it that you're communicating there about

8    the debate closing that Mr. O'Donnell had written?

9    A.  It was a well-written draft.

10           MR. GEE:  Exhibit 378.  372.  Scrolling to the

11   second page, please.

12   Q.  This email chain starts with an email from Jordan

13   Chinouth forwarding an email that says, "Karen wins first

14   debate!"

15           MR. GEE:  Can we scroll to the next page.  The

16   last page, please.  Keep going, please.

17   Q.  All right.  So the email that he's forwarding is an

18   email from who?

19   A.  From the campaign manager for one of the primary

20   opponents, Karen Handel.

21   Q.  Okay.

22           MR. GEE:  And can we scroll up -- next page up,

23   please.

24   Q.  And does it appear that this is an email that

25   Mr. Chinouth has gotten on the list for?

```
1    A.   Yes.

2    Q.   Okay.

3              MR. GEE:   Next page.

4    Q.   So in response to that, does Mr. Bowser write back?

5    A.   Yes.

6    Q.   And in general what's he doing in response to

7    Ms. Handel's email about the debate?

8    A.   He is analyzing the content and giving a suggestion for

9    what our counterresponse should possibly be.

10   Q.   Okay.

11             MR. GEE:   Scrolling up, please.

12   Q.   Does Mr. Bibee also give an analysis?

13   A.   Yes.  He had specific questions to pose to this primary

14   opponent.

15   Q.   Okay.

16             MR. GEE:   Next page up.

17   Q.   And eventually does Mr. O'Donnell have some comments as

18   well?

19   A.   Yes.

20   Q.   And in general, what is it you understood he was

21   suggesting?

22   A.   He's offering his advice on a slightly different

23   direction to take on the messaging.

24   Q.   In response to what?

25   A.   In response to what other people had written what our
```

1    campaign response or what the Congressman should do the next

2    time he's speaking.

3    Q.  And in relation to Ms. Handel?

4    A.  Correct.

5    Q.  Okay.

6          MR. GEE:  Scrolling a little further up.  And a

7    little further up, please.

8    Q.  And ultimately do you end up weighing in as well?

9    A.  Correct.

10   Q.  So what's this?  Another -- what is this an example of

11   the kinds of work both you and Mr. O'Donnell are performing?

12   A.  Well, with regard to Mr. O'Donnell, he's offering debate

13   messaging advice, and to me it was also including a

14   recommendation for how to use web videos to get into the

15   news cycle to influence the public commentary on the race.

16   Q.  All right.

17         MR. GEE:  Exhibit 412.  Second page, please.

18   Scroll down.

19   Q.  So this email starts off February 10, 2014, with an

20   email from Mr. Bibee and a document attached called "Broun

21   Senate 2014 Down the Stretch Messaging."  Do you see that?

22   A.  Yes.

23         MR. GEE:  All right.  Scrolling up, please.  And

24   one page up, and then we'll have to go back.

25   Q.  Do you see Mr. O'Donnell?  Does he respond?

 1    A.  Yes.

 2    Q.  And take a look at his first page of his response.  Just

 3    look up when you've had a chance to take a look at it.

 4    A.  (Witness reviews document) Yes.  What are you asking me

 5    to respond to?

 6              MR. GEE:  And go to the second page.

 7    Q.  I just wanted you to look at it for a second, and then

 8    I'll ask a couple of questions.

 9    A.  (Witness reviews document) Okay.

10    Q.  In general, what is Mr. O'Donnell responding to with

11    respect to this down-the-stretch messaging?

12    A.  He's giving his version of campaign-messaging strategy.

13    Q.  And "down the stretch," did you understand what they're

14    talking about there with respect to down-the-stretch

15    messaging?

16    A.  It's in the run-up to the primary election.

17              MR. GEE:  Can we go to the other page up, please.

18    Q.  And do we also see -- in response to Mr. O'Donnell's

19    thoughts, does Mr. Bowser respond?

20    A.  Yes.

21    Q.  And he's doing what?

22    A.  Seeing if we can get on the phone to discuss as a group.

23    Q.  Now, was there a point in approximately March 2014 when

24    there were a series of media reports about Mr. O'Donnell

25    being paid by Congressman Broun's official office?

1    A.   Yes.

2    Q.   And did they also address how he was not paid by the

3    campaign?

4    A.   Yes.

5    Q.   I'm going to talk about those briefly, but prior to

6    those articles -- I want to talk about what you knew prior

7    to those articles.

8              We've talked about how you were a paid consultant

9    to this campaign.  Based on your observations of the work

10   that Mr. O'Donnell performed during this campaign, how did

11   you view his position in the campaign prior to the March

12   articles?

13   A.   In my opinion, I was under the working knowledge that he

14   was a member of the campaign team.

15   Q.   Did Mr. O'Donnell appear to be providing professional

16   services to the campaign team?

17   A.   Yes.

18   Q.   Did he appear to be a political vendor of services, like

19   you or Mr. Tringali or the other consultants?

20   A.   Yes.

21   Q.   Did he act like a consultant the way you or Mr. Tringali

22   or the others did?  By "act," I mean in a professional

23   service-rendering way.

24   A.   He acted as a professional campaign vendor.  Obviously a

25   debate coach is much different than a media consultant or a

1    pollster, but -- but he acted like a vendor, yes.

2    Q.   Did you have any reason to believe, based on the

3    observations you made in the campaign, that Mr. O'Donnell

4    was providing his services on a volunteer basis?

5    A.   No, but I -- at the same time I wasn't -- I never had a

6    discussion about his compensation structure or arrangement.

7          But my understanding was that he was a member of

8    the campaign team.

9    Q.   Prior to the articles coming out, did the defendant,

10   Mr. O'Donnell, or anyone tell you that Mr. O'Donnell was

11   volunteering for the campaign?

12   A.   No.

13   Q.   Now -- and prior to the articles coming out, did

14   Mr. Bowser or anyone tell you that Mr. O'Donnell was being

15   paid on the official side?

16   A.   Was there a distinction between the previous question or

17   the --

18   Q.   Yes.   In the previous question I asked you about did

19   anyone ever tell you he was volunteering for the campaign.

20   A.   Oh.

21   Q.   I'm asking about the official side.   Prior to the

22   articles coming out, did anyone tell you that he was paid by

23   the Congressman's official office prior to --

24   A.   I never had a conversation about his compensation

25   structure from anywhere prior to the articles coming out.

1    Q.  And were you aware -- do you recall being aware at all

2    that he was providing any services on the official side

3    prior to the articles coming out?

4    A.  Not that I'm aware of.

5    Q.  All right.  After the articles started coming out, do

6    you remember how you learned about them initially?

7    A.  I believe my assistant, Calvin, emailed, or I received a

8    news alert of the stories that came out.

9             There was an incident where a reporter essentially

10   ambushed the Congressman, started asking him questions, and

11   the overall issue was in the news.  So it was essentially

12   from a news report that was emailed to my phone.

13   Q.  Did you think that these news reports were going to be

14   good for the campaign?

15   A.  No.

16   Q.  Did you view this as an issue for the campaign?

17   A.  Yes.

18   Q.  Given how you felt about the articles, what did you do

19   next?

20   A.  I contacted Mr. Bowser.  I don't remember if it was me

21   calling him and he answered or if I called him and then he

22   called me back, but ultimately we connected by phone.

23   Q.  What was your sort of demeanor when you were reaching

24   out and speaking with Mr. Bowser initially?

25   A.  I think I was probably perplexed as far as the whole

1   story and probably a bit heated because I knew it was going

2   to be a problematic series of events for us.

3   Q.   Did Mr. Bowser provide you with an explanation of how

4   Mr. O'Donnell was being paid?

5   A.   Yes.

6   Q.   What did he say about who was paying Mr. O'Donnell?

7   A.   The official office; the MRA, the Members'

8   Representational Allowance.

9   Q.   Did he say what Mr. O'Donnell's position was in the

10  campaign?

11  A.   A volunteer.

12  Q.   Prior to him telling you this in this conversation, had

13  anyone ever told you that Mr. O'Donnell was a volunteer to

14  the campaign?

15  A.   No.

16  Q.   When the defendant provided you with this explanation,

17  did you respond to him?

18  A.   I did.

19  Q.   Did you make any statement to him about whether that

20  made sense or not?

21  A.   I made it very clear that I didn't think that that made

22  sense.

23  Q.   Did you make any reference to him about what you thought

24  his explanation might result in?

25  A.   Something along the lines of, "This is the kind of thing

1    that gets people in trouble or gets you an investigation or

2    continued bad news cycles."

3    Q.  Now, these articles about Mr. O'Donnell and his payment,

4    was there more than one?

5    A.  Payments?

6    Q.  Was there more than one article about Mr. O'Donnell's

7    sort of employment situation with Congressman Broun's

8    office?

9    A.  Yes.  There was a whole series.

10   Q.  Okay.  And did you make some suggestions for the

11   campaign in terms of how to deal with them?

12   A.  Yes.

13   Q.  In general, what is it that you were trying to suggest

14   the campaign do?

15   A.  Go and pick a fight with one of the primary opponents to

16   move the attention away from us and away from an ethical

17   conflict to more of an idealogical one.

18           MR. GEE:  And let's look at Exhibit 469.

19   Scrolling down, please.

20   Q.  So, for example, 469, it starts with an email from you

21   forwarding another email.  Let's just take a quick look.

22   The email you're forwarding is Barney Keller with the Club

23   for Growth on March 19, 2014.

24           MR. GEE:  Can we go to the next page.

25   Q.  We don't need to go through the whole thing, but in

```
 1    general is this a press release from the Club for Growth?

 2    A.  Yes.

 3    Q.  And in general -- do you need to see the whole thing, or

 4    do you kind of know what it's about?

 5    A.  Yes, I see what it's about.

 6    Q.  All right.  So in general the Club for Growth is sending

 7    out a press release about what?

 8    A.  Effectively they're attacking the U.S. Chamber of

 9    Commerce.  It was kind of their arch nemesis in this world

10    of policy political groups.

11            MR. GEE:  Okay.  Going up to the next page.

12    Q.  So you forward that article to Mr. Bowser; is that

13    right?

14    A.  Yes.

15    Q.  As well as Mr. Tringali?

16    A.  Yes.

17    Q.  And can you read for us what it is that you write?

18    A.  "Maybe I'm the only one getting pinged by folks on the

19    DebateGate thing, but as a way to get back on offense, what

20    about slamming the shit out of the Ex-Im Bank and Putin,

21    picking a fight with the Chamber?

22            "We may as well use this opportunity to get our

23    allies to jump in on our behalf."

24    Q.  So in general there, what is it that you're suggesting?

25    A.  Picking a fight with the U.S. Chamber.
```

```
1    Q.  As a way to do what?

2    A.  As a way to divert attention away from the flak over who

3    is paying Mr. O'Donnell and get it oriented into picking a

4    fight with the idealogically more moderate group.

5    Q.  And is that kind of a normal thing to do in a campaign

6    when there's bad press?

7    A.  That's what I do.

8    Q.  Fair enough.

9         MR. GEE:  Scrolling up, please.

10   Q.  Mr. Tringali, in general, what is he suggesting in

11   response to your idea?

12   A.  "In other words, you think the Chamber is going to spend

13   money against us anyway so we might as well get something

14   out of it?

15        "I find it hard to argue against the logic."

16   Q.  So is he agreeing with you?

17   A.  Correct.

18        MR. GEE:  And scrolling up, please.

19   Q.  Does Mr. Bowser respond?

20   A.  He does.

21   Q.  He writes, "Apologies, guys.  Not ignoring y'all.  In

22   Georgia trying to finish hammering out the next eight weeks

23   (including going back on the air) and trying to stop the

24   bleeding so we can go back on offense.  There's a few more

25   DebateGate items coming."
```

1          First off, the reference including going back on

2     the air, did you understand what that might mean?

3     A.  I don't remember at that point if we -- maybe at one

4     point for one of the debates, if we had ever actually put an

5     ad up on the air, maybe over just one day or surrounding a

6     particular event.  But obviously going back on the air would

7     refer to mass media communication.

8     Q.  Okay.  And then he says, "There are a few more

9     DebateGate items coming."

10          At the time you received this, did you know what

11    he was referring to?

12    A.  Yes, that was -- well, not what the items were, but

13    that it was referring to the media drama surrounding

14    Mr. O'Donnell.

15    Q.  More articles and things like that?  Is that what you

16    thought he might be referring to?

17    A.  That's what I assumed it to be, more media -- negative

18    media attention.

19          MR. GEE:  Let's look at Exhibit 482a.

20    Q.  This email is a couple of days later, March 25, 2014; is

21    that right?

22    A.  Yes.

23    Q.  And do you receive this one?

24    A.  Yes.

25    Q.  All right.  And the subject is "Change on Team Broun."

1    We don't need to go through it, but in general what is it

2    that you understood you were receiving at this point?  An

3    email from the defendant saying what?

4    A.   That Mr. O'Donnell was no longer part of the team.

5    Q.   And Team Broun you understood to mean what?

6    A.   Previously, when we would discuss Team Broun, it was

7    more focused on the campaign team.  In here he says he

8    resigned his contract position with the official office.

9    Q.   Okay.  And these other folks that are on the email

10   besides you, for the -- well, let's go through a couple

11   of them.  Like Mr. Bibee, Mr. Tringali, Mr. Chinouth,

12   Ms. Hardman, Mr. Short, are those all folks that did

13   campaign work in the Senate race?

14   A.   Let me review the list.

15        (Pause)

16   A.   There are a couple of people who I can't speak to what

17   specifically they did, but for the names I recognize, they

18   all had some sort of role within the overall campaign

19   structure.

20   Q.   Exhibit -- so this email's March 25th, 11:12 a.m.  Let's

21   look at Exhibit 488.  This one's March 25th, 2:28 p.m., and

22   this email, it's from you to Mr. Bowser; is that right?

23   A.   Yes.

24   Q.   And the subject is "Talk to me..."  What is it that you

25   write?

1    A.  I think I was trying to get Mr. Bowser to engage as far

2    as what our path ahead would be with the campaign.

3    Q.  Okay.  And you're asking with respect to the O'Donnell

4    thing.  What are you basically asking there?

5    A.  I believe it was in specific response to the

6    resignation.  But the conversation was a few years ago --

7    Q.  I understand.

8    A.  -- so that detail might be a little unclear.

9            MR. GEE:  And let's look at Exhibit 489.

10   Q.  This one's the next day, March 26th.  This is in --

11   well, actually, I'm sorry.  It starts with an email from

12   you, another email from you, March 25th at 9:00 p.m.  And

13   you write "You okay?"  Is that right?

14   A.  Yes.

15   Q.  And the next day you get a response from Mr. Bowser; is

16   that right?

17   A.  Yes.

18   Q.  And he says, "Apologies my friend, just been slammed on

19   all fronts, out until around noon today.  If you're around

20   this afternoon, let's plan on talking.  Thanks!"  Is that

21   right?

22   A.  Yes.

23   Q.  Do you ever recall getting -- did the defendant ever

24   explain to you the circumstances of Mr. O'Donnell's

25   resignation?  Did he ever tell you whether he quit?  Whether

1    he got fired?

2    A.   From the written communication, it was that he resigned.

3    I don't remember him ever saying anything different on the

4    phone, different from his written commentary.

5    Q.   Do you remember ever having a conversation with him

6    about it on the telephone?

7    A.   We would typically speak rather often, and so I don't

8    remember if there was a stand-alone conversation specific to

9    the issue of whether or not Mr. O'Donnell resigned or was

10   fired, but certainly we discussed Mr. O'Donnell a couple of

11   times.

12   Q.   And so you don't remember whether there was ever a

13   conversation where the resignation was further discussed

14   outside of the emails?

15   A.   I know we definitely discussed Mr. O'Donnell and what

16   was going on, but I don't remember if there was a stand-

17   alone conversation or if it was in the context of a -- with

18   just myself and Mr. Bowser or if it was an explanation to

19   the entire team or kind of where exactly that was.

20   Q.   Okay.  And did you ever see Mr. O'Donnell again after

21   the campaign, after the Broun campaign?

22   A.   I've seen him a couple of times in the years since.

23   Q.   Where, for example, have you seen Mr. O'Donnell since

24   the Broun campaign?

25   A.   I passed him in the hallway at a presidential debate in

```
 1    2015, I believe.  It may have been early 2016, but I think

 2    it was 2015 when he was working for Lindsey Graham.

 3                And then I ran into him at the train station in

 4    New York maybe six, seven months ago.

 5                MR. GEE:  Nothing further.

 6                THE COURT:  All right.  Cross-examination.

 7                (To the witness) Please don't be offended if

 8    counsel questions you while she's being seated.  I extended

 9    this conversation to all the attorneys early on, but this

10    has been such a long trial.

11                MS. GORDON:  I'm going to try it from the podium

12    this afternoon.

13                THE COURT:  Sure.  It's your call.

14                MS. GORDON:  If I need to sit down, I will.  Thank

15    you.

16                THE COURT:  We've all been sitting down for two

17    weeks.  I figured the lawyers, if they wanted to sit down

18    and ask questions, they could, too.

19                MS. GORDON:  Mr. Gee, I think these are yours.

20    Mr. Gee.

21                MR. GEE:  Oh, yes.

22                             CROSS-EXAMINATION

23    BY MS. GORDON:

24    Q.  Good afternoon, Mr. Miller.

25    A.  Hi.
```

1    Q.  All right.  So when you first started your testimony,

2    you told us that you reached out for the Broun campaign

3    before the 2012 general election; is that right?

4    A.  Yes.

5    Q.  And you sent the -- you sent Mr. Bowser, actually, a

6    proposal, right, to do some work for Congressman Broun?

7    A.  Correct.

8    Q.  Okay.  And the proposal was to work on his re-election

9    in the House, right?

10   A.  Correct.

11   Q.  That's what was happening at the time, right?

12   A.  Yes.

13   Q.  Okay.  But he didn't hire you.  "He" being the

14   Congressman.  He didn't hire you to work on the re-election,

15   did he?

16   A.  Correct.

17   Q.  You thought there was a possibility of a Senate race,

18   right?

19   A.  Yes.

20   Q.  Okay.  And that was based on what?

21   A.  That was based on public chatter and also conversations

22   with Mr. Bowser and other allies of Mr. Broun or Congressman

23   Broun.

24   Q.  So it was generally known by people that knew Mr. --

25   knew Dr. Broun that he wanted to be a U.S. senator, right?

1    A.   Yes.

2    Q.   Were you aware that he ran for the U.S. Senate in the

3    '90s?

4    A.   I know he had run for office multiple times before, but

5    I never went through and studied the details of those

6    previous campaigns.

7    Q.   He's not the only congressman who thinks he'd make a

8    good senator, is he?

9    A.   I imagine they probably all think they would be.

10   Q.   So the possibility of a Senate run is not the same as

11   actually running though; is that right?  Am I right?

12   A.   Until they announce, that's correct.

13   Q.   And in general, candidates will do some exploring,

14   thinking, testing the waters before they actually decide to

15   run, correct?

16   A.   Frequently.

17             MS. GORDON:  So let's look at Government's Exhibit

18   79, please.

19   Q.   All right.  So in this email you looked at with Mr.

20   Gee --

21             MS. GORDON:  If we can look at this part, please.

22   Q.   So this is the email you looked at earlier today.

23   Mr. Bowser's talking to you.  He's responding to your email

24   where you are saying that you want to be a part of the

25   Congressman's run if he's going to run for the Senate,

1    right?

2    A.  Correct.

3    Q.  You say here "I want this one bad!"  Right?

4    A.  Yes.

5    Q.  Why is that?

6    A.  The Congressman is a known conservative.  He would be a

7    good addition to the U.S. Senate, if he ever got there.  And

8    also, looking at the trend, conservatives usually do better

9    in Republican primaries than moderates or liberals, so if he

10   could put together a professional operation, I thought he'd

11   be a formidable candidate.

12   Q.  Now you do the media ads, right?

13   A.  That's what I used to do, yes.

14   Q.  Sorry.  You aren't in that business any longer?

15   A.  Correct.

16   Q.  You're on the private business side now.  So at this

17   time -- if I make those remarks, I'm talking about the time

18   period that we're discussing, okay?

19          So at this time, this is the business you were in.

20   You were doing media ads for politicians.

21   A.  Yes.

22   Q.  And you were trying to get that business.

23   A.  Yes.

24   Q.  Nothing wrong with that, right?

25   A.  Right.

1    Q.   Okay.  So you are continuing to reach out to Mr. Bowser

2    to get the work.  He does get back to you, and he says that

3    he, meaning Congressman Broun, is 98 percent sure he's going

4    to do it, right?

5    A.   Yes.

6    Q.   And this is in September of 2012, right?

7    A.   Yes.

8    Q.   Okay.  But there's no Senate campaign yet, right?

9    A.   Correct.

10   Q.   And, in fact --

11              MS. GORDON:  Let's make this smaller, please,

12   Ms. Diggs.  Let's look at this part.

13   Q.   And, in fact, Mr. Bowser had written you to say that the

14   Congressman wanted to wait until after the election during

15   the lame duck session, right?

16   A.   Yes.

17   Q.   So he wanted to win his re-election to his own seat, and

18   then decide if he wanted to run for the Senate?

19   A.   I can't really speak to the motivation, but that's the

20   time where he wanted to continue the conversation.

21   Q.   Okay.  Well, on the section above --

22              MS. GORDON:  If we can look at that.

23   Q.   -- you say, "Roger that re: the lame duck," right?

24   A.   As far as when we'd pick up the conversation again, yes.

25   Q.   Okay.  You described it this morning as the possibility

1    of such a run for the Senate, that it would be laying the

2    groundwork.  That's right, isn't it?  That's what's

3    happening here?

4    A.  I'm sorry.  I'm not quite following your question.

5    Q.  You talking to the Congressman about doing campaign ads

6    for him in the fall of 2012 would be laying the groundwork

7    for a Senate campaign for the 2014 election, right?

8    A.  Yes.  I mean, depending on what point during the

9    conversation.  At one point it would have been to get on

10   board with the congressional re-elect, and then at a certain

11   point then that would potentially become a U.S. Senate race,

12   and so it would all be building toward that ideally.

13   Q.  This conversation's taking place in September of 2012,

14   right?

15   A.  This particular one, yes.

16   Q.  Okay.  And so the Congressman's re-election was going to

17   be in November, seven weeks later?

18   A.  The first week in November, yes.

19   Q.  And he had not hired you for the re-election.

20   A.  Correct.

21   Q.  Okay.  You talked a little bit about the campaign

22   financing, and you said that the campaign fundraising was

23   minuscule by comparison to the other candidates.

24   A.  Yes.

25   Q.  How do you know that?

1    A.  I have things that are called FEC reports from the

2    Federal Election Commission, so it's all posted online as

3    far as how much each campaign is raising.

4    Q.  And so you checked to see what the Congressman raised

5    and what his competitors raised?

6    A.  Yes.  I would -- I mean, at the time in realtime I was

7    tracking and following all of that.

8    Q.  Okay.  And isn't it true that Mr. Perdue raised by far

9    the most money of any of the candidates in the Senate

10   campaign?

11   A.  He definitely spent the most.  I have not committed to

12   memory the 2014 primary and run-off fundraising totals by

13   candidate, but he had a lot of personal money, so he ended

14   up spending the most.  I can definitely speak to that.

15   Q.  He far outspent all of the rest of them, right?

16   A.  I don't know what the disparity was between he and Jack

17   Kingston, who is his opponent in the run-off.  I know he

18   spent the most, but I can't offer an opinion as to whether

19   it was significantly more or marginally more.

20   Q.  Okay.

21            MS. GORDON:  The Court's indulgence.

22            THE COURT:  Sure.

23   Q.  Okay.  So in terms of fundraising, you said you looked

24   at the records.  Can you tell us how much money Congressman

25   Broun raised?

1    A.  Again, the exact fundraising totals of each phase during

2    the 2014 primary is not something I've committed to memory.

3    Q.  Okay.  Would you be surprised to know it was about $1.9

4    million?

5              MR. GEE:  Objection.  Objection.

6              THE COURT:  Sustained.

7    Q.  Isn't it true that Congressman Broun raised less money

8    than some of his competitors, but more than others?

9    A.  Again, I didn't commit to memory the details.  I mean,

10   there were a couple of bottom-feeders in the race that maybe

11   raised $10,000, but where he ranked as far as the other

12   candidates, that's not something I've committed to memory.

13   He just either had money to do TV ads or he didn't have

14   money do TV ads.  That's the world I operated in.

15   Q.  So you're telling us you can't really say by comparison

16   how much he raised, right?

17             THE COURT:  I think you've explored that, Counsel.

18   I think the answers are clear.

19             MS. GORDON:  I have one more question, Your Honor.

20   Q.  This morning you told us it was minuscule by comparison.

21   A.  Correct.

22   Q.  But now you're saying you're not really sure, right?

23   A.  No.  What I said is I don't have the exact numbers

24   memorized for all the candidates.  That's typically, four

25   years after the fact, not something you would have memorized

```
 1    for a multicandidate primary.

 2           But, again, to the comment I made a moment ago,

 3    either you have money for a robust advertising program or

 4    you don't, and in this case we didn't.

 5    Q.  You talked a little bit about Mr. O'Donnell and his role

 6    in the campaign, right?

 7    A.  Yes.

 8    Q.  Okay.  And almost all of your role was on the campaign

 9    side, right?

10    A.  Correct.

11    Q.  You did do the one official advertisement, right?

12    A.  Yes.

13    Q.  So if Mr. O'Donnell was having weekly official sessions

14    with the Congressman, it's unlikely that you would have

15    known about that, don't you agree?

16           MR. GEE:  Objection.

17           THE COURT:  I didn't see the question.  Let me see

18    the question.

19           Sustained.

20    Q.  Let me put it this way then.  You don't know what, if

21    any, work Mr. O'Donnell was doing on the official side,

22    right?

23    A.  The only work that I can speak to that Mr. O'Donnell did

24    was the work that I saw, which included frequent meetings at

25    my townhouse and participation in emails and phone calls
```

1    regarding the campaign.

2    Q.   Okay.  Now, let's talk about the NRCC for just one

3    moment.  You said that the NRCC sort of frowned upon

4    congressional members using their space when they were

5    running for the Senate, right?

6    A.   Correct.

7    Q.   There's another organization.  It's probably the NRSC,

8    I'm thinking, right?

9    A.   Yes.

10   Q.   For the National Republican Senatorial Committee?

11   A.   Yes.

12   Q.   Okay.  The NRCC is a dues-paying organization though,

13   right?

14   A.   Yes.

15   Q.   Okay.  And it's on a yearly dues schedule?

16   A.   I don't know their dues structure.

17   Q.   All right.  At a certain point Congressman Broun's

18   campaign started doing debate prep sessions in your offices

19   though, right?

20   A.   Correct.

21   Q.   And since you're an outside political consultant outside

22   of the congressional space, there's nothing wrong with that,

23   right?

24   A.   Correct.

25   Q.   You talked a little bit about the volunteering, so you

```
 1    talked about the kinds of local volunteers that we all know
 2    about, the people who go and knock on doors, right?  They're
 3    volunteers.
 4    A.  Yes.
 5    Q.  And put signs in yards and that kind of thing, right?
 6    A.  Yes.  Are you asking if I'm aware that that happens?
 7    Q.  They're volunteers, wouldn't you agree, typically?
 8    A.  Somebody who does that type of activity?
 9    Q.  Yes.
10    A.  Frequently, yes.
11    Q.  Okay.  Now, you're a professional political person
12    yourself, though, or you were, right?
13    A.  Formerly, yes.
14    Q.  Yes.  So have you ever volunteered your professional
15    services to a campaign?
16    A.  Very little.
17    Q.  But sometimes, right?
18    A.  Two or three times.
19    Q.  And you're saying you did not volunteer on Congressman
20    Broun's campaign?
21    A.  Correct.
22    Q.  Would you agree with me that to volunteer means to do
23    work but not be paid for it?
24    A.  Correct.
25    Q.  In this case, with Congressman Broun, you were doing the
```

```
 1    media buys, right?

 2    A.  Yes, and ad creation.

 3    Q.  And also some strategy, campaign strategy work, yes?

 4    A.  Yes.

 5    Q.  And also some help with debate prep, right?

 6    A.  A little bit on debate prep.  I typically would not sit

 7    in the debate prep sessions.

 8    Q.  You said that you thought you sat in on one or two of

 9    them, right?

10    A.  Yes.  There would be a couple of times, but typically I

11    would not.

12    Q.  And you went over some of the emails with Mr. Gee that

13    were situations in which you were lending your expertise on

14    the debate topics.  Do you remember those?

15    A.  Correct.

16    Q.  So typically it was something that Mr. O'Donnell, who

17    was the debate person, was sending to the full team, right?

18    A.  Usually.

19    Q.  You and Mr. Tringali.  He would send it to you and

20    Mr. Tringali?

21    A.  Among others, yes.

22    Q.  Mr. Bibee also, I think, right?

23    A.  Yes.  I mean, there were five or six names that were

24    usually on the distribution list.

25    Q.  Okay.  These are the people that were involved in sort
```

1  of the overall messaging of the campaign.  Would you agree?

2  A.  Yes.

3  Q.  So let's look, then, at your contract with the

4  Congressman's office, which I believe is Government's

5  Exhibit 271.

6         MS. GORDON:  And let's look at this part here.

7  Q.  Okay.  Now, this is the part of the contract that

8  describes the services that you're going to perform for

9  Congressman Broun, right?

10 A.  Yes.

11 Q.  And the first one has to do with producing and

12 developing the ads, the Web videos, the radio ads you told

13 us about, right?

14 A.  Yes.

15 Q.  And the second one is about placing those ads, right?

16 A.  Yes.

17 Q.  And for that work, you were getting a commission, a

18 percentage fee; am I right?

19 A.  Correct.

20 Q.  And then on No. 3, you say, "Participate in scheduled

21 calls to create, review, and outline strategy with the

22 campaign," right?

23 A.  Yes.

24 Q.  No. 4 is "Meet with the candidate and campaign staff as

25 needed to review strategy execution and implementation,"

1   right?

2   A.  Yes.

3   Q.  Now, for those you told us earlier that typically you

4   would charge a monthly retainer for that, right?

5   A.  If I had the title of "General Consultant" or "Lead

6   Strategist."  But this was kind of the standard language

7   that I would have in a contract for being available to

8   contribute and participate in campaign strategy.  There's a

9   difference between that and being the lead strategist.

10  Q.  I was focusing on the difference in the way that you are

11  paid for those services.  So for the first two you've got a

12  commission fee, right?

13  A.  Yes, but I would -- I would only charge a consulting fee

14  if I had the title of "General Consultant" as well.

15  Q.  Okay.  My question is, for number one and number two

16  you're charging a commission rate, yes?

17  A.  Correct.

18  Q.  Okay.  You told us this morning that if you did strategy

19  stuff, that that would be charged differently, that it would

20  be on a retainer typically.  Am I right?

21  A.  If it was unclear in the way I presented it, I would add

22  a monthly retainer if I was the lead strategist, usually

23  referred to as the general consultant on a campaign.

24       If I did not have that title or that designation,

25  then there usually would not be a monthly retainer.

1    Q.   Okay.  You're sort of getting ahead of where my question

2    is.  I'm just trying to draw the distinction between some of

3    the work that's on a fee and some of it's on a retainer

4    first.  And then we can talk about what specifically you

5    did.  Okay?

6    A.   Got it.

7    Q.   So you told us this morning that the media ads would be

8    fee-based and the strategy would typically be retainer-

9    based.  Am I right so far?  If you were doing it, their

10   strategy.

11   A.   No.  What I was saying was that I would always -- if I'm

12   doing the advertising, I would always charge a commission

13   fee structure, and then sometimes I would charge a retainer

14   fee depending on the accountability level and what level of

15   strategy I was contributing to a campaign.

16   Q.   Right.  The retainer part goes with the strategy part.

17   That's what I'm trying to get to.  Right?  There's no fee

18   commission on the strategy.

19   A.   Correct.  It would be a flat fee.

20   Q.   It's a retainer, okay.

21        Now -- you said "retainer," and I wanted to

22   understand what you meant by that.

23        So is it a flat fee for a campaign or an hourly

24   rate for hours worked?  What would the retainer usually look

25   like?

1   A.   Typically it would be -- if there was a retainer

2   involved, there would be a flat monthly fee.  It would range

3   anywhere from a thousand dollars a month, depending upon how

4   much work was being done, upwards of -- it could potentially

5   be something as big as $8,000 to $10,000 a month, depending

6   on the scope and magnitude of the work.

7   Q.   Okay.  And the retainer work is for the strategy work,

8   right?  Which is No. 3 and No. 4 on your list here, if you

9   were doing it.

10  A.   So in this case I did not charge a retainer, and so the

11  strategy work that I did was all compensated under the

12  commission structure.

13  Q.   Really?  You did the strategy work, but now you're

14  saying that it was really subsumed under the fee for the

15  ads?

16  A.   Well, again, as I've mentioned a couple of times now,

17  that if I had a title of "General Consultant" or "Lead

18  Strategist," then there would be the additional fee.  If

19  somebody hired me to be their lead media vendor, then there

20  would be a percentage, a commission structure, and then --

21  but it's kind of my MO to dive in and help out and give

22  people kind of my thoughts as they request them.

23          MS. GORDON:  So then let's look at the next page

24  of the contract.

25  Q.   So here we have --

```
 1                    MS. GORDON:  Let's look just at this part.

 2     Q.  You tell us what the media production looks like, right?

 3     A.  Yes.

 4     Q.  So this is the cost of actually producing the ads and

 5     editing and so on and so forth, right?

 6     A.  Correct.

 7     Q.  Okay.

 8                    MS. GORDON:  Let's go down a little farther and

 9     look at the fees.  Just this part.

10     Q.  So in this particular case for Congressman Broun, you

11     waived the strategy fees, right?

12     A.  Yes.  We had -- our commission came only from -- or our

13     payment came only from commission on ad placement.

14     Q.  But you did do strategy work for Congressman Broun.

15     A.  Yes.

16     Q.  Okay.  You did that work for free?

17     A.  I was being -- I mean, I was being compensated by the

18     campaign.  I did not have a separate fee structure for the

19     strategy work.

20     Q.  Because you waived your fee for the strategy work.

21     A.  Because I was being paid for doing the ads.  I mean, I

22     wasn't going to do it for free.

23     Q.  You weren't going to do the ads for free, right?

24     A.  I wasn't going to do the overall scope of engagement for

25     free.
```

1          MS. GORDON:  Let's go back to the -- let's look at

2     this part.

3     Q.  So here you say how much you're charging for the media

4     part, right?

5     A.  Yes.

6          MS. GORDON:  And then let's go back and look at

7     the first page.

8     Q.  No. 5, which we saved for last, also says that you would

9     participate, as part of your services, in debate prep

10    sessions and offer media training services at no additional

11    charge, right?

12    A.  Yes.

13    Q.  So the debate prep work that you did in this case, both

14    the meetings and the emails that you went over with Mr. Gee,

15    you did that work for free, right?

16    A.  There was no additional charge.

17    Q.  That's what "free" means, isn't it?

18    A.  Well, I was being compensated for doing the TV ads, and

19    I kept a focus on the commission structure rather than

20    adding an additional fee for being paid for debate-specific

21    or strategy-specific.

22    Q.  Right.  So you got paid for the ads, and you did the

23    strategy and the debate prep for free.  You threw that in,

24    right?

25    A.  I didn't charge anything extra.  I mean, I was being

1    paid from the campaign.  Those are services that I added in

2    since I was being compensated otherwise.

3    Q.  So you don't think you volunteered your services on

4    Congressman Broun's campaign?

5    A.  As a paid campaign vendor, I mean, no.  I mean --

6    Q.  Is there a reason -- I'm sorry.  I'll let you finish.

7    A.  No, I mean, I was being paid by the campaign.  I mean, I

8    wanted to see him win so I was charging as little as

9    possible to make sure to have more money to go toward actual

10   ad placement, so I gave them a good deal.  I probably

11   shouldn't have given them that good of a deal, but I did.

12   Q.  There's no reason why you can't charge for some things

13   and not others, is there?

14   A.  I mean, ultimately any vendor relationship is going to

15   be between the campaign and the vendor, so you can set it up

16   however you want.

17   Q.  Right.  And in this case you set it up to charge him for

18   some things and not for others?

19   A.  Charged it based on -- charge it based on the ad

20   placement.  I mean, I wouldn't have -- for example, I

21   wouldn't -- without the ad placement, I wouldn't have helped

22   out in the other areas.

23   Q.  But you did help out in the other areas, right?

24   A.  Right.  Because I was being compensated for ad

25   placement, which there wasn't much of.

 1    Q.  Now, you told us that when you talked to Mr. Bowser,

 2    after the media articles came out about Mr. O'Donnell's

 3    relationship with the Broun campaign, that you were

 4    perplexed and heated, right?

 5    A.  Correct.

 6    Q.  You'd read the articles.

 7    A.  Yes.

 8    Q.  But you had not yet spoken to Mr. Bowser about them,

 9    right?

10    A.  Correct.

11    Q.  But you were already heated?

12    A.  Yes.

13    Q.  Because you assumed that it was a problem?

14    A.  Well, it was a problem.  That's why we're here.

15    Q.  That's yet to be determined, I think.

16    A.  That's my opinion.

17    Q.  Your opinion only.

18            THE COURT:  Okay.  All right.  Okay.  All right.

19    Let's get to the next question.  All right.

20    Q.  You said it was the kind of thing that could get you

21    into trouble, right?

22    A.  Correct.

23    Q.  And could create investigations, right?

24    A.  Correct.

25    Q.  And also create bad news cycles, right?

1    A.   Correct.

2    Q.   And Mr. Bowser told you that Mr. O'Donnell had an

3    official job that he was being paid for out of the MRA and

4    that he was volunteering on the campaign?

5    A.   Yes.

6    Q.   Mr. Gee asked you --

7              THE COURT:  Let me just -- I think I should tell

8    the jurors.

9              The back-and-forth, it happens sometimes.  Your

10   job is to decide the facts in the case regardless of any --

11   regardless of my opinion.  If you hear me express an opinion

12   about what you think the facts are, first of all, you're

13   wrong; and secondly, if you hear me -- if you hear me -- if

14   I make a mistake and you hear me say that's my opinion about

15   so and so, disregard it, because that's not my job.  My job

16   is to determine legal issues.

17             So if there's back-and-forth question-and-

18   answering, the answer may have suggested an opinion about

19   facts, but the facts are yours to decide, okay?  And I just

20   think I needed to provide that guidance because -- because

21   that's my job.  I should do that at that point.

22             So no harm.  There's always back-and-forth in

23   questions and answers.  That happens.  But I don't want you

24   to lose sight on what your job is, and your job is to

25   exclusively find the facts in this case and determine what

1    the facts are.  It's not my job at all so...

2              All right.  That's a fair instruction.  All right.

3              MS. GORDON:  Thank you, Judge.

4    Q.  So Mr. Gee asked you about was this sort of the first

5    time you'd heard Mr. O'Donnell described as a volunteer?

6    A.  From the articles, yes.

7    Q.  Okay.  From the articles or from Mr. Bowser?  I'm sorry?

8    A.  I'm sorry.  Backing up, the first time I learned of the

9    news that he was being paid from the MRA was from the news

10   reports; and then my conversation with Mr. Bowser, that's

11   when he informed me that he was doing the campaign work as a

12   volunteer.

13   Q.  And you told us that that was the first time that you

14   heard that Mr. O'Donnell was a volunteer?

15   A.  Correct.

16   Q.  Was there any reason why you would have known that

17   before?

18   A.  No.  And, in fact, as I said earlier, I didn't know the

19   contract particulars of the other members of the team.

20             MS. GORDON:  Okay.  I pass the witness.

21             THE COURT:  All right.  I think the other

22   instruction -- I just want to add a little to it.  Even as

23   we talk, even after the many days of trial, there's been a

24   presumption of innocence that remains with Mr. Bowser unless

25   and until the government proves guilt beyond a reasonable

```
1    doubt.

2              The burden rests with the government.  It doesn't

3    rest with Mr. Bowser to prove his innocence.  That's not the

4    way the system works.

5              I thought I should just add that as well.  It's

6    been a while since we talked about instructions of law.

7              You'll hear all that again when we finish this

8    trial -- when we finish the trial.  And that will be -- that

9    will be -- and we'll talk about that at the end of the day,

10   too, about predictions about -- and I told you it's

11   difficult to predict time for trial, but we'll talk a little

12   bit more, and I'll give you the best guidance I can give you

13   at that time.  Okay?

14             All right.  Any redirect, Counsel?

15             MR. GEE:  No questions.

16             THE COURT:  All right.  Mr. Miller, thank you.

17   You take care.  Good to see you.  Take care.  Step down.

18   You may be excused, sir.

19             All right.  Call your next witness, Counsel.

20             MR. MULRYNE:  Your Honor, may the government call

21   its next witness?

22             THE COURT:  Yes, please.  Yes, uh-huh.

23             MR. MULRYNE:  The government's calling Bryson

24   Morgan.

25             THE COURT:  All right.
```

 1          MR. MULRYNE:  Thank you, Your Honor.

 2          THE COURT:  How are you today, sir?

 3          THE WITNESS:  I'm doing well.

 4          THE COURT:  Good.

 5                    BRYSON MORGAN, Sworn

 6                    DIRECT EXAMINATION

 7  BY MR. MULRYNE:

 8  Q.  Good afternoon, Mr. Morgan.

 9  A.  Hello.

10          MR. MULRYNE:  Your Honor, before we get into the

11  questions, the government moves to admit Government Exhibits

12  491, 501, 501a, 503, 506, 507, 509, 510, 511, 516, 518, OCE

13  53, OCE 90, 490b and OCE 1a.

14          THE COURT:  Any objection?

15          MS. GORDON:  No objection.

16          THE COURT:  Admitted.

17          MR. MULRYNE:  Thank you, Your Honor.

18  BY MR. MULRYNE:

19  Q.  Mr. Morgan, could you please state your full name for

20  the jury and for the court reporter, please.

21  A.  Yes.  It's Bryson Baird Morgan.

22  Q.  How old are you?

23  A.  I'm 35.

24  Q.  In what city and state do you live?

25  A.  I live in West Springfield, Virginia.

1    Q.  Could you tell us a little bit about your educational

2    background.

3    A.  Sure.  So I grew up in the Salt Lake City, Utah, area;

4    went to high school there.  I went to the University of Utah

5    for my undergraduate, with the exception of spending a

6    couple of years on a religious mission in South America.  I

7    graduated from the University of Utah in 2007, worked for a

8    year, and then started law school at Harvard Law School in

9    2008.  I graduated from Harvard Law School in 2011.

10   Q.  Are you a licensed attorney?

11   A.  I am.

12   Q.  Are you currently practicing law?

13   A.  Yes, I am.

14   Q.  Where is it that you work?

15   A.  I work here in Washington, D.C., with the law firm

16   Caplin & Drysdale.  I'm barred in both the D.C. bar and the

17   Utah state bar.

18   Q.  When did you begin with Caplin & Drysdale?

19   A.  Right out of law school in I think it was about

20   September of 2011.

21   Q.  Okay.  Prior to working at that law firm, where is it

22   that you worked?

23   A.  So I worked -- during undergraduate I worked at the

24   University of Utah.  During law school -- during my -- the

25   summer after my first year of law school I was with -- a law

1    clerk with the Office of Congressional Ethics in the House

2    of Representatives.

3            During my second summer of law school, I returned

4    back to the Office of Congressional Ethics as a law clerk

5    for a few weeks and was also a summer associate here in

6    Washington, D.C., at the law firm Hogan Lovells and, you

7    know, did some for-pay research during law school.

8            But I think that's, you know, about all I did

9    until I started as a first-year associate with Caplin &

10   Drysdale in September 2011.

11   Q.  And at some point you mentioned -- and we're going to

12   talk more about this in a moment -- you mentioned serving as

13   a law clerk with the Office of Congressional Ethics; is that

14   correct?

15   A.  Correct.

16   Q.  At some point did you work as a full-time employee with

17   the Office of Congressional Ethics?

18   A.  I did.  So I was at Caplin & Drysdale for, you know,

19   about two years, and then was offered and took a position as

20   an investigative counsel with the Office of Congressional

21   Ethics and began working there in September of 2013.  And I

22   was there at the OCE, as we would call it, until July of

23   2015.

24   Q.  Okay.  And we're going to focus your testimony primarily

25   on your time at OCE, okay?  And the jury may be able to hear

1    you, but just in case, could you move the microphone a

2    little bit closer?

3    A.   Certainly.

4    Q.   Could you tell -- could you explain to the jury, please,

5    what is the Office of Congressional Ethics.

6    A.   So the Office of Congressional Ethics is an independent

7    office within the U.S. House of Representatives that is

8    charged with assisting the House of Representatives in

9    carrying out its constitutional obligation to punish its own

10   members, which is a specific provision of the Constitution

11   that requires each House of Congress to be in charge of

12   punishing and disciplining its own members.  It's called the

13   disciplinary clause of the Constitution.

14        So the OCE assists the House in carrying out those

15   responsibilities by conducting investigations into

16   allegations of misconduct.

17   Q.   You described a moment ago the Office of Congressional

18   Ethics as independent within the House.  What does that

19   mean?

20   A.   So it's unlike a traditional House committee in that the

21   Office of Congressional Ethics is not directly overseen by

22   sitting members of Congress.  Instead, the OCE is overseen

23   by a bipartisan board that is appointed by the Speaker of

24   the House and the minority leader of the House.

25        So that eight-person board oversees the OCE, and

1    those board members are not current members of the House so

2    in that sense it's independent.

3    Q.  To be clear, you said that the board is bipartisan.

4    A.  Uh-huh.

5    Q.  To be clear, what do you mean by that?

6    A.  The board is appointed by -- in a bipartisan manner,

7    right?  So the Speaker of the House appoints four members;

8    the minority leader of the House appoints four members.  So

9    in that respect it's bipartisan.

10   Q.  And of course when you're referring to the Speaker of

11   the House and the minority leader, you're referring to House

12   representatives; is that correct?

13   A.  Correct.

14   Q.  We'll talk more about the board in a second, but how was

15   it that the Office of Congressional Ethics was created?

16   A.  So the House of Representatives appointed a task force

17   to study the issue of whether an independent ethics body

18   should be created.

19        I think, you know, big picture, there has long

20   been a criticism of the House of Representatives for failing

21   to adequately investigate allegations of misconduct, and the

22   critique almost always went to this point that there's a

23   sitting House ethics or a standing committee of the House

24   called the House Ethics Committee that is overseen by

25   members, it's made up of members, and the criticism was

1    often that those members would fail to aggressively and

2    adequately investigate their colleagues, the other members

3    of the House.  And so for decades people have advocated for

4    the creation of an independent ethics body, and in 2007 the

5    House created a task force to study that issue.

6           That task force then recommended for the creation

7    of an independent ethics body within the House.  That then

8    became a House resolution that was proposed before the House

9    and was passed, I believe, on March 11th of 2008.

10   Q.  What is a House resolution?

11   A.  A House resolution is a -- it's like a bill, but it's

12   not a statute.  So it's a piece of legislation that just

13   binds the House as a body because the OCE does not have any

14   jurisdiction beyond the House.  It doesn't have jurisdiction

15   over the Senate, for example, so it's just binding on the

16   House.  This was the House only creating this independent

17   ethics body.

18   Q.  So the Office of Congressional Ethics, was it created

19   then by legislation passed by the House of Representatives?

20   A.  Correct.  It's House Resolution 895 that created the

21   OCE.

22   Q.  And, again, when was the OCE created?

23   A.  I believe that resolution passed on March 11th of 2008,

24   and then it took some time.  I believe it was the summer of

25   2008 when the Speaker of the House and the minority leader

1    appointed their respective appointees to the board of the

2    OCE, and then it took, I think, a few months for the OCE to

3    hire a chief counsel and staff director and then, from

4    there, hire staff.

5            The OCE, I believe, began operating, began

6    conducting investigations, in the early part of 2009.

7    Q.  Okay.  So you talked a little bit moments ago about the

8    OCE board and how it's bipartisan, appointed by both

9    parties.  What exactly is the function of the OCE board?

10   A.  So the OCE board is the -- they are the body that

11   authorizes the OCE staff to conduct investigations, and then

12   at various stages throughout the investigative process they

13   are responsible for voting on whether the investigation will

14   continue.  And then, at the conclusion of the investigation,

15   the OCE board determines whether or not there is sufficient

16   evidence that merits a recommendation from the OCE to the

17   House Ethics Committee that the ethics committee further

18   investigate that matter.

19           So the OCE does not have the ability to impose

20   punishment on members or staff.  What they do is a first-

21   stage investigation, and if the allegations merit additional

22   investigation, they then can refer that matter over to the

23   House Ethics Committee for further investigation.

24   Q.  So I understand a lot that you mentioned there.  We're

25   going to break that down here in a moment.

1    A.    Uh-huh.

2    Q.    But going back to the OCE board, who is it, then, that

3    the OCE board oversees or supervises?

4    A.    They oversee the staff of the OCE.

5    Q.    Could you tell the jury about the staff and what exactly

6    it is the staff does.

7    A.    Sure.  So the head staff person at the OCE is a person

8    who's the chief counsel and staff director.  During my time

9    period there, from 2013 to 2015, there was only one person

10   in that position, and that position is responsible for

11   overseeing all of the investigations that the OCE is

12   conducting and on advising the OCE board and handling

13   staffing matters and administrative matters of the office.

14         Beneath the staff director and chief counsel is a

15   deputy chief counsel who oversees the investigations but

16   then also would be in charge of leading on maybe one or two

17   investigations at any given time period.

18         And then below the deputy chief counsel there were

19   three or four investigative counsels, like myself, and our

20   responsibilities were to, you know, lead the investigations.

21   During any period of time I would have, you know, one, two,

22   three investigations that I was leading subject to, you

23   know, supervision of the other persons in the office, but

24   then I would also assist in, you know, a second-chair or

25   third-chair capacity on the other investigations the office

1   was conducting.

2   Q.  So there at the end you just mentioned the role that you

3   held at OCE when you were working there full time; is that

4   right?

5   A.  Correct.

6   Q.  And what's the official title of that position?

7   A.  Investigative counsel.

8   Q.  And in that role you're conducting investigations on

9   behalf of the Office of Congressional Ethics; is that right?

10  A.  Correct.

11  Q.  Just to tie the loop together, you mentioned earlier

12  about serving as a law clerk with OCE.  Could you just

13  briefly -- when were the periods that you worked as a law

14  clerk?

15  A.  So I first worked as a law clerk during the summer after

16  my first year of law school, so that was summer of 2009, and

17  I was there for about ten weeks.  I was assisting the

18  investigative counsels and assisting the office with the

19  investigations it was running at that time.  You know,

20  putting documents together, preparing questions for

21  witnesses, typing up notes of witness interviews, putting

22  binders together for the board to consider.  I mean, it was

23  very, I would say, low-level legal work in assisting the

24  investigations.

25          And then during my second summer of law school,

```
 1    when I was back there for a few weeks, it was similar in
 2    nature.
 3    Q.   So as a law clerk were you assisting, then, the
 4    investigative counsel?
 5    A.   Yes.
 6    Q.   When was it that you returned to the OCE and became a
 7    full-time member of investigative counsel?
 8    A.   It was September of 2013.
 9    Q.   And you worked there until when?
10    A.   Until July of 2015.
11    Q.   Where are the Office of Congressional Ethics offices or
12    office located?
13    A.   So they were located during -- for a time they were
14    located in the Longworth House Office Building.
15    Q.   I'm sorry, were they here in Washington, D.C.?
16    A.   Here in Washington, D.C.
17    Q.   Does that remain true today?
18    A.   Yes, yes.  They're in a different building now, but
19    still here in D.C.
20    Q.   As an employee of the Office of Congressional Ethics,
21    are you also, then, an employee of the United States House
22    of Representatives?
23    A.   Yes.
24    Q.   How are you paid as an OCE employee?
25    A.   By the House of Representatives.
```

1    Q.  All right.  Is that with taxpayer money?

2    A.  Yes.

3    Q.  So we've talked a little bit about investigative work

4    that the office did, but I don't think we've yet asked you:

5    What kinds of allegations does the Office of Congressional

6    Ethics investigate when it comes to members of the House or

7    their staff?

8    A.  So the jurisdiction of the OCE is quite broad.  We were

9    empowered to investigate allegations of a violation of any

10   law, rule, regulation, or standard of conduct that applies

11   to a member of the House, employee of the House, officer of

12   the House in the conduct of their official duties.  That

13   would, I think, break down into a few categories that were

14   most common for OCE investigations.

15   Q.  What were those categories?

16   A.  You know, one was campaign activity --

17              MS. GORDON:  Objection, Your Honor.  May we

18   approach?

19              THE COURT:  Sure.

20              (The following is a conference held at the

21               bench outside the hearing of the jury)

22              THE COURT:  What's your objection?

23              MS. GORDON:  I'm wondering if this witness is an

24   expert or not.  I mean, it's -- I appreciate we needed some

25   background to know who he is and his relationship with the

 1  office, but now it seems like we're getting into a lot of --

 2  a history lesson.  He sounds like an expert sitting there to

 3  me.

 4            THE COURT:  That's appropriate.

 5            Counsel?

 6            MR. MULRYNE:  Your Honor, he very well may be an

 7  expert, but we're not qualifying him as such.

 8            THE COURT:  Right.

 9            MR. MULRYNE:  Right now we're not even talking

10  about his credentials and qualifications.  We're talking

11  about what the office itself does and what kind of work it

12  conducts.

13            THE COURT:  I think it's appropriate.  I'll allow

14  it.

15            MS. GORDON:  I have one concern.  It makes me a

16  little nervous if the testimony is going to be, like, all

17  the bad things that the Congress members do.

18            THE COURT:  I'm sorry, what?

19            MS. GORDON:  It's making me nervous if what we're

20  going to get into is all the bad things that the Congress

21  members do that Mr. Bowser is not charged with.  I mean,

22  where are we going with this next bit?

23            MR. MULRYNE:  Right now we're simply asking him

24  what kinds of investigations and allegations that the Office

25  of Congressional Ethics conducts, and then from there I'm

1    intending to ask him about how the investigations work, the

2    time frames, things of that sort.

3              THE COURT:  I think that's appropriate.

4              MS. GORDON:  If it's very short -- if it's short,

5    then okay.

6              THE COURT:  All right.

7              (This is the end of the bench conference)

8              THE COURT:  Go right ahead, Counsel.

9              MR. MULRYNE:  Thank you, Your Honor.

10   BY MR. MULRYNE:

11   Q.  Mr. Morgan, I asked you a moment ago, what kinds of

12   categories does the Office of Congressional Ethics

13   investigate commonly, I think, as you said?

14   A.  Yes.  So like I said, the jurisdiction is quite broad,

15   but commonly the investigations would focus on campaign

16   activity.  There are, you know, rules regarding campaign

17   activity and what people on the Hill -- you know, members,

18   office employees -- can do in that regard, use of official

19   resources, how those are used, if they're used properly.

20              You know, members, officers, employees of the

21   House are subject to various restrictions on gifts and

22   travel from outside sources, so that could be another area

23   of focus.  Financial disclosure reports that members,

24   officers, and employees are required to file and whether

25   they have fully disclosed their finances.

1              There are also restrictions on outside income, so

2      sort of other jobs that people on the Hill can have.

3              I think those are, I think, the main categories

4      that our investigations would focus on.

5      Q.   Okay.   Let's talk generally about these investigations.

6      How is it that they often come before -- how is it that a

7      matter often comes before the Office of Congressional Ethics

8      and then potentially leads to an open investigation?

9      A.   So one of the things that distinguishes the OCE from the

10     House Ethics Committee is that the OCE can receive

11     allegations from any source, and that was -- it was

12     intended, when the OCE was created, that there would be more

13     avenues for allegations to be reviewed.

14              And so it could come from a complaint.   Someone

15     could come to the OCE with evidence that misconduct had

16     occurred.   It could be -- it could be news reports of

17     misconduct that come forward.   It could be any source.   It

18     could be something that the board or the staff discover upon

19     reviewing information on their own.

20              So there really was -- any possible source could

21     be the source of an allegation.

22     Q.   Could you explain briefly to the jury generally about --

23     once a matter has been identified as a potential matter for

24     investigation, could you explain to the jury briefly about

25     how that then transitions into the early phase of an

1    investigation.

2    A.  Yes, sure.  So we, as OCE staff -- and this is one of my

3    responsibilities as an investigative counsel -- we would

4    monitor the press.  We would also -- we had, you know, a

5    hotline and email to which people could send complaints.

6    You know, people would also come forward with allegations.

7           But what we would do is when those would come in

8    there would be an initial process whereby we would decide if

9    something deserves additional internal review, and if

10   something looked -- you know, it wasn't just absolutely

11   crazy or nuts, if it looked like there might be an actual

12   allegation of misconduct, it would then get assigned to one

13   of the investigative counsels, and we would do some research

14   from what we could find from the publicly available

15   information, and we would type up an internal memorandum of

16   what we had found.

17          The staff would then come up with a recommendation

18   for the board, recommendation to either open an

19   investigation or to not, and that the memo and the staff

20   recommendation would be presented to the board that oversees

21   the OCE, and the OCE board would decide whether or not

22   they'd authorize an investigation to take place.

23   Q.  Within the OCE investigative realm is there what's known

24   as a preliminary review?

25   A.  Yes.  So that's the first stage.  It can be a little bit

1    complicated, but the OCE investigation is broken down into

2    two main stages, and the first is a 30-day preliminary

3    review.

4              So when I talked about the board of the OCE

5    authorizing an investigation, what they would be authorizing

6    is a 30-day preliminary review of those allegations.

7    Q.  And what happens at the end of the 30-day preliminary

8    review?

9    A.  At the end of the 30-day preliminary review, we, as a

10   staff, would go back to the board, tell them what we had

11   found or what was still out there that we had not yet been

12   able to run down, and they could decide to either let the

13   investigation terminate or to authorize a second-phase

14   investigation.  And that second phase would last for 45

15   days.

16   Q.  Do some investigations resolve or conclude during the

17   preliminary review period?

18   A.  Yes.  I mean, I don't think a majority of the cases

19   conclude during that 30-day preliminary review, but a lot of

20   cases do -- are resolved during that period.

21   Q.  And you mentioned a moment ago then there can be the

22   extension for another 45-day second-phase review; is that

23   right?

24   A.  Yes.  The second-phase review -- if the board decides,

25   the board can extend that 45-day second-phase review by an

1    additional 14 days.

2            So all together an OCE investigation can last up

3    to 89 days.

4    Q.  And what happens at the end of the 89-day OCE

5    investigative period?

6    A.  So at the end of the 89-day period, we -- so the OCE

7    board would meet on about a monthly basis, so we would -- at

8    the end of the 89-day period, we would then have, you know,

9    a month, maybe a month and a half or so where we, as the

10   staff of the OCE, would be compiling the evidence, reviewing

11   the evidence, going over witness transcripts, and typing up

12   a draft report and a draft of our findings of fact.  So that

13   would be the main bulk of activity during that time period.

14           We'd also be sort of crossing Ts and dotting Is

15   during that time period to make sure that we'd received

16   all the forms in from witnesses, you know, and receive any

17   other information that trickles in during that period as

18   well, but --

19   Q.  To be clear, what you just described there a moment ago

20   about drafting the reports and combing through the remainder

21   of evidence, what you just said there, is that during the --

22   that's during a period that follows the 89-day period?

23   A.  Correct.

24   Q.  After the 89-day investigative period has ended, does

25   the Office of Congressional Ethics request or make any

1    additional requests for evidence at that point?

2    A.  No.  We're not supposed to request additional evidence

3    at that point, but I -- you know, during the time I was at

4    the OCE, we always took the position that if we had

5    previously requested information, if it came into our office

6    after the 89-day period, we would be willing to accept it.

7    Q.  You mentioned moments ago about working on a draft

8    report.  Can you tell the jury what's the purpose of the

9    report and what happens to it at the conclusion of the

10   investigation.

11   A.  So it's -- the report is a fairly voluminous set of

12   findings of fact, so it's -- the OCE is just a fact-finding

13   body.  That's all we would try to do is nail down what

14   happened, and so we would put together a fairly voluminous

15   report of the facts that we uncovered, and we'd have that in

16   draft form.  We would then make a presentation.

17            You know, so as investigative counsel at that next

18   board meeting I would make an in-person presentation to the

19   board summarizing what we had found during the course of our

20   investigation, but the board would also be provided with a

21   draft of that report, you know, a few days or maybe even

22   about a week before their meeting so they could review that,

23   and they could also review witness interview transcripts,

24   the documents we had received, and any other evidence the

25   board would like to review.

1          And then during the meeting we would present the

2     facts that we'd found.  The board would often make edits to

3     the report, and then after the board meeting, we would make

4     those edits.

5          You know, at the board meeting, the board is

6     deciding, again, whether the matter warrants further

7     investigation by the ethics committee, and if the board does

8     determine that they -- that further investigation is

9     merited, then that report and the findings and the evidence

10    gets transmitted by the OCE to the House Ethics Committee.

11    Q.  You've mentioned a few times the House Ethics Committee.

12    A.  Uh-huh.

13    Q.  What is the House Ethics Committee?

14    A.  So the House Ethics Committee is -- you know, it was

15    created in the 1960s.  It is the committee of the House.  It

16    is the standing committee of the House that actually has

17    members on it.  It's a ten-member committee.  It's

18    bipartisan.

19         They're the House committee that's responsible for

20    recommending discipline for actually determining that a

21    violation of law or the rules or standards of conduct

22    occurred.

23    Q.  And so speaking of discipline, the Office of

24    Congressional Ethics makes a recommendation to the board.

25    The board may recommend it to the ethics committee.  Is that

1    what you had testified?

2    A.   The OCE doesn't recommend discipline to the House Ethics

3    Committee.

4    Q.   Sorry.  Let me correct myself.

5         Taking -- putting aside the discipline, the Office

6    of Congressional Ethics does an investigation, makes a

7    recommendation to the board, and then the board to the

8    ethics committee; is that right?

9    A.   Yes.  So the staff makes a recommendation to the board,

10   but it's the board -- I mean, the board vote -- the board

11   determination is what really matters.  So the board, when

12   they're in that meeting and reviewing all the evidence and

13   we give our oral presentation to the board, they're deciding

14   whether or not they are going to recommend that the ethics

15   committee conduct further investigation of that matter.

16        So the board is not determining that a violation

17   occurred or did not occur.  They're simply deciding whether

18   the matter merits further investigation by the House Ethics

19   Committee.

20   Q.   And at the conclusion of all this, who ultimately would

21   decide whether or not there was any violation?

22   A.   That would be the House Ethics Committee.

23   Q.   Okay.  And what is the range -- in terms of punishments,

24   as you mentioned earlier, what is the range of punishments

25   that could be -- that could be -- that could come from the

1    ethics committee in these matters?

2    A.   So they have -- the ethics committee has a few tools for

3    punishment.  One is -- I mean, they can do something as

4    simple as issue a -- what they call a private letter of

5    reprimand to the person who committed the offense.  They

6    can -- it's a step up from that.  They can issue a public

7    letter of reprimand.  They can also impose fines.

8         And then that's where I think disciplinary

9    authority ends, and if they want to go above that, they have

10   to recommend to the entire House as a body for there to be

11   censure or expulsion from the House.

12   Q.   Is the -- final question on this topic.  Is the Office

13   of Congressional Ethics report that's generated, is that

14   ever made public?

15   A.   Yes.  It's -- one of the purposes of the OCE was to --

16   you know, as I said earlier, was to provide an opportunity

17   for allegations to come from any source.  The context of

18   that is for the ethics committee to pursue a complaint, a

19   member of Congress has to sign off on it, and that was

20   viewed as an impediment to investigations because there was

21   perceived to be a hesitancy by members to want to

22   investigate other members.

23        So that's -- one aspect of the OCE is complaints.

24   Allegations can come from anyone.  The other is that the OCE

25   process, you know, guarantees transparency if the OCE board

1  determines that a violation -- that they believe a violation

2  occurred.

3          So the investigative product, the report, the

4  findings, the investigative materials in that instance go

5  over to the House Ethics Committee.  They then get a

6  certain amount of time to decide what they want to do with

7  it, but -- and there are a few different ways that can go,

8  but at the end of the day the OCE report and findings have

9  to be made public.

10 Q.  So I want to step away from that and turn our attention

11 now to the present matter.  Did there come a time in which

12 the Office of Congressional Ethics had an investigation

13 involving Congressman Paul Broun?

14 A.  Yes.

15 Q.  What led to the initiation of that investigation?

16 A.  I believe it was news reports.  There were -- I believe

17 a local news station from Georgia had a report that

18 Congressman Broun's office was paying -- was using their

19 official funds to pay for the services of Brett O'Donnell.

20 Q.  And you mentioned Brett O'Donnell.  Who is he?

21 A.  He's a fairly well-known -- someone I was aware of as a

22 debate coach.

23 Q.  And regarding the investigation for the Office of

24 Congressional Ethics involving Congressman Broun, were you

25 involved in that investigation?

1    A.  Yes, I was.

2    Q.  Were you lead investigative counsel on that

3    investigation?

4    A.  Yes, I was.

5    Q.  And did you have the assistance of some of your other

6    colleagues at different points during the investigation?

7    A.  I did.  I mean, the OCE is a fairly small office, so we

8    would work very collaboratively on all the investigations.

9    But, again, one investigative counsel was always the lead on

10   any investigation, and I was the lead on the investigation

11   into Congressman Broun.

12   Q.  And that investigation -- what was the focus, then,

13   during the course of your investigation?  What was the focus

14   of it?

15   A.  The focus was whether the MRA -- and I may use that

16   term.  It's an acronym for the Members' Representational

17   Allowance.  It's, I think, the official term for a

18   congressperson's official funds, the allowance they have for

19   operating their office.  So the focus of our investigation

20   was whether Congressman Broun's MRA had been misused.

21   Q.  Misused in what way?

22   A.  Well, one of the aspects was had it been used to pay for

23   what -- had it been used to pay for campaign services.

24   Q.  And what would it matter if -- whether it had or had not

25   been used for campaign services?

1    A.   Well, the House Ethics Manual -- the rules and

2    regulations of the House -- prohibit the use of official

3    funds and official resources; not only money, but also, you

4    know, equipment, office space, staff time.  It prohibits the

5    use of those resources for campaign purposes.

6    Q.   And to be clear, this investigation regarding the

7    allegations of misuse of MRA funds for campaign purposes,

8    did that center on the individual, Brett O'Donnell, that you

9    mentioned?

10   A.   Yes.

11   Q.   During the course of your investigation, did the Office

12   of Congressional Ethics also look into whether or not any

13   other House resources had been misused by Congressman Broun

14   or his staff?

15   A.   Well, we were, you know, not only focused on the

16   payments to Brett O'Donnell, but we, I think, during the

17   course of the investigation, asked various questions about

18   office space, you know, staff time, whether or not campaign

19   activity was occurring in the official office.

20   Q.   I'm sorry, to be clear, when you say "office space" or

21   "staff time," what do you mean?

22   A.   Well, the House -- you know, the rules of the House

23   prohibit House offices from being used for campaign

24   purposes, right?  So the rules say you're not supposed to

25   hold a meeting on campaign strategy within a House office,

 1    as an example of activity that is prohibited under those

 2    rules.

 3              Staff time as well.  Staff of the House are not

 4    supposed to use their official time to do campaign

 5    activities, but they have some flexibility as to what is

 6    considered their official time and what is considered to be

 7    their own time.  They're allowed to do campaign work on

 8    their own time as long as they're performing official duties

 9    that are commensurate with their official salary.

10    Q.  Sir, regarding the investigation here, approximately

11    when was the preliminary review?  OCE's preliminary review,

12    when did that begin?

13    A.  I believe it was requested by the OCE board on March

14    28th and then started the following day, on March 29th of

15    2014.

16    Q.  Okay.  All right.  Let's talk about your initial

17    contacts with Congressman Broun's office, okay?  I'd like to

18    show you --

19              THE COURT:  Excuse me, Counsel, Mr. Mulryne,

20    before we -- we started promptly at 2:00.  Let's take a ten-

21    minute recess.  I'm not going to keep you past 5:00, okay.

22              MR. MULRYNE:  Yes, Your Honor.

23              THE COURT:  Sorry.  Sorry to interrupt.

24              MR. MULRYNE:  No problem, Your Honor.

25              (Jury exits courtroom)

```
1              THE COURT:  Okay.  You can step out in the hall,

2      if you'd like to, all right?  I'd just ask that you not

3      discuss your testimony.

4              We'll start back in ten minutes, Counsel.  Do you

5      think you'll finish direct today, or not?

6              MR. MULRYNE:  I don't, Your Honor.

7              THE COURT:  Okay.  That's fine.

8              (Recess taken)

9              (The following is a conference held at the

10              bench outside the hearing of the jury)

11              MR. GEE:  Your Honor, we just -- given the

12      lateness of the hour, we just wanted to see if, in addition

13      to addressing the Juror No. 8 issue, if the Court would

14      still be willing to sort of give the jury kind of a general

15      we-think-we're-going-to-wrap-up-by-the-end-of-next-week type

16      of speech.

17              THE COURT:  Yes, yes.

18              MR. GEE:  It looks like --

19              THE COURT:  It looks like Thursday though.  I

20      mean, if we keep Juror No. 1, perhaps Thursday.

21              MS. GORDON:  I can't guarantee that, but I thought

22      the Court was considering maybe not sitting on Friday.

23              THE COURT:  Yes, I can do that.

24              MS. GORDON:  Since we haven't for the last two

25      weeks.
```

```
 1              THE COURT:  I'll just tell them that now.  Sure.

 2              MS. GORDON:  Yes.

 3              THE COURT:  Okay.  I'll do that.

 4              So let me ask you something.  Nothing beats

 5      asking.

 6              MR. GEE:  If I could -- I'm sorry.

 7              MS. GORDON:  No, go ahead.

 8              MR. GEE:  If we reached a point where we were only

 9      at closings on Friday, I think we might be willing to let

10      the juror go and do closings, so maybe we should just tell

11      the jury we may not sit next Friday as opposed to --

12              THE COURT:  Right.

13              MR. GEE:  Because I don't want to lose an

14      alternate now, but perhaps we would all be willing to do

15      that if --

16              MS. GORDON:  You think we would lose her if we

17      tell her we're not going to sit on Friday?

18              MR. GEE:  No, in other words, she's leaving

19      Thursday night.

20              THE COURT:  That's right.

21              MR. GEE:  If we reached a point where we had all

22      the other jurors still by the end of next week and all we

23      needed to do was closings and deliberations --

24              THE COURT:  Right.

25              MS. GORDON:  We could close on Friday, yes.
```

 1           MR. GEE:  -- perhaps we would be willing to close

 2      on Friday.  I think we would all just kind of have to see

 3      how we were feeling about that.

 4           MS. GORDON:  Yes, that would give us more

 5      flexibility.

 6           THE COURT:  And what?  And let her go?  Just

 7      excuse her?

 8           MR. GEE:  Yes.

 9           MS. GORDON:  At that time.

10           THE COURT:  Right.

11           MS. GORDON:  Because we wouldn't want to not sit

12      if she's not on the panel.

13           THE COURT:  Right, yes.

14           MS. GORDON:  Although --

15           MR. GEE:  I'm not suggesting we'd be okay with

16      that.  I think we maybe kind of want to see what bubbles up

17      next week.

18           THE COURT:  Yes.  I don't want to promise

19      anything.  I'll just say it quickly.  Yes, I'll just play it

20      by ear.

21           MS. GORDON:  The other thing, Judge, I'll say on

22      the record now, I like Juror 1.  I think she's a defense

23      juror, so I would be unwilling to --

24           THE COURT:  Or if we finish, we'll just

25      postpone -- I hate closings and instructions on any Friday

1     anyway.

2                MS. GORDON:  Yes, I agree.

3                THE COURT:  I sorry.  I just -- I just --

4                MS. GORDON:  I agree.

5                THE COURT:  There's room for mischief there

6     sometimes.

7                MS. GORDON:  But I will tell you both, tomorrow on

8     my plan of things to do is to go -- since he's nearly at the

9     end of his case, is to go back through all of my witnesses

10    and see what I can cut out, because there are things I can.

11               THE COURT:  All right.  All right.  Okay.  All

12    right.  Fair enough.

13               MR. GEE:  Thank you, Your Honor.

14               THE COURT:  Sure.

15               Oh, I know what I was going to say.  Counsel, may

16    I have just one second?

17               We probably can't do anything about it -- Mark,

18    I'm sorry.  You know, a family member had a commitment

19    yesterday that was just cancelled, so of course I'm

20    available, but there's no sense springing that on them.

21               MS. GORDON:  I'm sorry?  I don't understand.

22               THE COURT:  I had to be with a family member

23    tomorrow for a commitment that was just cancelled.

24               MS. GORDON:  Oh, I see.

25               THE COURT:  So of course I'm going to be a

```
 1    available.  I can't spring that on them.

 2              MS. GORDON:  Yes.  Well, and given the health

 3    issue I've had this week, I really need to --

 4              THE COURT:  Okay.  All right.  That would be

 5    unfair.  They've probably made plans.  All right.

 6              MS. GORDON:  Yes, they probably have.

 7              THE COURT:  All right.  Okay.

 8              (This is the end of the bench conference)

 9              THE COURT:  For real this time, Mark.

10              (Jury enters courtroom)

11              THE COURT:  All right, Counsel.

12              MR. MULRYNE:  Thank you, Your Honor.

13              THE COURT:  Sure.

14    BY MR. MULRYNE:

15    Q.  All right.  Mr. Morgan, when we left off, we were

16    talking about the beginning of the investigation into

17    Congressman Broun's office.  I want to show you -- I think I

18    have the overhead projector working here.  I want to show

19    you what's been admitted as Government Exhibit 490b.

20              And we will -- we'll go through this here in a

21    moment, but could you tell us, what is this document?

22    A.  This document is the notification that the person under

23    investigation receives from the OCE detailing what is being

24    investigated.  We call it the statement of the nature of

25    review.
```

1    Q.  Is this one of the first documents that's provided by

2    the Office of Congressional Ethics to the subject's office

3    when an investigation is being commenced?

4    A.  Yes.

5    Q.  Okay.  And generally speaking, what's the purpose of

6    this letter in an OCE investigation?

7    A.  It's to notify the subject of what is being

8    investigated.

9    Q.  All right.  So the date of this letter is what?

10   A.  April 1, 2014.

11   Q.  And looking here at the first paragraph, it reads:  "The

12   Board of the Office of Congressional Ethics ('OCE') has

13   initiated a preliminary review into a matter concerning

14   you," and then it goes on to provide some information there.

15   What are those things, these references here?

16   A.  Those a reference to House Resolution 895, the

17   resolution that established the OCE.  The reference there to

18   Rule 7 of OCE's rules for the conduct of investigations,

19   that's a set of rules that the OCE has internally to govern

20   its investigative process.

21   Q.  Okay.  And then if you would read, what is the -- "Below

22   is a statement of the nature of the review."  What is the

23   statement of the nature of the review?

24   A.  You'd like me to read it?

25   Q.  Yes, please.

1    A.  "From 2012 to 2013, representative Paul Broun retained

2    O'Donnell & Associates, LTD, as a contractor to provide

3    'training' to his congressional office.  Representative

4    Broun's congressional office has paid O'Donnell &

5    Associates, LTD, at least $33,750 for these services since

6    2012.

7            "If Representative Broun misused funds from his

8    Members' Representational Allowance ('MRA') then he may have

9    violated House rules and federal law."

10   Q.  If I could pause you there for a moment, with respect to

11   the allegation, if misuse had occurred, what was the

12   allegation here about what kind of misuse?

13   A.  The allegation was that the payments to O'Donnell &

14   Associates for Brett O'Donnell's services were improper.

15   Q.  Why?

16   A.  One of the reasons would be that we were looking into

17   whether it was for campaign services as opposed to official

18   services.

19   Q.  And then the last sentence here reads:  "The Board

20   reserves the authority to address any additional, potential

21   violations within its jurisdiction that may be discovered in

22   the course of this Review."  Did I read that correctly?

23   A.  Correct.

24   Q.  And we may see this name again.  Omar Ash --

25   A.  Ashmawy.

1    Q.  And who is Mr. Ashmawy?

2    A.  During that time period and currently, the staff

3    director and chief counsel of the OCE.

4    Q.  Was he your supervisor?

5    A.  Yes.

6    Q.  Was this letter sent to the -- Congressman Broun's

7    office?

8    A.  Yes.

9    Q.  Do you recall how it was provided to them?

10   A.  I believe there might be some document showing that, but

11   I don't -- I believe it was emailed to David Bowser.

12          MR. MULRYNE:  If we could pull up Government --

13   and let me switch back here to the computer.

14          If we could pull up Government Exhibit OCE 53.

15   And if we can go to the last page, please.  I think there

16   might be one more page.  There we go.

17   Q.  Looking here at the bottom, so Mr. Morgan, this is an

18   email, April 1, 2014, from whom to whom?

19   A.  That's an email from David Bowser to me.

20   Q.  Okay.  And the subject's "OCE Matter."  And the

21   defendant writes, "Bryson, I just wanted to make sure you

22   had my correct email address regarding the documents for my

23   boss, Congressman Paul Broun."  Did I read that correctly?

24   A.  Correct.

25   Q.  So do you recall -- prior to this email, do you recall

1    having any contacts with the defendant?

2    A.   I don't have a specific recollection of any contacts.

3    The email -- I think I would have had probably a telephone

4    conversation with David Bowser in advance of this, but, I

5    mean, what -- but I can say what typically happens and what

6    was our general practice was when the board of the OCE

7    authorized an investigation, we would send a very, you know,

8    boilerplate letter to the congressional office.  That letter

9    didn't say what we were investigating.  It merely said -- it

10   was a notification to the congressman or to the person under

11   investigation that the OCE board had taken an action

12   concerning them.  It then directed them to contact somebody

13   at the OCE to find out more information.

14         So what I believe would have occurred in this

15   instance is that letter would have -- you know, that's not

16   something I personally delivered, but it would have been

17   sent to the congressional office, to Representative Broun's

18   congressional office, and then somebody in that office would

19   have initiated contact back to me at the OCE to find out

20   what action had been taken concerning them.

21   Q.   Okay.

22         MR. MULRYNE:  If we go to Page -- the page before

23   this, and down at the bottom.

24   Q.   All right.  And so Mr. Morgan, did you respond to the

25   defendant?

1    A.  Yes.

2    Q.  Okay.  And here you write, "Attached you will find the

3    following three documents."

4            And then we see "statement of the nature of the

5    review," "Acknowledgement - Statement of Allegation & POC."

6    What is POC?

7    A.  Point of contact.

8            MR. MULRYNE:  And if we just skip to the page

9    after and up top.

10   Q.  "Calendar for Preliminary Review."

11           MR. MULRYNE:  Can we go back real quick.

12   Q.  These three documents that are referenced here, did you

13   attach those and send those as part of this email?

14   A.  Yes.

15   Q.  And could you -- there's a description here.  We don't

16   need to go through all that, but just generally what are

17   these three documents?

18   A.  So the Statement of the Nature of the Review is the

19   document we just reviewed a little bit ago that provides the

20   subject of the investigation a description of what we are

21   investigating.

22           The "Acknowledgement - Statement of Allegation &

23   POC," that's a form that the subject of the investigation

24   fills out to acknowledge that they received the Statement of

25   the Nature of Review from us and to also designate somebody

1    within their congressional office or somebody on their

2    behalf to be our point of contact for the investigation.

3    Q.  Okay.  And if we go back to the page before, "Calendar

4    for Preliminary Review"?

5    A.  Yes.  That lays out the, you know, date when the

6    preliminary review initiated and when it will end.

7    Q.  And here you provide your information in case there were

8    any questions, correct?

9    A.  Correct.

10   Q.  In the paragraph before that, you write, "Once you have

11   returned the second document to me, we will then send you

12   over a request for information requesting certain documents

13   and interviews."

14          What is it that you're referencing there?

15   A.  What's referenced there is a document we would call the

16   request for information or RFI, and that is -- that's the

17   document that we make our requests for, you know, for

18   documents for the identification of persons who have

19   relevant information and a request to interview, you know,

20   persons who have information.

21          MR. MULRYNE:  Okay.  If we can go back to the page

22   before.

23   Q.  All right.  So the emails we just looked at a moment ago

24   were dated April 1st; is that correct?

25   A.  Yes.

1    Q.   So what's the date now?

2    A.   This is Thursday, April 3, 2014.

3    Q.   Okay.  And you're writing to the defendant why?

4    A.   Seeking confirmation that he received the prior email.

5    Q.   All right.

6              MR. MULRYNE:  If we scroll up.

7    Q.   All right.  And did the defendant respond?

8    A.   Yes.

9    Q.   And what is it that he asks you in this email?

10   A.   He writes, "Can I please also receive the request for

11   information document?"

12   Q.   And is that -- that's the form you were referring to a

13   moment ago, the RFI?

14   A.   Correct.

15             MR. MULRYNE:  If we can go to the page before

16   this.

17   Q.   So same day, April 3rd, what is it here that you're

18   sending to the defendant?

19   A.   Sending the RFI again.  That's the request for

20   information and related documents.

21   Q.   What would those related documents include?

22   A.   Those related documents would have included a form

23   acknowledging that he had received the RFI.  It would have

24   included also a form that they don't have to return

25   immediately but a certification form that they are to submit

1    when they complete their production to our office, and also

2    a document detailing the format that we would like to have

3    the documents produced to our office in.

4    Q.  Okay.  Let's step away from this email chain for a

5    moment.  Let's go to Government Exhibit 491.

6         And looking here at the top first, what's the date

7    on this document, Mr. Morgan?

8    A.  April 3, 2014.

9    Q.  Okay.  And what is this document?

10   A.  This is the request for information that was sent to

11   David Bowser in that email we just reviewed.

12        MR. MULRYNE:  Can we close in a little bit more.

13   If we scroll down a little bit.

14   Q.  All right.  So looking at this email, you start off,

15   "This request for information is pursuant to a preliminary

16   review authorized by the Board of Office of Congressional

17   Ethics ('OCE')," and that gives the date that you mentioned

18   earlier; is that right?

19   A.  Correct.

20   Q.  Okay.  Does this letter specify the time period in which

21   a preliminary review period can last?

22   A.  Yes.  I mean, it specifies -- it specifies that a

23   preliminary review report must be delivered to the board of

24   OCE within 30 days.

25   Q.  And does the letter ask for a timely cooperation?

1    A.  Yes.

2    Q.  All right.  So I think you may have touched on this, but

3    what is the purpose of a request for information, or an RFI?

4    A.  It's to obtain evidence.  We are, again -- OCE is a

5    fact-finding body, so we are trying to obtain evidence to

6    help us assess whether or not a violation occurred.

7    Q.  All right.

8              MR. MULRYNE:  And if we scroll down, please.

9    Q.  So first off we start here -- we see that there is, "For

10   purposes of this request 'communications' include," and

11   could you go forward and tell us.  What's it include?

12   A.  "It includes, but is not limited to, written letters,

13   memoranda, emails, instant messages, records and memoranda

14   to file, or any document memorializing or reflecting a

15   meeting, conversation, or telephone call."

16   Q.  And I will not ask you to read each of these, but if we

17   can just go through, the letter asks, "Please provide the

18   following information."  Generally, what is requested here?

19   A.  In that number one?

20   Q.  Correct.

21   A.  "Any agreements between the congressional office and

22   Brett O'Donnell, O'Donnell & Associates, LTD, ODA

23   communications, or any other entity associated with Brett

24   O'Donnell."

25   Q.  Why is it that you want any agreements between the

1    congressional office and Mr. O'Donnell or his business?

2    A.   Well, I think we know at this point the congressional

3    office paid a certain amount of money to O'Donnell &

4    Associates, LTD.  We wanted to know the terms under which

5    that money was being paid to that entity or to any other

6    entity associated with Brett O'Donnell.

7    Q.   No. 2 -- and, again, you don't have to read, but just

8    generally what's being requested in Subparagraph No. 2?

9    A.   This is a similar request, but this time we're looking

10   for agreements between campaign entities associated with

11   Congressman Broun and Brett O'Donnell and his entities.

12   Q.   And why does that matter for your investigation?

13   A.   Well, we were, you know, also wondering if Brett

14   O'Donnell was providing services to the Congressman's

15   campaigns, and if so, we would want to know the agreement,

16   the terms under which those services were being provided.

17   Q.   And then 3 also asks for agreements; is that right?

18   A.   Yes.  This is -- this would have been agreements between

19   you, as in the Congressman personally, and Brett O'Donnell

20   or any entities associated with Brett O'Donnell.

21   Q.   Okay.  4, what's the request there?

22   A.   So this is names, contact information of individuals

23   associated with Brett O'Donnell and his entities with whom

24   the congressional office or the Congressman's campaign

25   entities interacted.  So we're -- I mean, you can see

1    what -- we're trying to do -- we know very little at this

2    point based on the public report.  We're trying to identify

3    who would be the individuals involved, who would have been

4    communicating with Brett O'Donnell and with, you know,

5    anybody else affiliated with Brett O'Donnell.

6    Q.  And Paragraph 5, is that essentially the same ask except

7    here you're referring to the congressional staff?

8    A.  Yes.

9    Q.  Okay.  And why would it matter to your investigation

10   learning the identities of people who may or may not have

11   had communications with Mr. O'Donnell as it relates to what

12   you're looking at here?

13   A.  Because those would be individuals we may want to talk

14   to, that we may want to interview to find out about the

15   nature of the interactions and the services provided by

16   Brett O'Donnell to the congressional office and to -- and,

17   if it occurred, to his campaigns.

18   Q.  Okay.

19            MR. MULRYNE:  If we scroll down.  Sorry, scroll

20   back up a little bit.

21   Q.  So 6, just briefly, what are you looking for there?

22   A.  So these are names and contact information of

23   individuals associated with Congressman Broun's campaign or

24   political entities who, you know, worked with Brett

25   O'Donnell or anybody affiliated with his entities.

1    Q.   Okay.   Then in Paragraph 7, the request reads:   "All

2    files, records, notes, communications and any other

3    documents relating to services provided or work performed

4    for you, your congressional office, your congressional

5    campaign committee, your Senate campaign committee, or your

6    leadership PAC by Brett O'Donnell, the O'Donnell entities,

7    or anyone employed by or associated with the O'Donnell

8    entities," and it continues on.   Did I read that correctly?

9    A.   Yes.

10   Q.   Is that intended as a very broad request or a very

11   narrow request?

12   A.   That's a very broad request.

13   Q.   And as we continue down here, we see communications

14   between your congressional office and the Committee on House

15   Administration.   Did I read that correctly?

16   A.   Correct.

17   Q.   And then this Paragraph No. 9, what is it that you're

18   notifying the recipient here of?

19   A.   That we would like to interview not only Congressman

20   Broun, but individuals identified.

21        You know, as we just discussed, part of the

22   requests were for names of individuals, contact information

23   for certain individuals.   This No. 9 is a request to

24   interview the Congressman and certain of those individuals.

25   Q.   And the request here, is it limited to just the

1   Congressman, or does it encompass others as well?

2   A.  Others as well.

3   Q.  And the document request, is that for the Congressman

4   himself, or is that for others associated with the

5   Congressman as well?

6   A.  Others as well.

7   Q.  Why, then, is this -- we're looking here just at the

8   April 3rd letter.  We'll be looking at another letter here

9   shortly, but why, then, is this letter sent just to the

10  Congressman Broun?

11  A.  He was the --

12  Q.  In other words -- let me rephrase it.  At the top it

13  says "The Honorable Paul Broun."  Why is it addressed just

14  to The Honorable Paul Broun?

15  A.  Well, he wasn't -- this wasn't the only RFI that went

16  out.  You know, a separate RFI went to Brett O'Donnell

17  around the same time period.

18          But the OCE would -- this is what we would sort of

19  call our initial, more comprehensive document request.  We

20  would try to allow a congressional office -- you know, a

21  member has his congressional office.  He has various

22  campaign political entities.  I think here there was a

23  leadership PAC that he had as well.  We're trying to get all

24  that information through the single document request as

25  opposed to having to send separate requests to every

1    individual or entity that we identify as potentially having

2    information we would like to see.

3            So this is a very -- it's a very broadly worded

4    and intended to be very broad request.

5    Q.  So you used -- this letter had been sent to Congressman

6    Broun's office.  Is this letter intended to obtain documents

7    from individuals associated with the office other than just

8    Congressman Broun?

9    A.  Yes.

10   Q.  You had mentioned about Mr. O'Donnell.  Was a separate

11   RFI sent to Mr. O'Donnell?

12   A.  Yes.

13   Q.  And why would a separate one be sent to Mr. O'Donnell at

14   this point but not necessarily other individuals?

15   A.  Because Brett O'Donnell is not somebody who is

16   underneath the Congressman, right?  So the Congressman has

17   control over his congressional office under the rules of the

18   House.  In fact, all of the communications of his

19   congressional staff are considered to be his property, so

20   he's the custodian, so to speak, of that information.

21           Brett O'Donnell is in a separate scenario.  He and

22   his entities, the Congressman may not have access to or

23   control over that information or those documents.

24   Q.  Okay.  I just want to look at a couple of other things

25   here before we move on.

1            This paragraph here, "If you are not providing a

2      requested document or piece of information, then please

3      identify the document or information withheld and the reason

4      why it is being withheld."  What is the intention of that

5      paragraph?

6      A.  So it's a very broad document request.  I think this

7      line is meant to get at two things.  One might be -- there

8      might be privileged materials, like attorney-client

9      communications that cannot be handed over.  It also -- it

10     might be the case that there might be certain identifiable

11     sort of chunks of information that, although they may fit

12     within the scope of our request, there may be a reason why

13     the recipient wants to withhold those, but in that instance

14     we want those to be identified so that we know they're being

15     withheld and that we can have a conversation about that or

16     we can explore that further with them.

17     Q.  If the recipient is complying with your request, can the

18     recipient simply hold back documents without notifying your

19     office?

20     A.  No.  I mean, this is a voluntary document request,

21     right?  The OCE does not have subpoena power.  But if they

22     choose to comply, they need to comply fully; or if they

23     choose to withhold information, they need to identify it and

24     let us know that they're doing that.

25            MR. MULRYNE:  Can we turn to the page after this.

1    And if we could zoom in on -- yes, up top.

2    Q.  So last question about this document, Mr. Morgan.  Here

3    it mentions about the board drawing a negative inference

4    from any refusal to cooperate and may include a statement to

5    that effect in any referral to the Committee on Ethics.

6         Could you explain to the jury what that's about.

7    A.  So the House resolution or -- you know, House Resolution

8    895 instructs the OCE to identify witnesses by name who did

9    not cooperate with the OCE review.  So this is, in part,

10   notifying them that if they do not -- if they choose -- and

11   it's their right to choose to do so, but if they choose to

12   not cooperate with the OCE review, we're notifying them that

13   they might be identified as a noncooperative witness in that

14   referral to the Committee on Ethics.  The other is the

15   negative inference.

16        So, again, the purpose of the OCE is to decide

17   what allegations need additional investigation by the

18   Committee on Ethics.  If a witness, particularly a key

19   witness that we believe has relevant -- you know, important

20   responsive relevant information, decides not to cooperate

21   with the OCE, that might be a thumb on the scale in favor of

22   the board deciding it needs to get referred to the ethics

23   committee for further investigation.

24        And, remember, the ethics committee -- I don't

25   think I said this yet.  The ethics committee does have

1    subpoena power.  OCE does not.

2          So what this is getting at here is OCE helping the

3    ethics committee identify who may have information and to

4    whom subpoenas may be appropriate to be issued.

5          MR. MULRYNE:  If we could go back to Government

6    Exhibit OCE 53, and if we go to Page 3 of this document.

7    Q.  All right.  So Mr. Morgan, before we -- before we turned

8    our attention back to the RFI, we were looking at the email

9    in which you had sent that document.  Do you recall?

10   A.  Correct.

11   Q.  All right.  So now what's the date of this email?

12   A.  This is Tuesday, April 8, 2014.

13   Q.  Okay.  And you're emailing the defendant?

14   A.  Correct.

15   Q.  And what is it that you're writing to him?

16   A.  I ask him when we can expect to receive a response to

17   our request.

18          MR. MULRYNE:  If we go to Page 2.

19   A.  Would you mind going back?  I didn't see where this -- I

20   didn't see where this chain started.  It might be helpful

21   for me.

22   Q.  Sure.

23          MR. MULRYNE:  Can we just scroll down.

24   Q.  Was this the email we were looking at moments ago?

25   A.  Yes.

1    Q.  Before we were looking at the request for information?

2    A.  Yes.  Thank you.

3             MR. MULRYNE:  So now we're going to the page

4    before.

5    Q.  All right.  So the email we had just seen was April 8th,

6    correct?

7    A.  Correct.

8    Q.  And now we're here on May 6, 2014, approximately a month

9    later?

10   A.  Approximately.

11   Q.  Okay.  And Mr. Bowser's responding to you, and what is

12   it that he's asking you?

13   A.  He's asking me if I have a moment to speak on the phone.

14   Q.  Okay.  Now, between -- during this period between then,

15   who is your contact with Congressman Broun's office

16   primarily?

17   A.  I was told the Congressman had retained Christopher

18   DeLacy as his counsel, and during that time period I had,

19   you know, exchanged telephone calls, voice mails, with

20   Mr. DeLacy.  No substantive conversations with Mr. DeLacy,

21   but we did exchange messages.

22   Q.  So now Mr. Bowser's getting in touch with you, correct?

23   A.  Correct.

24             MR. MULRYNE:  If we scroll up, please.

25   Q.  So the same day do you respond to the defendant?

1    A.  Yes.

2    Q.  And what is it that you're sharing with him?

3    A.  I told him I would prefer to communicate exclusively

4    through Mr. DeLacy, the attorney I just referenced, since he

5    is representing the Congressman in this matter.

6    Q.  All right.

7             MR. MULRYNE:  And if we scroll up.

8    Q.  Same day does the defendant respond?

9    A.  Yes.

10   Q.  And he writes, "That is why I called.  The Congressman

11   has decided against retaining outside counsel in this

12   matter."  Is that right?

13   A.  Correct.

14            MR. MULRYNE:  If we go to the page before.

15   Q.  All right.  And, Mr. Morgan, do you respond to the

16   defendant?

17   A.  Yes, I did.

18   Q.  Okay.  And what is it that you're writing to the

19   defendant here?

20   A.  I tell him that for our records we then need Mr. Bowser

21   or -- we need the Congressman to designate somebody else as

22   his point of contact.

23            I write here that I assume that point of contact

24   would be the defendant.  I think that's because I'd had, you

25   know, this correspondence with the defendant.  It's also, I

1    think, overwhelmingly the case in our investigations that if

2    a congressman or congresswoman doesn't retain outside

3    counsel, their point of contact for our investigation would

4    be their chief of staff.

5    Q.  Is that common in your investigations?

6    A.  Yes.  It's very common.

7    Q.  And in providing that answer, you're saying that is why

8    you wrote here "I assume that it will be you"?

9    A.  Uh-huh.

10   Q.  And in your investigations, is there typically a point

11   of contact for the congressman or congresswoman's office

12   that serves as a liaison with the Office of Congressional

13   Ethics?

14           MS. GORDON:  Objection.

15           MR. MULRYNE:  I'll rephrase, Your Honor.

16           THE COURT:  I'll allow it.  Overruled.

17   Q.  You can answer the question.

18   A.  Yes.  I think in every case I can think of there is a

19   point of contact.  I don't -- I'm not aware of any situation

20   in which the member of Congress was their own point of

21   contact for our investigation.

22   Q.  Okay.

23           MR. MULRYNE:  Scrolling up, please.

24   Q.  All right.  So Mr. Bowser responds.  What is it that

25   he's asking and sharing with you?

1    A.  He's saying leave the form -- I believe that's a

2    reference to the point of contact form -- in his folder, in

3    the Congressman's folder that night and get back to me the

4    following day, and he's also looking to schedule the

5    Congressman's interview.

6              MR. MULRYNE:  And if we scroll up to the very top.

7    All right.

8    Q.  Do you respond to the defendant?

9    A.  Yes, I did.

10   Q.  Okay.  And you write, "Yes, we do want to speak with

11   him, but before we do that we need to receive the documents

12   and information we requested in our Request For Information

13   dated April 3, 2014."

14             You go on to say, "Once we have those documents,

15   we will need at least a few business days to review them

16   before we speak with him or any other congressional or

17   campaign personnel we would like to interview."

18             Did I read that correctly?

19   A.  Yes.

20   Q.  So let's just break that down for a moment.

21             You say at the outset that you're going to need to

22   review the documents we requested before the interview.  Why

23   is that?

24   A.  We would -- and it was -- you know, not 100 percent of

25   the time, but it was an office policy, and we would do

1    everything we could to make it be the case that we could

2    review documents before witness interviews.

3              We didn't like going into witness interviews

4    blind.  We liked to know what evidence there was, what

5    correspondence there had been, what emails there had been so

6    that we can ask the person we were interviewing about those.

7              So we -- you know, at times we would get, you

8    know, documents coming in in multiple phases and have to go

9    back and interview a witness twice.  We also didn't like to

10   do that.

11   Q.  Okay.  And that line, then, a little bit later about we

12   will need at least a few business days to review, is that

13   the same, because you need time to review the documents

14   before the interviews?

15   A.  Correct.

16   Q.  And then you mention here about "before we speak with

17   him" -- "him" being who?

18   A.  Congressman Broun.

19   Q.  -- "or any other congressional or campaign personnel we

20   would like to interview."

21             As part of this investigation, were you planning

22   on interviewing other congressional and campaign staff?

23   A.  Yes.

24             MR. MULRYNE:  Take it down, please.

25   Q.  So that email we were just looking at, that final

1    exchange there is in early May of 2014.

2    A.  Uh-huh.

3    Q.  When did the preliminary review period in this

4    investigation end?

5    A.  I believe the preliminary review ended sometime toward

6    the latter part of April 2014.

7    Q.  So before that exchange we just saw?

8    A.  Uh-huh.

9    Q.  Okay.  I'm sorry, yes or no?

10   A.  Yes.

11   Q.  Was there an extension?  Was there a second-phase review

12   that was initiated?

13   A.  The board of the OCE authorized a second-phase review,

14   so at that time period, early May, we would have been in

15   that -- you know, that 45-day second-phase review.

16   Q.  Now, do you recall -- we saw that exchange on May 6th.

17   Do you recall, did the Office of Congressional Ethics

18   receive any documents from Congressman Broun or anyone else

19   during the month of May in 2014?

20   A.  No, I don't believe we did.

21           MR. MULRYNE:  Can we pull up Government Exhibit

22   501.

23   Q.  All right.  Mr. Morgan, this is an email from yourself

24   to the defendant on May 30, 2014; is that right?

25   A.  Correct.

1    Q.   "Subject:  Confidential Notice of Noncooperation"?

2    A.   Correct.

3    Q.   And what is it that you're sending to the defendant

4    here?

5    A.   We're sending -- I mentioned this a little bit earlier,

6    but we're sending a notification to the Congressman of two

7    things.  One, that he may be found to be noncooperative with

8    the OCE review, and that that could lead to the board making

9    a negative inference.

10             MR. MULRYNE:  Can we turn to 501a, please.

11   Q.   And what is that document, then, we're looking at right

12   now?

13   A.   This is that document, providing that notification of

14   noncooperation.

15   Q.   Okay.  And it mentions here -- looking at the second

16   paragraph, first line, what does it say here about whether

17   or not the Office of Congressional Ethics received any

18   response?

19   A.   It's notifying him that as of the date of the letter --

20   so May 30th -- we have not received a response to that April

21   3, 2014, RFI.

22   Q.   So the date on this one --

23             MR. MULRYNE:  If we scroll up briefly.

24   Q.   The date on this letter is May 30, 2014; is that

25   correct?

1    A.  Correct.

2    Q.  All right.

3            MR. MULRYNE:  If we could look at Government

4    Exhibit 503.

5    Q.  Mr. Morgan, what are we looking at here?

6    A.  This is a request for information dated June 3, 2014, to

7    David Bowser.

8    Q.  Okay.  Now, come around this June 3rd period, what did

9    the Office of Congressional Ethics do in relation to the

10   investigation involving Congressman Broun and his office?

11   A.  So up to this point we had not received any cooperation.

12   We had not received a response to that April 3, 2014,

13   document request, so if -- you know, and this would happen

14   occasionally in our investigations.  The action we would

15   take is notify the person that they may be found

16   noncooperative, and then, as would happen occasionally, we

17   would then do our best -- and I recall doing this -- we

18   would do our best to identify the people who might be in

19   possession of information evidence that we would want to

20   see, and then we would send individual RFIs to them.

21           And that's what this June 3, 2014, RFI is.  It's a

22   request to David Bowser for information.

23   Q.  Were there other similar letters that were sent to other

24   individuals other than the defendant?

25   A.  Yes, there were.

1    Q.  And would that include, for example, Ms. Christine

2    Hardman, the press secretary?

3    A.  Yes.  I believe there was a batch of these RFIs that

4    went out on June 3, 2014, to several individuals, including

5    Ms. Hardman.

6              MR. MULRYNE:  And if we could just zoom in.

7    Q.  Is this letter -- there's some differences between this

8    letter and the previous letter we saw, the April 3, 2014,

9    letter?

10   A.  Yes.  There -- I mean, it's more narrowed in the focus

11   of the request.

12   Q.  Okay.  Are there also portions that are substantially

13   similar to the one we saw on April 3rd?

14   A.  I believe so.

15   Q.  All right.  Well, let's take a look a little bit here.

16             MR. MULRYNE:  Scroll down, please.

17   Q.  So here, this section here, "For purposes of this

18   request 'communications,'" is that similar to the request

19   that we had seen previously?

20   A.  Yes, I believe so.

21   Q.  Okay.  And let me ask you, as we're about to go through

22   this, were you responsible at all for drafting any of this

23   letter?

24   A.  So the request for information document is a template

25   that our office would use, and I was responsible for filling

1   in the -- you know, the bracketed numbers there, 1, 2, 3.

2   But the rest of it is essentially a template document that

3   our office would use.

4   Q.  Okay.  So we're looking at 1 and 2 on this page, and 3

5   is on the next page, right?

6   A.  I believe so.  I think so.

7   Q.  Those bracketed paragraphs there, are those the ones

8   that you're referring to that you drafted?

9   A.  Yes.  I would have drafted those.   I mean, there would

10  have been other folks in our office involved in reviewing

11  that.  We always put multiple sets of eyes on these requests

12  before they went out.

13  Q.  And in drafting those, did you draft those to be

14  specific to this investigation?

15  A.  Yes.

16  Q.  Okay.  And so the first paragraph, "Please provide the

17  following information:  All files, records, notes,

18  communications, and any other documents relating to Brett

19  O'Donnell, O'Donnell & Associates, LTD, or anyone employed

20  by or associated with O'Donnell & Associates, LTD, from

21  January 1, 2012, to the present."

22          Did I read that correctly?

23  A.  Yes.

24  Q.  All right.  After that, No. 2, "All communications

25  between you and the Committee on House Administration" -- it

1    gives the time period -- "relating to Brett O'Donnell"; is

2    that right?

3    A.   Uh-huh.   That's correct.

4    Q.   And then -- if we jump to the second page, and then this

5    third paragraph, what is this paragraph about?

6    A.   It's a request to interview David Bowser.

7    Q.   All right.   And did the other RFIs that went out around

8    this period, did they also request interviews with the other

9    respective individuals?

10   A.   I believe they did.

11   Q.   Okay.   This paragraph here, is that paragraph the same

12   as the one we saw in the previous request regarding the

13   withholding of information or documents?

14   A.   Yes.   I believe it is the same.

15   Q.   And, again, what is it that that paragraph makes clear?

16   A.   It's supposed to make clear to the recipient of this

17   letter that if they're holding any information back, then

18   they need to identify that and tell us why they're

19   withholding it.

20   Q.   Okay.   You provide your contact information here at the

21   bottom, correct?

22   A.   Correct.

23   Q.   All right.

24              MR. MULRYNE:   And if we can just flip back to Page

25   1 one last time.   And if we scroll down, please.

1    Q.  Looking at this Subparagraph 1, the one requesting all

2    files, records, notes, communications and any other

3    documents, did you include any language in there limiting

4    the scope of that request?

5    A.  I'm not sure I understand the question, but --

6    Q.  What was your intention in drafting that paragraph?

7    What was it that you were looking to receive from the

8    recipients of these letters?

9              MS. GORDON:  Objection.

10             THE COURT:  Just a minute.

11             Overruled.

12   Q.  You may answer.

13   A.  We were looking for, you know, any communications,

14   records -- I mean, this is a very broad request.  I want --

15   in this request to David Bowser, I want to see any

16   communications, any records, that he has related to Brett

17   O'Donnell or those O'Donnell-associated entities during this

18   time period.

19             THE COURT:  Let me ask you this.  You mentioned

20   that word "this was a broad request" a couple of times.  Was

21   this an atypical investigation?  Was this fairly standard,

22   this type of investigation, or not?

23             THE WITNESS:  Yes.  I think both the subject

24   matter of the investigation was fairly typical.  I don't

25   know if you're asking if this was a typical document

1    request.

2              THE COURT:  You used the word "broad."  It's not

3    unusual then?  You said this was a broad request.  You would

4    normally make a broad request, I assume.  Is that right?

5              THE WITNESS:  Yes, it's intended to be -- it's

6    intended to be a very broad request.

7              THE COURT:  All right.

8              THE WITNESS:  We intend to -- hope to get and

9    intend to get a voluminous production of evidence.  We want

10   to see everything.

11             THE COURT:  Yes.  I was just trying to determine

12   whether or not this was within the norm or was this outside

13   the normal type of investigation.  It sounds like it was the

14   normal type of investigation.

15             THE WITNESS:  I would say it's -- we don't know

16   how much there is.

17             THE COURT:  Right.

18             THE WITNESS:  So when I'm asking for every record

19   or every communication with Brett O'Donnell, I don't know if

20   I'm asking for five documents or what I'm going to get is

21   five million.

22             THE COURT:  So you're asking for any and all,

23   then, I assume.

24             THE WITNESS:  You're asking for any and all.  We

25   don't know what there is or what there isn't.

1           We'll say what they asked for is tailored to the

2     investigation that we're pursuing, so in some investigations

3     the time period, you know, it might be narrower, it might be

4     broader, but it's -- the any-and-all type language is common

5     to all of our investigations.

6               THE COURT:  Okay.  Common to the OCE

7     investigations?

8               THE WITNESS:  Yes, yes.

9               THE COURT:  Right.

10    BY MR. MULRYNE:

11    Q.  So Mr. Morgan, in this Subparagraph 1 we were looking

12    at, it says, all -- among other things, all communications.

13    Communications, up here we looked at, includes emails,

14    correct?

15    A.  Correct.

16    Q.  Does this request limit the emails being requested to

17    only those on official government email accounts?

18    A.  No, it does not.

19    Q.  Did you intend this email -- this document request to

20    include those on the personal email accounts?

21    A.  Yes.

22    Q.  Why?

23    A.  Again, one of our -- one of the focuses of our

24    investigation here was Brett O'Donnell being paid to do

25    campaign work.  It wouldn't make sense to run that

1    investigation and only look at official House email, right?

2           House employees, they're supposed to conduct

3    campaign activity off of their House email, right?  So if

4    you want to do an investigation into whether Brett O'Donnell

5    is providing services to the campaign, you would need to

6    look at emails other than just the official House emails.

7           MR. MULRYNE:  Turn to Government Exhibit 509.

8    Q.  All right.  And this is an email from whom to whom?

9    A.  From David Bowser to me.

10   Q.  All right.  What's the date?

11   A.  June 10, 2014.

12   Q.  And there's a number of things here.  And we'll look at

13   some of those, but generally what is the defendant emailing

14   you here?

15   A.  He's letting me know that one of their office interns is

16   on her way to the OCE office to deliver certain documents.

17   Q.  And we see here it refers to signed forms and email

18   batch from Dade Bowser, Teddie Norton, Christine Hardman.

19   Did I read that correctly?

20   A.  Correct.

21   Q.  All right.  And then it does mention under there, it

22   says, "Signed forms with accompanying letter of no records/

23   relevant interaction with Brett O'Donnell from," and then it

24   lists three other individuals.  Do you see that?

25   A.  Yes, I do.

1    Q.   What is that in reference to?

2    A.   So prior -- I think prior to this email the defendant

3    and I had a conversation on the phone, I believe, in which I

4    was told that certain of the individuals who had received --

5    you know, as I said on -- that June 3rd RFI went to several

6    individuals.  I was told by the defendant that certain of

7    those individuals didn't have anything or, in certain cases,

8    may not have even known Brett O'Donnell, and I was asked

9    what should those persons do in that situation.  And I told

10   the defendant that in that case they should provide a

11   letter, a signed letter, to the OCE stating that they didn't

12   have any such information.  So that's the reference here to

13   signed forms.

14          The signed forms are the forms that accompany the

15   RFI.  One of those forms is a certification form, but then

16   additionally a letter of no record/relevant interaction is

17   in reference to -- I think my instruction to the defendant

18   was those individuals should do that initial step of

19   certifying to us in a letter that they didn't have anything

20   responsive to our request.

21   Q.   Now, at any time, this conversation you're referring to

22   with the defendant or at any other time, did you indicate to

23   the defendant -- did you tell the defendant that you were

24   narrowing the scope of what you were requesting in the RFI

25   that we saw earlier?

1     A.  No.

2     Q.  Did you ever tell him that there were certain documents

3     that may have been responsive, that no longer need to be

4     produced?

5     A.  No.  I don't recall any conversation along those lines.

6     Q.  Okay.  Here you're talking about -- you mentioned a

7     moment ago about telling the defendant that you would need a

8     letter from those -- from those people who have no

9     responsive documents, basically saying something to that

10    effect.  Is that correct?

11    A.  Correct.

12    Q.  All right.  Is that typical in your investigations?

13    A.  No.

14              MS. GORDON:  Objection.

15              THE COURT:  I'll allow it.

16    A.  No.  To the best of my recollection, this is the only

17    investigation in which I requested that, in addition to

18    submitting the certification, these individuals take the

19    additional step of providing a letter, signed letter,

20    stating that they didn't have any responsive materials.

21    Q.  Why did you do that in this investigation?

22    A.  You know, I was starting to wonder if I was going to get

23    everything that had been requested.  I was starting to

24    wonder if -- you know, for example, one of the individuals

25    here is Paul Kilgore, who would have been the custodian of

1    records, the treasurer of the campaign.  I was starting to

2    wonder did these people really not have anything.

3            I had no reason to believe that they had

4    information they were holding back.  I want to be clear on

5    that.  But I wanted that additional step.  I wanted that

6    additional assurance, that submission to our office that

7    they didn't have anything.

8    Q.  This email again, as we already noted, is June 10, 2014.

9    To your recollection, prior to this email had you received

10   any documents from Congressman Broun's office, any of his

11   staff members, either on the campaign or official side,

12   anyone who had received an RFI?

13   A.  I don't believe we had.

14           MR. MULRYNE:  Take it down, please.

15           THE COURT:  If you're going to get into a new

16   area, Counsel, maybe it's appropriate to recess now.  We

17   can't finish direct today anyway.

18           MR. MULRYNE:  That's fine, Your Honor.  Yes, sir.

19           THE COURT:  All right.  I'm going to excuse you

20   for the day.  We're not sitting tomorrow.  You'll have to

21   come back Monday.  We're going to start at 9:00.

22           THE WITNESS:  Yes, sir.

23           THE COURT:  Enjoy your evening.  I have to also

24   instruct you not to discuss any aspect of the case with

25   anyone.

1        THE WITNESS:  Certainly.

2        THE COURT:  Thank you.  Enjoy your weekend.

3        All right.  Ladies and gentlemen, so I need to, to

4    the extent I can, speak kind of candidly with you about

5    where we are and where we expect to be starting Monday, and,

6    again, I think probably the first thing I told you on more

7    than one occasion was it's very difficult to predict times

8    for trial.  I've been a judge for a number of years on

9    different courts.  It doesn't get any easier predicting how

10   long a trial will take.  It's like any other type of life

11   experience.  Things happen.  None anticipated.

12       Yesterday we came -- the best intention was to

13   remain all day.  We couldn't.  There was one intention to

14   stay until I think about 6:00 or so, and that was fraught

15   with mischief, and so, you know, things just happen.  You

16   know, like I tell -- like we all say, it's life.  Things

17   happen.  Sometimes you can anticipate things will happen;

18   sometimes you can't.

19       So we're actually, based on my opinion -- in my

20   opinion, we're actually proceeding very quickly.  I mean,

21   it's a very paper-intensive trial.  And, again, the

22   attorneys work extremely hard.  They'll be working tonight

23   and over the weekend, and I know they will because I know

24   what they're working on, more exhibits, but it's all in an

25   effort to streamline the time it takes to present this case

1    because, again, your time is precious to us.

2         Now, you're probably saying, "All right.  What's

3    this all leading up to?"  Another, you know, prediction.

4    That's all I can do.

5         I suspect -- I predict -- I'm trying to predict

6    that by Thursday of next week the trial should be concluded.

7    When I say "concluded," I'm probably not referring to

8    closing arguments or final instructions.  I'm probably not

9    referring to those.  It may well be that we'll have to carry

10   over until Monday for closing arguments, instructions, maybe

11   another witness or two.  But I think it's only fair to let

12   you know where we are and where I think we're going, and

13   that's about all I can say.

14        I've had a number of notes, and I want to tell the

15   note-writers that I'm not going to forget you.

16        So there's a lot to be considered, but I think

17   it's only fair to say that's where we are, and that's where

18   I think we will be at this time next week.

19        And we may finish earlier than Thursday.  It may

20   go another day or two past Thursday of next week.

21        But that's all I can do is give you my best

22   thoughts, having spoken with the attorneys.  And we

23   thought -- all of us thought it might be appropriate to kind

24   of share some thoughts with you about what I've just talked

25   about.

1           That's about all I can say right now.

2           If I've overlooked anything, Counsel, you may want

3      to approach and tell me.

4           That's where we are.  And then, again, you know,

5      it's -- you'd be surprised how hard they work, this group

6      of attorneys works in the evening, and fortunately they're

7      able -- for my benefit they're able to work out a lot of

8      matters that makes it easier for the Court to proceed after

9      the jury leaves for the day.  And you can rest assured every

10     time one of the attorneys gets up and offers something in

11     evidence, rarely has there been an objection, and that's

12     because whatever issues, evidentiary issues, or whatever

13     other issues there may have been with the presentation of

14     evidence have been resolved to the attorneys' satisfaction.

15          So, again, if we didn't do it that way and did it

16     the traditional way, I'm not sure where we would be now.

17     Probably just after opening statements probably.  I mean,

18     with the number of exhibits -- there are 700 exhibits or so

19     in this case.  It's something like that.  Maybe more.

20          So I'm just being up front with you.  I'm always

21     going to be up front with you and talk to you about things I

22     can talk about.

23          You know, yesterday, I know, people -- you know,

24     you see that people have -- you leave people with an empty

25     feeling when you say, "You know what, we've got to leave.

1     It's 3:30."  But something happened through no one's fault,

2     and it was just one of those things we couldn't predict.

3            So those are my best thoughts.  So with that,

4     enjoy your weekend.

5            I do need to speak with Juror No. 8.  The

6     attorneys and I need to ask you a few questions.

7            Leave your books there.

8            I mean, I can see the light at the end of the

9     tunnel.  You know, it's there.  I can assure you of that.

10    And it may be -- and it may end earlier than Thursday.  I

11    wouldn't count on that.  I wouldn't count on it, but it

12    could.  And that's about all I can say.

13           I mean, believe me, if I had a crystal ball and

14    could predict when this trial would be over, I wouldn't be

15    sitting up here with this black robe on.  I'd be doing

16    something else.  I'd be a consultant somewhere.

17           But that's my best thought.  All right?

18           Enjoy your weekend, folks.  Leave your books

19    there.  Enjoy your weekend.  I have to ask you again, please

20    do not discuss any aspect of the case with anyone.

21           Juror No. 4, I did receive your note.  All right?

22    Okay.

23           JUROR NO. 4:  Thank you.

24           THE COURT:  We don't need to talk right now, but I

25    did get it.

1          JUROR NO. 4:  Thank you.

2          THE COURT:  And I ask, if anyone writes a note,

3     don't share the contents with your fellow jurors.  It's just

4     between the juror writing the note and the judge and

5     lawyers.

6          (Jury exits courtroom)

7          THE COURT:  Juror No. 8, how are you -- you can

8     just have a seat there.  How are you today?

9          JUROR NO. 8:  Pretty good.  How are you?

10         THE COURT:  Good.  Good, good, good.

11         So today is the last -- this week is the last week

12    of your paying -- your good paying job, right?

13         JUROR NO. 8:  Well, that was last week.

14         THE COURT:  That was last week.

15         All right.  When was your job -- when was your job

16    completed?

17         JUROR NO. 8:  Last week.

18         THE COURT:  Last week.

19         JUROR NO. 8:  Last Friday.

20         THE COURT:  When do you start your new job?  The

21    13th, for some reason I'm thinking.

22         JUROR NO. 8:  Monday.

23         THE COURT:  This coming Monday, okay.

24         JUROR NO. 8:  Yes.

25         THE COURT:  The attorneys and I have spoken.

1    We're going to excuse you from further service.  We wish you

2    well.  You're going to -- is it Georgia or Pennsylvania or

3    where?

4              JUROR NO 8:  I'll be in D.C. for a while, but I'm

5    going to Philly for orientation, and then I'll be moving to

6    Georgia in August --

7              THE COURT:  Right.

8              JUROR NO. 8:  -- with this role.

9              THE COURT:  All right.  Well, good luck to you in

10   your future endeavors.  You're an attorney, right?

11             JUROR NO. 8:  Yes, I am.

12             THE COURT:  Good luck to you in your future

13   endeavors, but we're going to excuse you because it would be

14   a financial hardship.  Right?

15             JUROR NO. 8:  Sure.  Yes, sir.

16             THE COURT:  We're aware of that.

17             Thank you for your patience and attention.  I'd

18   ask if there are any jurors remaining back in the jury room

19   that you not say anything --

20             JUROR NO. 8:  Sure.

21             THE COURT:  -- to them.

22             JUROR NO. 8:  Yes, sir.

23             THE COURT:  Well, thank you very much.

24             JUROR NO. 8:  All right.  Thank you.  Thank you.

25             THE COURT:  Good luck to you in the future.  Okay.

1          JUROR NO 8:  Yes, sir.  Thank you.

2          (Juror No. 8 is excused)

3          THE COURT:  I don't know.  I try not to look in

4    people's eyes when I give them that spiel about, you know,

5    difficult to predict.  I don't know.  What's your read on --

6    what's your read on them?  Is anyone really ticked off?

7    They seemed to be okay?

8          MR. GEE:  Yes.  I think they seemed fine.  We can

9    clarify for --

10          THE COURT:  It is difficult.

11          MR. GEE:  I think for --

12          THE COURT:  There's no better way to do it though.

13    You know?  Things happen.

14          MR. GEE:  I think for Juror No. 1, I think it

15    would be fine to clarify for her that we're going to

16    accommodate her.  I wouldn't want her --

17          THE COURT:  Right.

18          MR. GEE:  -- canceling her trip.  I think we'll --

19    we can make that clarification.

20          THE COURT:  You know what, and for the record,

21    when I was walking back to chambers from the last recess, I

22    said, "We're not going to forget you."  I said that.  So if

23    you want me to say something more to her on Monday, I'll be

24    happy to do that.

25          I don't want her fretting about that --

1               MR. GORDON:  Right.

2               THE COURT:  -- because it sounds like it's a

3      serious personal trip, and, you know, we don't want to

4      deprive her of that.  I don't see us sitting next Friday,

5      but, you know, I'd like to keep her as a juror.

6               MR. GEE:  Agreed.

7               THE COURT:  Because we're down to one alternate.

8               MS. GORDON:  Yes.  Yes, agreed.

9               THE COURT:  Now -- all right.  So you filed a

10     motion.  I was just reading your motion for reconsideration.

11     The government's going to -- how much time do you need to

12     respond to that, Counsel?  This is for the expert.  I mean,

13     it's not time-sensitive right now.  It was a motion for

14     reconsideration of the expert rulings, I think; is that

15     right, Counsel?

16              MS. GORDON:  Yes.  We had talked about it

17     earlier.  Obviously I would like a ruling as soon as the

18     government can be accommodated because, if the Court were to

19     reconsider --

20              THE COURT:  Right.

21              MS. GORDON:  -- I need to have logistical things

22     done so we can finish on Thursday or Friday.

23              THE COURT:  All right.  What's fair to the

24     government?

25              MR. GEE:  Well, Your Honor, just by way of a

1    couple of updates, I think it's very likely the government

2    will rest on Monday.  We're going to do some assessments

3    also, like Ms. Gordon.  I think it's very likely we may rest

4    early enough that the defense case will begin on Monday.

5            THE COURT:  Great.  Because I'm not going to

6    stop -- I'm not going to carry it over to Tuesday.  We're

7    going to move right along, Counsel.  Okay.  All right.

8            MS. GORDON:  I'll be ready.

9            MR. GEE:  And given that, I'm not sure where the

10   experts are -- would be in that process, but the government,

11   I think, is -- will be able to respond over the weekend to

12   the motion.

13           THE COURT:  Can you respond by Saturday?

14           MR. GEE:  I would think we could, as long as we

15   can respond by the evening on Saturday, and then she can

16   file a reply on Sunday, if need be.

17           THE COURT:  That means -- that means -- if you

18   respond by the evening, that means -- we start working at

19   9:00.

20           MR. GEE:  Well, it depends on whether the Court

21   will need to reply or not.

22           THE COURT:  What's that?

23           MR. GEE:  It depends on whether the Court needs to

24   reply or not.  In other words, we're certainly happy to file

25   something on Saturday as early as the Court wants it, and

1      then --

2                  THE COURT:  All right.  I'll tell you what.  What

3      about 5:00 Saturday for a response?

4                  I find replies to be extremely helpful sometimes.

5      I don't know if this is one of those times or not, but 5:00

6      for a reply on Sunday.

7                  MS. GORDON:  Very well.

8                  THE COURT:  All right.

9                  MR. GEE:  We can certainly do that, Your Honor.

10                 THE COURT:  5:00 for the response.

11                 Now, so we're getting down to the MJOA stage.  I

12     assume there will be one.

13                 MS. GORDON:  Okay.

14                 THE COURT:  I'm not going to stop the trial for

15     any argument or consideration or research for the MJOA.  I'm

16     going to take it under advisement.

17                 You have the right to make the motion, and the

18     motion will be decided based upon the state of the evidence

19     at the time it's made, but the rules say I don't have to

20     rule on it; I can proceed with the trial, which I want to

21     do, which I will do, unless there's some reason why the

22     Circuit says I can't do it.

23                 MS. GORDON:  No.  I anticipated that you would

24     hold it in reserve and that you would give the government

25     time to brief it.

 1            THE COURT:  Right.  I may wait until after the

 2      verdict.

 3            So, I mean, let's talk about this for a second

 4      now.  What makes sense?  You're going to make a motion for

 5      judgment of acquittal, I assume, right?

 6            MS. GORDON:  Yes, sir.

 7            THE COURT:  I think you have to do that anyway to

 8      preserve your right to make it at the end of the trial.

 9            You know, I mean, take a look at the -- I don't

10      know.  Let's talk about it.

11            MS. GORDON:  Well, if I may --

12            THE COURT:  If I plan to take it under advisement,

13      send the case to the jury, I think I have the option of

14      either deciding that motion before the jury returns or

15      after, or I can convert it to a motion for judgment of

16      acquittal in the event there's a conviction.  I mean, there

17      are a lot of options available.  I just don't want to stop

18      the trial.

19            MS. GORDON:  Right.  I didn't figure you would

20      stop the trial.

21            THE COURT:  Yes.

22            MS. GORDON:  I figured I'd make the motion, file

23      my memorandum.  They would brief it, and then the Court --

24            THE COURT:  File it?  File something, what, in

25      writing?

1            MS. GORDON:  Yes, yes.

2            THE COURT:  Well, then that changes everything

3     then.  I mean, I'm not -- you know, you certainly have the

4     right to do that.  We don't get them often.  In fact, I

5     think I've only had one written MJOA, and that was in the

6     *Stevens* trial, and I'm not sure quite what I did there other

7     than to -- excuse me.

8            I'm not sure what we did, and I'm not going to try

9     to go back over that docket to find out what I did, but if

10    you're going to file something in writing, of course the

11    government gets a chance to respond, but -- and then it gets

12    a little tricky, too, because you have the right to make an

13    MJOA at the close of evidence.

14            MS. GORDON:  Right.

15            THE COURT:  So what makes sense here?  So I

16    should -- should I just wait and say, "Okay, I'm going to

17    take it under advisement"?  This could be moot.  If the

18    defendant's acquitted, I never get to it.  If he's

19    convicted, do I just morph it into a motion for judgment of

20    acquittal and then give the government a chance to respond

21    to everything at that point?

22            MS. GORDON:  Well, based on the nature of the

23    arguments that I have, I think our position would be that

24    the Court needs to rule on some, if not most, of the counts

25    before the jury retires.

1          Now, if the --

2          THE COURT:  Before the jury retires?

3          MS. GORDON:  Before the jury retires.  Yes, you

4    can grant the MJOA at any point.  I think the Court will --

5          THE COURT:  I know, but I don't have to.

6          MR. GORDON:  No, you don't.

7          THE COURT:  And why should I?

8          MS. GORDON:  As I said, it's based on the legal

9    arguments that I'm prepared to brief.  So obviously the

10   Court -- it's at the Court's option.

11         If the Court rules on the motion prior to the jury

12   retiring, then obviously the government has no right of

13   appeal.  If the Court holds the motion --

14         THE COURT:  Well, wait, wait, wait.  If I rule on

15   it at the close of the government's case, you can renew that

16   at the close of all the evidence, and you can challenge that

17   in the Court of Appeals, but you have to make your motion at

18   the close of the government's case in order to preserve your

19   right to make it again at the close of the trial.  But you

20   can't -- that's a reviewable decision.

21         MS. GORDON:  But, Your Honor, I said if the Court

22   rules in favor of my motion --

23         THE COURT:  Oh.

24         MS. GORDON:  -- prior to the jury retiring, the

25   government has no right of appeal.

1          THE COURT:  Right.

2          MS. GORDON:  If the Court holds the ruling until

3    after --

4          THE COURT:  I'm sorry, I thought you said you

5    didn't.  Of course you do, yes.

6          MS. GORDON:  Right.  If the Court holds the ruling

7    until after the jury retires, and then they acquit, then

8    that's the end of the story.

9          If they convict, and then the Court converts it

10   into MJOA, then the government would have the right of

11   appeal.

12         THE COURT:  All right.  Well, I haven't seen the

13   motion.  I don't know -- I have an idea probably what

14   arguments you're going to make, but I'm not going to sit

15   here and spend time saying what I'm definitively going to do

16   other than to say I don't think that I'm going to issue a

17   ruling on that until after the jury renders a verdict.

18         But I could while the jury's deliberating.  That's

19   an option available.

20         I want to be fair to the government.  If you're

21   going to tell me you're going to file something in writing,

22   then I think it's only fair to the government to say, "Look,

23   what are you going to do?  You want to file something in

24   writing, which is going to take some time."

25         MS. GORDON:  That's what I anticipated.  So I'm

1    going to make the motion.  I have a memorandum of law to

2    file.  I anticipated the Court would continue with the

3    proceedings, give the government time to file a counter-

4    memorandum, and then make a decision either before or after

5    the jury retires.

6              THE COURT:  Right.  Right.  It would not be error

7    to decide that issue at the close of the government's

8    evidence after jury verdict in the event of conviction,

9    correct?

10             MS. GORDON:  Technically yes, but based on the

11   argument --

12             THE COURT:  I said it would not be error, would

13   it?

14             MS. GORDON:  It wouldn't be -- well, I can't

15   answer --

16             THE COURT:  That's an option available under the

17   rule, I think.

18             MS. GORDON:  Yes, but in light of the arguments

19   that I'm making, I think it would be error to submit some of

20   the counts to the jury, which will be clear based on the

21   arguments --

22             THE COURT:  I have the rule, then, that says the

23   judge can decide the case after a verdict.

24             MS. GORDON:  You need to see the arguments that

25   I'm making, is the bottom line.

```
 1                THE COURT:  All right.

 2                MS. GORDON:  Yes.

 3                THE COURT:  All right.  All right.

 4           All right.  Well, anyway, I'm just raising it.  I

 5      think one thing's fairly clear.  I'm not going to stop the

 6      trial; that's for sure.

 7                MS. GORDON:  Right.  Right.

 8                THE COURT:  And I don't think I'm going to rule on

 9      MJOA issues prior to a verdict because this all could be --

10      if he's acquitted or there's a hung jury -- well, if there's

11      a hung jury I guess I'd have to deal with it, I guess,

12      maybe.  I'm not sure.

13                MS. GORDON:  I think the logistical question is:

14      Does the Court want to entertain argument on the MJOA --

15                THE COURT:  Of course I do.  That's what I'm

16      saying, but I don't want to --

17                MS. GORDON:  -- prior to -- yes.

18                THE COURT:  Of course I do.  Of course I do.

19                MS. GORDON:  Yes.

20                THE COURT:  Having invested all this time, of

21      course I do, which is another reason why I'm not going to

22      stop anything.

23                MS. GORDON:  Right.

24                THE COURT:  So -- all right.  I think it's pretty

25      clear in my mind, I think, that -- well, one thing is clear,
```

1     I'm not going to stop the trial.  The other thing that's

2     unclear is when I'm going to rule.  I'm leaning towards

3     ruling on everything, if at all, after the jury returns the

4     verdict because all of this could be moot so...

5               But I haven't seen your memorandum.

6               MS. GORDON:  Right, so...  Right.

7               THE COURT:  And I don't see where there's any

8     prejudice, either, to Mr. Bowser.  Even if you have very

9     precise questions of law, I don't see where there's

10    prejudice to him to allow the case to go to the jury.

11              MS. GORDON:  I disagree, Your Honor.  There are

12    counts in this case that should not be, for legal reasons,

13    submitted to the jury --

14              THE COURT:  Okay.

15              MS. GORDON:  -- and we're entitled to acquittal on

16    those.

17              THE COURT:  All right.  Okay.  All right.  Let's

18    just wait until you file your motion.

19              You're going to file that when the government --

20    you're going to file that when the government rests.

21              MS. GORDON:  Right.  I'm working on it now so it

22    will be --

23              THE COURT:  All right.  But I'm not going to stop

24    this trial to give you time to finish that either so --

25              MS. GORDON:  No, it will be ready to file when --

```
 1    on the day that they rest, when I make the motion.  We're

 2    working on it now.  We'll work on it over the weekend.

 3              THE COURT:  All right.  Okay.

 4              And I'm going to be fair to the government.  I

 5    mean, think about what you may want to do, Counsel.  I'm not

 6    going to stop the trial.  That's one thing.

 7              MS. GORDON:  Right.

 8              THE COURT:  I'm clear about that.  I'm not going

 9    to stop the trial.

10              MS. GORDON:  No one's asking you to, so I think

11    we're all on the same page.

12              THE COURT:  All right.  So then the question

13    becomes when.  I really am strongly leaning to -- if there's

14    something that's really clear, and I think there were --

15    maybe there were a couple of counts I granted in Stevens.  I

16    don't know.

17              I'm not going to go back over the docket.  There

18    may be something.  I don't know.  I'll wait and see.  I'm

19    not going to sit here and try to think of what arguments

20    you're going to make, although I have an idea, but we'll

21    see.

22              Anything else we need to talk about while we have

23    the time?

24              MR. GEE:  Just briefly, Your Honor.

25              THE COURT:  Yes, Counsel.
```

1      MR. GEE:  Just briefly, Your Honor.  With respect

2   to the matters before the Court still now, the expert

3   renewal, and the defense, I know, also -- I haven't had a

4   chance to read it yet, but they also filed a pleading that

5   sort of relates to the hearsay statements about the

6   defendant searching for a new job.

7      THE COURT:  You know, I saw that just now on the

8   docket.  I've not even read it so...

9      MR. GEE:  I have not yet either, and so the

10   government will --

11      THE COURT:  Do you want to file a response to

12   that?

13      MR. GEE:  We'll respond to both on Saturday by

14   5:00.

15      THE COURT:  Good.

16      MR. GEE:  I'm not sure, given that we're plugging

17   along -- I don't know the Court's availability.  Since we

18   have the jury here at 9:00, perhaps we can start a little

19   bit earlier than 9:00 so that we can address those legal

20   arguments and --

21      THE COURT:  I totally agree.  You know, and

22   unfortunately, or fortunately, that matter that I was

23   committed to tomorrow is no longer on the schedule, but we

24   can't use that time, I don't think.  I mean, unless we can.

25   Is there some reason -- is there some way we can use that

1     time?

2               MS. GORDON:  I don't see how.  They haven't had a

3     chance to respond to anything yet.

4               THE COURT:  Any other issues of law that we need

5     to talk about?

6               MS. GORDON:  There was one thing I wanted to just

7     make a -- put on the record just to preserve my argument.

8               As we've gone along, the government has put on

9     evidence, again, on the 404(b) issues, both documents and

10    testimonial evidence, and I have been -- I just want to make

11    this clear for the record; I'm not challenging anything.  I

12    have been not objecting to the introduction of documents and

13    testimony relying on the Court's pretrial rulings on both

14    the admission of the 404(b) evidence and also the opinion

15    evidence offered by the witnesses, but so as not to

16    interrupt the government's --

17              THE COURT:  The lay opinion.

18              MS. GORDON:  -- process -- so as to not interrupt

19    their process of their case, I have not made objections.

20              THE COURT:  Did you -- did I ask you if you wanted

21    me to make any instruction with respect to lay opinion?  I

22    mean, I may -- I think at the conclusion of this case I'll

23    give an instruction, and if you want me to give an

24    instruction Monday morning, I'll be happy to do that.

25              MS. GORDON:  I thought it comes better with the

1    other instructions.  That particular one, I thought, came

2    better at the end.

3             THE COURT:  All right.  Okay.  And I'll probably

4    just follow the rule with an instruction.

5             MS. GORDON:  Right.

6             THE COURT:  But I probably will give an

7    instruction.  I think it's appropriate to do so.

8             MS. GORDON:  I think we agreed to the standard

9    instruction, if I'm not mistaken.

10            THE COURT:  All right.  I've not given that

11   though.  I mean, if either side wants it prior to closing,

12   I'll give it.

13            MS. GORDON:  The evidence came in a little

14   different, as it always does in trial.

15            THE COURT:  Yes, right.  Right.  Anything else?

16            MS. GORDON:  I don't --

17            THE COURT:  It's probably too early to talk about

18   final instructions.  That sounds like a post-5:00 discussion

19   one day next week.

20            MS. GORDON:  Right.  For charging conference?

21   Yes.

22            THE COURT:  Right.

23            I mean, is there a need to get together -- for us

24   to assemble prior to 9:00 on Monday morning?  The issue

25   about Mr. -- I've not read that issue about Mr. Bowser

1    looking for a job.  Is that tied to some testimony that's --

2              MS. GORDON:  I have two witnesses --

3              THE COURT:  -- going to come in on the

4    government's case-in-chief.

5              MS. GORDON:  Not in their case.  It's --

6              THE COURT:  All right.

7              MS. GORDON:  That's why I filed it today, so that

8    we'd have some sorted out before I put my witnesses --

9              THE COURT:  All right.  And the government's going

10   to respond to that on Saturday.

11             MS. GORDON:  Right.

12             THE COURT:  And you'll file a reply by Friday so I

13   don't think I need -- I don't think we need to talk about

14   that at 8:30 in the morning on Monday morning, I don't

15   think.

16             MR. GEE:  Our only concern is, again, I think the

17   government will likely rest on Monday with probably -- I

18   think we're going to shorten some things up a little bit

19   potentially.

20             THE COURT:  Really?  Before the lunch break?

21             MR. GEE:  Maybe not before the lunch break, but

22   probably right around then.

23             THE COURT:  All right.  All right.  Good.

24             MR. GEE:  So, in other words, I think there's

25   going to be several hours of defense testimony.  I don't

1    know what the order may be so...

2         THE COURT:  Well, I think that's only fair.  Who

3    are your witnesses?  I mean, I don't feel as though I'm

4    being unfair by asking you what's your order of witnesses.

5         MS. GORDON:  Well, at the moment I don't know

6    because I thought I was going to start sometime on Tuesday.

7         THE COURT:  Well, all right, but it looks like

8    you're going to start on Monday.

9         MS. GORDON:  Yes.

10        THE COURT:  So by 5:00 on Friday let us know who

11   your first three or four witnesses are.  I think that's only

12   fair.

13        MS. GORDON:  I will try to do that.

14        THE COURT:  No, Counsel, you're going to have to

15   do it, all right?  You're going to have to do it.

16        MS. GORDON:  So you said 5:00 on Friday?

17        THE COURT:  Saturday.  Saturday.

18        MS. GORDON:  Saturday, okay.

19        THE COURT:  I mean, if you can do it on Friday,

20   that's fine.

21        MS. GORDON:  I don't think I can because I need to

22   contact people.

23        THE COURT:  I think 5:00 on --

24        MS. GORDON:  Saturday.

25        THE COURT:  -- Saturday is fine.  If the

1    government wants to file anything in response to that...

2              Whatever information that you're obligated to turn

3    over to the government about your witnesses, you've turned

4    over, I assume, right?

5              MS. GORDON:  I believe so, yes.  Yes.

6              THE COURT:  All right.  All right.

7              MS. GORDON:  I don't think there's anything

8    outstanding discovery-wise between us.

9              THE COURT:  Okay.  All right.  Anything else we

10   need to talk about?

11             MS. GORDON:  I don't think so.

12             THE COURT:  All right.

13             All right, everyone.  So I'll just schedule --

14   maybe let's get together at 8:45 Monday morning, all right?

15   And I'll just inquire then.

16             Let me know if there's anything you need a ruling

17   on over the weekend, but I want to get these folks started

18   again promptly at 9:00.

19             All right.  Everyone, enjoy your weekend.  Thank

20   you.

21             (Whereupon the hearing was

22              adjourned at 5:14 p.m.)

23

24

25

1      ## CERTIFICATE OF OFFICIAL COURT REPORTER

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4      certify that the above and foregoing constitutes a true and

5      accurate transcript of my stenographic notes and is a full,

6      true and complete transcript of the proceedings to the best

7      of my ability.

8          Dated this 8th day of March, 2018.

9

10                             /s/Lisa A. Moreira, RDR, CRR
                               Official Court Reporter
11                             United States Courthouse
                               Room 6718
12                             333 Constitution Avenue, NW
                               Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$10,000** [2] - 31:11, 39:5
**$33,750** [1] - 78:5
**$8,000** [1] - 39:5

## '

**'90s** [1] - 26:3
**'communications** [1] - 102:18
**'communications'** [1] - 85:10
**'MRA'** [1] - 78:8
**'OCE'** [2] - 77:12, 84:17
**'training'** [1] - 78:3

## /

**/s/Lisa** - 136:10

## 1

**1** [11] - 72:20, 74:22, 77:10, 79:18, 103:1, 103:4, 103:21, 104:25, 105:1, 107:11, 118:14
**1.9** [1] - 31:3
**10** [3] - 11:19, 108:11, 111:8
**100** [1] - 97:24
**1140** [1] - 1:18
**11:12** [1] - 21:20
**11th** [1] - 52:9, 52:23
**13th** [1] - 116:21
**14** [1] - 63:1
**1400** [1] - 1:15
**16-059** [1] - 1:4
**19** [1] - 17:23
**1960s** [1] - 65:15
**19th** [1] - 1:18
**1a** [1] - 47:13
**1st** [1] - 82:24

## 2

**2** [6] - 86:7, 86:8, 93:18, 103:1, 103:4, 103:24
**20001** [2] - 1:23, 136:12
**20005** [1] - 1:15
**20036** [1] - 1:19
**2007** [2] - 48:7, 52:4
**2008** [4] - 48:9, 52:9, 52:23, 52:25
**2009** [2] - 53:6, 55:16
**2011** [3] - 48:9, 48:20,

49:10
**2012** [7] - 25:3, 28:6, 29:6, 29:13, 78:1, 78:6, 103:21
**2013** [5] - 5:9, 49:21, 54:9, 56:8, 78:1
**2014** [32] - 4:13, 8:7, 8:16, 11:19, 11:21, 12:23, 17:23, 20:20, 29:7, 30:12, 31:2, 71:15, 77:10, 79:18, 83:2, 84:8, 93:12, 94:8, 97:13, 99:1, 99:6, 99:19, 99:24, 100:21, 100:24, 101:6, 101:12, 101:21, 102:4, 102:8, 108:11, 111:8
**2015** [5] - 24:1, 24:2, 49:23, 54:9, 56:10
**2016** [1] - 24:1
**2018** [2] - 1:4, 136:8
**202** [2] - 1:16, 1:19
**202-354-3187** [1] - 1:23
**24** [1] - 2:4
**25** [1] - 20:20
**25th** [3] - 21:20, 21:21, 22:12
**26** [1] - 5:9
**26th** [1] - 22:10
**271** [1] - 36:5
**28th** [1] - 71:14
**293-0534** [1] - 1:19
**29th** [1] - 71:14
**2:00** [1] - 71:20
**2:09** [1] - 1:5
**2:28** [1] - 21:21

## 3

**3** [16] - 2:4, 36:20, 39:8, 83:2, 84:8, 86:17, 93:6, 97:13, 100:21, 101:6, 101:12, 101:21, 102:4, 102:8, 103:1, 103:4
**30** [3] - 84:24, 99:24, 100:24
**30-day** [5] - 62:2, 62:6, 62:7, 62:9, 62:19
**30th** [1] - 100:20
**330** [1] - 5:6
**333** [2] - 1:22, 136:12
**339** [1] - 7:3
**341** [1] - 8:6
**342** [2] - 8:15, 9:1
**342a** [1] - 8:22
**347** [1] - 9:4

**35** [1] - 47:23
**372** [1] - 9:10
**378** [1] - 9:10
**3:30** [1] - 115:1
**3rd** [5] - 83:17, 89:8, 101:8, 102:13, 109:5

## 4

**4** [6] - 36:24, 39:8, 86:21, 115:21, 115:23, 116:1
**404(b** [2] - 131:9, 131:14
**412** [1] - 11:17
**45** [1] - 62:14
**45-day** [3] - 62:22, 62:25, 99:15
**469** [2] - 17:18, 17:20
**47** [1] - 2:6
**482a** [1] - 20:19
**488** [1] - 21:21
**489** [1] - 22:9
**490b** [2] - 47:13, 76:19
**491** [2] - 47:12, 84:5

## 5

**5** [2] - 41:8, 87:6
**501** [2] - 47:12, 99:22
**501a** [2] - 47:12, 100:10
**503** [2] - 47:12, 101:4
**506** [1] - 47:12
**507** [1] - 47:12
**509** [2] - 47:12, 108:7
**510** [1] - 47:12
**511** [1] - 47:12
**514-9751** [1] - 1:16
**516** [1] - 47:12
**518** [1] - 47:12
**53** [3] - 47:13, 79:14, 93:6
**5:00** [8] - 71:21, 121:3, 121:5, 121:10, 130:14, 134:10, 134:16, 134:23
**5:14** [1] - 135:22

## 6

**6** [2] - 87:21, 94:8
**6718** [2] - 1:22, 136:11
**6:00** [1] - 112:14
**6th** [1] - 99:16

## 7

**7** [3] - 1:8, 77:18, 88:1
**700** [1] - 114:18
**79** [1] - 26:18

**7th** [1] - 7:4

## 8

**8** [20] - 1:4, 72:13, 93:12, 115:5, 116:7, 116:9, 116:13, 116:17, 116:19, 116:22, 116:24, 117:4, 117:8, 117:11, 117:15, 117:20, 117:22, 117:24, 118:1, 118:2
**89** [1] - 63:3
**89-day** [6] - 63:4, 63:6, 63:8, 63:22, 63:24, 64:6
**895** [3] - 52:20, 77:16, 92:8
**8:30** [1] - 133:14
**8:45** [1] - 135:14
**8th** [2] - 94:5, 136:8

## 9

**9** [4] - 8:6, 8:16, 88:17, 88:23
**90** [1] - 47:13
**98** [1] - 28:3
**9:00** [7] - 22:12, 111:21, 120:19, 130:18, 130:19, 132:24, 135:18

## A

**a.m** [1] - 21:20
**ability** [2] - 53:19, 136:7
**able** [6] - 7:16, 49:25, 62:12, 114:7, 120:11
**absolutely** [1] - 61:10
**accept** [1] - 64:6
**access** [1] - 90:22
**accommodate** [1] - 118:16
**accommodated** [1] - 119:18
**accompany** [1] - 109:14
**accompanying** [1] - 108:22
**accountability** [1] - 38:14
**accounts** [2] - 107:17, 107:20
**accurate** [1] - 136:5
**acknowledge** [1] - 81:24
**Acknowledgement** [2] - 81:5, 81:22

**acknowledging** [1] - 83:23
**acquit** [1] - 125:7
**acquittal** [4] - 122:5, 122:16, 123:20, 128:15
**acquitted** [2] - 123:18, 127:10
**acronym** [1] - 69:16
**act** [2] - 13:21, 13:22
**acted** [2] - 13:24, 14:1
**Action** [1] - 1:3
**action** [3] - 80:11, 80:20, 101:14
**activities** [1] - 71:5
**activity** [8] - 34:8, 57:16, 59:16, 59:17, 63:13, 70:19, 71:1, 108:3
**actual** [2] - 42:9, 61:11
**ad** [7] - 20:5, 35:2, 40:13, 42:10, 42:19, 42:21, 42:24
**add** [3] - 37:21, 45:22, 46:5
**added** [1] - 42:1
**adding** [1] - 41:20
**addition** [3] - 27:7, 72:12, 110:17
**additional** [14] - 39:18, 41:10, 41:16, 41:20, 53:21, 61:9, 63:1, 64:1, 64:2, 78:20, 92:17, 110:19, 111:5, 111:6
**additionally** [1] - 109:16
**address** [4] - 13:2, 78:20, 79:22, 130:19
**addressed** [1] - 89:13
**addressing** [1] - 72:13
**Adel** [2] - 8:7, 8:17
**adequately** [2] - 51:21, 52:2
**adjourned** [1] - 135:22
**Administration** [2] - 88:15, 103:25
**administrative** [1] - 54:13
**admission** [1] - 131:14
**admit** [1] - 47:11
**admitted** [2] - 47:16, 76:19
**ads** [15] - 27:12, 27:20, 29:5, 31:13, 31:14, 36:12, 36:15, 38:7, 39:15, 40:4, 40:21, 40:23, 41:18, 41:22
**advance** [2] - 8:13, 80:4

**advertisement** [1] - 32:11
**advertising** [2] - 32:3, 38:12
**advice** [2] - 10:22, 11:13
**advisement** [3] - 121:16, 122:12, 123:17
**advising** [1] - 54:12
**advocated** [1] - 52:3
**affiliated** [2] - 87:5, 87:25
**AFTERNOON** [1] - 1:8
**afternoon** [5] - 3:9, 22:20, 24:12, 24:24, 47:8
**aggressively** [1] - 52:1
**ago** [14] - 22:6, 24:4, 32:2, 50:17, 53:7, 59:11, 62:21, 63:19, 64:7, 81:19, 82:23, 83:13, 93:24, 110:7
**agree** [7] - 32:15, 34:7, 34:22, 36:1, 75:2, 75:4, 130:21
**agreed** [3] - 119:6, 119:8, 132:8
**agreeing** [1] - 19:16
**agreement** [1] - 86:15
**agreements** [5] - 85:21, 85:25, 86:10, 86:17, 86:18
**ahead** [4] - 22:2, 38:1, 59:8, 73:7
**aided** [1] - 1:25
**air** [4] - 19:23, 20:2, 20:5, 20:6
**alert** [1] - 15:8
**allegation** [5] - 60:21, 61:12, 78:11, 78:12, 78:13
**Allegation** [2] - 81:5, 81:22
**allegations** [14] - 50:16, 51:21, 53:21, 57:5, 57:9, 58:24, 60:11, 60:13, 61:6, 62:6, 67:17, 67:24, 70:7, 92:17
**allies** [2] - 18:23, 25:22
**allow** [5] - 58:13, 89:20, 96:16, 110:15, 128:10
**Allowance** [3] - 16:8, 69:17, 78:8
**allowance** [1] - 69:18
**allowed** [1] - 71:7
**almost** [2] - 32:8,

51:22
**alone** [2] - 23:8, 23:17
**alternate** [2] - 73:14, 119:7
**ambushed** [1] - 15:10
**America** [1] - 48:6
**AMERICA** [1] - 1:3
**amount** [2] - 68:6, 86:3
**analysis** [1] - 10:12
**analyzing** [1] - 10:8
**announce** [1] - 26:12
**answer** [5] - 44:18, 96:7, 96:17, 105:12, 126:15
**answered** [1] - 15:21
**answering** [1] - 44:18
**answers** [2] - 31:18, 44:23
**anticipate** [1] - 112:17
**anticipated** [4] - 112:11, 121:23, 125:25, 126:2
**any-and-all** [1] - 107:4
**anyway** [5] - 19:13, 75:1, 111:17, 122:7, 127:4
**Apologies** [2] - 19:21, 22:18
**appeal** [3] - 124:13, 124:25, 125:11
**Appeals** [1] - 124:17
**appear** [3] - 9:24, 13:15, 13:18
**APPEARANCES** [1] - 1:12
**applies** [1] - 57:10
**appointed** [5] - 50:23, 51:6, 51:16, 53:1, 53:8
**appointees** [1] - 53:1
**appoints** [2] - 51:7, 51:8
**appreciate** [1] - 57:24
**approach** [2] - 57:18, 114:3
**appropriate** [7] - 58:4, 58:13, 59:3, 93:4, 111:16, 113:23, 132:7
**April** [15] - 77:10, 79:18, 82:24, 83:2, 83:17, 84:8, 89:8, 93:12, 94:5, 97:13, 99:6, 100:20, 101:12, 102:8, 102:13
**arch** [1] - 18:9
**area** [3] - 48:3, 59:22, 111:16

**areas** [4] - 6:22, 6:24, 42:22, 42:23
**argue** [1] - 19:15
**argument** [4] - 121:15, 126:11, 127:14, 131:7
**arguments** [10] - 113:8, 113:10, 123:23, 124:9, 125:14, 126:18, 126:21, 126:24, 129:19, 130:20
**arrangement** [1] - 14:6
**article** [2] - 17:6, 18:12
**articles** [16] - 13:6, 13:7, 13:12, 14:9, 14:13, 14:22, 14:25, 15:3, 15:5, 15:18, 17:3, 20:15, 43:2, 43:6, 45:6, 45:7
**Ash** [1] - 78:24
**Ashmawy** [2] - 78:25, 79:1
**aside** [1] - 66:5
**aspect** [3] - 67:23, 111:24, 115:20
**aspects** [1] - 69:22
**assemble** [1] - 132:24
**assess** [1] - 85:6
**assessments** [1] - 120:2
**assigned** [1] - 61:12
**assist** [1] - 54:24
**assistance** [1] - 69:5
**assistant** [1] - 15:7
**assisting** [5] - 50:8, 55:17, 55:18, 55:23, 56:3
**assists** [1] - 50:14
**associate** [2] - 49:5, 49:9
**associated** [11] - 85:23, 86:6, 86:10, 86:20, 86:23, 87:23, 88:7, 89:4, 90:7, 103:20, 105:17
**Associates** [7] - 78:2, 78:5, 78:14, 85:22, 86:4, 103:19, 103:20
**ASSOCIATES** [1] - 1:18
**assume** [7] - 95:23, 96:8, 106:4, 106:23, 121:12, 122:5, 135:4
**assumed** [2] - 20:17, 43:13
**assurance** [1] - 111:6
**assure** [1] - 115:9
**assured** [1] - 114:9
**attach** [1] - 81:13

**attached** [1] - 11:20
**Attached** [1] - 81:2
**attachment** [2] - 8:21, 8:22
**attack** [1] - 6:20
**attacking** [1] - 18:8
**attendance** [1] - 3:18
**attendees** [1] - 3:13
**attention** [6] - 17:16, 19:2, 20:18, 68:10, 93:8, 117:17
**attorney** [4] - 48:10, 91:8, 95:4, 117:10
**attorney-client** [1] - 91:8
**attorneys** [7] - 24:9, 112:22, 113:22, 114:6, 114:10, 115:6, 116:25
**attorneys'** [1] - 114:14
**atypical** [1] - 105:21
**August** [1] - 117:6
**authority** [2] - 67:9, 78:20
**authorize** [2] - 61:22, 62:13
**authorized** [3] - 80:7, 84:16, 99:13
**authorizes** [1] - 53:11
**authorizing** [2] - 62:5
**availability** [1] - 130:17
**available** [7] - 37:7, 61:14, 75:20, 76:1, 122:17, 125:19, 126:16
**Avenue** [3] - 1:15, 1:22, 136:12
**avenues** [1] - 60:13
**aware** [8] - 15:1, 15:4, 26:2, 34:6, 68:21, 96:19, 117:16

## B

**back-and-forth** [3] - 44:9, 44:17, 44:22
**background** [2] - 48:2, 57:25
**backing** [1] - 45:8
**bad** [6] - 17:2, 19:6, 27:3, 43:25, 58:17, 58:20
**Baird** [1] - 47:21
**ball** [1] - 115:13
**Bank** [1] - 18:20
**bar** [2] - 48:16, 48:17
**Barney** [1] - 17:22
**barred** [1] - 48:16
**based** [15] - 13:9,

14:2, 25:20, 25:21, 38:8, 38:9, 42:19, 87:2, 112:19, 121:18, 123:22, 124:8, 126:10, 126:20
**basis** [2] - 14:4, 63:7
**batch** [2] - 102:3, 108:18
**beats** [1] - 73:4
**became** [2] - 52:8, 56:6
**become** [1] - 29:11
**becomes** [1] - 129:13
**BEFORE** [1] - 1:10
**began** [3] - 49:21, 53:5
**begin** [3] - 48:18, 71:12, 120:4
**beginning** [1] - 76:16
**behalf** [3] - 18:23, 55:9, 82:2
**below** [1] - 54:18
**Below** [1] - 77:21
**bench** [4] - 57:21, 59:7, 72:10, 76:8
**beneath** [1] - 54:14
**benefit** [1] - 114:7
**best** [9] - 46:12, 101:17, 101:18, 110:16, 112:12, 113:21, 115:3, 115:17, 136:6
**better** [4] - 27:8, 118:12, 131:25, 132:2
**between** [16] - 14:16, 30:16, 37:9, 38:2, 42:15, 85:21, 85:25, 86:10, 86:18, 88:14, 94:14, 102:7, 103:25, 116:4, 135:8
**beyond** [2] - 45:25, 52:14
**Bibee** [4] - 10:12, 11:20, 21:11, 35:22
**big** [2] - 39:5, 51:19
**bill** [1] - 52:11
**binders** [1] - 55:22
**binding** [1] - 52:15
**binds** [1] - 52:13
**bipartisan** [6] - 50:23, 51:3, 51:6, 51:9, 53:8, 65:18
**bit** [23] - 5:16, 5:17, 16:1, 29:21, 32:5, 33:25, 35:6, 46:12, 48:1, 50:2, 53:7, 57:3, 58:22, 61:25, 81:19, 84:12, 84:13, 87:20, 98:11, 100:5,

102:15, 130:19, 133:18
**black** [1] - 115:15
**bleeding** [1] - 19:24
**blind** [1] - 98:4
**Board** [3] - 77:12, 78:19, 84:16
**board** [54] - 29:10, 50:23, 50:25, 51:1, 51:3, 51:6, 51:14, 53:1, 53:8, 53:9, 53:10, 53:15, 54:2, 54:3, 54:12, 55:22, 60:18, 61:18, 61:20, 61:21, 62:4, 62:10, 62:24, 62:25, 63:7, 64:18, 64:19, 64:20, 64:25, 65:2, 65:3, 65:5, 65:7, 65:24, 65:25, 66:7, 66:9, 66:10, 66:11, 66:13, 66:16, 67:25, 71:13, 80:6, 80:11, 84:23, 92:3, 92:22, 99:13, 100:8
**body** [9] - 51:17, 52:4, 52:7, 52:13, 52:17, 53:10, 64:13, 67:10, 85:5
**boilerplate** [1] - 80:8
**boiling** [1] - 4:10
**books** [2] - 115:7, 115:18
**boss** [1] - 79:23
**bottom** [7] - 5:7, 31:10, 79:17, 80:23, 104:21, 126:25
**bottom-feeders** [1] - 31:10
**BOWSER** [1] - 1:6
**Bowser** [40] - 5:10, 7:19, 10:4, 12:19, 14:14, 15:20, 15:24, 16:3, 18:12, 19:19, 21:22, 22:1, 22:15, 23:18, 25:5, 25:22, 28:1, 28:13, 43:1, 43:8, 44:2, 45:7, 45:10, 45:24, 46:3, 58:21, 79:11, 79:19, 80:4, 84:11, 95:20, 96:24, 101:7, 101:22, 104:6, 105:15, 108:9, 108:18, 128:8, 132:25
**bowser** [1] - 3:17
**Bowser's** [3] - 26:23, 94:11, 94:22
**bracketed** [2] - 103:1,

103:7
**break** [5] - 53:25, 57:13, 97:20, 133:20, 133:21
**Brett** [29] - 68:19, 68:20, 70:8, 70:16, 78:14, 85:22, 85:23, 86:6, 86:11, 86:13, 86:19, 86:20, 86:23, 87:4, 87:5, 87:16, 87:24, 88:6, 89:16, 90:15, 90:21, 103:18, 104:1, 105:16, 106:19, 107:24, 108:4, 108:23, 109:8
**brief** [3] - 121:25, 122:23, 124:9
**briefly** [8] - 13:5, 55:13, 60:22, 60:24, 87:21, 100:23, 129:24, 130:1
**broad** [12] - 57:8, 59:14, 88:10, 88:12, 90:4, 91:6, 105:14, 105:20, 106:2, 106:3, 106:4, 106:6
**broader** [1] - 107:4
**broadly** [1] - 90:3
**broke** [1] - 3:11
**broken** [1] - 62:1
**Broun** [38] - 3:22, 5:21, 6:14, 11:20, 20:25, 21:5, 21:6, 23:21, 23:24, 25:2, 25:6, 25:22, 25:23, 25:25, 28:3, 30:25, 31:7, 34:25, 36:9, 40:10, 40:14, 43:3, 68:13, 68:24, 69:11, 70:13, 78:1, 78:7, 79:23, 86:11, 88:20, 89:10, 89:13, 89:14, 90:8, 98:18, 99:18, 101:10
**Broun's** [16] - 12:25, 17:7, 33:17, 34:20, 42:4, 68:18, 69:20, 71:17, 76:17, 78:4, 79:6, 80:17, 87:23, 90:6, 94:15, 111:10
**Bryson** [3] - 46:23, 47:21, 79:21
**BRYSON** [2] - 2:5, 47:5
**bubbles** [1] - 74:16
**building** [2] - 29:12, 56:18
**Building** [1] - 56:14
**bulk** [1] - 63:13

**burden** [1] - 46:2
**business** [7] - 27:14, 27:16, 27:19, 27:22, 86:1, 97:15, 98:12
**buys** [1] - 35:1
**BY** [7] - 3:8, 24:23, 47:7, 47:18, 59:10, 76:14, 107:10
**bytes** [1] - 4:11

**C**

**Calendar** [2] - 81:10, 82:3
**Calvin** [1] - 15:7
**campaign** [89] - 4:13, 4:16, 7:25, 9:19, 11:1, 12:12, 13:3, 13:9, 13:10, 13:11, 13:14, 13:16, 13:24, 14:3, 14:8, 14:11, 14:19, 15:14, 15:16, 16:10, 16:14, 17:11, 17:14, 19:5, 21:7, 21:13, 21:18, 22:2, 23:21, 23:24, 25:2, 28:8, 29:5, 29:7, 29:21, 29:22, 30:3, 30:10, 32:6, 32:8, 33:1, 33:18, 34:15, 34:20, 35:3, 36:1, 36:22, 36:24, 37:8, 37:23, 38:15, 38:23, 40:18, 42:1, 42:4, 42:5, 42:7, 42:15, 43:3, 44:4, 45:11, 57:16, 59:15, 59:16, 69:23, 69:25, 70:5, 70:7, 70:18, 70:23, 70:25, 71:4, 71:7, 78:17, 86:10, 86:24, 87:23, 88:5, 89:22, 97:17, 98:19, 98:22, 107:25, 108:3, 108:5, 111:1, 111:11
**campaign-messaging** [1] - 12:12
**campaign-related** [1] - 7:25
**campaigns** [3] - 26:6, 86:15, 87:17
**canceling** [1] - 118:18
**cancelled** [2] - 75:19, 75:23
**candidate** [3] - 27:11, 30:13, 36:24
**candidates** [4] - 26:13, 29:23, 30:9, 31:12, 31:24
**candidly** [1] - 112:4

**cannot** [1] - 91:9
**capacity** [1] - 54:25
**Caplin** [4] - 48:16, 48:18, 49:9, 49:18
**care** [2] - 46:17
**carry** [2] - 113:9, 120:6
**carrying** [2] - 50:9, 50:14
**case** [31] - 32:4, 34:25, 39:10, 40:10, 41:13, 42:17, 44:10, 44:25, 50:1, 75:9, 82:7, 91:10, 96:1, 96:18, 98:1, 109:10, 111:24, 112:25, 114:19, 115:20, 120:4, 122:13, 124:15, 124:18, 126:23, 128:10, 128:12, 131:19, 131:22, 133:4, 133:5
**case-in-chief** [1] - 133:4
**cases** [3] - 62:18, 62:20, 109:7
**categories** [4] - 57:13, 57:15, 59:12, 60:3
**censure** [1] - 67:11
**center** [1] - 70:8
**certain** [13] - 29:10, 33:17, 68:6, 82:12, 86:3, 88:23, 88:24, 91:10, 108:16, 109:4, 109:6, 109:7, 110:2
**certainly** [6] - 23:10, 50:3, 112:1, 120:24, 121:9, 123:3
**CERTIFICATE** [1] - 136:1
**certification** [3] - 83:25, 109:15, 110:18
**certify** [1] - 136:4
**certifying** [1] - 109:19
**chain** [5] - 7:4, 7:21, 9:12, 84:4, 93:20
**chair** [2] - 54:24, 54:25
**challenge** [1] - 124:16
**challenging** [1] - 131:11
**Chamber** [4] - 18:8, 18:21, 18:25, 19:12
**chambers** [1] - 118:21
**chance** [5] - 12:3, 123:11, 123:20, 130:4, 131:3
**Change** [1] - 20:25
**changes** [1] - 123:2
**charge** [13] - 37:4,

37:13, 38:12, 38:13, 39:10, 41:11, 41:16, 41:25, 42:12, 42:17, 42:19, 50:11, 54:16
**charged** [4] - 37:19, 42:19, 50:8, 58:21
**charging** [4] - 37:16, 41:3, 42:8, 132:20
**chatter** [1] - 25:21
**chatting** [1] - 4:5
**checked** [1] - 30:4
**chief** [8] - 53:3, 54:8, 54:14, 54:15, 54:18, 79:3, 96:4, 133:4
**Chinouth** [3] - 9:13, 9:25, 21:11
**choose** [5] - 91:22, 91:23, 92:10, 92:11
**Christine** [2] - 102:1, 108:18
**Christopher** [1] - 94:17
**chunks** [1] - 91:11
**Circuit** [1] - 121:22
**circumstances** [1] - 22:24
**city** [1] - 47:24
**City** [1] - 48:3
**clarification** [1] - 118:19
**clarify** [2] - 118:9, 118:15
**clause** [1] - 50:13
**clear** [17] - 16:21, 31:18, 51:3, 51:5, 63:19, 70:6, 70:20, 104:15, 104:16, 111:4, 126:20, 127:5, 127:25, 129:8, 129:14, 131:11
**clerk** [7] - 49:1, 49:4, 49:13, 55:12, 55:14, 55:15, 56:3
**client** [1] - 91:8
**close** [10] - 8:17, 73:25, 74:1, 84:12, 123:13, 124:15, 124:16, 124:18, 124:19, 126:7
**Close** [1] - 8:18
**closer** [1] - 50:2
**closing** [6] - 8:25, 9:5, 9:8, 113:8, 113:10, 132:11
**closings** [4] - 73:9, 73:10, 73:23, 74:25
**Club** [3] - 17:22, 18:1, 18:6
**coach** [2] - 13:25,

68:22
**collaboratively** [1] -
69:8
**colleagues** [2] - 52:2,
69:6
**COLUMBIA** [1] - 1:1
**combing** [1] - 63:20
**coming** [10] - 14:9,
14:13, 14:22, 14:25,
15:3, 15:5, 19:25,
20:9, 98:8, 116:23
**commenced** [1] - 77:3
**commensurate** [1] -
71:9
**comment** [1] - 32:2
**commentary** [2] -
11:15, 23:4
**comments** [3] - 6:13,
6:17, 10:17
**Commerce** [1] - 18:9
**commission** [10] -
36:17, 37:12, 37:16,
38:12, 38:18, 39:12,
39:20, 40:12, 40:13,
41:19
**Commission** [1] - 30:2
**commit** [1] - 31:9
**commitment** [2] -
75:18, 75:23
**committed** [5] - 30:11,
31:2, 31:12, 67:5,
130:23
**committee** [20] -
50:20, 51:23, 53:17,
65:7, 65:15, 65:16,
65:17, 65:19, 65:25,
66:8, 66:15, 67:1,
67:2, 67:18, 88:5,
92:23, 92:24, 92:25,
93:3
**Committee** [18] -
33:10, 51:24, 53:17,
53:23, 60:10, 65:10,
65:11, 65:13, 65:14,
66:3, 66:19, 66:22,
68:5, 88:14, 92:5,
92:14, 92:18, 103:25
**common** [5] - 57:14,
96:5, 96:6, 107:4,
107:6
**commonly** [2] - 59:13,
59:15
**communicate** [1] -
95:3
**communicating** [2] -
9:7, 87:4
**communication** [3] -
20:7, 23:2, 106:19
**communications** [13]
- 85:23, 87:11, 88:2,

88:13, 90:18, 91:9,
103:18, 103:24,
105:2, 105:13,
105:16, 107:12,
107:13
**comparison** [3] -
29:23, 31:15, 31:20
**compensated** [5] -
39:11, 40:17, 41:18,
42:2, 42:24
**compensation** [2] -
14:6, 14:24
**competitors** [2] - 30:5,
31:8
**compiling** [1] - 63:10
**complaint** [2] - 60:14,
67:18
**complaints** [2] - 61:5,
67:23
**complete** [2] - 84:1,
136:6
**completed** [1] -
116:16
**complicated** [1] - 62:1
**comply** [2] - 91:22
**complying** [1] - 91:17
**comprehensive** [1] -
89:19
**computer** [2] - 1:25,
79:13
**computer-aided** [1] -
1:25
**concern** [2] - 58:15,
133:16
**concerning** [3] -
77:13, 80:12, 80:20
**concise** [1] - 4:11
**conclude** [2] - 62:16,
62:19
**concluded** [2] - 113:6,
113:7
**conclusion** [4] -
53:14, 64:9, 66:20,
131:22
**conduct** [7] - 53:11,
57:10, 57:12, 65:21,
66:15, 77:18, 108:2
**conducting** [5] -
50:15, 53:6, 54:12,
55:1, 55:8
**conducts** [2] - 58:12,
58:25
**conference** [5] -
57:20, 59:7, 72:9,
76:8, 132:20
**confidential** [1] -
100:1
**confirmation** [1] - 83:4
**conflict** [1] - 17:17
**Congress** [6] - 50:11,

50:22, 58:17, 58:20,
67:19, 96:20
**congressional** [25] -
29:10, 33:4, 33:22,
78:3, 78:4, 80:8,
80:17, 80:18, 82:1,
85:21, 86:1, 86:2,
86:24, 87:7, 87:16,
88:4, 88:14, 89:20,
89:21, 90:17, 90:19,
97:16, 98:19, 98:22
**Congressional** [32] -
49:1, 49:4, 49:13,
49:17, 49:20, 50:5,
50:6, 50:17, 50:21,
51:15, 52:18, 55:9,
56:11, 56:20, 57:5,
58:25, 59:12, 60:7,
63:25, 65:24, 66:6,
67:13, 68:12, 68:24,
70:12, 77:2, 77:12,
84:16, 96:12, 99:17,
100:17, 101:9
**Congressman** [62] -
3:22, 4:6, 4:23, 5:21,
6:24, 8:13, 11:1,
12:25, 15:10, 17:7,
25:6, 25:14, 25:22,
27:6, 28:3, 28:14,
29:5, 30:4, 30:24,
31:7, 32:14, 33:17,
34:19, 34:25, 36:9,
40:10, 40:14, 42:4,
68:13, 68:18, 68:24,
69:11, 69:20, 70:13,
71:17, 76:17, 79:6,
79:23, 86:11, 86:19,
87:23, 88:19, 88:24,
89:1, 89:3, 89:5,
89:10, 90:5, 90:8,
90:16, 90:22, 94:15,
94:17, 95:5, 95:10,
95:21, 98:18, 99:18,
100:6, 101:10,
111:10
**congressman** [4] -
26:7, 80:10, 96:2,
96:11
**Congressman's** [9] -
4:10, 14:23, 26:25,
29:16, 36:4, 86:14,
86:24, 97:3, 97:5
**congressperson's** [1]
- 69:18
**congresswoman** [1] -
96:2
**congresswoman's** [1]
- 96:11
**connected** [1] - 15:22
**conservative** [1] - 27:6

**conservatives** [1] -
27:8
**consider** [1] - 55:22
**consideration** [1] -
121:15
**considered** [4] - 71:6,
90:19, 113:16
**considering** [1] -
72:22
**constitutes** [1] - 136:4
**Constitution** [5] -
1:22, 7:15, 50:10,
50:13, 136:12
**constitutional** [1] -
50:9
**consultant** [6] - 13:8,
13:21, 13:25, 33:21,
37:23, 115:16
**Consultant** [2] - 37:5,
37:14, 39:17
**consultants** [1] -
13:19
**consulting** [1] - 37:13
**contact** [17] - 80:12,
80:19, 81:7, 82:2,
86:22, 87:22, 88:22,
94:15, 95:22, 95:23,
96:3, 96:11, 96:19,
96:21, 97:2, 104:20,
134:22
**contacted** [1] - 15:20
**contacts** [3] - 71:17,
80:1, 80:2
**content** [1] - 10:8
**contents** [1] - 116:3
**context** [2] - 23:17,
67:17
**continue** [4] - 28:20,
53:14, 88:13, 126:2
**Continued** [1] - 3:7
**continued** [1] - 17:2
**continues** [1] - 88:8
**continuing** [1] - 28:1
**contract** [6] - 21:8,
36:3, 36:7, 37:7,
39:24, 45:19
**contractor** [1] - 78:2
**contrast** [1] - 5:21
**contribute** [1] - 37:8
**contributing** [1] -
38:15
**control** [2] - 90:17,
90:23
**conversation** [18] -
14:24, 16:12, 22:6,
23:5, 23:8, 23:13,
23:17, 24:9, 28:20,
28:24, 29:9, 45:10,
80:4, 85:15, 91:15,
109:3, 109:21, 110:5

**conversation's** [1] -
29:13
**conversations** [2] -
25:21, 94:20
**convert** [1] - 122:15
**converts** [1] - 125:9
**convict** [1] - 125:9
**convicted** [1] - 123:19
**conviction** [2] -
122:16, 126:8
**cooperate** [4] - 92:4,
92:9, 92:12, 92:20
**cooperation** [2] -
84:25, 101:11
**copy** [1] - 8:23
**correct** [37] - 3:16,
7:20, 8:2, 11:4, 11:9,
19:17, 25:7, 25:10,
25:16, 26:12, 26:15,
27:2, 27:15, 28:9,
29:20, 31:21, 32:10,
33:6, 33:20, 33:24,
34:21, 34:24, 35:15,
36:19, 37:17, 38:19,
40:6, 43:5, 43:10,
43:22, 43:24, 44:1,
45:15, 49:14, 49:15,
51:12, 51:13, 52:20,
55:5, 55:10, 63:23,
66:4, 78:23, 79:22,
79:24, 82:8, 82:9,
82:24, 83:14, 84:19,
85:20, 88:16, 93:10,
93:14, 94:6, 94:7,
94:22, 94:23, 95:13,
98:15, 99:25, 100:2,
100:25, 101:1,
104:3, 104:21,
104:22, 107:14,
107:15, 108:20,
110:10, 110:11,
126:9
**correctly** [7] - 78:22,
79:23, 88:8, 88:15,
97:18, 103:22,
108:19
**correspondence** [2] -
95:25, 98:5
**cost** [1] - 40:4
**Counsel** [16] - 31:17,
46:14, 46:19, 58:5,
59:8, 71:19, 72:4,
75:15, 76:11, 114:2,
119:12, 119:15,
120:7, 129:5,
129:25, 134:14
**counsel** [19] - 24:8,
49:20, 53:3, 54:8,
54:14, 54:15, 54:18,
55:7, 56:4, 56:7,

61:3, 64:17, 69:2,
69:9, 79:3, 94:18,
95:11, 96:3, 111:16
**counsels** [3] - 54:19,
55:18, 61:13
**count** [2] - 115:11
**counter** [1] - 126:3
**counterresponse** [1] -
10:9
**counts** [4] - 123:24,
126:20, 128:12,
129:15
**couple** - 12:8,
20:20, 21:10, 21:16,
23:10, 23:22, 31:10,
35:10, 39:16, 48:6,
90:24, 105:20,
120:1, 129:15
**course** [14] - 51:10,
64:19, 69:13, 70:11,
70:17, 75:19, 75:25,
78:22, 123:10,
125:5, 127:15,
127:18, 127:21
**court** [1] - 47:20
**COURT** [171] - 1:1, 3:2,
3:5, 24:6, 24:13,
24:16, 30:22, 31:6,
31:17, 32:17, 43:18,
44:7, 45:21, 46:16,
46:22, 46:25, 47:2,
47:4, 47:14, 47:16,
57:19, 57:22, 58:4,
58:8, 58:13, 58:18,
59:3, 59:6, 59:8,
71:19, 71:23, 72:1,
72:7, 72:17, 72:19,
72:23, 73:1, 73:3,
73:12, 73:20, 73:24,
74:6, 74:10, 74:13,
74:18, 74:24, 75:3,
75:5, 75:11, 75:14,
75:22, 75:25, 76:4,
76:7, 76:9, 76:11,
76:13, 96:16,
105:10, 105:19,
106:2, 106:7,
106:11, 106:17,
106:22, 107:6,
107:9, 110:15,
111:15, 111:19,
111:23, 112:2,
115:24, 116:2,
116:7, 116:10,
116:14, 116:18,
116:20, 116:23,
116:25, 117:7,
117:9, 117:12,
117:16, 117:21,
117:23, 117:25,

118:3, 118:10,
118:12, 118:17,
118:20, 119:2,
119:7, 119:9,
119:20, 119:23,
120:5, 120:13,
120:17, 120:22,
121:2, 121:8,
121:10, 121:14,
122:1, 122:7,
122:12, 122:21,
122:24, 123:2,
123:15, 124:2,
124:5, 124:7,
124:14, 124:23,
125:1, 125:4,
125:12, 126:6,
126:12, 126:16,
126:22, 127:1,
127:3, 127:8,
127:15, 127:18,
127:20, 127:24,
128:7, 128:14,
128:17, 128:23,
129:3, 129:8,
129:12, 129:25,
130:7, 130:11,
130:15, 130:21,
131:4, 131:17,
131:20, 132:3,
132:6, 132:10,
132:15, 132:17,
132:22, 133:3,
133:6, 133:9,
133:12, 133:20,
133:23, 134:2,
134:7, 134:10,
134:14, 134:17,
134:19, 134:23,
134:25, 135:6,
135:9, 135:12, 136:1
**Court** [24] - 1:21, 1:21,
72:13, 72:22, 114:8,
119:18, 120:20,
120:23, 120:25,
122:23, 123:24,
124:4, 124:10,
124:11, 124:13,
124:17, 124:21,
125:2, 125:6, 125:9,
126:2, 127:14,
130:2, 136:10
**Court's** [4] - 30:21,
124:10, 130:17,
131:13
**Courthouse** [2] - 1:22,
136:11
**courtroom** [3] - 71:25,
76:10, 116:6
**courts** [1] - 112:9

**crazy** [1] - 61:11
**create** [3] - 36:21,
43:23, 43:25
**created** [8] - 51:15,
51:18, 52:5, 52:18,
52:20, 52:22, 60:12,
65:15
**creating** - 52:16
**creation** - 35:2,
52:4, 52:6
**credentials** [1] - 58:10
**Criminal** [1] - 1:3
**criticism** [2] - 51:20,
51:25
**critique** [1] - 51:22
**cross** [1] - 24:6
**CROSS** - 24:22
**cross-examination** [1]
- 24:6
**CROSS-**
**EXAMINATION** [1] -
24:22
**crossing** - 63:14
**CRR** [3] - 1:21, 136:3,
136:10
**crystal** [1] - 115:13
**current** - 51:1
**custodian** [2] - 90:20,
110:25
**cut** [1] - 75:10
**cycle** [2] - 7:17, 11:15
**cycles** [2] - 17:2,
43:25

# D

**D.C** [10] - 1:6, 1:15,
1:19, 48:15, 48:16,
49:6, 56:15, 56:16,
56:19, 117:4
**Dade** [1] - 108:18
**date** [11] - 4:14, 77:9,
82:5, 83:1, 84:6,
84:17, 93:11,
100:19, 100:22,
100:24, 108:10
**dated** [3] - 82:24,
97:13, 101:6
**Dated** [1] - 136:8
**David** [9] - 79:11,
79:19, 80:4, 84:11,
101:7, 101:22,
104:6, 105:15, 108:9
**DAVID** [1] - 1:6
**DAY** [1] - 1:8
**days** [9] - 20:20,
45:23, 62:15, 63:1,
63:3, 64:21, 84:24,
97:15, 98:12
**DC** [2] - 1:23, 136:12

**deal** [4] - 17:11, 42:10,
42:11, 127:11
**Debate** [3] - 7:10, 8:7,
8:17
**debate** [32] - 3:12,
3:20, 4:7, 4:17, 4:21,
4:22, 4:24, 5:25, 6:4,
7:2, 7:13, 7:23, 8:13,
8:25, 9:8, 9:14, 10:7,
11:12, 13:25, 23:25,
33:18, 35:5, 35:6,
35:7, 35:14, 35:17,
41:9, 41:13, 41:20,
41:23, 68:22
**debate-specific** [1] -
41:20
**DebateGate** [3] -
18:19, 19:25, 20:9
**debates** [2] - 5:4, 20:4
**decades** [1] - 52:3
**December** [1] - 5:9
**decide** [12] - 26:14,
28:18, 44:10, 44:19,
61:8, 61:21, 62:12,
66:21, 68:6, 92:16,
126:7, 126:23
**decided** [2] - 95:11,
121:18
**decides** [2] - 62:24,
92:20
**deciding** [5] - 65:6,
66:13, 66:17, 92:22,
122:14
**decision** [2] - 124:20,
126:4
**defendant** [31] - 14:9,
16:16, 21:3, 22:23,
79:21, 80:1, 80:25,
83:3, 83:7, 83:18,
93:13, 94:25, 95:8,
95:16, 95:19, 95:24,
95:25, 97:8, 99:24,
100:3, 101:24,
108:13, 109:2,
109:6, 109:10,
109:17, 109:22,
109:23, 110:7, 130:6
**Defendant** [2] - 1:7,
1:17
**defendant's** [1] -
123:18
**defending** [1] - 7:8
**defense** [4] - 74:22,
120:4, 130:3, 133:25
**definitely** [3] - 23:15,
30:11, 30:14
**definitively** [1] -
125:15
**DeLacy** [4] - 94:18,
94:20, 95:4

**deliberating** [1] -
125:18
**deliberations** [1] -
73:23
**deliver** [1] - 108:16
**delivered** [2] - 80:16,
84:23
**demeanor** [1] - 15:23
**demonstrate** [1] - 7:16
**DEPARTMENT** [1] -
1:14
**deprive** [1] - 119:4
**deputy** [2] - 54:15,
54:18
**described** [4] - 28:25,
45:5, 50:17, 63:19
**describes** [1] - 36:8
**description** [2] -
81:15, 81:20
**deserves** [1] - 61:9
**designate** [2] - 81:25,
95:21
**designation** [1] -
37:24
**detail** [1] - 22:8
**detailing** [2] - 76:23,
84:2
**details** [2] - 26:5, 31:9
**determination** [1] -
66:11
**determine** [4] - 44:16,
44:25, 65:8, 106:11
**determined** [1] - 43:15
**determines** [2] -
53:15, 68:1
**determining** [2] -
65:20, 66:16
**developing** [1] - 36:12
**difference** [2] - 37:9,
37:10
**differences** [1] - 102:7
**different** [9] - 10:22,
13:25, 23:3, 23:4,
56:18, 68:7, 69:6,
112:9, 132:14
**differently** [1] - 37:19
**difficult** [4] - 46:11,
112:7, 118:5, 118:10
**Diggs** [1] - 28:12
**direct** [3] - 3:2, 72:5,
111:17
**DIRECT** [2] - 3:7, 47:6
**directed** [1] - 80:12
**direction** [2] - 4:7,
10:23
**directly** [1] - 50:21
**director** [4] - 53:3,
54:8, 54:14, 79:3
**disagree** [1] - 128:11
**disciplinary** [2] -

50:13, 67:8
**discipline** [4] - 65:20, 65:23, 66:2, 66:5
**disciplining** [1] - 50:12
**disclosed** [1] - 59:25
**disclosure** [1] - 59:23
**discover** [1] - 60:18
**discovered** [1] - 78:21
**discovery** [1] - 135:8
**discovery-wise** [1] - 135:8
**discuss** [5] - 12:22, 21:6, 72:3, 111:24, 115:20
**discussed** [5] - 5:4, 23:10, 23:13, 23:15, 88:21
**discussing** [2] - 4:6, 27:18
**discussion** [2] - 14:6, 132:18
**disparity** [1] - 30:16
**disregard** [1] - 44:15
**distinction** [2] - 14:16, 38:2
**distinguishes** [1] - 60:9
**distribution** [1] - 35:24
**DISTRICT** [3] - 1:1, 1:1, 1:10
**dive** [1] - 39:21
**divert** [1] - 19:2
**docket** [3] - 123:9, 129:17, 130:8
**document** [32] - 11:20, 12:4, 12:9, 76:21, 76:22, 79:10, 81:19, 82:11, 82:15, 82:17, 83:11, 84:2, 84:7, 84:9, 85:14, 89:3, 89:19, 89:24, 91:2, 91:3, 91:6, 91:20, 92:2, 93:6, 93:9, 100:11, 100:13, 101:13, 102:24, 103:2, 105:25, 107:19
**documents** [34] - 55:20, 64:24, 77:1, 79:22, 81:3, 81:12, 81:17, 82:12, 82:18, 83:20, 83:21, 83:22, 84:3, 88:3, 90:6, 90:23, 91:18, 97:11, 97:14, 97:22, 98:2, 98:8, 98:13, 99:18, 103:18, 104:13, 105:3, 106:20, 108:16, 110:2,

110:9, 111:10, 131:9, 131:12
**dollars** [1] - 39:3
**done** [2] - 39:4, 119:22
**doors** [1] - 34:2
**dotting** [1] - 63:14
**doubt** [1] - 46:1
**Down** [1] - 11:21
**down** [31] - 4:10, 5:17, 5:24, 11:18, 12:11, 12:13, 12:14, 17:19, 24:14, 24:16, 24:17, 40:8, 46:17, 53:25, 57:13, 62:1, 62:12, 64:13, 80:23, 84:13, 85:8, 87:19, 88:13, 93:23, 97:20, 98:24, 102:16, 104:25, 111:14, 119:7, 121:11
**down-the-stretch** [2] - 12:11, 12:14
**Dr** [2] - 6:14, 25:25
**draft** [8] - 9:5, 9:9, 63:12, 64:7, 64:16, 64:21, 103:13
**drafted** [2] - 103:8, 103:9
**drafting** [4] - 63:20, 102:22, 103:13, 105:6
**drama** [1] - 20:13
**draw** [1] - 38:2
**drawing** [1] - 92:3
**drill** [1] - 8:16
**drive** [1] - 4:9
**Drysdale** [4] - 48:16, 48:18, 49:10, 49:18
**duck** [2] - 28:15, 28:23
**dues** [3] - 33:12, 33:15, 33:16
**dues-paying** [1] - 33:12
**during** [34] - 13:10, 28:14, 29:8, 31:1, 48:23, 48:24, 49:3, 49:7, 54:8, 54:21, 55:15, 55:25, 56:13, 62:16, 62:19, 62:20, 63:13, 63:15, 63:17, 63:21, 63:22, 64:3, 64:19, 65:1, 69:6, 69:13, 70:11, 70:16, 79:2, 94:14, 94:18, 99:19, 105:17
**duties** [2] - 57:12, 71:8

---

**E**

**ear** [1] - 74:20

**early** [9] - 24:1, 24:9, 53:6, 60:25, 99:1, 99:14, 120:4, 120:25, 132:17
**easier** [2] - 112:9, 114:8
**editing** [1] - 40:5
**edits** [2] - 65:2, 65:4
**educational** [1] - 48:1
**effect** [2] - 92:5, 110:10
**effectively** [1] - 18:8
**effort** [1] - 112:25
**eight** [2] - 19:22, 50:25
**eight-person** [1] - 50:25
**either** [11] - 31:13, 32:3, 61:18, 62:12, 111:11, 122:14, 126:4, 128:8, 128:24, 130:9, 132:11
**elect** [1] - 29:10
**election** [9] - 12:16, 25:3, 25:8, 25:14, 28:14, 28:17, 29:7, 29:16, 29:19
**Election** [1] - 30:2
**email** [65] - 5:9, 5:17, 5:20, 6:5, 6:19, 7:4, 7:5, 7:12, 7:21, 7:22, 8:1, 8:6, 8:8, 8:17, 8:19, 9:5, 9:12, 9:13, 9:17, 9:18, 9:24, 10:7, 11:19, 11:20, 17:20, 17:21, 17:22, 20:20, 21:3, 21:9, 21:22, 22:11, 22:12, 26:19, 26:22, 26:23, 61:5, 79:18, 79:19, 79:22, 79:25, 80:3, 81:13, 83:4, 83:9, 84:4, 84:11, 84:14, 93:8, 93:11, 93:24, 94:5, 98:25, 99:23, 107:17, 107:19, 107:20, 108:1, 108:3, 108:8, 108:17, 109:2, 111:8, 111:9
**email's** [1] - 21:20
**emailed** [3] - 15:7, 15:12, 79:11
**emailing** [1] - 93:13, 108:13
**emails** [12] - 5:3, 23:14, 32:25, 35:12, 41:14, 82:23, 85:13, 98:5, 107:13, 107:16, 108:6

**EMMET** [1] - 1:10
**employed** [2] - 88:7, 103:19
**employee** [5] - 49:16, 56:20, 56:21, 56:24, 57:11
**employees** [4] - 59:18, 59:20, 59:24, 108:2
**employment** [1] - 17:7
**empowered** [1] - 57:9
**empty** [1] - 114:24
**encompass** [1] - 89:1
**end** [21] - 11:8, 46:9, 55:2, 59:7, 62:7, 62:9, 63:4, 63:6, 63:8, 68:8, 72:15, 73:22, 75:9, 76:8, 82:6, 99:4, 115:8, 115:10, 122:8, 125:8, 132:2
**endeavors** [2] - 117:10, 117:13
**ended** [3] - 30:13, 63:24, 99:5
**ends** [1] - 67:9
**engage** [1] - 22:1
**engagement** [1] - 40:24
**enjoy** [6] - 111:23, 112:2, 115:4, 115:18, 115:19, 135:19
**enters** [1] - 76:10
**entertain** [1] - 127:14
**entire** [2] - 23:19, 67:10
**entities** [12] - 86:10, 86:11, 86:20, 86:23, 86:25, 87:24, 87:25, 88:6, 88:8, 89:22, 90:22, 105:17
**entitled** [2] - 8:7, 128:15
**entity** [4] - 85:23, 86:5, 86:6, 90:1
**equipment** [1] - 70:4
**error** [3] - 126:6, 126:12, 126:19
**ESQ** [3] - 1:13, 1:13, 1:17
**essentially** [4] - 15:9, 15:11, 87:6, 103:2
**established** [1] - 77:17
**ethical** [1] - 17:16
**Ethics** [48] - 49:1, 49:4, 49:13, 49:17, 49:21, 50:5, 50:6, 50:18, 50:21, 51:15, 51:24, 52:18, 53:17, 53:23, 55:9, 56:11,

56:20, 57:6, 58:25, 59:12, 60:7, 60:10, 63:25, 65:10, 65:11, 65:13, 65:14, 65:24, 66:2, 66:6, 66:18, 66:22, 67:13, 68:5, 68:12, 68:24, 70:1, 70:12, 77:2, 77:12, 84:17, 92:5, 92:14, 92:18, 96:13, 99:17, 100:17, 101:9
**ethics** [17] - 51:17, 51:23, 52:4, 52:7, 52:17, 53:17, 65:7, 65:25, 66:8, 66:14, 67:1, 67:2, 67:18, 92:22, 92:24, 92:25, 93:3
**evening** [4] - 111:23, 114:6, 120:15, 120:18
**event** [3] - 20:6, 122:16, 126:8
**events** [1] - 16:2
**eventual** [1] - 5:14
**eventually** [1] - 10:17
**evidence** [26] - 53:16, 60:15, 63:10, 63:11, 63:21, 64:1, 64:2, 64:24, 65:9, 66:12, 85:4, 85:5, 98:4, 101:19, 106:9, 114:11, 114:14, 121:18, 123:13, 124:16, 126:8, 131:9, 131:10, 131:14, 131:15, 132:13
**evidentiary** [1] - 114:12
**Ex** [1] - 18:20
**Ex-Im** [1] - 18:20
**exact** [4] - 4:14, 5:2, 31:1, 31:23
**exactly** [5] - 23:19, 53:9, 54:5
**examination** [2] - 3:3, 24:6
**EXAMINATION** [3] - 3:7, 24:22, 47:6
**example** [9] - 5:6, 11:10, 17:20, 23:23, 42:20, 52:15, 71:1, 102:1, 110:24
**except** [1] - 87:6
**exception** [1] - 48:5
**exchange** [4] - 94:21, 99:1, 99:7, 99:16
**exchanged** [1] - 94:19
**exclusively** [2] -

44:25, 95:3
**excuse** [6] - 71:19, 74:7, 111:19, 117:1, 117:13, 123:7
**excused** [2] - 46:18, 118:2
**execution** [1] - 36:25
**exhibit** [1] - 21:20
**Exhibit** [19] - 5:6, 7:3, 8:6, 8:15, 9:10, 11:17, 17:18, 20:19, 21:21, 22:9, 26:17, 36:5, 76:19, 79:14, 84:5, 93:6, 99:21, 101:4, 108:7
**exhibits** [3] - 112:24, 114:18
**Exhibits** [1] - 47:11
**exits** [2] - 71:25, 116:6
**expect** [2] - 93:16, 112:5
**experience** [1] - 112:11
**expert** [6] - 57:24, 58:2, 58:7, 119:12, 119:14, 130:2
**expertise** [1] - 35:13
**experts** [1] - 120:10
**explain** [5] - 22:24, 50:4, 60:22, 60:24, 92:6
**explanation** [4] - 16:3, 16:16, 16:24, 23:18
**explore** [1] - 91:16
**explored** [1] - 31:17
**exploring** [1] - 26:13
**express** [1] - 44:11
**expulsion** [1] - 67:11
**extend** [1] - 62:25
**extended** [1] - 24:8
**extension** [2] - 62:22, 99:11
**extent** [1] - 112:4
**extra** [1] - 41:25
**extremely** [2] - 112:22, 121:4
**eyes** [2] - 103:11, 118:4

## F

**fact** [10] - 28:10, 28:13, 31:25, 45:18, 63:12, 64:12, 85:5, 90:18, 123:4
**fact-finding** [2] - 64:12, 85:5
**facts** [8] - 44:10, 44:12, 44:19, 44:25, 45:1, 64:15, 65:2

**fail** [1] - 52:1
**failing** [1] - 51:20
**fair** [11] - 19:8, 45:2, 75:12, 113:11, 113:17, 119:23, 125:20, 125:22, 129:4, 134:2, 134:12
**fairly** [7] - 64:11, 64:14, 68:21, 69:7, 105:21, 105:24, 127:5
**fall** [1] - 29:6
**family** [2] - 75:18, 75:22
**far** [8] - 15:25, 22:1, 28:24, 30:3, 30:8, 30:15, 31:11, 38:9
**fault** [1] - 115:1
**favor** [2] - 92:21, 124:22
**February** [1] - 11:19
**FEC** [1] - 30:1
**federal** [1] - 78:9
**Federal** [1] - 30:2
**fee** [16] - 36:18, 37:12, 37:13, 38:3, 38:8, 38:13, 38:14, 38:17, 38:19, 38:23, 39:2, 39:14, 39:18, 40:18, 40:20, 41:20
**fee-based** [1] - 38:8
**feeders** [1] - 31:10
**fees** [2] - 40:9, 40:11
**fellow** [1] - 116:3
**felt** [1] - 15:18
**few** [6] - 4:12, 4:18, 19:24, 20:8, 22:6, 49:5, 53:2, 56:1, 57:13, 64:21, 65:11, 67:2, 68:7, 97:15, 98:12, 115:6
**fight** [4] - 17:15, 18:21, 18:25, 19:4
**figure** [1] - 122:19
**figured** [2] - 24:17, 122:22
**file** [19] - 59:24, 85:14, 120:16, 120:24, 122:22, 122:24, 123:10, 125:21, 125:23, 126:2, 126:3, 128:18, 128:19, 128:20, 128:25, 130:11, 133:12, 135:1
**filed** [3] - 119:9, 130:4, 133:7
**files** [3] - 88:2, 103:17, 105:2
**filling** [1] - 102:25

**fills** [1] - 81:24
**final** [4] - 67:12, 98:25, 113:8, 132:18
**finances** [1] - 59:25
**financial** [2] - 59:23, 117:14
**financing** [1] - 29:22
**findings** [5] - 63:12, 64:12, 65:9, 68:4, 68:8
**fine** [6] - 72:7, 111:18, 118:8, 118:15, 134:20, 134:25
**fines** [1] - 67:7
**finish** [10] - 19:22, 42:6, 46:7, 46:8, 72:5, 74:24, 111:17, 113:19, 119:22, 128:24
**fired** [2] - 23:1, 23:10
**firm** [3] - 48:15, 48:21, 49:6
**first** [28] - 9:13, 12:2, 20:1, 25:1, 29:18, 36:11, 37:11, 38:4, 41:7, 44:12, 45:4, 45:8, 45:13, 48:25, 49:9, 53:20, 55:15, 55:16, 61:25, 62:2, 77:1, 77:11, 84:6, 85:9, 100:16, 103:16, 112:6, 134:11
**first-year** [1] - 49:9
**fit** [1] - 91:11
**five** [3] - 35:23, 106:20, 106:21
**flak** [1] - 19:2
**flat** [3] - 38:19, 38:23, 39:2
**flexibility** [2] - 71:5, 74:5
**flip** [1] - 104:24
**focus** [10] - 41:19, 49:24, 59:15, 59:23, 60:4, 69:12, 69:13, 69:15, 69:19, 102:10
**focused** [2] - 21:7, 70:15
**focuses** [1] - 107:23
**focusing** [3] - 6:22, 6:25, 37:10
**folder** [2] - 97:2, 97:3
**folks** [9] - 7:21, 8:1, 8:3, 18:18, 21:9, 21:12, 103:10, 115:18, 135:17
**follow** [1] - 22:18
**following** [9] - 29:4, 30:7, 57:20, 71:14,

72:9, 81:3, 85:18, 97:4, 103:17
**follows** [1] - 63:22
**FOR** [1] - 1:1
**for-pay** [1] - 49:7
**force** [3] - 51:16, 52:5, 52:6
**foregoing** [1] - 136:4
**forget** [2] - 113:15, 118:22
**form** [6] - 64:16, 81:23, 83:12, 83:22, 83:24, 83:25, 97:1, 97:2, 109:15
**format** [1] - 84:2
**formerly** [1] - 34:13
**formidable** [1] - 27:11
**forms** [7] - 63:16, 108:17, 108:22, 109:13, 109:14, 109:15
**forth** [4] - 40:5, 44:9, 44:17, 44:22
**fortunately** [2] - 114:6, 130:22
**forward** [4] - 18:12, 60:17, 61:6, 85:11
**forwarding** [4] - 9:13, 9:17, 17:21, 17:22
**four** [5] - 31:24, 51:7, 51:8, 54:19, 134:11
**frames** [1] - 59:2
**fraught** [1] - 112:14
**free** [7] - 40:16, 40:22, 40:23, 40:25, 41:15, 41:17, 41:23
**frequent** [1] - 32:24
**frequently** [2] - 26:16, 34:10
**fretting** [1] - 118:25
**Friday** [14] - 72:22, 73:9, 73:11, 73:17, 73:25, 74:2, 74:25, 116:19, 119:4, 119:22, 133:12, 134:10, 134:16, 134:19
**friend** [1] - 22:18
**front** [2] - 114:20, 114:21
**fronts** [1] - 22:19
**frowned** [1] - 33:3
**full** [6] - 35:17, 47:19, 49:16, 55:3, 56:7, 136:5
**full-time** [2] - 49:16, 56:7
**fully** [2] - 59:25, 91:22
**function** [1] - 53:9
**fundraising** [4] -

29:22, 30:12, 30:23, 31:1
**funds** [5] - 68:19, 69:18, 70:3, 70:7, 78:7
**future** [3] - 117:10, 117:12, 117:25

## G

**GEE** [67] - 1:13, 3:4, 3:8, 5:7, 5:16, 5:24, 6:2, 6:12, 6:15, 7:3, 7:18, 8:15, 8:21, 9:4, 9:10, 9:15, 9:22, 10:3, 10:11, 10:16, 11:6, 11:17, 11:23, 12:6, 12:17, 17:18, 17:24, 18:11, 19:9, 19:18, 20:19, 22:9, 24:5, 24:21, 31:5, 32:16, 46:15, 72:11, 72:18, 73:6, 73:8, 73:13, 73:18, 73:21, 74:1, 74:8, 74:15, 75:13, 118:8, 118:11, 118:14, 118:18, 119:6, 119:25, 120:9, 120:14, 120:20, 120:23, 121:9, 129:24, 130:1, 130:9, 130:13, 130:16, 133:16, 133:21, 133:24
**gee** [7] - 24:19, 24:20, 26:20, 35:12, 41:14, 44:6, 45:4
**Gee)...........................
............ [1] - 2:4
**general** [21] - 4:8, 6:3, 6:19, 7:7, 8:10, 10:6, 10:20, 12:10, 17:13, 18:1, 18:3, 18:6, 18:24, 19:10, 21:1, 25:3, 26:13, 37:23, 72:14, 80:6
**General** [3] - 37:5, 37:14, 39:17
**generally** [8] - 25:24, 60:5, 60:22, 77:5, 81:16, 85:18, 86:8, 108:13
**generated** [1] - 67:13
**gentlemen** [1] - 112:3
**Georgia** [5] - 5:14, 19:22, 68:17, 117:2, 117:6
**gifts** [1] - 59:21
**given** [8] - 15:18, 42:11, 54:17, 72:11,

8

76:2, 120:9, 130:16,
132:10
**GOP** [1] - 7:9
**Gordon** [1] - 120:3
**GORDON** [110] - 1:17,
1:18, 24:11, 24:14,
24:19, 24:23, 26:17,
26:21, 28:11, 28:22,
30:21, 31:19, 36:6,
39:23, 40:1, 40:8,
41:1, 41:6, 45:3,
45:20, 47:15, 57:17,
57:23, 58:15, 58:19,
59:4, 72:21, 72:24,
73:2, 73:7, 73:16,
73:25, 74:4, 74:9,
74:11, 74:14, 74:21,
75:2, 75:4, 75:7,
75:21, 75:24, 76:2,
76:6, 96:14, 105:9,
110:14, 119:1,
119:8, 119:16,
119:21, 120:8,
121:7, 121:13,
121:23, 122:6,
122:11, 122:19,
122:22, 123:1,
123:14, 123:22,
124:3, 124:6, 124:8,
124:21, 124:24,
125:2, 125:6,
125:25, 126:10,
126:14, 126:18,
126:24, 127:2,
127:7, 127:13,
127:17, 127:19,
127:23, 128:6,
128:11, 128:15,
128:21, 128:25,
129:7, 129:10,
131:2, 131:6,
131:18, 131:25,
132:5, 132:8,
132:13, 132:16,
132:20, 133:2,
133:5, 133:7,
133:11, 134:5,
134:9, 134:13,
134:16, 134:18,
134:21, 134:24,
135:5, 135:7, 135:11
Gordon)...................
................ [1] - 2:4
**govern** [1] - 77:19
**government** [26] -
45:25, 46:2, 46:20,
47:11, 107:17,
119:18, 119:24,
120:1, 120:10,
121:24, 123:11,

123:20, 124:12,
124:25, 125:10,
125:20, 125:22,
126:3, 128:19,
128:20, 129:4,
130:10, 131:8,
133:17, 135:1, 135:3
**Government** [9] -
47:11, 76:19, 79:12,
79:14, 84:5, 93:5,
99:21, 101:3, 108:7
**Government's** [2] -
26:17, 36:4
**government's** [8] -
46:23, 119:11,
124:15, 124:18,
126:7, 131:16,
133:4, 133:9
**graduated** [2] - 48:7,
48:9
**Graham** [1] - 24:2
**grant** [1] - 124:4
**granted** [1] - 129:15
**Great** [1] - 120:5
**grew** [1] - 48:3
**grid** [1] - 6:20
**groundwork** [2] -
29:2, 29:6
**group** [5] - 7:24, 8:3,
12:22, 19:4, 114:5
**groups** [1] - 18:10
**Growth** [3] - 17:23,
18:1, 18:6
**guarantee** [1] - 72:21
**guarantees** [1] - 67:25
**guess** [2] - 127:11
**guidance** [2] - 44:20,
46:12
**guilt** [1] - 45:25
**guys** [1] - 19:21

**H**

**half** [1] - 63:9
**hall** [1] - 72:1
**hallway** [1] - 23:25
**hammering** [1] - 19:22
**handed** [1] - 91:9
**Handel** [2] - 9:20, 11:3
**Handel's** [1] - 10:7
**handling** [1] - 54:12
**happy** [3] - 118:24,
120:24, 131:24
**hard** [3] - 19:15,
112:22, 114:5
**Hardman** [1] - 21:12,
102:2, 102:5, 108:18
**hardship** [1] - 117:14
**harm** [1] - 44:22
**Harvard** [2] - 48:8,

48:9
**hate** [1] - 74:25
**head** [1] - 54:7
**health** [1] - 76:2
**hear** [6] - 44:11, 44:13,
44:14, 46:7, 49:25
**heard** [2] - 45:5, 45:14
**hearing** [3] - 57:21,
72:10, 135:21
**hearsay** [1] - 130:5
**heated** [3] - 16:1, 43:4,
43:11
**HELD** [1] - 1:10
**held** [3] - 55:3, 57:20,
72:9
**hello** [2] - 3:10, 47:9
**help** [4] - 35:5, 39:21,
42:23, 85:6
**helped** [1] - 42:21
**helpful** [2] - 93:20,
121:4
**helping** [1] - 93:2
**hereby** [1] - 136:3
**hesitancy** [1] - 67:21
**hi** [1] - 24:25
**high** [1] - 48:4
**highlighting** [2] - 6:22,
6:24
**Hill** [2] - 59:17, 60:2
**himself** [1] - 89:4
**hire** [4] - 25:13, 25:14,
53:3, 53:4
**hired** [2] - 29:19, 39:19
**history** [1] - 58:2
**Hogan** [1] - 49:6
**hold** [3] - 70:25, 91:18,
121:24
**holding** [2] - 104:17,
111:4
**holds** [3] - 124:13,
125:2, 125:6
**Honor** [22] - 31:19,
46:20, 47:1, 47:10,
47:17, 57:17, 58:6,
59:9, 71:22, 71:24,
72:6, 72:11, 75:13,
76:12, 96:15,
111:18, 119:25,
121:9, 124:21,
128:11, 129:24,
130:1
**Honorable** [2] - 89:13,
89:14
**HONORABLE** [1] -
1:10
**hope** [1] - 106:8
**hotline** [1] - 61:5
**hour** [1] - 72:12
**hourly** [1] - 38:23
**hours** [2] - 38:24,

133:25
**House** [77] - 25:9,
49:1, 50:7, 50:8,
50:11, 50:14, 50:18,
50:20, 50:24, 51:1,
51:7, 51:8, 51:11,
51:16, 51:20, 51:23,
51:24, 52:3, 52:5,
52:7, 52:8, 52:10,
52:11, 52:13, 52:14,
52:16, 52:19, 52:20,
52:25, 53:17, 53:23,
56:14, 56:21, 56:25,
57:6, 57:11, 57:12,
59:21, 60:10, 65:10,
65:11, 65:13, 65:14,
65:15, 65:16, 65:19,
66:2, 66:18, 66:22,
67:10, 67:11, 68:5,
70:1, 70:2, 70:13,
70:22, 70:23, 70:25,
71:3, 77:16, 78:9,
88:14, 90:18, 92:7,
103:25, 108:1,
108:2, 108:3, 108:6
**hung** [2] - 127:10,
127:11

**I**

**idea** [3] - 19:11,
125:13, 129:20
**ideally** [1] - 29:12
**ideological** [1] - 17:17
**ideologically** [1] - 19:4
**identifiable** [1] - 91:10
**identification** [1] -
82:18
**identified** [4] - 60:23,
88:20, 91:14, 92:13
**identify** [8] - 87:2,
90:1, 91:3, 91:23,
92:8, 93:3, 101:18,
104:18
**identities** [1] - 87:10
**ignoring** [1] - 19:21
**imagine** [1] - 26:9
**immediately** [1] -
83:25
**impediment** [1] -
67:20
**implementation** [1] -
36:25
**important** [1] - 92:19
**impose** [2] - 53:19,
67:7
**improper** [1] - 78:14
**IN** [1] - 1:1
**in-person** [1] - 64:18
**incident** [1] - 15:9

**include** [7] - 83:21,
85:10, 85:11, 92:4,
102:1, 105:3, 107:20
**included** [4] - 7:22,
32:24, 83:22, 83:24
**includes** [2] - 85:12,
107:13
**including** [4] - 11:13,
19:23, 20:1, 102:4
**income** [1] - 60:1
**independent** [7] -
50:6, 50:18, 51:2,
51:17, 52:4, 52:7,
52:16
**indicate** [1] - 109:22
**individual** [3] - 70:8,
90:1, 101:20
**individuals** [20] -
86:22, 87:3, 87:13,
87:23, 88:20, 88:22,
88:23, 88:24, 90:7,
90:14, 101:24,
102:4, 104:9,
108:24, 109:4,
109:6, 109:7,
109:18, 110:18,
110:24
**indulgence** [1] - 30:21
**inference** [3] - 92:3,
92:15, 100:9
**influence** [1] - 11:15
**Information** [1] - 97:12
**information** [43] -
60:19, 61:15, 63:17,
64:5, 77:14, 80:13,
82:7, 82:12, 82:16,
82:19, 82:20, 83:11,
83:20, 84:10, 84:15,
85:3, 85:18, 86:22,
87:22, 88:22, 89:24,
90:2, 90:20, 90:23,
91:2, 91:3, 91:11,
91:23, 92:20, 93:3,
94:1, 97:12, 101:6,
101:19, 101:22,
102:24, 103:17,
104:13, 104:17,
104:20, 109:12,
111:4, 135:2
**informed** [1] - 45:11
**infrequent** [1] - 3:24
**initial** [7] - 7:5, 7:12,
7:22, 61:8, 71:16,
89:19, 109:18
**initiated** [4] - 77:13,
80:19, 82:6, 99:12
**initiation** [1] - 68:15
**innocence** [2] - 45:24,
46:3
**input** [1] - 6:4

**inquire** [1] - 135:15
**instance** [3] - 68:4, 80:15, 91:13
**instant** [1] - 85:13
**instead** [1] - 50:22
**instruct** [1] - 111:24
**instruction** [9] - 45:2, 45:22, 109:17, 131:21, 131:23, 131:24, 132:4, 132:7, 132:9
**instructions** [6] - 46:6, 74:25, 113:8, 113:10, 132:1, 132:18
**instructs** [1] - 92:8
**INTEGRITY** [1] - 1:14
**intend** [3] - 106:8, 106:9, 107:19
**intended** [6] - 60:12, 88:10, 90:4, 90:6, 106:5, 106:6
**intending** [1] - 59:1
**intensive** [1] - 112:21
**intention** [4] - 91:4, 105:6, 112:12, 112:13
**interact** [2] - 7:24, 8:3
**interacted** [1] - 86:25
**interaction** [2] - 108:23, 109:16
**interactions** [1] - 87:15
**internal** [2] - 61:9, 61:15
**internally** [1] - 77:19
**interns** [1] - 108:15
**interrupt** [3] - 71:23, 131:16, 131:18
**interview** [11] - 64:23, 82:19, 87:14, 88:19, 88:24, 97:5, 97:17, 97:22, 98:9, 98:20, 104:6
**interviewing** [2] - 98:6, 98:22
**interviews** [6] - 55:21, 82:13, 98:2, 98:3, 98:14, 104:8
**introduction** [1] - 131:12
**invested** [1] - 127:20
**investigate** [7] - 51:21, 52:2, 53:18, 57:6, 57:9, 59:13, 67:22
**investigated** [2] - 76:24, 77:8
**investigating** [2] - 80:9, 81:21
**investigation** [68] -

17:1, 53:13, 53:14, 53:21, 53:22, 53:23, 60:8, 60:24, 61:1, 61:19, 61:22, 62:1, 62:5, 62:13, 62:14, 63:2, 64:10, 64:20, 65:7, 65:8, 66:6, 66:15, 66:18, 68:12, 68:15, 68:23, 68:25, 69:3, 69:6, 69:10, 69:12, 69:13, 69:19, 70:6, 70:11, 70:17, 71:10, 76:16, 76:23, 77:3, 77:6, 80:7, 80:11, 81:20, 81:23, 82:2, 86:12, 87:9, 92:17, 92:23, 96:3, 96:21, 98:21, 99:4, 101:10, 103:14, 105:21, 105:22, 105:24, 106:13, 106:14, 107:2, 107:24, 108:1, 108:4, 110:17, 110:21
**investigations** [31] - 43:23, 50:15, 53:6, 53:11, 54:11, 54:15, 54:17, 54:20, 54:22, 54:25, 55:8, 55:19, 55:24, 57:14, 58:24, 59:1, 59:15, 60:4, 60:5, 62:16, 67:20, 69:8, 77:18, 96:1, 96:5, 96:10, 101:14, 107:2, 107:5, 107:7, 110:12
**investigative** [19] - 49:20, 53:12, 54:19, 55:7, 55:18, 56:4, 56:7, 57:3, 61:3, 61:13, 61:23, 63:5, 63:24, 64:17, 68:3, 68:4, 69:2, 69:9, 77:20
**involved** [5] - 35:25, 39:2, 68:25, 87:3, 103:10
**involving** [4] - 3:21, 68:13, 68:24, 101:10
**issue** [13] - 15:11, 15:16, 23:9, 51:17, 52:5, 67:4, 67:6, 72:13, 76:3, 125:16, 126:7, 132:24, 132:25
**issued** [1] - 93:4
**issues** [7] - 44:16, 114:12, 114:13, 127:9, 131:4, 131:9

**items** [3] - 19:25, 20:9, 20:12
**itself** [1] - 58:11

## J

**Jack** [2] - 7:8, 30:16
**Jamestown** [1] - 4:17
**January** [4] - 7:4, 8:6, 8:16, 103:21
**JASON** [2] - 2:3, 3:6
**job** [14] - 44:3, 44:10, 44:15, 44:21, 44:24, 45:1, 116:12, 116:15, 116:20, 130:6, 133:1
**jobs** [1] - 60:2
**Jordan** [2] - 6:3, 9:12
**journal** [1] - 7:14
**Judge** [2] - 45:3, 74:21
**JUDGE** [1] - 1:10
**judge** [3] - 112:8, 116:4, 126:23
**judgment** [3] - 122:5, 122:15, 123:19
**July** [2] - 49:22, 56:10
**jump** [2] - 18:23, 104:4
**June** [7] - 101:6, 101:8, 101:21, 102:4, 108:11, 109:5, 111:8
**jurisdiction** [5] - 52:14, 57:8, 59:14, 78:21
**Juror** [7] - 72:13, 72:20, 74:22, 115:5, 115:21, 116:7, 118:14
**JUROR** [16] - 115:23, 116:1, 116:9, 116:13, 116:17, 116:19, 116:22, 116:24, 117:4, 117:8, 117:11, 117:15, 117:20, 117:22, 117:24, 118:1
**juror** [5] - 73:10, 74:23, 116:4, 118:2, 119:5
**jurors** [4] - 44:8, 73:22, 116:3, 117:18
**jury** [35] - 47:20, 49:25, 50:4, 54:5, 57:21, 60:22, 60:24, 64:8, 71:25, 72:10, 72:14, 73:11, 76:10, 92:6, 114:9, 116:6, 117:18, 122:13, 122:14, 123:25,

124:2, 124:3, 124:11, 124:24, 125:7, 125:17, 126:5, 126:8, 126:20, 127:10, 127:11, 128:3, 128:10, 128:13, 130:18
**JURY** [1] - 1:9
**jury's** [1] - 125:18
**JUSTICE** [1] - 1:14

## K

**Karen** [2] - 9:13, 9:20
**keep** [5] - 6:15, 9:16, 71:21, 72:20, 119:5
**Keller** [1] - 17:22
**kept** [1] - 41:19
**key** [6] - 4:5, 4:8, 5:21, 6:22, 6:24, 92:18
**Kilgore** [1] - 110:25
**kind** [18] - 4:9, 16:25, 18:4, 18:9, 19:5, 23:19, 34:5, 37:6, 39:21, 39:22, 43:20, 58:11, 72:14, 74:2, 74:16, 78:12, 112:4, 113:23
**kinds** [5] - 11:11, 34:1, 57:5, 58:24, 59:11
**Kingston** [2] - 7:8, 30:17
**Knives** [1] - 5:12
**knock** [1] - 34:2
**knowledge** [1] - 13:13
**known** [7] - 25:24, 27:6, 32:15, 45:16, 61:23, 68:21, 109:8

## L

**ladies** [1] - 112:3
**laid** [1] - 6:9
**Lake** [1] - 48:3
**lame** [2] - 28:15, 28:23
**language** [3] - 37:6, 105:3, 107:4
**last** [18] - 9:16, 41:8, 62:14, 63:2, 72:24, 78:19, 79:15, 84:21, 92:2, 104:25, 116:11, 116:13, 116:14, 116:17, 116:18, 116:19, 118:21
**late** [1] - 4:13
**lateness** [1] - 72:12
**latter** [1] - 99:6
**law** [26] - 46:6, 48:8, 48:12, 48:15, 48:19,

48:21, 48:24, 48:25, 49:3, 49:4, 49:6, 49:7, 49:13, 55:12, 55:13, 55:15, 55:16, 55:25, 56:3, 57:10, 65:21, 78:9, 126:1, 128:9, 131:4
**Law** [2] - 48:8, 48:9
**lawyers** [2] - 24:17, 116:5
**lay** [2] - 131:17, 131:21
**laying** [2] - 29:1, 29:6
**lays** [1] - 82:5
**Lead** [2] - 37:5, 39:17
**lead** [8] - 37:9, 37:22, 39:19, 54:20, 69:2, 69:9, 69:10, 100:8
**leader** [4] - 50:24, 51:8, 51:11, 52:25
**leadership** [2] - 88:6, 89:23
**leading** [3] - 54:16, 54:22, 113:3
**leads** [1] - 60:8
**leaning** [2] - 128:2, 129:13
**learned** [2] - 15:6, 45:8
**learning** [1] - 87:10
**least** [3] - 78:5, 97:15, 98:12
**leave** [5] - 97:1, 114:24, 114:25, 115:7, 115:18
**leaves** [1] - 114:9
**leaving** [1] - 73:18
**led** [1] - 68:15
**left** [4] - 4:13, 4:16, 4:23, 76:15
**legal** [5] - 44:16, 55:23, 124:8, 128:12, 130:19
**legislation** [2] - 52:12, 52:19
**lending** [1] - 35:13
**length** [1] - 3:25
**lESLIE** [1] - 1:17
**leslie.mcadoo@ mcadoolaw.com** [1] - 1:20
**less** [1] - 31:7
**lesson** [1] - 58:2
**letter** [32] - 67:4, 67:7, 77:6, 77:9, 79:6, 80:8, 80:15, 84:20, 84:25, 85:17, 89:8, 89:9, 90:5, 90:6, 100:19, 100:24, 102:7, 102:8, 102:9, 102:23, 104:17,

108:22, 109:11, 109:16, 109:19, 110:8, 110:19
**letters** [3] - 85:12, 101:23, 105:8
**letting** [1] - 108:15
**level** [3] - 38:14, 55:23
**liaison** [1] - 96:12
**liberals** [1] - 27:9
**licensed** [1] - 48:10
**life** [2] - 112:10, 112:16
**light** [2] - 115:8, 126:18
**likely** [3] - 120:1, 120:3, 133:17
**limit** [1] - 107:16
**limited** [2] - 85:12, 88:25
**limiting** [1] - 105:3
**Lindsey** [1] - 24:2
**line** [4] - 91:7, 98:11, 100:16, 126:25
**lines** [3] - 4:8, 16:25, 110:5
**link** [1] - 7:9
**LISA** [1] - 136:3
**Lisa** [1] - 1:21
**list** [4] - 9:25, 21:14, 35:24, 39:8
**lists** [1] - 108:24
**live** [2] - 47:24, 47:25
**local** [2] - 34:1, 68:17
**located** [2] - 56:12, 56:13, 56:14
**logic** [1] - 19:15
**logistical** [2] - 119:21, 127:13
**Longworth** [1] - 56:14
**Look** [1] - 125:22
**look** [33] - 5:6, 7:3, 8:15, 12:2, 12:3, 12:7, 17:18, 17:21, 20:19, 21:21, 22:9, 26:17, 26:21, 28:12, 28:22, 36:3, 36:6, 38:24, 39:23, 40:1, 40:9, 41:1, 41:6, 70:12, 90:24, 101:3, 102:15, 108:1, 108:6, 108:12, 118:3, 122:9
**looked** [7] - 26:19, 26:22, 30:23, 61:10, 61:11, 82:23, 107:13
**looking** [27] - 8:6, 9:4, 27:8, 77:11, 78:16, 79:17, 84:6, 84:14, 86:9, 87:12, 87:21, 89:7, 89:8, 93:8,

93:24, 94:1, 97:4, 98:25, 100:11, 100:15, 101:5, 103:4, 105:1, 105:7, 105:13, 107:11, 133:1
**looks** [4] - 40:2, 72:18, 72:19, 134:7
**loop** [1] - 55:11
**lose** [3] - 44:24, 73:13, 73:16
**Lovells** [1] - 49:6
**low** [1] - 55:23
**low-level** [1] - 55:23
**LTD** [6] - 78:2, 78:5, 85:22, 86:4, 103:19, 103:20
**luck** [3] - 117:9, 117:12, 117:25
**lunch** [2] - 133:20, 133:21

## M

**magnitude** [1] - 39:6
**mails** [1] - 94:19
**main** [3] - 60:3, 62:2, 63:13
**majority** [1] - 62:18
**manager** [1] - 9:19
**manner** [1] - 51:6
**Manual** [1] - 70:1
**March** [14] - 1:4, 12:23, 13:11, 17:23, 20:20, 21:20, 21:21, 22:10, 22:12, 52:9, 52:23, 71:13, 71:14, 136:8
**marginally** [1] - 30:19
**Mark** [2] - 75:17, 76:9
**mass** [1] - 20:7
**materials** [3] - 68:4, 91:8, 110:20
**Matter** [1] - 79:20
**matter** [17] - 53:18, 53:22, 60:7, 60:23, 65:6, 66:15, 66:18, 68:11, 69:24, 77:13, 86:12, 87:9, 95:5, 95:12, 105:24, 130:22
**matters** [7] - 7:25, 54:13, 66:11, 67:1, 114:8, 130:2
**McADOO** [2] - 1:17, 1:18
**me..** [1] - 21:24
**mean** [50] - 13:22, 20:2, 21:5, 29:8, 30:6, 31:9, 35:23,

40:17, 40:21, 41:25, 42:5, 42:7, 42:14, 42:20, 50:19, 51:5, 55:22, 57:24, 58:21, 62:18, 66:10, 67:3, 69:7, 70:21, 72:20, 80:5, 84:22, 86:25, 91:20, 102:10, 103:9, 105:14, 112:20, 114:17, 115:8, 115:13, 119:12, 122:3, 122:9, 122:16, 123:3, 129:5, 130:24, 131:22, 132:11, 132:23, 134:3, 134:19
**meaning** [1] - 28:3
**means** [5] - 34:22, 41:17, 120:17, 120:18
**meant** [2] - 38:22, 91:7
**mechanical** [1] - 1:24
**media** [15] - 12:24, 13:25, 20:7, 20:13, 20:17, 20:18, 27:12, 27:20, 35:1, 38:7, 39:19, 40:2, 41:3, 41:10, 43:2
**meet** [1] - 63:7
**Meet** [1] - 36:24
**meeting** [10] - 5:1, 64:18, 64:22, 65:1, 65:3, 65:5, 66:12, 70:25, 85:15
**meetings** [4] - 4:18, 4:21, 32:24, 41:14
**member** [13] - 13:14, 14:7, 56:7, 57:11, 65:17, 67:19, 75:18, 75:22, 89:21, 96:20
**members** [24] - 33:4, 45:19, 50:10, 50:12, 50:22, 51:1, 51:7, 51:8, 51:25, 52:1, 52:2, 53:20, 57:6, 58:17, 58:21, 59:17, 59:20, 59:23, 65:17, 67:21, 67:22, 111:11
**Members'** [3] - 16:7, 69:16, 78:8
**memo** [1] - 61:19
**memoranda** [2] - 85:13
**memorandum** [5] - 61:15, 122:23, 126:1, 126:4, 128:5
**memorializing** [1] - 85:14
**memorized** [2] -

31:24, 31:25
**memory** [4] - 30:12, 31:2, 31:9, 31:12
**mention** [2] - 98:16, 108:21
**mentioned** [17] - 39:16, 49:11, 49:12, 53:24, 55:2, 55:11, 62:21, 64:7, 65:11, 66:24, 68:20, 70:9, 84:17, 90:10, 100:5, 105:19, 110:6
**mentions** [2] - 92:3, 100:15
**merely** [1] - 80:9
**merit** [1] - 53:21
**merited** [1] - 65:9
**merits** [2] - 53:16, 66:18
**messages** [3] - 4:9, 85:13, 94:21
**Messaging** [1] - 11:21
**messaging** [9] - 4:5, 5:21, 10:23, 11:13, 12:11, 12:12, 12:15, 36:1
**microphone** [1] - 50:1
**might** [22] - 3:23, 4:7, 16:24, 19:13, 20:2, 20:16, 22:8, 61:11, 73:9, 79:10, 79:16, 91:7, 91:8, 91:10, 92:13, 92:21, 93:20, 101:18, 107:3, 113:23
**MILLER** [2] - 2:3, 3:6
**Miller** [4] - 3:9, 3:11, 24:24, 46:16
**million** [2] - 31:4, 106:21
**mind** [2] - 93:19, 127:25
**minority** [4] - 50:24, 51:8, 51:11, 52:25
**minuscule** [2] - 29:23, 31:20
**minute** [2] - 71:21, 105:10
**minutes** [2] - 4:12, 72:4
**mischief** [2] - 75:5, 112:15
**misconduct** [5] - 50:16, 51:21, 60:15, 60:17, 61:12
**mission** [1] - 48:6
**mistake** [1] - 44:14
**mistaken** [1] - 132:9
**misuse** [3] - 70:7, 78:11, 78:12

**misused** [4] - 69:20, 69:21, 70:13, 78:7
**MJOA** [8] - 121:11, 121:15, 123:5, 123:13, 124:4, 125:10, 127:9, 127:14
**MO** [1] - 39:21
**moderate** [1] - 19:4
**moderates** [1] - 27:9
**moment** [17] - 32:2, 33:3, 49:12, 50:17, 53:25, 59:11, 62:21, 63:19, 76:21, 78:10, 82:23, 83:13, 84:5, 94:13, 97:20, 110:7, 134:5
**moments** [2] - 53:7, 64:7, 93:24
**Monday** [14] - 111:21, 112:5, 113:10, 116:22, 116:23, 118:23, 120:2, 120:4, 131:24, 132:24, 133:14, 133:17, 134:8, 135:14
**money** [13] - 19:13, 30:9, 30:13, 30:24, 31:7, 31:13, 31:14, 32:3, 42:9, 57:1, 70:3, 86:3, 86:5
**monitor** [1] - 61:4
**month** [6] - 39:3, 39:5, 63:9, 94:8, 99:19
**monthly** [5] - 37:4, 37:22, 37:25, 39:2, 63:7
**months** [3] - 4:2, 24:4, 53:2
**moot** [2] - 123:17, 128:4
**MOREIRA** [1] - 136:3
**Moreira** [1] - 1:21, 136:10
**Morgan** [15] - 46:24, 47:8, 47:19, 47:21, 59:11, 76:15, 79:17, 80:24, 84:7, 92:2, 93:7, 95:15, 99:23, 101:5, 107:11
**MORGAN** [2] - 2:5, 47:5
**morning** [9] - 28:25, 31:20, 37:18, 38:7, 131:24, 132:24, 133:14, 135:14
**morph** [1] - 123:19
**most** [6] - 30:9, 30:11, 30:14, 30:18, 57:14,

123:24
**motion** [19] - 119:10, 119:13, 120:12, 121:17, 121:18, 122:4, 122:14, 122:15, 122:22, 123:19, 124:11, 124:13, 124:17, 124:22, 125:13, 126:1, 128:18, 129:1
**motivation** [1] - 28:19
**move** [4] - 17:16, 50:1, 90:25, 120:7
**moves** [1] - 47:11
**moving** [1] - 117:5
**MR** [117] - 3:4, 3:8, 5:7, 5:16, 5:24, 6:2, 6:12, 6:15, 7:3, 7:18, 8:15, 8:21, 9:4, 9:10, 9:15, 9:22, 10:3, 10:11, 10:16, 11:6, 11:17, 11:23, 12:6, 12:17, 17:18, 17:24, 18:11, 19:9, 19:18, 20:19, 22:9, 24:5, 24:21, 31:5, 32:16, 46:15, 46:20, 46:23, 47:1, 47:7, 47:10, 47:17, 47:18, 58:6, 58:9, 58:23, 59:9, 59:10, 71:22, 71:24, 72:6, 72:11, 72:18, 73:6, 73:8, 73:13, 73:18, 73:21, 74:1, 74:8, 74:15, 75:13, 76:12, 76:14, 79:12, 80:22, 81:8, 81:11, 82:21, 83:6, 83:15, 84:12, 85:8, 87:19, 91:25, 93:5, 93:18, 93:23, 94:3, 94:24, 95:7, 95:14, 96:15, 96:23, 97:6, 98:24, 99:21, 100:10, 100:23, 101:3, 102:6, 102:16, 104:24, 107:10, 108:7, 111:14, 111:18, 118:8, 118:14, 118:18, 119:1, 119:6, 119:25, 120:9, 120:14, 120:20, 120:23, 121:9, 124:6, 129:24, 130:1, 130:9, 130:13, 130:16, 133:16, 133:21, 133:24
**MRA** [6] - 16:7, 44:3, 45:9, 69:15, 69:20,

70:7
**MS** [105] - 24:11, 24:14, 24:19, 24:23, 26:17, 26:21, 28:11, 28:22, 30:21, 31:19, 36:6, 39:23, 40:1, 40:8, 41:1, 41:6, 45:3, 45:20, 47:15, 57:17, 57:23, 58:15, 58:19, 59:4, 72:21, 72:24, 73:2, 73:7, 73:16, 73:25, 74:4, 74:9, 74:11, 74:21, 75:2, 75:4, 75:7, 75:21, 75:24, 76:2, 76:6, 96:14, 105:9, 110:14, 119:8, 119:16, 119:21, 120:8, 121:7, 121:13, 121:23, 122:6, 122:11, 122:19, 122:22, 123:1, 123:14, 123:22, 124:3, 124:8, 124:21, 124:24, 125:2, 125:6, 125:25, 126:10, 126:14, 126:18, 126:24, 127:2, 127:7, 127:13, 127:17, 127:19, 127:23, 128:6, 128:11, 128:15, 128:21, 128:25, 129:7, 129:10, 131:2, 131:6, 131:18, 131:25, 132:5, 132:8, 132:13, 132:16, 132:20, 133:2, 133:5, 133:7, 133:11, 134:5, 134:9, 134:13, 134:16, 134:18, 134:21, 134:24, 135:5, 135:7, 135:11
**MULRYNE** [51] - 1:13, 46:20, 46:23, 47:1, 47:7, 47:10, 47:17, 47:18, 58:6, 58:9, 58:23, 59:9, 59:10, 71:22, 71:24, 72:6, 76:12, 76:14, 79:12, 80:22, 81:8, 81:11, 82:21, 83:6, 83:15, 84:12, 85:8, 87:19, 91:25, 93:5, 93:18, 93:23, 94:3, 94:24, 95:7, 95:14, 96:15, 96:23, 97:6, 98:24, 99:21, 100:10,

100:23, 101:3, 102:6, 102:16, 104:24, 107:10, 108:7, 111:14, 111:18
**Mulryne** [1] - 71:19
**Mulryne.....................**
**.............** [1] - 2:6
**multicandidate** [1] - 32:1
**multiple** [3] - 26:4, 98:8, 103:11
**must** [1] - 84:23

# N

**nail** [1] - 64:13
**name** [3] - 47:19, 78:24, 92:8
**names** [5] - 21:17, 35:23, 86:22, 87:22, 88:22
**narrow** [1] - 88:11
**narrowed** [1] - 102:10
**narrower** [1] - 107:3
**narrowing** [1] - 109:24
**National** [1] - 33:10
**nature** [7] - 56:2, 76:24, 77:22, 77:23, 81:4, 87:15, 123:22
**Nature** [2] - 81:18, 81:25
**nearly** [1] - 75:8
**necessarily** [1] - 90:14
**need** [37] - 17:25, 18:3, 21:1, 24:14, 76:3, 81:16, 91:22, 91:23, 92:17, 95:20, 95:21, 97:11, 97:15, 97:21, 98:12, 98:13, 104:18, 108:5, 110:3, 110:7, 112:3, 115:5, 115:6, 115:24, 119:11, 119:21, 120:16, 120:21, 126:24, 129:22, 131:4, 132:23, 133:13, 134:21, 135:10, 135:16
**needed** [4] - 36:25, 44:20, 57:24, 73:23
**needs** [3] - 92:22, 120:23, 123:24
**negative** [4] - 20:17, 92:3, 92:15, 100:9
**nemesis** [1] - 18:9
**nervous** [2] - 58:16, 58:19
**never** [4] - 14:5, 14:24,

26:5, 123:18
**New** [2] - 1:15, 24:4
**new** [3] - 111:15, 116:20, 130:6
**news** [13] - 7:17, 11:15, 15:8, 15:11, 15:12, 15:13, 17:2, 43:25, 45:9, 60:16, 68:16, 68:17
**next** [27] - 9:15, 9:22, 10:3, 10:16, 11:1, 15:19, 17:24, 18:11, 19:22, 22:10, 22:15, 39:23, 43:19, 46:19, 46:21, 58:22, 64:17, 72:15, 73:11, 73:22, 74:17, 103:5, 113:6, 113:18, 113:20, 119:4, 132:19
**night** [3] - 7:9, 73:19, 97:3
**NO** [16] - 115:23, 116:1, 116:9, 116:13, 116:17, 116:19, 116:22, 116:24, 117:4, 117:8, 117:11, 117:15, 117:20, 117:22, 117:24, 118:1
**Noncooperation** [1] - 100:1
**noncooperation** [1] - 100:14
**noncooperative** [3] - 92:13, 100:7, 101:16
**none** [1] - 112:11
**noon** [1] - 22:19
**norm** [1] - 106:12
**normal** [3] - 19:5, 106:13, 106:14
**normally** [1] - 106:4
**Norton** [1] - 108:18
**note** [4] - 113:15, 115:21, 116:2, 116:4
**note-writers** [1] - 113:15
**noted** [1] - 111:8
**notes** [6] - 55:21, 88:2, 103:17, 105:2, 113:14, 136:5
**nothing** [4] - 24:5, 27:24, 33:22, 73:4
**Notice** [1] - 100:1
**notification** [4] - 76:22, 80:10, 100:6, 100:13
**notify** [2] - 77:7, 101:15
**notifying** [5] - 88:18,

91:18, 92:10, 92:12, 100:19
**November** [2] - 29:17, 29:18
**NRCC** [3] - 33:2, 33:3, 33:12
**NRSC** [1] - 33:7
**number** [8] - 4:19, 37:15, 85:19, 108:12, 112:8, 113:14, 114:18
**numbers** [2] - 31:23, 103:1
**nuts** [1] - 61:11
**NW** [4] - 1:15, 1:18, 1:22, 136:12

# O

**O'Donnell** [91] - 3:21, 4:4, 4:13, 4:16, 4:23, 5:3, 5:9, 5:18, 5:19, 6:10, 6:13, 6:20, 8:1, 9:3, 9:8, 10:17, 11:11, 11:12, 11:25, 12:10, 12:24, 13:10, 13:15, 14:3, 14:10, 14:14, 16:4, 16:6, 16:13, 17:3, 19:3, 20:14, 21:4, 22:3, 23:9, 23:10, 23:15, 23:20, 23:23, 32:5, 32:13, 32:21, 32:23, 35:16, 44:2, 45:5, 45:14, 68:19, 68:20, 70:8, 70:16, 78:2, 78:4, 78:13, 85:22, 85:24, 86:1, 86:3, 86:6, 86:11, 86:14, 86:19, 86:20, 86:23, 87:4, 87:5, 87:11, 87:16, 87:25, 88:6, 88:7, 89:16, 90:10, 90:11, 90:13, 90:15, 90:21, 103:19, 103:20, 104:1, 105:17, 106:19, 107:24, 108:4, 108:23, 109:8
**O'Donnell's** [7] - 8:12, 12:18, 16:9, 17:6, 22:24, 43:2, 78:14
**O'Donnell-associated** [1] - 105:17
**objecting** [1] - 131:12
**objection** [11] - 31:5, 32:16, 47:14, 47:15, 57:17, 57:22, 96:14, 105:9, 110:14, 114:11

**objections** [1] - 131:19
**obligated** [1] - 135:2
**obligation** [1] - 50:9
**observations** [2] - 13:9, 14:3
**obtain** [3] - 85:4, 85:5, 90:6
**obviously** [5] - 13:24, 20:6, 119:17, 124:9, 124:12
**occasion** [1] - 112:7
**occasionally** [2] - 101:14, 101:16
**occur** [1] - 66:17
**occurred** [8] - 60:16, 65:22, 66:17, 68:2, 78:11, 80:14, 85:6, 87:17
**occurring** [3] - 3:21, 3:25, 70:19
**OCE** [86] - 47:12, 47:13, 49:22, 49:25, 50:14, 50:22, 50:25, 52:13, 52:21, 52:22, 53:2, 53:5, 53:8, 53:9, 53:10, 53:11, 53:15, 53:16, 53:19, 54:2, 54:3, 54:4, 54:7, 54:11, 54:12, 55:3, 55:12, 56:6, 56:24, 57:8, 57:14, 60:9, 60:10, 60:12, 60:15, 61:2, 61:21, 61:23, 62:1, 62:4, 63:2, 63:4, 63:6, 63:10, 64:4, 64:12, 65:10, 66:2, 67:15, 67:23, 67:24, 67:25, 68:8, 69:7, 71:13, 76:23, 77:6, 77:17, 77:19, 79:3, 79:14, 79:20, 80:6, 80:11, 80:13, 80:19, 84:24, 85:4, 89:18, 91:21, 92:8, 92:9, 92:12, 92:16, 92:21, 93:1, 93:2, 93:6, 99:13, 100:8, 107:6, 108:16, 109:11
**OCE's** [2] - 71:11, 77:18
**ODA** [1] - 85:22
**OF** [5] - 1:1, 1:3, 1:9, 1:14, 136:1
**offended** [1] - 24:7
**offense** [3] - 18:19, 19:24, 67:5
**offer** [2] - 30:18, 41:10
**offered** [2] - 49:19,

131:15
**offering** [2] - 10:22, 11:12
**offers** [1] - 114:10
**Office** [33] - 49:1, 49:4, 49:13, 49:17, 49:20, 50:5, 50:6, 50:17, 50:21, 51:15, 52:18, 55:9, 56:11, 56:14, 56:20, 57:5, 58:24, 59:12, 60:7, 63:25, 65:23, 66:5, 67:12, 68:12, 68:23, 70:11, 77:2, 77:12, 84:16, 96:12, 99:17, 100:17, 101:9
**office** [65] - 3:12, 3:21, 12:25, 14:23, 16:7, 17:8, 21:8, 26:4, 36:4, 50:7, 54:13, 54:23, 54:25, 55:18, 56:12, 57:4, 58:1, 58:11, 59:18, 64:5, 68:18, 69:7, 69:19, 70:4, 70:18, 70:19, 70:20, 70:25, 71:17, 76:17, 77:2, 78:3, 78:4, 79:7, 80:8, 80:17, 80:18, 82:1, 84:1, 84:3, 85:21, 86:1, 86:3, 86:24, 87:16, 88:4, 88:14, 89:20, 89:21, 90:6, 90:7, 90:17, 91:19, 94:15, 96:11, 97:25, 101:10, 102:25, 103:3, 103:10, 108:15, 108:16, 111:6, 111:10
**officer** [1] - 57:11
**officers** [2] - 59:20, 59:24
**offices** [3] - 33:18, 56:11, 70:23
**official** [30] - 12:25, 14:15, 14:21, 14:23, 15:2, 16:7, 21:8, 32:11, 32:13, 32:21, 44:3, 55:6, 57:12, 59:18, 68:19, 69:17, 69:18, 70:2, 70:3, 70:19, 71:4, 71:6, 71:8, 71:9, 78:17, 107:17, 108:1, 108:6, 111:11, 136:10
**Official** [1] - 1:21
**OFFICIAL** [1] - 136:1
**often** [7] - 3:20, 23:7, 52:1, 60:6, 60:7,

65:2, 123:4
**old** [1] - 47:22
**Omar** [1] - 78:24
**once** [1] - 60:23
**Once** [2] - 82:10, 97:14
**one** [68] - 8:1, 8:3, 9:19, 11:24, 17:4, 17:6, 17:15, 17:17, 18:18, 20:3, 20:4, 20:5, 20:23, 27:3, 29:9, 29:15, 31:19, 32:11, 33:2, 35:8, 36:11, 36:15, 37:15, 54:9, 54:16, 54:21, 57:16, 58:15, 60:9, 61:2, 61:12, 67:3, 67:15, 67:23, 69:9, 69:22, 75:16, 77:1, 78:16, 79:16, 85:19, 90:13, 91:7, 100:7, 100:22, 102:13, 104:12, 104:25, 105:1, 107:23, 108:15, 109:15, 110:24, 112:7, 112:13, 114:10, 115:2, 119:7, 121:5, 121:12, 123:5, 127:5, 127:25, 129:6, 131:6, 132:1, 132:19
**one's** [4] - 21:21, 22:10, 115:1, 129:10
**ones** [1] - 103:7
**online** [1] - 30:2
**Open** [1] - 8:7
**open** [2] - 60:8, 61:18
**opening** [2] - 8:12, 114:17
**operated** [1] - 31:14
**operating** [2] - 53:5, 69:19
**operation** [1] - 27:10
**opinion** [13] - 13:13, 30:18, 43:16, 43:17, 44:11, 44:14, 44:18, 112:19, 112:20, 131:14, 131:17, 131:21
**opponent** [3] - 5:14, 10:14, 30:17
**opponents** [3] - 5:22, 9:20, 17:15
**opportunity** [2] - 18:22, 67:16
**opposed** [3] - 73:11, 78:17, 89:25
**option** [4] - 122:13, 124:10, 125:19,

126:16
**options** [1] - 122:17
**oral** [1] - 66:13
**order** [3] - 124:18, 134:1, 134:4
**organization** [2] - 33:7, 33:12
**orientation** [1] - 117:5
**oriented** [1] - 19:3
**originally** [1] - 6:21
**ostensibly** [1] - 6:9
**otherwise** [1] - 42:2
**outline** [1] - 36:21
**outset** [1] - 97:21
**outside** [10] - 23:14, 33:21, 57:21, 59:22, 60:1, 72:10, 95:11, 96:2, 106:12
**outspent** [1] - 30:15
**outstanding** [1] - 135:8
**overall** [4] - 15:11, 21:18, 36:1, 40:24
**overhead** [1] - 76:18
**overlooked** [1] - 114:2
**overruled** [2] - 96:16, 105:11
**oversee** [1] - 54:4
**overseeing** [1] - 54:11
**overseen** [3] - 50:21, 50:22, 51:24
**oversees** [4] - 50:25, 54:3, 54:15, 61:20
**overwhelmingly** [1] - 96:1
**own** [7] - 28:17, 50:9, 50:12, 60:19, 71:7, 71:8, 96:20

---

**P**

**p.m** [4] - 1:5, 21:21, 22:12, 135:22
**PAC** [2] - 88:6, 89:23
**page** [30] - 5:8, 9:11, 9:15, 9:16, 9:22, 10:3, 10:16, 11:17, 11:24, 12:2, 12:6, 12:17, 17:24, 18:11, 39:23, 41:7, 79:15, 79:16, 80:22, 81:8, 82:3, 82:21, 83:15, 91:25, 94:3, 95:14, 103:4, 103:5, 104:4, 129:11
**Page** [4] - 80:22, 93:6, 93:18, 104:24
**PAGE** [1] - 2:2
**paid** [21] - 12:25, 13:2, 13:8, 14:15, 14:22,

16:4, 34:23, 37:11, 40:21, 41:20, 41:22, 42:1, 42:5, 42:7, 44:3, 45:9, 56:24, 78:4, 86:3, 86:5, 107:24
**panel** [1] - 74:12
**paper** [1] - 112:21
**paper-intensive** [1] - 112:21
**Paragraph** [3] - 87:6, 88:1, 88:17
**paragraph** [12] - 77:11, 82:10, 91:1, 91:5, 100:16, 103:16, 104:5, 104:11, 104:15, 105:6
**paragraphs** [1] - 103:7
**part** [19] - 21:4, 26:21, 26:24, 28:12, 36:6, 36:7, 38:16, 40:1, 40:9, 41:2, 41:4, 41:9, 53:6, 81:13, 88:21, 92:9, 98:21, 99:6
**Participate** [1] - 36:20
**participate** [2] - 37:8, 41:9
**participation** [1] - 32:25
**particular** [4] - 20:6, 29:15, 40:10, 132:1
**particularly** [1] - 92:18
**particulars** [1] - 45:19
**parties** [1] - 53:9
**pass** [1] - 45:20
**passed** [4] - 23:25, 52:9, 52:19, 52:23
**past** [2] - 71:21, 113:20
**path** [1] - 22:2
**patience** [1] - 117:17
**Paul** [6] - 68:13, 78:1, 79:23, 89:13, 89:14, 110:25
**Pause** [1] - 21:15
**pause** [1] - 78:10
**pay** [4] - 49:7, 68:19, 69:22, 69:23
**paying** [6] - 16:6, 19:3, 33:12, 68:18, 116:12
**payment** [2] - 17:3, 40:13
**payments** [3] - 17:5, 70:16, 78:13
**Pennsylvania** [1] - 117:2
**people** [21] - 7:24, 10:25, 17:1, 21:16,

25:24, 34:2, 35:25, 39:22, 52:3, 59:17, 60:2, 61:5, 61:6, 87:10, 101:18, 110:8, 111:2, 114:23, 114:24, 134:22
**people's** [1] - 118:4
**perceived** [1] - 67:21
**percent** [2] - 28:3, 97:24
**percentage** [2] - 36:18, 39:20
**Perdue** [3] - 5:12, 5:13, 30:8
**perform** [1] - 36:8
**performed** [2] - 13:10, 88:3
**performing** [1] - 11:11, 71:8
**perhaps** [4] - 72:20, 73:14, 74:1, 130:18
**period** [29] - 27:18, 54:9, 54:17, 54:21, 62:17, 62:20, 63:5, 63:6, 63:8, 63:13, 63:15, 63:17, 63:22, 63:24, 64:6, 79:2, 84:20, 84:21, 89:17, 94:14, 94:18, 99:3, 99:14, 101:8, 104:1, 104:8, 105:18, 107:3
**periods** [1] - 55:13
**perplexed** [2] - 15:25, 43:4
**person** [12] - 34:11, 35:17, 50:25, 54:7, 54:9, 64:18, 67:5, 76:22, 80:10, 98:6, 101:15
**personal** [3] - 30:13, 107:20, 119:3
**personally** [2] - 80:16, 86:19
**personnel** [2] - 97:17, 98:19
**persons** [4] - 54:23, 82:18, 82:20, 109:9
**phase** [10] - 31:1, 60:25, 62:13, 62:14, 62:22, 62:24, 62:25, 99:11, 99:13, 99:15
**phases** [1] - 98:8
**Philly** [1] - 117:5
**phone** [7] - 12:22, 15:12, 15:22, 23:4, 32:25, 94:13, 109:3
**pick** [2] - 17:15, 28:24
**picking** [3] - 18:21, 18:25, 19:3

**picture** [1] - 51:19
**piece** [2] - 52:12, 91:2
**pinged** [1] - 18:18
**place** [2] - 29:13, 61:22
**placement** [5] - 40:13, 42:10, 42:20, 42:21, 42:25
**placing** [1] - 36:15
**Plaintiff** [1] - 1:4
**plan** [3] - 22:20, 75:8, 122:12
**planning** [1] - 98:21
**plans** [1] - 76:5
**play** [1] - 74:19
**pleading** [1] - 130:4
**plugging** [1] - 130:16
**POC** [3] - 81:5, 81:6, 81:23
**podium** [1] - 24:11
**point** [32] - 4:13, 12:23, 20:3, 20:4, 21:2, 29:8, 29:9, 29:11, 33:17, 44:21, 49:11, 49:16, 51:22, 64:1, 64:3, 73:8, 73:21, 81:7, 82:2, 86:2, 87:2, 90:14, 95:22, 95:23, 96:3, 96:10, 96:19, 96:20, 97:2, 101:11, 123:21, 124:4
**points** [3] - 4:6, 5:21, 69:6
**policy** [2] - 18:10, 97:25
**political** [6] - 13:18, 18:10, 33:21, 34:11, 87:24, 89:22
**politicians** [1] - 27:20
**pollster** [1] - 14:1
**pop** [3] - 3:14, 3:17, 4:3
**popped** [1] - 4:22
**portions** [1] - 102:12
**pose** [1] - 10:13
**position** [9] - 13:11, 16:9, 21:8, 49:19, 54:10, 55:6, 64:4, 123:23
**possession** [1] - 101:19
**possibility** [3] - 25:17, 26:10, 28:25
**possible** [2] - 42:9, 60:20
**possibly** [1] - 10:9
**post-5:00** [1] - 132:18
**posted** [1] - 30:2
**postpone** [1] - 74:25

**potential** [2] - 60:23, 78:20
**potentially** [5] - 29:11, 39:4, 60:8, 90:1, 133:19
**power** [2] - 91:21, 93:1
**practice** [1] - 80:6
**practicing** [1] - 48:12
**precious** [1] - 113:1
**precise** [2] - 4:19, 128:9
**predict** [7] - 46:11, 112:7, 113:5, 115:2, 115:14, 118:5
**predicting** [1] - 112:9
**prediction** [1] - 113:3
**predictions** [1] - 46:10
**prefer** [1] - 95:3
**prejudice** [2] - 128:8, 128:10
**preliminary** [16] - 61:24, 62:2, 62:6, 62:7, 62:9, 62:17, 62:19, 71:11, 77:13, 82:6, 84:15, 84:21, 84:23, 99:3, 99:5
**Preliminary** [2] - 81:10, 82:4
**prep** [11] - 3:20, 4:17, 4:21, 4:23, 33:18, 35:5, 35:6, 35:7, 41:9, 41:13, 41:23
**prepared** [1] - 124:9
**preparing** [1] - 55:20
**present** [4] - 65:1, 68:11, 103:21, 112:25
**presentation** [4] - 64:16, 64:18, 66:13, 114:13
**presented** [2] - 37:21, 61:20
**preserve** [3] - 122:8, 124:18, 131:7
**presidential** [1] - 23:25
**press** [5] - 18:1, 18:7, 19:6, 61:4, 102:2
**presumption** [1] - 45:24
**pretrial** [1] - 131:13
**pretty** [2] - 116:9, 127:24
**previous** [5] - 14:16, 14:18, 26:6, 102:8, 104:12
**previously** [3] - 21:6, 64:5, 102:19
**primaries** [1] - 27:9
**primarily** [2] - 49:24,

94:16
**primary** [10] - 5:14, 5:22, 7:14, 9:19, 10:13, 12:16, 17:15, 30:12, 31:2, 32:1
**Primary** [1] - 7:10
**private** [2] - 27:16, 67:4
**privileged** [1] - 91:8
**problem** [3] - 43:13, 43:14, 71:24
**problematic** [1] - 16:2
**proceed** [3] - 3:2, 114:8, 121:20
**proceeding** [1] - 112:20
**proceedings** [2] - 126:3, 136:6
**Proceedings** [1] - 1:24
**process** [7] - 53:12, 61:8, 67:25, 77:20, 120:10, 131:18, 131:19
**produced** [3] - 1:25, 84:3, 110:4
**producing** [2] - 36:11, 40:4
**product** [1] - 68:3
**production** [3] - 40:2, 84:1, 106:9
**professional** [6] - 13:15, 13:22, 13:24, 27:10, 34:11, 34:14
**program** [1] - 32:3
**prohibit** [2] - 70:2, 70:23
**prohibited** [1] - 71:1
**prohibits** [1] - 70:4
**projector** [1] - 76:18
**promise** [1] - 74:18
**promptly** [2] - 71:20, 135:18
**properly** [1] - 59:19
**property** [1] - 90:19
**proposal** [2] - 25:6, 25:8
**proposed** [3] - 8:25, 9:2, 52:8
**prove** [1] - 46:3
**proves** [1] - 45:25
**provide** [11] - 7:9, 16:3, 44:20, 67:16, 77:14, 78:2, 82:7, 85:17, 103:16, 104:20, 109:10
**provided** [9] - 6:20, 8:23, 16:16, 64:20, 77:1, 79:9, 86:16, 87:15, 88:3
**provides** [1] - 81:19

**providing** [12] - 5:19, 6:4, 9:1, 13:15, 14:4, 15:2, 86:14, 91:1, 96:7, 100:13, 108:5, 110:19
**provision** [1] - 50:10
**public** [6] - 11:15, 25:21, 67:6, 67:14, 68:9, 87:2
**PUBLIC** [1] - 1:14
**publicly** [2] - 7:14, 61:14
**pull** [3] - 79:12, 79:14, 99:21
**Pulls** [1] - 5:12
**punish** [1] - 50:9
**punishing** [1] - 50:12
**punishment** [2] - 53:20, 67:3
**punishments** [1] - 66:23, 66:24
**purpose** [4] - 64:8, 77:5, 85:3, 92:16
**purposes** [6] - 67:15, 70:5, 70:7, 70:24, 85:10, 102:17
**pursuant** [1] - 84:15
**pursue** [1] - 67:18
**pursuing** [1] - 107:2
**put** [10] - 8:12, 20:4, 27:10, 32:20, 34:5, 64:14, 103:11, 131:7, 131:8, 133:8
**Putin** [1] - 18:20
**putting** [3] - 55:20, 55:21, 66:5

## Q

**qualifications** [1] - 58:10
**qualifying** [1] - 58:7
**question-and** [1] - 44:17
**questions** [13] - 10:13, 12:8, 15:10, 24:8, 24:18, 44:23, 46:15, 47:11, 55:20, 70:17, 82:8, 115:6, 128:9
**quick** [2] - 17:21, 81:11
**quickly** [2] - 74:19, 112:20
**quit** [1] - 22:25
**quite** [4] - 29:4, 57:8, 59:14, 123:6

## R

**race** [5] - 11:15, 21:13, 25:17, 29:11, 31:10

**radio** [1] - 36:12
**raised** [7] - 30:4, 30:5, 30:8, 30:25, 31:7, 31:11, 31:16
**raising** [2] - 30:3, 127:4
**ran** [2] - 24:3, 26:2
**range** [3] - 39:2, 66:23, 66:24
**ranked** [1] - 31:11
**rarely** [1] - 114:11
**rate** [2] - 37:16, 38:24
**rather** [2] - 23:7, 41:19
**RDR** [3] - 1:21, 136:3, 136:10
**re** [7] - 25:8, 25:14, 28:17, 28:23, 29:10, 29:16, 29:19
**re-elect** [1] - 29:10
**re-election** [5] - 25:8, 25:14, 28:17, 29:16, 29:19
**reach** [1] - 28:1
**reached** [3] - 25:2, 73:8, 73:21
**reaching** [1] - 15:23
**read** [18] - 18:17, 43:6, 77:21, 77:24, 78:22, 79:23, 85:16, 86:7, 88:8, 88:15, 97:18, 103:22, 108:19, 118:5, 118:6, 130:4, 130:8, 132:25
**reading** [1] - 119:10
**reads** [3] - 77:11, 78:19, 88:1
**ready** [2] - 120:8, 128:25
**real** [2] - 76:9, 81:11
**really** [14] - 6:8, 28:19, 31:15, 31:22, 39:13, 39:14, 60:20, 66:11, 76:3, 111:2, 118:6, 129:13, 129:14, 133:20
**realm** [1] - 61:23
**realtime** [1] - 30:6
**reason** [12] - 5:2, 14:2, 42:6, 42:12, 45:16, 91:3, 91:12, 111:3, 116:21, 121:21, 127:21, 130:25
**reasonable** [1] - 45:25
**reasons** [2] - 78:16, 128:12
**receive** [11] - 8:7, 8:19, 20:23, 60:10, 63:16, 83:10, 93:16, 97:11, 99:18, 105:7, 115:21
**received** [14] - 15:7,

20:10, 63:15, 64:24, 81:24, 83:4, 83:23, 100:17, 100:20, 101:11, 101:12, 109:4, 111:9, 111:12
**receives** [1] - 76:23
**receiving** [2] - 8:11, 21:2
**recess** [3] - 71:21, 111:16, 118:21
**Recess** [1] - 72:8
**recipient** [5] - 88:18, 91:13, 91:17, 91:18, 104:16
**recipients** [1] - 105:8
**recognize** [1] - 21:17
**recollection** [3] - 80:2, 110:16, 111:9
**recommend** [4] - 65:25, 66:2, 66:14, 67:10
**recommendation** [8] - 11:14, 53:16, 61:17, 61:18, 61:20, 65:24, 66:7, 66:9
**recommended** [1] - 52:6
**recommending** [1] - 65:20
**reconsider** [1] - 119:19
**reconsideration** [2] - 119:10, 119:14
**record** [6] - 7:8, 74:22, 106:18, 118:20, 131:7, 131:11
**record/relevant** [1] - 109:16
**recorded** [1] - 1:24
**records** [10] - 30:24, 85:13, 88:2, 95:20, 103:17, 105:2, 105:14, 105:16, 108:22, 111:1
**redirect** [1] - 46:14
**refer** [2] - 20:7, 53:22
**reference** [8] - 16:23, 20:1, 77:16, 77:17, 97:2, 109:1, 109:12, 109:17
**referenced** [3] - 81:12, 82:15, 95:4
**references** [1] - 77:15
**referencing** [1] - 82:14
**referral** [2] - 92:5, 92:14
**referred** [2] - 37:23, 92:22
**referring** [11] - 20:11, 20:13, 20:16, 51:10,

51:11, 83:12, 87:7, 103:8, 109:21, 113:7, 113:9
**refers** [1] - 108:17
**reflecting** [1] - 85:14
**refusal** [1] - 92:4
**regard** [3] - 7:16, 11:12, 59:18
**regarding** [7] - 33:1, 59:16, 68:23, 70:6, 71:10, 79:22, 104:12
**regardless** [2] - 44:10, 44:11
**regulation** [1] - 57:10
**regulations** [1] - 70:2
**related** [5] - 7:25, 83:20, 83:21, 83:22, 105:16
**relates** [1] - 87:11, 130:5
**relating** [3] - 88:3, 103:18, 104:1
**relation** [2] - 11:3, 101:9
**relationship** [3] - 42:14, 43:3, 57:25
**release** [2] - 18:1, 18:7
**relevant** [4] - 82:19, 92:19, 92:20, 108:23
**religious** [1] - 48:6
**rely** [1] - 120:24
**relying** [1] - 131:13
**remain** [2] - 56:17, 112:13
**remainder** [1] - 63:20
**remaining** [1] - 117:18
**remains** [1] - 45:24
**remarks** [1] - 27:17
**remember** [12] - 4:14, 4:24, 15:6, 15:20, 20:3, 23:3, 23:5, 23:8, 23:12, 23:16, 35:14, 92:24
**rendering** [1] - 13:23
**renders** [1] - 125:17
**renew** [1] - 124:15
**renewal** [1] - 130:3
**rephrase** [2] - 89:12, 96:15
**replies** [1] - 121:4
**reply** [4] - 120:16, 120:21, 121:6, 133:12
**report** [15] - 15:12, 63:12, 64:8, 64:9, 64:11, 64:15, 64:21, 65:3, 65:9, 67:13, 68:3, 68:8, 68:17, 84:23, 87:2
**reported** [1] - 7:14

**Reporter** [3] - 1:21, 1:21, 136:10
**REPORTER** [1] - 136:1
**reporter** [2] - 15:9, 47:20
**reports** [8] - 12:24, 15:13, 30:1, 45:10, 59:23, 60:16, 63:20, 68:16
**Representational** [3] - 16:8, 69:16, 78:8
**representative** [1] - 78:1
**Representative** [3] - 78:3, 78:7, 80:17
**Representatives** [8] - 49:2, 50:7, 50:8, 51:16, 51:20, 52:19, 56:22, 56:25
**representatives** [1] - 51:12
**representing** [1] - 95:5
**reprimand** [2] - 67:5, 67:7
**Republican** [2] - 27:9, 33:10
**Request** [1] - 97:12
**request** [51] - 39:22, 63:25, 64:2, 82:12, 82:16, 82:19, 83:10, 83:19, 84:10, 84:15, 85:3, 85:10, 86:9, 86:21, 88:1, 88:10, 88:11, 88:12, 88:23, 88:25, 89:3, 89:19, 89:24, 90:4, 91:6, 91:12, 91:17, 91:20, 93:17, 94:1, 101:6, 101:13, 101:22, 102:11, 102:18, 102:24, 104:6, 104:8, 104:12, 105:4, 105:14, 105:15, 105:20, 106:1, 106:3, 106:4, 106:6, 107:16, 107:19, 109:20
**requested** [10] - 64:5, 71:13, 85:18, 86:8, 91:2, 97:12, 97:22, 107:16, 110:17, 110:23
**requesting** [3] - 82:12, 105:1, 109:24
**requests** [5] - 64:1, 82:17, 88:22, 89:25, 103:11
**required** [1] - 59:24
**requires** [1] - 50:11

**research** [3] - 49:7, 61:13, 121:15
**reserve** [1] - 121:24
**reserves** [1] - 78:20
**resignation** [3] - 22:6, 22:25, 23:13
**resigned** [3] - 21:8, 23:2, 23:9
**resolution** [6] - 52:8, 52:10, 52:11, 52:23, 77:17, 92:7
**Resolution** [3] - 52:20, 77:16, 92:7
**resolve** [1] - 62:16
**resolved** [2] - 62:20, 114:14
**resources** [4] - 59:19, 70:3, 70:5, 70:13
**respect** [8] - 6:20, 12:11, 12:14, 22:3, 51:9, 78:10, 130:1, 131:21
**respective** [2] - 53:1, 104:9
**respond** [22] - 9:5, 11:25, 12:5, 12:19, 16:17, 19:19, 80:24, 83:7, 94:25, 95:8, 95:15, 97:8, 119:12, 120:11, 120:13, 120:15, 120:18, 123:11, 123:20, 130:13, 131:3, 133:10
**responding** [4] - 6:3, 12:10, 26:23, 94:11
**responds** [2] - 7:19, 96:24
**response** [19] - 6:5, 10:4, 10:6, 10:24, 10:25, 11:1, 12:2, 12:18, 19:11, 22:5, 22:15, 93:16, 100:18, 100:20, 101:12, 121:3, 121:10, 130:11, 135:1
**responses** [1] - 4:8
**responsibilities** [3] - 50:15, 54:20, 61:3
**responsible** [5] - 53:13, 54:10, 65:19, 102:22, 102:25
**responsive** [5] - 92:20, 109:20, 110:3, 110:9, 110:20
**rest** [8] - 30:15, 46:3, 103:2, 114:9, 120:2, 120:3, 129:1, 133:17
**restrictions** [2] -

59:21, 60:1
**rests** [2] - 46:2, 128:20
**result** [1] - 16:24
**Resumed** [2] - 2:3, 3:6
**retain** [1] - 96:2
**retained** [2] - 78:1, 94:17
**retainer** [14] - 37:4, 37:20, 37:22, 37:25, 38:3, 38:8, 38:13, 38:16, 38:20, 38:21, 38:24, 39:1, 39:7, 39:10
**retaining** [1] - 95:11
**retires** [5] - 123:25, 124:2, 124:3, 125:7, 126:5
**retiring** [2] - 124:12, 124:24
**return** [1] - 83:24
**returned** [3] - 49:3, 56:6, 82:11
**returns** [2] - 122:14, 128:3
**review** [41] - 21:14, 36:21, 36:25, 61:9, 61:24, 62:3, 62:6, 62:8, 62:9, 62:17, 62:19, 62:22, 62:24, 62:25, 64:22, 64:23, 64:25, 71:11, 76:25, 77:13, 77:22, 77:23, 81:5, 82:6, 84:16, 84:21, 84:23, 92:9, 92:12, 97:15, 97:22, 98:2, 98:12, 98:13, 99:3, 99:5, 99:11, 99:13, 99:15, 100:8
**Review** [5] - 78:22, 81:10, 81:18, 81:25, 82:4
**reviewable** [1] - 124:20
**reviewed** [3] - 60:13, 81:19, 84:11
**reviewing** [4] - 60:19, 63:10, 66:12, 103:10
**reviews** [2] - 12:4, 12:9
**RFI** [15] - 82:16, 83:13, 83:19, 83:23, 85:3, 89:15, 89:16, 90:11, 93:8, 100:21, 101:21, 109:5, 109:15, 109:24, 111:12
**RFIs** [3] - 101:20, 102:3, 104:7
**robe** [1] - 115:15
**robust** [1] - 32:3

**Roger** [1] - 28:23
**role** [6] - 21:18, 32:5, 32:8, 55:2, 55:8, 117:8
**rolling** [1] - 7:13
**Room** [2] - 1:22, 136:11
**room** [2] - 75:5, 117:18
**rule** [9] - 57:10, 121:20, 123:24, 124:14, 126:17, 126:22, 127:8, 128:2, 132:4
**Rule** [1] - 77:18
**rules** [13] - 59:16, 65:21, 70:1, 70:22, 70:24, 71:2, 77:18, 77:19, 78:9, 90:17, 121:19, 124:11, 124:22
**ruling** [6] - 119:17, 125:2, 125:6, 125:17, 128:3, 135:16
**rulings** [2] - 119:14, 131:13
**run** [12] - 12:16, 26:4, 26:10, 26:15, 26:25, 28:18, 29:1, 30:12, 30:17, 62:12, 107:25
**run-off** [2] - 30:12, 30:17
**run-up** [1] - 12:16
**running** [4] - 4:22, 26:11, 33:5, 55:19

**S**

**salary** [1] - 71:9
**Salt** [1] - 48:3
**sat** [1] - 35:8
**satisfaction** [1] - 114:14
**Saturday** [12] - 7:9, 120:13, 120:15, 120:25, 121:3, 130:13, 133:10, 134:17, 134:18, 134:24, 134:25
**saved** [1] - 41:8
**saw** [8] - 32:24, 99:7, 99:16, 102:8, 102:13, 104:12, 109:25, 130:7
**scale** [1] - 92:21
**scenario** [1] - 90:21
**schedule** [5] - 7:23, 33:15, 97:4, 130:23, 135:13

**scheduled** [1] - 36:20
**Schedules** [1] - 7:9
**School** [2] - 48:8, 48:9
**school** [9] - 48:4, 48:8, 48:19, 48:24, 48:25, 49:3, 49:7, 55:16, 55:25
**scope** [5] - 39:6, 40:24, 91:12, 105:4, 109:24
**script** [1] - 8:12
**scroll** [20] - 5:16, 5:17, 5:24, 6:12, 6:15, 9:15, 9:22, 11:18, 83:6, 84:13, 85:8, 87:19, 93:23, 94:24, 95:7, 97:6, 100:23, 102:16, 104:25
**scrolling** [10] - 7:18, 8:21, 9:10, 10:11, 11:6, 11:23, 17:19, 19:9, 19:18, 96:23
**Scrolling** [1] - 6:2
**SEAN** [1] - 1:13
**searching** [1] - 130:6
**season** [1] - 7:14
**seat** [2] - 28:17, 116:8
**seated** [1] - 24:8
**second** [23] - 5:8, 9:11, 11:17, 12:6, 12:7, 36:15, 49:3, 51:14, 54:24, 55:25, 62:13, 62:14, 62:22, 62:24, 62:25, 75:16, 82:11, 99:11, 99:13, 99:15, 100:15, 104:4, 122:3
**second-chair** [1] - 54:24
**second-phase** [7] - 62:13, 62:22, 62:24, 62:25, 99:11, 99:13, 99:15
**secondly** [1] - 44:13
**secretary** [1] - 102:2
**SECTION** [1] - 1:14
**section** [2] - 28:21, 102:17
**see** [43] - 4:3, 5:17, 6:3, 6:5, 7:19, 11:21, 11:25, 12:18, 18:3, 18:5, 23:20, 30:4, 32:17, 42:8, 46:17, 72:12, 74:2, 74:16, 75:10, 75:24, 78:24, 81:4, 85:9, 86:25, 88:13, 90:2, 93:19, 93:20, 101:20, 105:15, 106:10, 108:17, 108:24,

114:24, 115:8, 119:4, 126:24, 128:7, 128:9, 129:18, 129:21, 131:2
**seeing** [1] - 12:22
**seeking** [1] - 83:4
**Senate** [17] - 7:10, 11:21, 21:13, 25:17, 26:2, 26:10, 26:25, 27:7, 28:8, 28:18, 29:1, 29:7, 29:11, 30:9, 33:5, 52:15, 88:5
**senator** [3] - 5:14, 25:25, 26:8
**Senatorial** [1] - 33:10
**send** [8] - 35:19, 61:5, 80:7, 81:13, 82:11, 89:25, 101:20, 122:13
**sending** [8] - 7:5, 18:6, 35:17, 83:18, 83:19, 100:3, 100:5, 100:6
**sense** [7] - 16:20, 16:22, 51:2, 75:20, 107:25, 122:4, 123:15
**sensitive** [1] - 119:13
**sent** [11] - 25:5, 79:6, 80:17, 84:10, 89:9, 90:5, 90:11, 90:13, 93:9, 101:23
**sentence** [1] - 78:19
**separate** [6] - 40:18, 89:16, 89:25, 90:10, 90:13, 90:21
**September** [6] - 28:6, 29:13, 48:20, 49:10, 49:21, 56:8
**series** [3] - 12:24, 16:2, 17:9
**serious** [1] - 119:3
**serves** [1] - 96:12
**service** [2] - 13:23, 117:1
**service-rendering** [1] - 13:23
**services** [23] - 13:16, 13:18, 14:4, 15:2, 34:15, 36:8, 37:11, 41:9, 41:10, 42:1, 42:3, 68:19, 69:23, 69:25, 78:5, 78:14, 78:17, 78:18, 86:14, 86:16, 87:15, 88:3, 108:5
**serving** [2] - 49:12, 55:12

**session** [3] - 4:23, 7:13, 28:15
**SESSION** [1] - 1:8
**sessions** [14] - 3:12, 3:13, 3:15, 3:17, 3:18, 3:20, 4:3, 4:17, 4:21, 4:25, 32:13, 33:18, 35:7, 41:10
**set** [4] - 42:15, 42:17, 64:11, 77:19
**sets** [1] - 103:11
**seven** [2] - 24:4, 29:17
**several** [4] - 4:2, 102:4, 109:5, 133:25
**share** [2] - 113:24, 116:3
**sharing** [2] - 95:2, 96:25
**shit** [1] - 18:20
**short** [3] - 21:12, 59:4
**shorten** [1] - 133:18
**shorter** [1] - 4:10
**shortly** [1] - 89:9
**show** [3] - 71:18, 76:17, 76:18
**showing** [1] - 79:10
**side** [8] - 14:15, 14:21, 15:2, 27:16, 32:9, 32:21, 111:11, 132:11
**sight** [1] - 44:24
**sign** [1] - 67:19
**signed** [5] - 108:17, 109:11, 109:13, 109:14, 110:19
**Signed** [1] - 108:22
**significantly** [1] - 30:19
**signs** [1] - 34:5
**similar** [5] - 56:1, 86:9, 101:23, 102:13, 102:18
**simple** [1] - 67:4
**simply** [3] - 58:23, 66:17, 91:18
**single** [1] - 89:24
**sit** [8] - 24:14, 24:17, 35:6, 73:11, 73:17, 74:11, 125:14, 129:19
**sitting** [8] - 24:16, 50:22, 51:23, 58:2, 72:22, 111:20, 115:15, 119:4
**situation** [3] - 17:7, 96:19, 109:9
**situations** [1] - 35:13
**six** [2] - 24:4, 35:23
**skip** [1] - 81:8
**slammed** [1] - 22:18

**slamming** [1] - 18:20
**slightly** [1] - 10:22
**small** [1] - 69:7
**smaller** [1] - 28:11
**so..** [5] - 45:1, 128:4, 128:6, 130:8, 134:1
**someone** [3] - 4:22, 60:14, 68:21
**sometime** [2] - 99:5, 134:6
**sometimes** [10] - 3:18, 3:19, 3:23, 34:17, 38:13, 44:9, 75:6, 112:17, 112:18, 121:4
**somewhere** [1] - 115:16
**soon** [1] - 119:17
**sorry** [23] - 5:17, 6:6, 6:23, 8:22, 22:11, 27:14, 29:4, 42:6, 45:7, 45:8, 56:15, 58:18, 66:4, 70:20, 71:23, 73:6, 75:3, 75:18, 75:21, 87:19, 99:9, 125:4
**sort** [14] - 15:23, 17:7, 21:18, 33:3, 35:25, 38:1, 45:4, 59:2, 60:2, 63:14, 72:14, 89:18, 91:11, 130:5
**sorted** [1] - 133:8
**sound** [1] - 4:11
**sounds** [5] - 4:14, 58:2, 106:13, 119:2, 132:18
**source** [5] - 60:11, 60:17, 60:20, 60:21, 67:17
**sources** [1] - 59:22
**South** [1] - 48:6
**space** [6] - 5:1, 33:4, 33:22, 70:4, 70:18, 70:20
**Speaker** [4] - 50:23, 51:7, 51:10, 52:25
**speaking** [5] - 6:8, 11:2, 15:24, 65:23, 77:5
**specific** [8] - 10:13, 22:5, 23:8, 41:20, 41:21, 50:10, 80:2, 103:14
**specifically** [3] - 4:24, 21:17, 38:4
**specifies** [1] - 84:22
**specify** [1] - 84:20
**speech** [1] - 72:16
**spend** [2] - 19:12, 125:15

**spending** [2] - 30:14, 48:5
**spent** [2] - 30:11, 30:18
**spiel** [1] - 118:4
**spoken** [3] - 43:8, 113:22, 116:25
**spring** [1] - 76:1
**Springfield** [1] - 47:25
**springing** [1] - 75:20
**staff** [31] - 36:24, 53:3, 53:4, 53:11, 53:20, 54:4, 54:5, 54:6, 54:7, 54:8, 54:14, 57:7, 60:18, 61:2, 61:17, 61:19, 62:10, 63:10, 66:9, 70:4, 70:14, 70:18, 70:21, 71:3, 79:2, 87:7, 90:19, 96:4, 98:22, 111:11
**staffing** [1] - 54:13
**stage** [3] - 53:21, 61:25, 121:11
**stages** [2] - 53:12, 62:2
**stand** [2] - 23:8, 23:16
**stand-alone** [1] - 23:8
**standard** [4] - 37:6, 57:10, 105:21, 132:8
**standards** [1] - 65:21
**standing** [1] - 51:23, 65:16
**start** [9] - 72:4, 84:14, 85:9, 111:21, 116:20, 120:18, 130:18, 134:6, 134:8
**started** [10] - 15:5, 15:10, 25:1, 33:18, 48:8, 49:9, 71:14, 71:20, 93:20, 135:17
**starting** [4] - 110:22, 110:23, 111:1, 112:5
**starts** [5] - 7:4, 9:12, 11:19, 17:20, 22:11
**state** [4] - 47:19, 47:24, 48:17, 121:18
**Statement** [4] - 81:5, 81:18, 81:22, 81:24
**statement** [8] - 8:25, 9:2, 16:19, 76:24, 77:22, 77:23, 81:4, 92:4
**statements** [2] - 114:17, 130:5
**STATES** [3] - 1:1, 1:3, 1:10
**States** [3] - 1:13, 56:21, 136:11
**stating** [2] - 109:11,

110:20
**station** [2] - 24:3, 68:17
**statute** [1] - 52:12
**stay** [1] - 112:14
**stenographic** [1] - 136:5
**stenography** [1] - 1:24
**Step** [1] - 46:17
**step** [7] - 67:6, 68:10, 72:1, 84:4, 109:18, 110:19, 111:5
**Stevens** [2] - 123:6, 129:15
**still** [5] - 56:19, 62:11, 72:14, 73:22, 130:2
**stop** [11] - 19:23, 120:6, 121:14, 122:17, 122:20, 127:5, 127:22, 128:1, 128:23, 129:6, 129:9
**stories** [1] - 15:8
**story** [2] - 16:1, 125:8
**Strategist** [2] - 37:6, 39:18
**strategist** [2] - 37:9, 37:22
**strategy** [25] - 5:25, 6:4, 6:9, 12:12, 35:3, 36:21, 36:25, 37:8, 37:18, 38:8, 38:10, 38:15, 38:16, 38:18, 39:7, 39:11, 39:13, 40:11, 40:14, 40:19, 40:20, 41:21, 41:23, 70:25
**strategy-specific** [1] - 41:21
**streamline** [1] - 112:25
**Street** [1] - 1:18
**stretch** [3] - 12:11, 12:13, 12:14
**Stretch** [1] - 11:21
**stretches** [1] - 3:23
**strong** [1] - 9:6
**strongly** [1] - 129:13
**structure** [9] - 14:6, 14:25, 21:19, 33:16, 38:13, 39:12, 39:20, 40:18, 41:19
**studied** [1] - 26:5
**study** [2] - 51:17, 52:5
**stuff** [1] - 37:19
**subject** [11] - 5:12, 8:17, 20:25, 21:24, 54:22, 59:21, 77:7, 81:20, 81:23, 100:1, 105:23

**subject's** [2] - 77:2, 79:20
**submission** [1] - 111:6
**submit** [2] - 83:25, 126:19
**submitted** [1] - 128:13
**submitting** [1] - 110:18
**Subparagraph** [3] - 86:8, 105:1, 107:11
**subpoena** [2] - 91:21, 93:1
**subpoenas** [1] - 93:4
**substantially** [1] - 102:12
**substantive** [1] - 94:20
**subsumed** [1] - 39:14
**sufficient** [1] - 53:15
**suggest** [1] - 17:13
**suggested** [1] - 44:18
**suggesting** [4] - 10:21, 18:24, 19:10, 74:15
**suggestion** [1] - 10:8
**suggestions** [1] - 17:10
**SULLIVAN** [1] - 1:10
**summarizing** [1] - 64:19
**summer** [7] - 48:25, 49:3, 49:5, 52:24, 55:15, 55:16, 55:25
**Sunday** [2] - 120:16, 121:6
**supervises** [1] - 54:3
**supervision** [1] - 54:23
**supervisor** [1] - 79:4
**supposed** [5] - 64:2, 70:24, 71:4, 104:16, 108:2
**surprised** [2] - 31:3, 114:5
**surrounding** [2] - 20:5, 20:13
**suspect** [1] - 113:5
**sustained** [2] - 31:6, 32:19
**switch** [1] - 79:13
**Sworn** [1] - 47:5
**system** [1] - 46:4

**T**

**tack** [1] - 4:6
**tailored** [1] - 107:1
**targeted** [1] - 4:8
**task** [3] - 51:16, 52:5,

52:6
**taxpayer** [1] - 57:1
**Team** [3] - 20:25, 21:5, 21:6
**team** [8] - 13:14, 13:16, 14:8, 21:4, 21:7, 23:19, 35:17, 45:19
**technically** [1] - 126:10
**Teddie** [1] - 108:18
**telephone** [4] - 23:6, 80:3, 85:15, 94:19
**template** [2] - 102:24, 103:2
**ten** [4] - 55:17, 65:17, 71:20, 72:4
**ten-member** [1] - 65:17
**term** [2] - 69:16, 69:17
**terminate** [1] - 62:13
**terms** [5] - 17:11, 30:23, 66:23, 86:4, 86:16
**testified** [1] - 66:1
**testimonial** [1] - 131:10
**testimony** [7] - 25:1, 49:24, 58:16, 72:3, 131:13, 133:1, 133:25
**testing** [1] - 26:14
**that..** [1] - 135:1
**THE** [182] - 1:1, 1:1, 1:10, 3:2, 3:5, 24:6, 24:13, 24:16, 30:22, 31:6, 31:17, 32:17, 43:18, 44:7, 45:21, 46:16, 46:22, 46:25, 47:2, 47:3, 47:4, 47:14, 47:16, 57:19, 57:22, 58:4, 58:8, 58:13, 58:18, 59:3, 59:6, 59:8, 71:19, 71:23, 72:1, 72:7, 72:17, 72:19, 72:23, 73:1, 73:3, 73:12, 73:20, 73:24, 74:6, 74:10, 74:13, 74:18, 74:24, 75:3, 75:5, 75:11, 75:14, 75:22, 75:25, 76:4, 76:7, 76:9, 76:11, 76:13, 96:16, 105:10, 105:19, 105:23, 106:2, 106:5, 106:7, 106:8, 106:11, 106:15, 106:17, 106:18, 106:22, 106:24, 107:6,

107:8, 107:9, 110:15, 111:15, 111:19, 111:22, 111:23, 112:1, 112:2, 115:24, 116:2, 116:7, 116:10, 116:14, 116:18, 116:20, 116:23, 116:25, 117:7, 117:9, 117:12, 117:16, 117:21, 117:23, 117:25, 118:3, 118:10, 118:12, 118:17, 118:20, 119:2, 119:7, 119:9, 119:20, 119:23, 120:5, 120:13, 120:17, 120:22, 121:2, 121:8, 121:10, 121:14, 122:1, 122:7, 122:12, 122:21, 122:24, 123:2, 123:15, 124:2, 124:5, 124:7, 124:14, 124:23, 125:1, 125:4, 125:12, 126:6, 126:12, 126:16, 126:22, 127:1, 127:3, 127:8, 127:15, 127:18, 127:20, 127:24, 128:7, 128:14, 128:17, 128:23, 129:3, 129:8, 129:12, 129:25, 130:7, 130:11, 130:15, 130:21, 131:4, 131:17, 131:20, 132:3, 132:6, 132:10, 132:15, 132:17, 132:22, 133:3, 133:6, 133:9, 133:12, 133:20, 133:23, 134:2, 134:7, 134:10, 134:14, 134:17, 134:19, 134:23, 134:25, 135:6, 135:9, 135:12

**the..** [1] - 7:1
**they've** [1] - 76:5
**thing's** [1] - 127:5
**thinking** [3] - 26:14, 33:8, 116:21
**thinks** [1] - 26:7
**third** [2] - 54:25, 104:5

**third-chair** [1] - 54:25
**thoughts** [6] - 7:23, 12:19, 39:22, 113:22, 113:24, 115:3
**thousand** [1] - 39:3
**three** [8] - 34:18, 54:19, 54:22, 81:3, 81:12, 81:17, 108:24, 134:11
**threw** [1] - 41:23
**throughout** [1] - 53:12
**thumb** [1] - 92:21
**Thursday** [9] - 72:19, 72:20, 73:19, 83:2, 113:6, 113:19, 113:20, 115:10, 119:22
**ticked** [1] - 118:6
**tie** [1] - 55:11
**tied** [1] - 133:1
**time-sensitive** [1] - 119:13
**timely** [1] - 84:25
**title** [5] - 37:5, 37:14, 37:24, 39:17, 55:6
**today** [9] - 22:19, 26:22, 47:2, 56:17, 72:5, 111:17, 116:8, 116:11, 133:7
**TODD** [1] - 1:13
**todd.gee2@usdoj.gov** [1] - 1:16
**together** [9] - 8:13, 27:10, 55:11, 55:20, 55:22, 63:2, 64:14, 132:23, 135:14
**tomorrow** [5] - 6:14, 75:7, 75:23, 111:20, 130:23
**tonight** [1] - 112:22
**took** [4] - 49:19, 52:24, 53:2, 64:4
**tools** [1] - 67:2
**top** [7] - 6:5, 81:9, 84:6, 89:12, 92:1, 97:6
**topic** [1] - 67:12
**topics** [1] - 35:14
**totally** [1] - 130:21
**totals** [2] - 30:12, 31:1
**touch** [1] - 94:22
**touched** [1] - 85:2
**toward** [3] - 29:12, 42:9, 99:5
**towards** [1] - 128:2
**townhouse** [2] - 4:18, 32:25
**tracking** [1] - 30:7
**traditional** [2] - 50:20,

114:16
**train** [1] - 24:3
**training** [1] - 41:10
**transcript** [3] - 1:24, 136:5, 136:6
**TRANSCRIPT** [1] - 1:9
**transcription** [1] - 1:25
**transcripts** [2] - 63:11, 64:23
**transitions** [1] - 60:25
**transmitted** [1] - 65:10
**transparency** [1] - 67:25
**travel** [1] - 59:22
**treasurer** [1] - 111:1
**trend** [1] - 27:8
**trial** [23] - 24:10, 45:23, 46:8, 46:11, 112:8, 112:10, 112:21, 113:6, 115:14, 121:14, 121:20, 122:8, 122:18, 122:20, 123:6, 124:19, 127:6, 128:1, 128:24, 129:6, 129:9, 132:14
**TRIAL** [1] - 1:9
**trickles** [1] - 63:17
**tricky** [1] - 123:12
**Tringali** [8] - 5:10, 13:19, 13:21, 18:15, 19:10, 21:11, 35:19, 35:20
**trip** [2] - 118:18, 119:3
**trouble** [2] - 17:1, 43:21
**true** [5] - 30:8, 31:7, 56:17, 136:4, 136:6
**try** [7] - 24:11, 64:13, 89:20, 118:3, 123:8, 129:19, 134:13
**trying** [13] - 17:13, 19:22, 19:23, 22:1, 27:22, 38:2, 38:17, 85:5, 87:1, 87:2, 89:23, 106:11, 113:5
**Ts** [1] - 63:14
**Tuesday** [3] - 93:12, 120:6, 134:6
**tunnel** [1] - 115:9
**turn** [5] - 68:10, 91:25, 100:10, 108:7, 135:2
**turned** [2] - 93:7, 135:3
**TV** [3] - 31:13, 31:14, 41:18
**twice** [1] - 98:9
**two** [15] - 24:16, 34:18,

35:8, 37:11, 37:15, 49:19, 54:16, 54:21, 62:2, 72:24, 91:7, 100:6, 113:11, 113:20, 133:2
**tying** [1] - 7:15
**type** [8] - 34:8, 61:15, 72:15, 105:22, 106:13, 106:14, 107:4, 112:10
**typical** [3] - 105:24, 105:25, 110:12
**typically** [13] - 7:24, 23:7, 31:24, 34:7, 35:6, 35:10, 35:16, 37:3, 37:20, 38:8, 39:1, 80:5, 96:10
**typing** [2] - 55:21, 63:11

## U

**U.S** [9] - 1:22, 7:10, 18:8, 18:25, 25:25, 26:2, 27:7, 29:11, 50:7
**u.S** [1] - 1:14
**ultimately** [4] - 11:8, 15:22, 42:14, 66:20
**unclear** [3] - 22:8, 37:21, 128:2
**uncovered** [1] - 64:15
**under** [14] - 13:13, 39:11, 39:14, 71:1, 76:22, 80:10, 86:4, 86:16, 90:17, 108:21, 121:16, 122:12, 123:17, 126:16
**undergraduate** [2] - 48:5, 48:23
**underneath** [1] - 90:16
**understood** [5] - 5:19, 8:10, 10:20, 21:2, 21:5
**unfair** [2] - 76:5, 134:4
**unfortunately** [1] - 130:22
**UNITED** [3] - 1:1, 1:3, 1:10
**United** [3] - 1:13, 56:21, 136:11
**University** [3] - 48:4, 48:7, 48:24
**unless** [3] - 45:24, 121:21, 130:24
**unlike** [1] - 50:20
**unlikely** [1] - 32:14
**unusual** [1] - 106:3
**unwilling** [1] - 74:23

**up** [57] - 5:16, 6:2, 6:12, 6:15, 7:18, 9:4, 9:22, 10:11, 10:16, 11:6, 11:7, 11:8, 11:23, 11:24, 12:3, 12:16, 12:17, 18:11, 19:9, 19:18, 20:5, 28:24, 30:14, 42:15, 42:17, 45:8, 48:3, 51:25, 55:21, 61:15, 61:17, 63:2, 63:11, 67:6, 72:15, 74:16, 79:12, 79:14, 81:9, 83:6, 87:20, 92:1, 94:24, 95:7, 96:23, 97:6, 99:21, 100:23, 101:11, 107:13, 113:3, 114:10, 114:20, 114:21, 115:15, 133:18
**upcoming** [3] - 4:7, 7:2, 7:13
**updates** [1] - 120:1
**upwards** [1] - 39:4
**Utah** [5] - 48:3, 48:4, 48:7, 48:17, 48:24

## V

**value** [1] - 7:16
**various** [4] - 53:12, 59:21, 70:17, 89:21
**vendor** [7] - 13:18, 13:24, 14:1, 39:19, 42:5, 42:14, 42:15
**verdict** [6] - 122:2, 125:17, 126:8, 126:23, 127:9, 128:4
**version** [1] - 12:12
**videos** [3] - 7:16, 11:14, 36:12
**view** [2] - 13:11, 15:16
**viewed** [1] - 67:20
**viewpoints** [1] - 4:10
**violated** [1] - 78:9
**violation** [7] - 57:9, 65:21, 66:16, 66:21, 68:1, 85:6
**violations** [1] - 78:21
**Virginia** [1] - 47:25
**voice** [1] - 94:19
**voluminous** [3] - 64:11, 64:14, 106:9
**voluntary** [1] - 91:20
**volunteer** [8] - 14:4, 16:11, 16:13, 34:19, 34:22, 45:5, 45:12, 45:14
**volunteered** [2] - 34:14, 42:3

**volunteering** [4] - 14:11, 14:19, 33:25, 44:4
**volunteers** [3] - 34:1, 34:3, 34:7
**vote** [1] - 66:10
**voting** [1] - 53:13
**vs** [1] - 1:5

## W

**wait** [8] - 28:14, 122:1, 123:16, 124:14, 128:18, 129:18
**waived** [2] - 40:11, 40:20
**walking** [1] - 118:21
**wants** [4] - 91:13, 120:25, 132:11, 135:1
**warrants** [1] - 65:6
**Washington** [9] - 1:6, 1:15, 1:19, 1:23, 48:15, 49:6, 56:15, 56:16, 136:12
**waters** [1] - 26:14
**ways** [1] - 68:7
**we-think-we're-going-to-wrap-up-by-the-end-of-next-week** [1] - 72:15
**web** [1] - 11:14
**Web** [1] - 36:12
**week** [16] - 29:18, 64:22, 72:15, 73:22, 74:17, 76:3, 113:6, 113:18, 113:20, 116:11, 116:13, 116:14, 116:17, 116:18, 132:19
**weekend** [9] - 112:2, 112:23, 115:4, 115:18, 115:19, 120:11, 129:2, 135:17, 135:19
**weekly** [2] - 3:23, 32:13
**weeks** [7] - 19:22, 24:17, 29:17, 49:5, 55:17, 56:1, 72:25
**weighing** [1] - 11:8
**well-known** [1] - 68:21
**well-written** [1] - 9:9
**West** [1] - 47:25
**whereby** [1] - 61:8
**whole** [4] - 15:25, 17:9, 17:25, 18:3
**WILLIAM** [1] - 1:13
**willing** [5] - 64:6, 72:14, 73:9, 73:14,

74:1
**win** [2] - 28:17, 42:8
**wins** [1] - 9:13
**wise** [1] - 135:8
**wish** [1] - 117:1
**withheld** [3] - 91:3, 91:4, 91:15
**withhold** [2] - 91:13, 91:23
**withholding** [2] - 104:13, 104:19
**witness** [15] - 24:7, 45:20, 46:19, 46:21, 55:21, 57:23, 63:11, 64:23, 92:13, 92:18, 92:19, 98:2, 98:3, 98:9, 113:11
**Witness** [2] - 12:4, 12:9
**WITNESS** [11] - 2:2, 47:3, 105:23, 106:5, 106:8, 106:15, 106:18, 106:24, 107:8, 111:22, 112:1
**witnesses** [11] - 55:21, 63:16, 75:9, 92:8, 131:15, 133:2, 133:8, 134:3, 134:4, 134:11, 135:3
**wonder** [3] - 110:22, 110:24, 111:2
**wondering** [2] - 57:23, 86:13
**word** [2] - 105:20, 106:2
**worded** [1] - 90:3
**words** [5] - 19:12, 73:18, 89:12, 120:24, 133:24
**works** [2] - 46:4, 114:6
**world** [2] - 18:9, 31:14
**wrap** [1] - 72:15
**write** [9] - 9:6, 10:4, 18:17, 21:25, 22:13, 81:2, 82:10, 95:23, 97:10
**writers** [1] - 113:15
**writes** [5] - 19:21, 79:21, 83:10, 95:10, 116:2
**writing** [8] - 83:3, 93:15, 95:18, 116:4, 122:25, 123:10, 125:21, 125:24
**written** [8] - 9:8, 9:9, 10:25, 23:2, 23:4, 28:13, 85:12, 123:5
**wrote** [1] - 96:8

## Y

**y'all** [1] - 19:21
**yards** [1] - 34:5
**year** [4] - 48:8, 48:25, 49:9, 55:16
**yearly** [1] - 33:15
**years** [6] - 22:6, 23:22, 31:25, 48:6, 49:19, 112:8
**yesterday** [3] - 75:19, 112:12, 114:23
**York** [2] - 1:15, 24:4
**yourself** [2] - 34:12, 99:23

## Z

**zoom** [2] - 92:1, 102:6