```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
      - - - - - - - - - - - - - - - x
 3    UNITED STATES OF AMERICA,
                                        Criminal Action No.
 4                  Plaintiff,          No. 16-059
                                        March 15, 2018
 5    vs.                               1:37 p.m.

 6    DAVID BOWSER,                     Washington, D.C.

 7                  Defendant.
      - - - - - - - - - - - - - - - x
 8                  DAY 11 - AFTERNOON SESSION

 9    _____

10                   TRANSCRIPT OF JURY TRIAL
          HELD BEFORE THE HONORABLE EMMET G. SULLIVAN
11                 UNITED STATES DISTRICT JUDGE
      _____
12    APPEARANCES:

13    For the United States:       TODD WILLIAM GEE, ESQ.
                                   SEAN F. MULRYNE, ESQ.
14                                 U.S. DEPARTMENT OF JUSTICE
                                   PUBLIC INTEGRITY SECTION
15                                 1400 New York Avenue, NW
                                   Washington, D.C.  20005
16                                 (202) 514-9751
                                   todd.gee2@usdoj.gov
17
      For the Defendant:           LESLIE S. McADOO GORDON, ESQ.
18                                 McADOO GORDON & ASSOCIATES
                                   1140 19th Street, NW
19                                 Washington, D.C.  20036
                                   (202) 293-0534
20                                 leslie.mcadoo@mcadoolaw.com

21    Court Reporter:             Lisa A. Moreira, RDR, CRR
                                   Official Court Reporter
22                                 U.S. Courthouse, Room 6718
                                   333 Constitution Avenue, NW
23                                 Washington, DC  20001
                                   202-354-3187
24
      Proceedings recorded by mechanical stenography; transcript
25    produced by computer-aided transcription
```

1                          I N D E X

2
     WITNESS                                              PAGE
3
     DAVID G. BOWSER, Resumed
4         (By Ms. Gordon)................................  5
          (By Mr. Gee)................................... 59
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                P R O C E E D I N G S
 2          THE COURT:  All right.  I'm going to sustain that
 3   objection.  I can't think of another way to get it in,
 4   Counsel.  If you want to call that man and have him testify
 5   in court, that's fine with me.
 6          MS. GORDON:  All right.
 7          THE COURT:  But you know what, fair is fair
 8   though.  If -- you know what, he's down in Atlanta
 9   somewhere?
10          MR. BOWSER:  Athens.
11          MS. GORDON:  Yes, Athens.
12          THE COURT:  Is there a federal courthouse near
13   there?  I mean, fair is fair.  I offered to accommodate the
14   government witnesses.
15          MS. GORDON:  We can do him by video instead of
16   phone.
17          THE COURT:  I think that's only fair, to extend
18   the same accommodation.
19          MR. GEE:  We would love to see Congressman Broun
20   on TV.  Let's do it.
21          THE COURT:  All right.  Just let the record
22   reflect I'm more than willing to accommodate defense counsel
23   or accommodate the Congressman, whatever, have him testify
24   here, if you want to call him.
25          (Pause)
```

1          THE COURT:  So the juror with the child care issue

2     can stay only as late as 5:15, so that's fine.  That's

3     understandable.

4          Just asking, how long do you anticipate your

5     remaining direct to take?

6          MS. GORDON:  I was cutting it down so I think the

7     topics I have left sort of all flow together for a change.

8     I think an hour, an hour and a half.

9          THE COURT:  Okay.  You're going to increase the

10    pace though, right?

11         MS. GORDON:  Yes.

12         THE COURT:  All right.

13         MS. GORDON:  Because now I don't have to go back

14    and forth.

15         THE COURT:  All right.

16         MS. GORDON:  I think all of the exhibits I've

17    either used or have been excluded so --

18         THE COURT:  All right.

19         MS. GORDON:  -- I think we can...

20         (Jury enters courtroom)

21         THE COURT:  (To Juror No. 9) Thank you for asking.

22    That's certainly understandable.  We're going to adhere to

23    that.  We will not keep you past 5:15 though.  Thanks for

24    asking, though.

25         All right.

1                        DAVID G. BOWSER, Resumed

2                     DIRECT EXAMINATION, Continued

3      BY MS. GORDON:

4      Q.  Good afternoon, Mr. Bowser.

5      A.  Good afternoon.

6      Q.  All right.  So we left off in the spring, March, of

7      2014.

8      A.  Yes.

9      Q.  And we've heard previously that there was a newspaper

10     article in July of 2013 about Mr. O'Donnell.

11     A.  Yes.

12     Q.  Was there also some media attention about

13     Mr. O'Donnell's relationship with Congressman Broun in March

14     of 2014?

15     A.  There was.

16     Q.  Okay.  Can you tell us a little bit about that.  Why was

17     there?

18     A.  The Congressman was walking back from a meeting or a

19     hearing of some kind.  Just as he got to the office door, a

20     camera and a reporter stepped right in front of him and

21     asked him a question.

22     Q.  Concerning Mr. O'Donnell?

23     A.  Concerning Mr. O'Donnell.

24     Q.  Right.  And then what kind of media response was there

25     to that initial report?

1    A.   There was quite a flurry of activity.

2    Q.   And what was the response in the office to that media

3    activity?

4    A.   There was an effort to ascertain exactly what had

5    happened.  It wasn't so much about the topic.  It was more

6    about the sensationalism about how -- there was never really

7    an interview.  The Congressman said, "I'm late for a

8    meeting.  I can't talk right now."  And he walked into his

9    office.

10          The door is on an automatic hinge, and he walked

11   into his office, and the door came and closed, and the

12   camera was right in the door.

13          They made it sound as if he slammed the door in

14   their face.

15   Q.   So then, as a result of this press, what steps did the

16   office take to try to deal with the press?

17   A.   Well, the typical steps would be our communications

18   director, Christine Hardman, would talk to the Congressman,

19   talk to myself, figure out the response that we would put

20   together, create talking points to give to the staff in case

21   people called, either in the district or in the D.C. office,

22   and start fielding whatever follow-up media requests there

23   were.

24   Q.   And were there follow-up media requests?

25   A.   There were.

1          MS. GORDON:  So let's take a look at Government's

2    Exhibit 464A.

3    Q.  All right.  Mr. Bowser, so what's the date of this email

4    here?

5    A.  Wednesday, March 19, 2014.

6    Q.  Okay.  So let's look at the bottom then.  And the first

7    part of this email is from whom?

8    A.  A gentleman named Justin Gray.

9    Q.  And who is Mr. Gray?

10   A.  I believe he's the reporter for WSB or WNB.

11   Q.  And what's WNB?  Do you know?

12   A.  A television station in Atlanta.

13   Q.  All right.  And Mr. Gray is writing this email to whom?

14   A.  Brett O'Donnell.

15   Q.  And what does he want to know about?

16   A.  He wants a comment or an interview with Mr. O'Donnell or

17   from Mr. O'Donnell on his work with congressional offices.

18   Q.  Okay.

19          MS. GORDON:  And then let's look at the top part.

20   Q.  Okay.  What does Mr. O'Donnell do?

21   A.  He forwarded the email to Christine Hardman and myself.

22   Q.  On what date?

23   A.  Wednesday, March 19, 2014, basically telling us he

24   wasn't going to talk to the guy.

25   Q.  Okay.

1          MS. GORDON:  All right.  So let's look at the

2     bottom half of it then.  Just this part here, how about?

3     Q.  All right.  This is the inquiry from the reporter,

4     right?

5     A.  Correct.

6     Q.  And the reporter writes, "We'd like to talk to you today

7     about the contract staff positions you have with members of

8     Congress from their office budgets.  You advertise your

9     serviced on the website as 'Campaign consultation' and

10    'Campaign debate preparation' -- trying to understand how

11    the work you do for these members is not campaign related.

12    Thank you."

13          Do you see that?

14    A.  Yes.

15    Q.  That's what the reporter wanted to know about?

16    A.  Yes.

17    Q.  And the "you" he's talking to here is whom?

18    A.  Brett O'Donnell.

19    Q.  All right.  So did you read this email when you had it

20    forwarded to you from Mr. O'Donnell?

21    A.  I'm sure I had.

22    Q.  Okay.  And so what did you think the press was focusing

23    on?  What was their inquiry?

24    A.  Their inquiry was Mr. O'Donnell being paid out of the

25    MRA or official funds.

1    Q.   Okay.

2    A.   And whether he was doing official work for those funds.

3    Q.   Now, the reporter's pointing out here that Mr. O'Donnell

4    advertises himself as a campaign consultant, right?

5    A.   That's what he's saying.

6    Q.   Did you understand the inquiry to be concerning whether

7    or not Mr. O'Donnell was doing campaign work?

8    A.   No.

9    Q.   Were there other media inquiries on this same topic at

10   this same time?

11   A.   There were.

12   Q.   And ultimately did Congressman Broun's office respond in

13   any formal way to the media inquiries?

14   A.   We may have.  I don't recall.  Christine Hardman was

15   fielding these inquiries.

16           There were many press items both in Washington,

17   D.C., and in Georgia on the story.

18   Q.   And then was there any consequence as a result of this

19   media flurry?

20   A.   There was.  We -- Dr. Broun isn't a stranger to

21   sensationalized stories, mostly at his own doing.  Typically

22   we would see how long the story had what they called legs,

23   how long it would last in the media.

24           The story continued to generate stories for

25   several days, and at that point it became apparent that the

1    story was not just going to go away overnight.

2            And the Congressman first was not paying attention

3    to the stories.  He was sort of ignoring them.  Then he

4    called me into the office and suggested that the stories

5    were not being helpful to him, and they were about one of

6    our -- one of our team members.

7    Q.  All right.  So what happened next?

8    A.  The Congressman asked me to separate from Mr. O'Donnell

9    and our relationship.

10   Q.  All right.  And did you do that?

11   A.  I did.

12   Q.  Okay.  Tell us how that happened.

13   A.  Brett O'Donnell had come in a few days later -- I think

14   around the 25th of March -- for a regular weekly meeting.  I

15   asked him into my office and told him that the stories were

16   getting -- were not going away, and that he's taking away

17   from the Congressman's message, and, as is typical in these

18   situations, when you become the story, then you should

19   remove yourself, and he resigned.

20           We gave him the opportunity -- we asked him to

21   resign.

22   Q.  And what was his response to this request for his

23   resignation?

24   A.  He was not happy.  He thought we should fight it.

25           And I just told him this was the Congressman's

1    decision, and we had to move forward.

2    Q.  Did he tender his resignation?

3    A.  Not in any written format, no.

4    Q.  After that did Mr. O'Donnell do any work either for the

5    official office or for the campaign?

6    A.  No.

7    Q.  All right.  And then we've heard that there was also an

8    OCE investigation generated as a result of these media

9    inquiries.

10   A.  Directly -- shortly thereafter.

11   Q.  All right.  So I want to show you first a document

12   that's been marked as Defendant's 227.  I'll ask you to take

13   a look at this.

14             Do you recognize this?

15   A.  I do.

16   Q.  Okay.  What are we looking at here?

17   A.  This is a record of cell phone conversations between

18   Brett O'Donnell and myself for a particular date, period of

19   dates.

20   Q.  Do you remember the testimony the other day from the FBI

21   tech where she testified how she withdrew this --

22   A.  Yes.

23   Q.  -- information from the AT&T records?

24             Okay.  Is there any difference between this

25   exhibit and the government's exhibit?

1    A.  This exhibit has numbers on the side, I believe.

2    Q.  Right.  We put numbers down the left-hand side.

3    A.  Left-hand side.

4    Q.  Is that the only difference?

5    A.  Yes.

6    Q.  All right.  So we're going to come back to that.

7          MS. GORDON:  Let's look at Defense Exhibit 164.

8    Q.  All right.  We've seen this email before, I believe.

9    Just look at this part here.  Do you recognize this,

10   Mr. Bowser?

11   A.  I do.

12   Q.  Okay.  And tell us what it is.

13   A.  It's an email from Bryson Morgan with the Office of

14   Congressional Ethics to myself regarding the OCE matter, and

15   he was sending me three documents.

16   Q.  And what's the date?

17   A.  Tuesday, April 1, 2014.

18   Q.  What time?

19   A.  2:18 p.m.

20   Q.  All right.  And is this the first that you learned of

21   the OCE investigation, or not?

22   A.  No.

23   Q.  Okay.  Tell us how you first learned about it.

24   A.  I believe OCE called the office and said they had an

25   item to send over and wanted to know whose attention to make

 1    it out to.

 2    Q.  Okay.

 3         MS. GORDON:  All right.  So then if we look at the

 4    next page.

 5    Q.  All right.  You said he was sending you three documents,

 6    so Mr. Morgan sent you some other acknowledgements and

 7    timelines and so forth, right?

 8    A.  Correct.  Some forms had to be completed and signed.

 9    Q.  And were those completed and sent back to Mr. Morgan?

10    A.  They were.

11         MS. GORDON:  And then if we look at the top part

12    of this email.  This part here.

13    Q.  This is dated what day?

14    A.  Thursday, April 3, 2014.

15    Q.  And you're asking Mr. Morgan to send you the request for

16    information at that point, right?

17    A.  Yes.  I was confirming that I received his email and

18    asked to get the -- the RFI, they've been calling it.

19    Q.  By the 3rd you didn't have the Congressman's RFI yet?

20    A.  No.

21         MS. GORDON:  All right.  So let's switch back over

22    to -- whoops, sorry -- to the phone log.

23    Q.  These are calls between you and Mr. O'Donnell, correct?

24    A.  Yes.  That's correct.

25    Q.  Let's look at April.  So do you see here Line 7 and Line

1    8?  What's the date there?

2    A.  April 1, 2014.

3    Q.  Okay.  And these are calls from you to Mr. O'Donnell.

4    A.  Yes.

5    Q.  Okay.  Look at the duration of the phone calls on the

6    far right-hand side.

7    A.  27 seconds and 28 seconds.

8    Q.  Okay.  So what do you think those calls are?

9    A.  Either small voice mails or just disconnects.

10   Q.  Okay.  Why are you calling him on April 1st?

11   A.  I believe that's when the OCE had reached out to me and

12   indicated that they wanted to send some items over.

13   Q.  So what are you calling him about?

14   A.  To let him know.

15   Q.  All right.  And then Line 9, same date, right?

16   A.  Correct.

17   Q.  Okay.  And how long is the duration of the call there?

18   A.  Five minutes and one second.

19   Q.  Okay.  Who is making the call there?

20   A.  Mr. O'Donnell had called me.

21   Q.  Okay.  And do you remember what this conversation was

22   about?

23   A.  Primarily about the OCE.  We were going to be sending

24   over some documents.

25   Q.  And what's the time there?

1   A.  2:31 p.m.

2   Q.  All right.  So would you agree this is very

3   shortly after you got the initial email communication from

4   Mr. Bryson?

5   A.  Yes.

6   Q.  Mr. Morgan, excuse me.

7            MS. GORDON:  All right.  Then let's look at

8   Government's Exhibit -- no, sorry, Defense Exhibit 159.

9   Q.  All right.  Mr. Bowser, what are we looking at here?

10  A.  This is from the Office of Congressional Ethics, an

11  initiation of a preliminary review.

12  Q.  All right.

13           MS. GORDON:  So let's look at this language here.

14  Q.  Do you see this language below is a statement of the

15  nature of the review?

16  A.  Yes.

17  Q.  That's one of the things that Mr. Morgan said he was

18  going to be sending you on the 1st, right?

19  A.  Yes.

20  Q.  And the letter's dated April 1st, right?

21  A.  Yes.

22  Q.  Okay.  Then let's look at what the substance of it is.

23           MS. GORDON:  Let's look at this part here.

24  Q.  Now, this letter is addressed to whom?

25  A.  Congressman Paul Broun.

1    Q.  Who did you think was the subject of the OCE

2    investigation?

3    A.  Congressman Paul Broun.

4    Q.  And when you got this letter from the OCE, did you read

5    it?

6    A.  I did.

7    Q.  What did you do with it then?

8    A.  I gave it to the Congressman.

9    Q.  All right.  And this part that we've highlighted here is

10   the part where the OCE is telling you what the nature of the

11   review is, right?

12   A.  Correct.

13   Q.  Okay.  So it says, "From 2012 to 2013, representative

14   Paul Broun retained O'Donnell & Associates, LTD, as a

15   contractor to provide 'training' to his congressional

16   office.  Representative Broun's congressional office has

17   paid O'Donnell & Associates, LTD, at least $33,750 for these

18   services since 2012.

19         "If Representative Broun misused funds from his

20   Members' Representational Allowance ('MRA'), then he may

21   have violated House rules and federal law."

22         Do you see that?

23   A.  Yes.

24   Q.  When you received this and read that language, what did

25   you think the OCE was investigating?

1   A.   Whether Brett O'Donnell had done official work or not.

2   Q.   Why did you think that was the case?

3   A.   Combined with the media fervor that was going on at the

4   time, it appeared that they were wondering if the money we

5   had paid Brett O'Donnell, the $33,750, was actually for

6   official work.

7   Q.   All right.

8           MS. GORDON:   Then let's look at Government's

9   Exhibit 490.

10          Mr. Mulryne, can you confirm that that one is in

11  evidence?  490.  I have it as a yes on my chart.  You have

12  490A.  Before we show that.

13          So for the record, it's 409A as in apple.

14          THE COURT:   All right.

15          MS. GORDON:   All right.  So let's look at the

16  bottom part here.

17  Q.   All right.  Now, what is this we're looking at?  It's an

18  email from...?

19  A.   It's an email from myself to Brett O'Donnell.

20  Q.   Okay.  What's the date?

21  A.   April 1, 2014.

22  Q.   And what's the time?

23  A.   3:29 p.m.

24  Q.   Okay.  So we looked at your earlier communication from

25  Mr. Morgan where you got the documents.  It was the same

1    date at 2:18 p.m.  So how much later in time is this?

2    A.  A little over an hour.

3    Q.  Okay.  And what are you writing to Mr. O'Donnell here?

4    A.  I'm venting my frustration.

5    Q.  Okay.  In what way?  What are you saying?

6    A.  At the time, as I mentioned, I thought that they were

7    investigating whether Brett O'Donnell actually did any

8    official work or not for the $33,000-plus that he had gotten

9    paid, and I really didn't see any difference between Brett

10   O'Donnell working on the official side and these other

11   vendors who would work on the official side and campaign

12   sides.

13   Q.  And what does Mr. O'Donnell write back to you?

14   A.  He said, "I hear you and have no idea."  He just doesn't

15   understand why he gets singled out in all of these crappy

16   investigations.

17   Q.  All right.

18            MS. GORDON:  Let's look at that just briefly.

19   Q.  All right.  So that's what he said.

20   A.  Correct.

21   Q.  All right.  So he wrote you back about what time?

22   A.  5:19 p.m.

23   Q.  Okay.  And, again, what time did you write to him?

24   A.  3:29 p.m., so about an hour and a half almost.

25   Q.  All right.

1    A.  Almost two hours.

2    Q.  So if we go back and look at the log, the phone log -- I

3    know it's hard to keep the dates and the times in your mind

4    at the same time.

5         If we look here on -- the conversation, the long

6    conversation that you actually had with Mr. O'Donnell on the

7    1st, again, it's at what time?

8    A.  2:31 p.m.

9    Q.  Okay.

10        MS. GORDON:  Is that document still up?  Yes.

11   Q.  So did you talk to him first, or did you email him

12   first?

13   A.  I talked to him first.

14   Q.  All right.

15        MS. GORDON:  All right.  Then let's look at

16   Defendant's Exhibit 230.

17   Q.  All right.  So if we look at the top here, you've seen

18   this before.  Mr. Morgan ultimately sent you the documents

19   for the Congressman, the substantive documents for the

20   Congressman, right?

21   A.  Yes.

22   Q.  And at this point he's talking about that the

23   Congressman might have a lawyer to assist him, right?

24   A.  Correct.

25   Q.  And one of the documents he sent you is the RFI, the

1    actual request for information to the Congressman, right?

2    A.  Yes.

3              MS. GORDON:  So let's take a look at that.  That's

4    Government's Exhibit -- well, it's Defense Exhibit 160.

5    Q.  All right.  Now, this is the letter for the Congressman,

6    but you received it directly?

7    A.  Yes.

8    Q.  Did you read it?

9    A.  I looked at it.

10   Q.  What did you do with it after that?

11   A.  I gave it to the Congressman.

12   Q.  And then what happened with respect to the request

13   itself?

14   A.  This document?  I didn't see it again.

15   Q.  All right.  Now, we looked yesterday at some of the

16   requests that are in this one to the Congressman, and they

17   do mention campaign, right?

18   A.  Yes.

19   Q.  The second one mentions campaign.

20             If we scroll down to the third page, there are

21   several others that mention campaign, right?

22   A.  Yes.

23             MS. GORDON:  Not this one.

24   Q.  No. 4, right?  No. 6, yes?

25   A.  Yes.

1   Q.  All right.  And then do you know whether or not

2   Mr. O'Donnell received a request for information from the

3   OCE?

4   A.  I know he did.

5   Q.  How do you know that?

6   A.  I believe he told us.

7   Q.  Okay.  Did you ever see a copy of it?

8   A.  He had sent me a copy, but I already knew what it was so

9   I didn't even look at it.

10  Q.  Okay.

11          MS. GORDON:  Let's look at Defense Exhibit 161.

12  Q.  This is the request to Mr. O'Donnell, right?

13  A.  Yes.

14  Q.  I didn't hear part of what you said.  You said you

15  didn't look at it because you already knew what it was?  Is

16  that what you said?

17  A.  The previous document?

18  Q.  This document.

19  A.  I did not.  He just sent it to me I believe without any

20  message.

21  Q.  All right.  So did you open the attachment and read it?

22  A.  No.

23  Q.  All right.  So between this early part of April -- well,

24  let's say after this early part of April, after the office

25  received the documents from the OCE, what happened in terms

1    of responding to them for the month of April?

2    A.   Originally Congressman Broun asked me to contact the

3    attorney, let him know about the issue, and get a sense from

4    the attorney on what something like this might cost him.

5            I did that.

6    Q.   And then did the Congressman retain the lawyer to help

7    him?

8    A.   Eventually, no.

9    Q.   All right.  So during the month of April, did you have

10   any contact with Mr. O'Donnell about the OCE's

11   investigation?

12   A.   After the -- around the 4th of April, I don't believe

13   so.

14   Q.   All right.  So let's go back to the phone log.

15   A.   Oh, yes, I did.  April, okay.

16   Q.   So I'm asking you about April.

17   A.   April, yes.

18   Q.   So here we see a phone call from you to Mr. O'Donnell on

19   the 4th, right?

20   A.   Yes.

21   Q.   And what's the duration of it?

22   A.   Two minutes and 51 seconds.

23   Q.   And what's the call that precedes that?

24   A.   Mr. O'Donnell had called me about 40 minutes earlier.

25   Q.   So you're returning his call?

1     A.   I am.

2     Q.   And then we see here on Lines 13 and 14 some -- and 15

3     some short calls from you as well, right?

4     A.   Correct.

5     Q.   Very short.  No seconds, nine seconds, nine seconds.

6     A.   Correct.

7     Q.   What do you think those are about?

8     A.   I think I accidentally dialed him back, and I believe 14

9     and 15, as the FBI tech mentioned yesterday, were the same

10    call just off of different towers.

11    Q.   All right.  And then what happens here on Line 16?

12    A.   Mr. O'Donnell calls me on the 8th of April.

13    Q.   Okay.  And how long is the duration of the call there?

14    A.   12 seconds.

15    Q.   Okay.  Was that a phone call, do you think, an actual

16    call?

17    A.   No.  I believe he got my voice mail and hung up.

18    Q.   And then the next one is the next day, the 17th, right?

19    A.   Correct.

20    Q.   So you said you thought Line 16 was maybe a voice mail?

21    A.   No.  I don't do voice mails very well.  Most people who

22    work with me know that, so I'll see a missed call and call

23    them back, or they'll text me or email me.

24    Q.   So the next day you did call him.

25    A.   I did.

1    Q.  All right.  And you talked to him for how long?

2    A.  Four minutes and six seconds.

3    Q.  Okay.  And do you remember what that call was about?

4    A.  At this point Mr. O'Donnell was requesting that we

5    provide him with an attorney.

6    Q.  Who is "we"?

7    A.  I'm sorry, Congressman Broun would provide him with an

8    attorney.

9    Q.  And was that a possibility at that time?

10   A.  I did not know.  That was not my decision to make.

11   Q.  So what did you tell Mr. O'Donnell?

12   A.  I told him I would check with Congressman Broun and get

13   back to him.

14   Q.  All right.  And then on the next line, Line 18, who's

15   calling you there?

16   A.  Mr. O'Donnell had called me back that afternoon.

17   Q.  Okay.  And then on Line 19, what happens here?

18   A.  I had returned his call.  We spoke for approximately two

19   minutes and 41 seconds, at which point I told him I was

20   unable to raise the topic with the Congressman at the time,

21   that he just was not focused on it.

22   Q.  All right.  And then we see some time goes by.

23   A.  Yes.

24   Q.  A few days, right?

25            And we see here at Lines 20, 21, 22, and 23 are

1   all calls from Mr. O'Donnell, right?

2   A.  Correct.

3   Q.  Okay.  Did you receive any other communications from

4   Mr. O'Donnell during that time?

5   A.  At some point around this time he had sent me an email.

6   Q.  Okay.  So let's take a look at that.

7          MS. GORDON:  It's Defense Exhibit 149.

8   Q.  And this is an email from whom?

9   A.  Brett O'Donnell.

10  Q.  To whom?

11  A.  Myself.

12  Q.  Okay.  What's the date?

13  A.  Saturday, April 12, 2014.

14  Q.  And what's the subject?

15  A.  "Please call me."

16  Q.  And what's Mr. O'Donnell talking about here?

17  A.  Whether or not he was going to be provided an attorney

18  or legal fees; he needs to get this done as soon as

19  possible.  And then he basically tells me it's to our

20  advantage to have legal representation coordinating with our

21  attorney or my attorney.

22  Q.  All right.  And this is on the 12th, so at that time did

23  you have an answer for him about the lawyer?

24  A.  No, I did not.

25         MS. GORDON:  Let's go back to the phone log then.

1    Q.  All right.  So again, Lines 20, 21, 22, 23, he's still

2    calling you, right?

3    A.  Correct.

4    Q.  Mr. O'Donnell's still calling you.

5    A.  Yes.

6    Q.  All right.

7              MS. GORDON:  Then let's look at Defense Exhibit

8    212.  No, 212.  212.  No, it can't be 212.

9              Are you in the defense exhibits?  It's been

10   scanned wrong.  Let me just put it on the ELMO.

11   Q.  All right.  So Mr. Bowser, looking at the top of this

12   email, it's -- let's start here, okay?

13   A.  Yes.

14   Q.  Who is that email from?

15   A.  That is me emailing Brett O'Donnell on May 8, 2014.

16   Q.  And you're saying what?

17   A.  "Do you have a minute to talk sometime today?"

18   Q.  And Mr. O'Donnell replies and says what?

19   A.  "I can talk between now and 3:45 or after 5:15 p.m."

20   Q.  And the date again?

21   A.  Thursday, May 8, 2014.

22   Q.  You're asking Mr. O'Donnell if he has time to talk?

23   A.  Yes, correct.

24   Q.  On May 8th.

25             And does it appear from the log that you actually

1     spoke on the 8th?

2     A.  No, we did not.

3     Q.  Okay.  Let's look at Line 24 though.  It's a call from

4     you to Mr. O'Donnell, right?

5     A.  Correct.

6     Q.  On the 9th.

7     A.  The next day, yes.

8     Q.  And how long is the phone call?

9     A.  Six minutes and 16 seconds.

10    Q.  Okay.  And do you remember what that call was about?

11    A.  The Congressman had opted against having legal

12    representation and would not be paying for Mr. O'Donnell to

13    have legal representation either, and I was passing that

14    information along to him.

15    Q.  All right.

16            MS. GORDON:  So then let's look at Defense Exhibit

17    165.  Let's go down to the -- in the middle there.  No, a

18    little farther up.  Go back up one page, two pages.  Keep

19    going.

20            Oh, stop.  Let's look at this part here.

21    Q.  All right.  So this is an email communication between

22    you and Mr. Morgan at the OCE, right?

23    A.  Correct.

24    Q.  And he's saying he would prefer to communicate with

25    Mr. DeLacy, the lawyer, right?

1    A.  Our attorney, correct.

2    Q.  And then, if we go up a little bit, you're telling him

3    here -- you're telling him what?

4    A.  The Congressman has decided against retaining outside

5    counsel.

6    Q.  And the date of that is...?

7    A.  Tuesday, May 6, 2014, 6:00 p.m.

8    Q.  All right.  So as of the date of that last email, you're

9    communicating with Mr. Morgan about the -- getting the

10   request for information that we've just looked at.

11          We've already had those.  I beg your pardon.

12   A.  Yes.

13   Q.  And you're letting him know that the Congressman's not

14   going to have a lawyer and that you're going to be the point

15   of contact, right?

16   A.  Correct.  We made a change to that, yes.

17   Q.  As of that date, May 6th, had the Congressman provided

18   any documents to the OCE?

19   A.  I don't believe so, no.

20   Q.  Why not?

21   A.  The Congressman was ignoring it up until that pint.

22   Q.  And did there come a point in time when that changed?

23   A.  After the primary.

24   Q.  And the date of the primary again?

25   A.  July 25th, I believe, 2014.

1    Q.  The date of the primary in 2014?

2    A.  Oh, I'm sorry, May 20 -- somewhere around May 25, 2014.

3    Q.  And then shortly thereafter the OCE sent the RFIs to

4    yourself and to the other congressional staff, right?

5    A.  Correct.  June 7th, I want to say.  Oh, I'm sorry, June

6    1st, I mean.

7    Q.  Well, we're going to look at it here.  We'll look at it

8    again.

9            MS. GORDON:  This is Defendant's Exhibit 162.

10   Q.  So this is the RFI to you, right?

11   A.  Yes.

12   Q.  Okay.  The date is June 3rd?

13   A.  June 3, 2014.

14   Q.  All right.  So were you in the office on the day that

15   these came in?

16   A.  I don't believe so, no.

17   Q.  And so tell us, when you came back into the office after

18   these had arrived, what happened?

19   A.  I started getting contacted by people, both in the

20   Washington, D.C., office and people down in Georgia who had

21   also received requests for information, and some of them

22   didn't know who Brett O'Donnell was, some of them had

23   checked their emails and didn't have anything, and they were

24   just asking what I thought the next step would be.

25   Q.  All right.  What steps did you take in response to the

1    one that was directed to you?

2    A.  I looked at it, read it, and then called Bryson Morgan.

3    Q.  All right.  So let's look at what you were actually

4    being asked to provide.

5              We've seen this before.  Did you read this when

6    you got -- the one that was directed to you, did you read

7    it?

8    A.  I did, yes.

9    Q.  And what did you think that the OCE was investigating?

10   A.  The same thing as the original one from April 1st, which

11   was the employment of Brett O'Donnell in the official office

12   and whether he actually earned those official dollars.

13   Q.  So with respect to -- we're going to talk just about

14   your own communications.

15             With respect to your own communications, what

16   steps did you take to respond?

17   A.  I believe I started searching my emails.

18   Q.  And tell us about that process a little bit.  What did

19   you do?

20   A.  I went into my Outlook.  I typed in Brett O'Donnell's

21   email address and hit "search," and then I typed his name in

22   and also hit "search."

23             That's how I pulled up some of the calendar items

24   and then started printing them out and pulling them

25   together.

1    Q.  And did you search on your official email and your

2    personal email, or one or the other, or what?

3    A.  Just my official email.

4    Q.  And why was that?

5    A.  I believed they were looking to ascertain whether or not

6    Brett O'Donnell earned official dollars for the work he had

7    done that he had got paid for.

8    Q.  So with respect to the other staff members --

9              MS. GORDON:  Let's take a look, then, at Defense

10   Exhibit 167.

11   Q.  Do you remember this email?

12   A.  I do.

13   Q.  All right.  And what's the date of it?

14   A.  Tuesday, June 10, 2014.

15   Q.  It's from whom?

16   A.  From myself to Bryson Morgan.

17   Q.  And what's the importance level that you put on it?

18   A.  High.

19   Q.  And what are you doing here in this email?  What are you

20   telling him?

21   A.  I'm informing Bryson that I am sending over my

22   documents, as are several staff members, as well as some

23   forms from some nonstaff members; and basically everybody

24   who he had indicated to me were receiving these letters, an

25   update on them all.

1    Q.  All right.  Now, physically how did the documents leave

2    the office and go to Mr. Morgan?

3    A.  We had a big banker's box, and Christine, Teddie, and

4    myself had put our stacks of paper bundled up into the box,

5    as well as the other forms, and it was physically

6    transported over to the OCE.

7           They are not on campus.  They were several blocks

8    away from the House.

9    Q.  Now, we see here this line that says, "Signed forms with

10   accompanying letter of no records/relevant interaction with

11   Brett O'Donnell from Tim Reitz, Erika Miller and Paul

12   Kilgore."  Do you see that?

13   A.  Yes, I do.

14   Q.  With respect to these three staffers, what information

15   did you have about their interaction with Mr. O'Donnell?

16   A.  These are three people who came to me specifically to

17   say that they either had no emails or they didn't even know

18   who Brett O'Donnell was.

19   Q.  Now, we see here that you're also providing Mr. Morgan

20   with information about Mr. Chinouth, Mr. Findlay, and

21   Mr. Heenan, correct?

22   A.  Correct.

23           MS. GORDON:  So let's look, then, at I believe

24   it's Government's Exhibit 506.

25   Q.  We've seen this one before, right?

1    A.   Yes.

2    Q.   All right.  So this is an email from you, right?

3    A.   It is from me to Jessica Hayes, Tim Reitz, David Heenan,

4    Paul Kilgore, and Josh Findlay the day before that other

5    email.  This is Monday, June 9, 2014.  Also high importance.

6    Q.   All right.  Now, the letter -- the email says you spoke

7    to the counsel at the Office of Congressional Ethics, right?

8    A.   Correct.

9    Q.   And who is that?

10   A.   Bryson Morgan.

11   Q.   Do you remember the conversation you had with

12   Mr. Morgan?

13   A.   Vaguely.

14   Q.   Tell us what you remember about that conversation.

15   A.   I had asked Mr. Morgan -- I had informed Mr. Morgan that

16   I had several people who were in the situation where they

17   either didn't have any documents or they didn't even know

18   who Brett O'Donnell was and how did they want them to be

19   handled.

20        And he explained to me about the forms.  They had

21   to be signed, the additional letter that he would like them

22   to create, and have it sent back to him as soon as possible.

23   They were in a bit of a rush.

24        As far as the documents, I told him that we were

25   producing -- I was producing documents and would be sending

1     them down shortly, and I had a question for him regarding

2     group emails.

3              And at which point I asked him, I said, if I have

4     a group email and there's, say, six people on it, and

5     there's eight responses to it, does he want all eight

6     responses separately, or does he just want the final

7     response with all eight beneath it.

8              And he told me as long as it was unbroken, there

9     was an unbroken chain, then he could just take the final

10    document that showed all eight below it.

11    Q.  All right.  And the email that you wrote to these folks,

12    does it substantially set forth what you understood from

13    your conversation with Mr. Morgan?

14    A.  It does.

15    Q.  Okay.  Now, you sent it to these five folks.  Why these

16    five?

17    A.  Well, three of them -- Mr. Reitz and Kilgore and

18    Ms. Hayes -- were the three that told me they either didn't

19    have any emails or they didn't know who Brett O'Donnell was.

20             At this point it's been six days since the letter

21    came out, and I had not heard anything from David Heenan or

22    Josh Findlay at that point, so I included them on the email

23    as well.

24    Q.  Did you know at that time that Mr. Findlay hadn't even

25    received the communication from OCE yet?

1    A.  I did not.

2    Q.  All right.  Now, you say here in the second sentence, "I

3    told them" -- there you mean Mr. Morgan, the OCE, right?

4    A.  Yes, I do.

5    Q.  -- "that none of you" -- the people that you're writing

6    to, right?

7    A.  Correct.

8    Q.  -- "really had any relevant direct conversations or

9    interactions with Brett O'Donnell (to my knowledge).  If

10   that is indeed the case, then you won't need to turn over

11   any information" -- then you talk about the group email --

12   "and then they won't need to interview you."

13           Why did you think that that applied to Mr. Heenan?

14   A.  Well, at the time there were two reasons.  One was his

15   position with Congressman Broun.  You know, he was in the

16   district.  He was the driver, the body man.  He videotaped

17   the Congressman when he was speaking.  And then, when the

18   Congressman was in the district, he worked out of the

19   official office doing -- helping with some scheduling items

20   and fieldwork, and my first impression was he would have no

21   interaction with Mr. O'Donnell.

22   Q.  So there were two reasons.  What was the second reason?

23   A.  The second reason was I hadn't heard from him.  I

24   just -- this had been six days, and I thought, if he had had

25   any information, he would have gotten back to me by now, and

1    I just assumed he was ignoring it because he didn't have any

2    information.

3    Q.  And Mr. Findlay, why did you include him?

4    A.  Initially I thought the same reason.  He was in the

5    district.  He was working on the campaign side.  I don't

6    know if he had ever -- I knew he had never physically met

7    Mr. O'Donnell.  And that was just my first impression.

8    Q.  Now, there are a couple of people that you don't include

9    on this email.

10   A.  Correct.

11   Q.  Ms. Miller.

12   A.  Correct, Erika Miller in our D.C. office.

13   Q.  Okay.  Why didn't you include her?

14   A.  I had personally told her this information, and she had

15   the documents already, the forms already.

16   Q.  And then Mr. Chinouth is not on here either, right?

17   A.  Correct.

18   Q.  Why didn't you include him?

19   A.  I knew Mr. Chinouth had volumes of emails.

20   Q.  Okay.  Let's look at the bottom part of the page.

21        Now, you told us that Mr. Morgan told you about

22   this additional letter that he wanted, right?

23   A.  Correct.

24   Q.  And he told us about that, too.

25        This language that you've got here, did he

1    actually dictate that to you word for word?

2    A.  I don't believe it was word for word.  I believe it was

3    sort of an impromptu type of situation.  He just said the

4    letter needs to convey this information.

5    Q.  Okay.  And what did you do with that -- with what he was

6    telling --

7    A.  I was fiercely writing it down as he was telling me and

8    typed it out.

9    Q.  All right.  Let's look at the phone log.

10          Now, you've just told us that you got the letters

11   from the OCE, the RFIs, in the first part of June, right?

12   A.  Correct.

13   Q.  And you're working with the other staff members in the

14   first part of June to gather their documents and turn them

15   in, whether they have them or they don't, so on and so

16   forth.

17   A.  Correct.

18   Q.  Did you have any communication with Mr. O'Donnell at --

19   A.  Not by phone.

20   Q.  All right.  During the first half of June, let's say?

21   A.  No, not by phone, and I don't recall any emails but...

22   Q.  Were there things that Mr. Morgan asked you to obtain

23   for him after he received your initial production?

24   A.  Yes, there were.

25   Q.  What were those?

1    A.  He asked me for all invoices from Brett O'Donnell to the

2    office of Congressman Paul Broun.

3    Q.  And what did you do in response to that request?

4    A.  I connected him with our accountant, who maintained

5    those invoices in their files, and I believe they were

6    provided to him.

7    Q.  After you'd provided your documents and some of the

8    other staffers had, then what happened?  Did you hear from

9    Mr. Morgan for a while?

10   A.  Not initially.  I had asked him about when he wanted to

11   schedule the meeting with the Congressman, and he said,

12   "Let's get the documents first, and then we'll talk."

13   Q.  Okay.  Now, there was -- there's been some discussion

14   about the urgency, the press that Mr. Morgan was under --

15   A.  Yes.

16   Q.  -- to get the documents in advance of doing the

17   interviews, right?

18   A.  Yes.

19   Q.  Okay.  Whose decision was it not to respond to the OCE

20   initial request for information?

21   A.  Dr. Broun, Congressman Broun.

22   Q.  Once you received your request for information, how many

23   days was it until you responded?

24   A.  Six.  I responded right away to Mr. Morgan.  I produced

25   the final results in six days.

1    Q.  Let's turn, then, to a discussion of the interviews.  Do

2    you remember what day you were interviewed on?

3    A.  I do not.  It was June -- actually I remember now.  June

4    24th, I want to say, give or take a day.

5    Q.  And who all was interviewed?

6    A.  Teddie Norton, Christine Hardman, and myself on one day.

7    And the next day Congressman Paul Broun was interviewed.

8    Q.  Do you know of anyone else who was interviewed?

9    A.  I know they went down to Georgia.  OCE, Mr. Morgan, went

10   down to Georgia and interviewed Jordan Chinouth and at that

11   time I thought possibly Josh Findlay.

12   Q.  And do you know if they interviewed Mr. O'Donnell?  Do

13   you know now?

14   A.  Now I do, yes.

15   Q.  All right.  When did you learn that they were going to

16   interview Mr. O'Donnell?

17   A.  The morning of the interview with him.  That will be the

18   23rd, I believe, of June 2014.

19   Q.  Okay.

20          MS. GORDON:  So let's look at Defense Exhibit 222.

21   Q.  And tell us what we're looking at here.

22   A.  It's an email from Brett O'Donnell to myself on Monday,

23   June 23, 2014, at 8:48 in the morning.  The subject is

24   "OCE," and Mr. O'Donnell's letting me know that he's

25   testifying that morning at 11:00 a.m. to OCE.

```
 1    Q.  All right.  And let's look over at the phone log.  So

 2    the date of that was June --

 3    A.  23rd.

 4    Q.  -- 23rd.

 5          So if we look on Line 25 here, Mr. O'Donnell calls

 6    you.

 7    A.  He calls me a little bit before he sends that email at

 8    8:42 in the morning.  He must have got my voice mail, didn't

 9    leave a message.

10    Q.  And then what happens on the next line, Line 26?

11    A.  About 10 minutes or 14 minutes later I see a missed

12    call, and I returned his call.

13    Q.  Did you know he was going to be interviewed that

14    morning?

15    A.  Not at that point, no.

16    Q.  Tell us what you remember about this conversation.

17    A.  I remember -- well, it was eight minutes, 23 seconds.  I

18    remember him telling me that he was going to go in,

19    interview with the OCE, and that he was providing all of his

20    documents.

21          And I informed him that we had done the same.  We

22    had turned over our documents, and we were scheduled to do

23    interviews the next day.

24    Q.  All right.  And then Line 27, what's going on here?

25    It's a call from whom to --
```

1    A.  Brett O'Donnell had called me later that afternoon.  We

2    spoke for approximately six minutes and 20 seconds, and he

3    was just letting me know that he had done the interview, how

4    long it went, and some of the topics that they had covered.

5    Q.  All right.

6              MS. GORDON:  Then let's look at Defense Exhibit

7    184, and let's look at this part here.

8    Q.  All right.  Now, this is an email from whom?

9    A.  This is from me to Bryson Morgan on Thursday, June 26,

10   2014, late in the afternoon regarding the interview that we

11   had had -- "Interview Today" is the topic, subject.

12   Q.  So why are you writing Mr. Morgan?  What are you doing

13   here?

14   A.  Mr. Morgan had finished interviewing the Congressman

15   that morning, and the Congressman had asked me to follow up

16   with him and see if there was anything else we needed to do

17   in the process, and that's what I was doing.

18   Q.  All right.  And at that point what did you think was the

19   status of the OCE investigation?

20   A.  I'm sorry, as far as status?  I thought that we had

21   answered their questions on whether or not Mr. O'Donnell had

22   done official work to earn his official money.  I thought it

23   was pretty clear from the emails and from the interview and

24   the discussions we had.

25              I was told that there was -- would be an

1   opportunity for the Congressman to address their board

2   before they made their decision, and that we were interested

3   in doing that as well, or the Congressman was interested in

4   doing that as well.

5   Q.  All right.  So I want to ask you a few questions, then,

6   about your actual interview with the OCE.

7   A.  Yes.

8   Q.  All right.  So do you remember being asked this question

9   and giving these answers?  It's one of the OCE lawyers

10   speaking.

11          "Were you involved?"

12          MR. GEE:  Can we have a line?

13          MS. GORDON:  Yes.  I'm on Page 85, Line 17.

14   Q.  And the question is:  "Okay.  Were you involved in

15   putting together the office's response to the WSB/TV story?"

16          Your answer:  "I'm sure I was, yes."

17          So let me pause there and ask what's the time

18   frame of that story, that media story?

19   A.  Mid-March 2014.

20   Q.  Okay.  Then the question follows on Line 20:  "Let's

21   just get it right here from Christine.  When this says near

22   the end, 'As stated by the House Administration Committee,

23   O'Donnell's communications training is in compliance with

24   all House rules,' do you know what that is referring to,

25   what statement by the committee?

1      "ANSWER:  I believe the news article that was in

2   *USA Today* by Paul Singer --

3      "QUESTION:  Okay.

4      "ANSWER:  -- where they stated that we were in

5   compliance with all House rules?"

6      All right.  Do you remember that portion of your

7   interview --

8   A.  I do.

9   Q.  -- with the OCE?

10     Okay.  As we said before, without telling us

11  anything that was in the content of the *USA Today* article,

12  what are you referring to in this portion of your testimony

13  to the OCE?

14  A.  I'm referring to an item or a response that was in the

15  article.

16  Q.  Okay.  A little further on in your OCE interview you

17  were asked also the following questions.  Let me find the

18  right page.

19     MS. GORDON:  Counsel, this is at Page 80 -- it's

20  on Page 81, Line 20.

21  Q.  Mr. Solis, the other OCE lawyer, asks you this

22  question:  "He attended that meeting" -- he's speaking of

23  Mr. O'Donnell -- "though at the restaurant with the campaign

24  there, right?"

25     You're answer:  "I'm sure he did.  I mean, I can't

1    recall specifically.  I'm sure he did.  It was sort of an

2    impromptu meeting because when we went down there we did not

3    know we were having a campaign.

4          "I think Saxby literally renounced" -- it says

5    "renounced" -- "his decision like a week and a half prior,

6    and we got down there.  We still -- Dr. Broun wasn't even

7    sure if he was going to run or not at that point in time,

8    and I think there was sort of a meeting to discuss -- you

9    know, he wanted to sort of hear whether everybody thought he

10   should run or not, and he was going to contemplate that."

11         Mr. Solis says, "Okay."

12         "ANSWER:  I know had he not announced yet."

13         Do you remember that portion of your OCE

14   interview?

15   A.  I do now, yes.

16   Q.  Okay.  Now, prior to your OCE interview, what did you do

17   to prepare?

18   A.  Nothing.

19   Q.  When you turned over your emails to Mr. Morgan, did you

20   read them?

21   A.  Not really, no.

22   Q.  Did you organize them in any way?

23   A.  No.  They came out of the printer, and when the box got

24   full, I would take off the paper and put them in the pile

25   and wait for the next batch to come out.

1    Q.   Did you save a copy for yourself?

2    A.   I thought I had, but I haven't been able to find it.

3    Q.   Did you review any of them before you went into the

4    meeting with OCE?

5    A.   No, I had not.

6    Q.   All right.  So in this -- these answers that you gave to

7    Mr. Solis, the OCE, you're saying that you thought Saxby --

8    Senator Chambliss?

9    A.   Senator Chambliss.

10   Q.   -- had announced, I think it should be, his decision a

11   week and a half prior before the Chateau Elan trip.  And

12   that's not really right, is it?

13   A.   No, it is not.

14   Q.   What's wrong with it?

15   A.   I had a lot of time frames mixed up in my head at the

16   time.  It was very hectic, late January/early February.  My

17   daughter had just been born.  I had been home for ten days,

18   and I wasn't even there when they did the announcement.

19        The actual timeline was Saxby had retired --

20   announced his retirement.  Congressman Broun contemplated

21   and then decided to run, made his announcement public,

22   official, and then we did the Chateau Elan retreat.

23   Q.   All right.  And then there's one other item from the OCE

24   interview.

25        MS. GORDON:  Counsel, this is on Page 92, Line 17.

1    Q.  You were asked this question:  "Was there any

2    expectation or any understanding or even a conversation with

3    Brett that if all -- that if things went well on the Senate

4    campaign, if the funding was -- was good enough, that he

5    could be paid by the campaign for the debate prep" --

6              Your answer:  "No."

7              And then the question was interrupted --

8    "services, debate prep services?

9              "ANSWER:  I don't think we ever got to that point.

10             "QUESTION:  Never a conversation like that?

11             "ANSWER:  Never got to that point.

12             "QUESTION:  Where, if Dr. Broun made it through

13   the primary, he would be hired unofficially by the

14   campaign?"

15             Your answer:  "No, sir."

16             "QUESTION:  You don't recall a conversation?

17             "ANSWER:  I mean no.  We actually never had a

18   conversation about any role that Brett would quite honestly

19   have.  It just sort of evolved.  In other words, he offered

20   to volunteer.  We took him up on his offer at one point, and

21   it just sort of came for and more involved, and then it

22   wasn't working out so we starting pulling him back."

23             Do you remember those questions and answers from

24   your OCE interview?

25   A.  I do.

1    Q.   Okay.  Now, the first question was, was there any

2    expectation or any understanding or even a conversation with

3    Brett that if things went well on the Senate campaign, if

4    the funding was good enough, that he could be paid by the

5    campaign for the debate prep services.

6              So you told us earlier that there was a

7    conversation with Mr. O'Donnell where he asked about being

8    paid.

9    A.   Correct.

10   Q.   And you told him to hang in there.

11   A.   The second time, yes.

12   Q.   So why is it that you were telling the OCE investigators

13   here that there was not a conversation in response to a

14   question of where, if Dr. Broun made it through the primary,

15   he would be hired unofficially by the campaign?

16   A.   My thought was that we had not gotten that far yet.  It

17   was literally a level of specifics that we had not reached.

18   If Brett O'Donnell was still there, and Dr. Broun had made

19   it through the campaign, then we would sit down and have

20   that discussion with the Congressman.

21             But to me, that conversation had not occurred.

22   Q.   Specifically what conversation had not occurred?

23   A.   Whether Brett O'Donnell would have a role in the

24   campaign and whether it would be paid or not, a specific

25   role.

1    Q.  Now, you've mentioned several times about things that

2    you were going to run by Dr. Broun, so I want to ask you a

3    few questions about that.

4    A.  Yes.

5    Q.  In terms of who was the decision-maker in the office,

6    who did you think made the decisions?

7    A.  Well, it depended on the level of decision-making.  We

8    never -- nobody was ever hired or fired without the

9    Congressman signing off on it.  The final budget was

10   presented to the Congressman, and he signed off on it.

11        Once a month we would get payroll forms, and the

12   Congressman would review them and sign them.  He had to

13   personally sign them and submit them.  Things like that on

14   the official side.

15        On the campaign side, it is pretty much the same

16   story.  His level of sort of interest and micromanaging ebb

17   and flow depending on what was on his mind.  Sometimes he

18   would be heavily involved in the weeds, whether it was

19   designing a palm card or figuring out how many signs to

20   order all the way up to, you know, what is our poll going to

21   say, how much are we going to spend on it; what is a

22   television ad going to say, how much are we going to spend

23   on it.

24        So he was pretty involved, especially on the

25   campaign side, more and more as we went along further, but

1    my role was to funnel -- be a funnel for everything towards

2    him.

3            So we had approximately 18 staffers, 17 to 18

4    staffers, on the official side at any given point, and a

5    dozen consultants and employees on the campaign side at any

6    given point, and, you know, the Congressman can't have 30

7    people vying for his attention, so my job as chief of staff

8    was to funnel everything towards him in order of importance.

9    Q.  All right.  Now, we've talked about your interview with

10   the OCE.  Let's talk for a few minutes about Ms. Hardman.

11   A.  Yes.

12   Q.  She was interviewed by the OCE as well, right?

13   A.  She was.

14   Q.  And she testified here in the trial.

15   A.  She did.

16   Q.  And she gave some testimony about the communications

17   between you and her about responding to the OCE's requests.

18   A.  Correct.

19   Q.  And about what happened during the OCE interview?

20   A.  Correct.

21   Q.  So I'm going to ask you some questions about those.

22   A.  Yes.

23   Q.  When you initially got the request from OCE for the

24   documents, did you have a conversation with Ms. Hardman and

25   anyone else about how to respond to the request?

 1    A.  I did.  I talked to Ms. Hardman and Ms. Norton.  I

 2    told -- they both had received requests as well.  I knew

 3    they both had documents so, as they said and I say, I told

 4    them to go start printing out their documents.

 5    Q.  And then did there come a time -- another time when you

 6    discussed with Ms. Hardman what to do about the production

 7    of documents?

 8    A.  Yes.  When we were gathering towards the latter stage of

 9    gathering, printing and gathering all of our documents

10    together, we were sort of coalesced around Teddie Norton's

11    desk putting them all into the box to be transported over.

12         At this point we're pretty much done -- this is

13    the 6th or 7th of June -- producing the documents, and

14    Christine turns to me and says, "I only printed out official

15    documents.  Should I have printed out personal documents?"

16    And I told her to use her discretion.  I wasn't going to

17    involve myself in her decision-making process.

18    Q.  Now, Ms. Hardman testified that you said "just official

19    for now" or words to that effect.  Do you remember that

20    testimony?

21    A.  I remember the testimony.  That's not how I recall the

22    conversation.

23    Q.  Okay.  Ms. Hardman also testified that there was a third

24    situation in which she pulled some of the documents from her

25    production that involved campaign activity in the office.

1    Do you remember that testimony?

2    A.  I remember that testimony, yes.

3    Q.  Do you remember having that discussion with her?

4    A.  I remember a discussion with her, but not in that actual

5    context.

6            The third sort of encounter we had was prior to

7    her interview with the OCE in which she expressed to me

8    concern that she had turned over some emails that indicated

9    we were doing campaign work in the official office, and she

10   didn't know what to do about that.  And at that point I just

11   told her just not to lie.  I said, "Don't lie about it.

12   Just go in there and tell them what happened."

13   Q.  Now, did you review Ms. Hardman's document production

14   before she turned it over to OCE?

15   A.  I did not.

16   Q.  So do you know whether or not she turned over documents

17   of that nature --

18   A.  I do not.

19   Q.  -- or not?

20   A.  I have no idea.

21   Q.  All right.  Then Ms. Hardman was interviewed by the OCE,

22   and at a certain point she came out of the interview room,

23   right?

24   A.  She did.

25   Q.  And tell us what happened then.

1    A.  I was standing in the front office, the entranceway to

2    the Congressman's doorway, with Ms. Norton preparing to go

3    in, and Christine came out and was very flustered, and she

4    told me that she thinks she had just lied.

5              And I said, "In what way?"

6              And she said, "They asked me if I had talked to

7    Brett recently, and I told them I had not, and, in fact, I

8    had talked to him this morning."

9              And I said, "Go back in there and straighten it

10   out.  Tell them the truth."

11             And she went right back in.

12   Q.  All right.  Mr. Bowser, what was your understanding

13   about whether or not the OCE process was voluntary?

14   A.  I knew it to be voluntary.

15   Q.  How did you know that?

16   A.  Previous dealings.

17   Q.  So without getting into the -- necessarily the substance

18   of what the prior investigation was about, had you had a

19   previous case with OCE?

20   A.  My boss had, yes.

21   Q.  All right.

22   A.  Not myself.

23   Q.  You were not the subject?

24   A.  I was not the subject, no.

25   Q.  All right.

1       MS. GORDON:  Let's look at Defense Exhibit 185.

2  Q.  All right.  And what are we looking at here, Mr. Bowser?

3       MS. GORDON:  Well, let's look at the -- sorry,

4  let's look at the bottom part first.

5       Can we look at the bottom first.  Sorry.

6  Q.  All right.  So tell us what we're looking at here.

7  A.  This is an email from Bryson Morgan from OCE to myself,

8  and the subject is "David Heenan."  It's on Tuesday, July

9  15, 2014.

10  Q.  Okay.  And why is Mr. Morgan writing you?

11  A.  This is several weeks after the interviews that we

12  had with Mr. Morgan, and I had sent that email you had

13  shown earlier saying let us know what the next step would

14  be in the process, and he is emailing me to tell me that

15  the only person he had not received any documents from was

16  Mr. Heenan.

17  Q.  All right.  And did you know that at the time?

18  A.  I did not.

19  Q.  Okay.

20       MS. GORDON:  And let's look at the top part then.

21  Q.  All right.  And you write him back to say -- well, you

22  write Mr. Morgan back, right?

23  A.  I respond to Mr. Morgan, and I add on what I believe to

24  be the email addressed to David Heenan, and I tell Heenan to

25  please get the forms signed and touch base with Mr. Morgan.

1    Q.  All right.  Now, with both this email, which is dated

2    July 15, 2014, and the June 9th one that we have seen

3    repeatedly, were you telling Mr. Heenan to lie?

4    A.  Absolutely not.  At this point I believe that he was

5    ignoring all this because he didn't have anything and didn't

6    want to deal with it.  I was surprised that he had not

7    responded.

8              MS. GORDON:  And let's look at Defense Exhibit

9    226.

10   Q.  After the OCE concluded its investigation, did it

11   produce a report?

12   A.  It did.

13   Q.  Okay.  And do you remember approximately when that came

14   out?

15   A.  I knew it was in the fall.  I'm not exactly sure what

16   date.

17   Q.  What are we looking at here?

18   A.  This is an email from myself responding to Brett

19   O'Donnell on Wednesday, October 29, 2014.  The topic was *USA*

20   *Today*.

21   Q.  Now, the original email is from whom?

22   A.  Brett O'Donnell.

23   Q.  Okay.

24   A.  He's letting me know that *USA Today* is doing a story, as

25   is CQ, which stands for *Congressional Quarterly*.

1   Q.   And is this the same *USA Today* article from 2013?

2   A.   No, it is not.

3   Q.   Okay.  Did you read this article?

4   A.   I'm sure I did.

5   Q.   In this email Mr. O'Donnell doesn't tell us what it's

6   about, right?

7   A.   No, he does not.

8   Q.   Okay.  Without telling us what was in the article, in

9   general terms do you know what this one was about?

10   A.   I believe it would be about the OCE report.

11   Q.   All right.  And you write Mr. O'Donnell back and say

12   what?

13   A.   "Christine" -- that would be Hardman, our press

14   secretary -- "has already gotten well past 20 requests for

15   comment," and that Mr. Singer had apparently reached out to

16   us as well, and we were specifically ignoring his request.

17   Q.   All right.  So let's go back to the phone log then.

18   Now, the last one we looked at was these ones in June where

19   Mr. O'Donnell called you, and you returned his call the

20   morning of his OCE interview, right?

21   A.   Yes.

22   Q.   And then how much time went by before the next call?

23   A.   A little over two and a half months.

24   Q.   Okay.  When is the next call?

25   A.   September 15, 2014.

1    Q.   And how long is the call?

2    A.   Seven minutes and nine seconds.

3    Q.   Do you remember when that was about?

4    A.   I am not entirely sure.  My thought was it might be

5    about the OCE report being -- OCE sent us a copy of the

6    report prior to being released to the public.

7    Q.   All right.  And then how much time goes by before you

8    talk to him again?

9    A.   Approximately six weeks.

10   Q.   Okay.  And you call him twice here, right?

11   A.   I did.

12   Q.   Or apparently perhaps once maybe, right?  According to

13   what the tech told us the other day, these may or may not

14   be --

15   A.   No, those are -- yes, you're right.

16   Q.   -- may or may not be the same call.

17          That's on October 28th.

18   A.   Correct.

19   Q.   This is the day before the last email that we looked at?

20   A.   It is.

21   Q.   Okay.  And then on Line 31?

22   A.   Mr. O'Donnell calls me back, 7:19 in the evening, and we

23   spoke for about two minutes and 28 seconds.

24   Q.   And do you remember that call?

25   A.   I do.

1    Q.  What was the conversation about in that call?

2    A.  It was about the OCE report becoming public, and that we

3    were starting to get some press calls.

4    Q.  All right.

5              MS. GORDON:  And let's look at Defense Exhibit

6    224.

7    Q.  And what's the date of this email, the lower part here?

8    A.  December 2, 2014.

9    Q.  Who is it from?

10   A.  It's from Brett O'Donnell at an unfamiliar email address

11   to myself.

12   Q.  Okay.  And what does he ask?

13   A.  The title is "DOJ," and he's asking me if there is a DOJ

14   investigation of Dr. Broun.

15   Q.  Okay.  And what do you respond?

16   A.  This is the first I had heard of anything like that so I

17   said, "Not that I'm aware."  Ethics -- meaning the ethics

18   committee itself -- was still working on this investigation,

19   and I said, "Have you heard anything?"

20   Q.  And let's switch back to the phone log.

21              And there's these three last calls here at the

22   end, Lines 32, 33, and 34.  What's the date of those?

23   A.  December 11, 2014.

24   Q.  And what's the duration of the calls?

25   A.  Zero to five seconds.

1   Q.  And do you have any idea what that's about?

2   A.  I was calling Brett to find out if he had heard

3   anything, and at that point I did not connect.

4   Q.  All right.  Mr. Bowser, did you hire Brett O'Donnell to

5   work on Congressman Broun's campaign?

6   A.  I did not.

7   Q.  What did you hire Mr. O'Donnell to do?

8   A.  Technically Congressman Broun hired Brett O'Donnell to

9   help him improve his public speaking and messaging skills.

10  Q.  Did you pay Mr. O'Donnell out of MRA funds to work on

11  Congressman Broun's campaign?

12  A.  I did not.

13  Q.  Did you lie to the OCE about why Congressman Broun hired

14  Mr. O'Donnell?

15  A.  I did not.

16  Q.  Did you attempt in any way to obstruct the OCE's

17  investigation?

18  A.  I did not.

19  Q.  When you turned your documents in to OCE, you signed a

20  certification, right?

21  A.  Correct.

22  Q.  Okay.  And on that certification you certified that you

23  had not willfully or intentionally withheld documents,

24  correct?

25  A.  Correct.

1    Q.  Was that certification accurate at the time you signed

2    it?

3    A.  I believe so.

4    Q.  Why is that?

5    A.  I thought I had given them everything that -- or I

6    thought I had given them documents that they were looking

7    for.

8              MS. GORDON:  No nothing further.

9              THE COURT:  All right.  It's an appropriate time

10   to take a 15-minute recess, and then we'll start cross-

11   examination.

12             All right.  We'll start back at 3:15, okay?  Thank

13   you.

14             (Jury exits courtroom)

15             THE COURT:  All right.  You can step down, sir.

16             THE WITNESS:  Yes, sir.  I'm just picking up my

17   water bottle.

18             (Recess taken)

19             (Jury enters courtroom)

20             THE COURT:  All right.  We'll proceed with cross-

21   examination.  Counsel.

22             MR. GEE:  Thank you, Your Honor.

23                       CROSS-EXAMINATION

24   BY MR. GEE:

25   Q.  Good afternoon, Mr. Bowser.

```
 1    A.  Hello, sir.

 2    Q.  Mr. Bowser, you sat through that OCE interview for over

 3    an hour, correct?

 4    A.  Yes, sir.

 5    Q.  And in that interview -- we heard it on tape the other

 6    day, right?

 7    A.  Yes, sir.

 8    Q.  -- they asked you a lot of questions about Brett

 9    O'Donnell's campaign work, didn't they?

10    A.  I'm sure they asked some, yes.

11    Q.  You heard it on tape the other day.  They said

12    "campaign" a lot, didn't they?

13    A.  I'm not sure what "a lot" means, but they did mention

14    "campaign."

15    Q.  They said it more than ten times.

16    A.  Probably.

17    Q.  And they asked a lot -- well, they asked more than ten

18    questions about how he was paid, didn't they?

19    A.  I'm sure.

20    Q.  And they asked more than ten questions about how he was

21    hired, didn't they?

22    A.  I'm sure, yes.

23    Q.  And at the end of that interview, they invited you to

24    make a supplemental production, didn't they?

25    A.  That's what it sounded like, yes.
```

1           MR. GEE:  Can we call up Government's Exhibit 435.

2     Scroll down, please.

3     Q.  After that interview and that invitation to provide a

4     supplemental production, you didn't provide this email where

5     Brett O'Donnell wrote, "You hired me to coach the candidate.

6     I won't make ads, write mail pieces, manage the online

7     program or the campaign, but let's trust each other to play

8     the roles we were hired to do."

9           You didn't provide that, did you?

10    A.  I guess not.

11    Q.  After that interview, when they invited you to make a

12    supplemental production after all that, you didn't

13    provide --

14          MR. GEE:  Calling up Exhibit 356.

15    Q.  You didn't provide this email in which you said, "Since

16    our debate consultant actually abandoned us on our first

17    debate to visit people who don't pay him."  You didn't

18    provide that email, did you?

19    A.  Are you asking --

20    Q.  After that --

21    A.  -- if I knew about emails I did not provide?

22    Q.  Sir, this email --

23    A.  Yes.

24    Q.  This is an email you sent, correct?

25    A.  Yes.

1    Q.  And you know that this email was still in your Yahoo

2    account a year later in 2015, right?

3    A.  Yes.

4    Q.  And you did not provide this email after that OCE

5    interview when they asked you all those questions about how

6    he was paid and about the campaign and invited you to make a

7    supplemental production, did you?

8    A.  I guess not.

9    Q.  You guess not, or you did not provide it, sir?

10   A.  I guess not.  I don't know.

11   Q.  Sir, did you ever make a supplemental production after

12   that interview?

13   A.  I did not, no.

14   Q.  So do you need to guess whether you provided this email

15   or not?

16   A.  No.

17   Q.  You didn't, did you?

18   A.  I did not.

19   Q.  And after that interview, when they asked you all

20   those questions and invited you to make a supplemental

21   production --

22            MR. GEE:  Go to Exhibit 107.

23   Q.  This email where you said on February 5th, the day

24   before Congressman Broun's announcement speech, "There are

25   two things that we care about in this announcement.  It's

1     delivered well and it looks like it; what is the story and

2     the main theme we want printed.  The first is Brett and

3     Meredith's job," you didn't provide that in response to all

4     those questions about what Brett was doing --

5     A.  I did not.

6              THE WITNESS:  Sorry.

7     A.  I did not.

8     Q.  You don't have to guess about that one, do you?  Do you?

9     A.  No.

10    Q.  Let's go back to the beginning.

11              You spent a while yesterday talking about your

12    experience on campaigns, right?

13    A.  Yes.

14    Q.  You've been working on campaigns since the 1990s.

15    A.  Yes.

16    Q.  And it sounds like at all kinds of levels, right?

17    A.  Yes.

18    Q.  You know what a campaign is.

19    A.  Yes.

20    Q.  You know what different elements of a campaign are, like

21    raising money?

22    A.  Yes.

23    Q.  Like messaging?

24    A.  Yes.

25    Q.  Like polls?

```
 1    A.   Yes.

 2    Q.   Like debates?

 3    A.   Yes.

 4    Q.   And you know what a consultant is to a campaign, right?

 5    A.   Yes.

 6    Q.   People who do polls.

 7    A.   Yes.

 8    Q.   People who do messaging.

 9    A.   Yes.

10    Q.   People who raise money.

11    A.   Yes.

12    Q.   People who make TV ads.

13    A.   Yes.

14    Q.   People who coach debates.  You know that, right?

15    A.   Yes.

16    Q.   And you know what a media interview looks like when it's

17    related to a campaign, don't you?

18    A.   Sure.

19    Q.   When reporters are asking questions like, "Why are you

20    attacking your opponent in such and such way?" you know

21    that's a campaign media interview, right?

22    A.   It's a question, yes.

23    Q.   And you know that when reporters call up an elected

24    official and say, "I want to talk to you about a candidate

25    profile," you know that's a campaign media appearance,
```

1    right?

2    A.  Yes.

3    Q.  And you know when reporters call up and say, "I want to

4    talk to you about your attack on your opponent," that's a

5    campaign media appearance, right?

6    A.  Yes.

7    Q.  And you know what campaign events are, right?

8    A.  Yes.

9    Q.  It's an event where an elected official is talking about

10   why they should be elected in an upcoming election.

11            You know that, right?

12   A.  Yes.

13   Q.  And you know that campaign events, they're frequently

14   planned ahead of time, right?

15   A.  Some, yes.

16   Q.  And you know what a campaign debate is, right?

17   A.  Yes.

18   Q.  We've even learned about this extra category, campaign

19   forums, right?

20   A.  Yes.

21   Q.  They don't look like the presidential ones, but there

22   are still a lot of the same candidates on the same stage

23   together, right?

24   A.  Yes.

25   Q.  And all those are the things that you've known about all

1     the way back to the '90s, right?

2     A.   Through -- since the '90s, yes.

3     Q.   Now, on top of that you have worked on the Hill for two

4     different offices in the House of Representatives, right?

5     A.   A total of three, but yes.

6     Q.   Three, I'm sorry.

7     A.   That's okay.

8     Q.   And you were a chief of staff for a congressman even

9     before Paul Broun, right?

10    A.   Yes.

11    Q.   And did that for a number of years, right?

12    A.   Yes.

13    Q.   And you were then on a leave of absence working for the

14    NRCC when you went to work for Paul Broun, right?

15    A.   Yes.

16    Q.   And you actually were asked by the leadership to come in

17    to Paul Broun's office to help get some staffing issues

18    fixed, weren't you?

19    A.   Not totally, no.

20    Q.   Okay.  Well, you were asked to come into his office to

21    help fix some problems.

22    A.   To look at some things, yes.

23    Q.   And -- so you're a problem-solver on the Hill.

24    A.   Is that a question?

25    Q.   You're a problem-solver on the Hill, right?

1    A.   Sure.

2    Q.   Because you know how to fix problems on the Hill, right?

3    A.   Some.

4    Q.   And you know how to run congressional offices, right?

5    A.   Basically.

6    Q.   Now, once you started in Congressman Broun's office --

7    his name's on the door, right?

8    A.   Yes.

9    Q.   It's his name that's on the side of the envelopes,

10   right?

11   A.   Yes.

12   Q.   It's his name that everybody signs to the vouchers to

13   spend the money, right?

14   A.   Not everybody, but --

15   Q.   Well -- sorry.

16   A.   -- his name's on the vouchers, yes.

17   Q.   His name's what gets signed on the vouchers, as we've

18   heard, right?

19   A.   Yes.

20   Q.   And it's his name on the TV ads, right?

21   A.   Yes.

22   Q.   But Congressman Broun, you said, when you were there --

23   I think you said that your duties were to, quote, funnel

24   everything towards him in order of importance, right?

25   A.   Yes.

1    Q.  Now, you don't funnel every decision to Congressman

2    Broun, do you?

3    A.  No.

4    Q.  He trusts you to run the day-to-day affairs of the

5    office, right?

6    A.  Yes.

7    Q.  And as part of running the day-to-day affairs of the

8    office, you had a lot of authority.  Is that fair to say?

9    A.  Yes.

10   Q.  You could make decisions like whether someone got a

11   raise or not.

12   A.  No.

13   Q.  You had to consult with Congressman Broun about that?

14   A.  I did, yes.

15   Q.  You would do their performance reviews with the

16   staffers, right?

17   A.  Yes.

18   Q.  Often without Congressman Broun present?

19   A.  After Congressman Broun.

20   Q.  After he had talked to them?

21   A.  After he reviewed their -- individually.

22   Q.  Got it.  And you could make recommendations to

23   Congressman Broun about all kinds of things, right?

24   A.  Yes.

25   Q.  And you could also make a lot of decisions yourself,

1    couldn't you?

2    A.  A lot.

3    Q.  Now, on the campaign you never actually took the title

4    in 2012 or 2014 of campaign manager, did you?

5    A.  No.

6    Q.  And that's because you knew it would look bad for the

7    Congressman's chief of staff to have the title of campaign

8    manager, isn't it?

9    A.  No.

10   Q.  You actually set up Jordan Chinouth in the 2012 election

11   to be the on-the-ground campaign manager, right?

12   A.  Did I set that up?  No.  Congressman Broun set that up.

13   Q.  Well, it was you who made the decision about how much

14   Jordan would get paid, wasn't it?

15   A.  No.  It was Congressman Broun.

16   Q.  It was you who made the decision about how Jordan would

17   get paid, wasn't it?

18   A.  Yes.

19   Q.  Yes.  And let's look at that.

20          MR. GEE:  Exhibit 4, please.

21   Q.  So this is an email we haven't looked at before.  This

22   is March 1, 2012, and you say -- this is you emailing

23   Congressman Broun and Mr. Bibee, right?

24   A.  Yes.

25   Q.  And you say, "I am throwing out there as a discussion

1     item - as Jordan is corresponding now with the Simpson

2     campaign" -- Simpson was your opponent in March 1, 2012, or

3     expected opponent, right?

4     A.  Yes.

5     Q.  -- "taking the position as point of contact as campaign

6     manager in that response, and given that Simpson sees him

7     out there every day at nearly every event he appears at, I

8     am of the opinion we should look at sliding Jordan to the

9     campaign payroll and cutting back on his official salary at

10    some ratio starting today.  We don't have to start at 50-50.

11    We can do a month or some other ratio and bump it up to

12    50-50 in April when we have a big two-week recess, or we

13    just do 50-50 for continuity and simplicity's sake."

14            You said that, right?

15    A.  Yes.

16    Q.  And you said, "Any thoughts?"  Right?

17    A.  Yes.

18    Q.  Now, this is because Jordan -- you're essentially

19    recommending that he be paid by the official and the

20    campaign side, right?

21    A.  Yes.

22    Q.  And that's because he's doing so much campaign work,

23    right?

24    A.  Not yet, no.

25    Q.  He's going to be doing so much campaign work?

1    A.  He's going to.

2    Q.  And you're not just recommending it because he's doing

3    so much campaign work.  You're actually recommending it

4    because Simpson is going to see him doing that campaign

5    work.  That's why you recommended it, right?

6    A.  No.  At this point Simpson had approached Jordan and

7    tried to engage him in campaign activity, and at that point

8    we knew we had to have a point of contact.

9    Q.  "Taking the position as a point of contact at the

10   campaign and campaign manager," in that response, "and given

11   that Simpson sees him out there at nearly every event that

12   he appears at, I am of the opinion we should be sliding him

13   to the campaign payroll."

14          You talk in there about how Simpson is seeing

15   Mr. Chinouth out there at every event, right?

16   A.  Yes.

17   Q.  And so it would look bad for him to be paid only by the

18   official side where people down in Georgia can see that

19   occurring with him doing a lot of campaign work, right?

20   A.  Well, no.  He wasn't appearing at campaign events.  He

21   was appearing at regular functions, and Simpson would be

22   there as well.

23   Q.  Oh, Simpson just shows up at regular functions?  They're

24   not campaign events?

25   A.  Rotary Club, Lions Club, all those type of events.

1    Q.  When your opponent in a campaign shows up at a rotary

2    club --

3    A.  And engages Jordan in campaign conversation?

4    Q.  -- and if Jordan's there being paid only on the official

5    side and Simpson sees him, that could be a problem, couldn't

6    it?

7    A.  No.  It meant we had to start engaging in some campaign

8    activity.

9    Q.  Now -- and this is an example of the kinds of authority

10   you had in the campaign, was to make recommendations about

11   how things should be paid, right?

12   A.  I can make a recommendation, of course.

13   Q.  And you could also make decisions yourself about how to

14   spend money, too, couldn't you?

15   A.  Some.

16   Q.  We've seen some of that, like Josh Findlay needing your

17   permission to buy signs, right?

18   A.  Yes.

19   Q.  Jason Miller reaching out to you on how big an ad buy to

20   make, right?

21   A.  Asking about it, yes.

22   Q.  Now, this race, the Senate race -- let's talk a little

23   bit about the Senate race first.

24        You thought there was a chance Congressman Broun

25   could win it up until the very end, didn't you?

```
1    A.   No.

2    Q.   I'm going to show you what's been marked as Exhibit DB1.

3              MR. GEE:   It's not introduced yet.   It's going to

4    be on the ELMO.

5    Q.   Can you see it there on your screen, Mr. Bowser?

6    A.   It's focusing.   Yes.

7    Q.   Is this an email exchange that you had with Paul Kilgore

8    on May 19, 2014?

9    A.   Yes.

10   Q.   And that's one day before the primary, right?

11   A.   I'm not sure.

12             MR. GEE:   Move to admit Government's Exhibit DB1.

13             THE COURT:   Any objection?

14   A.   Yes, I'm sorry, it is.

15             THE COURT:   Any objection?

16             MS. GORDON:   I'm looking at the document, Judge.

17             No objection.

18             THE COURT:   Admitted.

19   Q.   On the bottom of this email you write to Mr. Kilgore,

20   "We are not in FEC money trouble anymore...still have a

21   shitload of vendor debt, but at least the other problem is

22   gone."

23             You write that first, right?

24   A.   Yes.

25   Q.   And the FEC money trouble was that you had spent money
```

1    that had been raised for the runoff in the general election

2    on the primary, but so you needed to raise money to refund

3    those people in the event the Congressman didn't make the

4    runoff, right?  That's the FEC money problem, right?

5    A.  The campaign ad, yes.

6    Q.  And it says -- he says, "I like it.  Nice work on your

7    part.  So what's the word tomorrow?  Do we have a shot?"

8            And you answered, "Yes.  With abysmal turnout it's

9    a narrow path, but one that's there."

10           This is -- you said that, right?

11   A.  Sarcastically, yes.

12           MR. GEE:  And let's look at DB11.  It's not

13   introduced yet.

14   Q.  This is another email exchange that you had with

15   Mr. Chinouth and others on May 16, 2014; is that right?

16   A.  Yes.

17   Q.  And you're talking about the election, right?

18   A.  Yes.

19   Q.  And you're talking about your reaction to the turnout

20   numbers, correct?

21   A.  Absentee, yes.

22           MR. GEE:  Move to admit DB11.

23           THE COURT:  Any objection?

24           MS. GORDON:  No objection.

25           THE COURT:  Admitted.

1    Q.  So at the bottom of this chain, Mr. Chinouth is giving

2    the numbers of folks that have already voted absentee,

3    right?

4    A.  Yes.

5    Q.  And throughout the rest of the chain you guys are

6    communicating about those numbers; is that right?

7    A.  Yes.

8    Q.  And then at the top of it you say, "Dammit, we have a

9    shot at this.  Bob and I talked earlier about doing the

10   edited Pat Boone call from last cycle."

11          Pat Boone, that's a celebrity, right?

12   A.  Yes.

13   Q.  So this is your idea to do a last-minute campaign

14   activity, right?

15   A.  Yes.

16   Q.  Because you thought, dammit, we have a shot at this,

17   right?

18   A.  A shot, sure.

19   Q.  Four days before the primary, right?

20   A.  Yes.

21   Q.  So do you want to change your answer about whether or

22   not you thought --

23          MS. GORDON:  Objection.

24   Q.  -- you had a chance to win to the very end?

25          MS. GORDON:  Objection.

1    A.  What was the question?

2         THE COURT:  Just a minute.  Overruled.

3    Q.  Do you want to change your answer about whether you

4    thought you had a chance to win to the very end?

5    A.  Can you tell me the question and answer again.

6    Q.  All right.  Now --

7         THE COURT:  I think he wants you to ask -- you

8    wanted the question again?

9         MR. GEE:  Oh, I know what he wants, Your Honor.

10   A.  It appears you didn't say "shot."

11   Q.  Now, in your time working on the Hill, you had mandatory

12   ethics training, right?

13   A.  In the latter half, yes.

14   Q.  And you had extra ethics training as a senior staffer in

15   Congressman Broun's office, right?

16   A.  Yes, an extra hour a year.

17   Q.  And you knew what the ethics manual was?

18   A.  Yes.

19   Q.  You had a copy of it in your office, right?

20   A.  I'm sure.

21   Q.  And you knew you could call the House Ethics Committee

22   any time with questions?

23   A.  Yes.

24   Q.  And you knew that the ethics manual talked about the

25   House rules for things like use of House resources, right?

1 A. Yes.

2 Q. And even leaving aside the ethics manual, you knew about

3 the rules for the use of House resources, right?

4 A. I'm sorry?  I knew about the rules?  The House rules or

5 the ethics rules?

6 Q. You knew that there were ethics rules on what you could

7 use House resources on, right?

8 A. Yes.

9 Q. You knew that you cannot use House resources for

10 campaign purposes.  You knew that when you worked for

11 Congressman Broun, didn't you?

12 A. Yes.

13 Q. You knew that you can't use MRA funds for campaign

14 purposes.  You knew that, right?

15 A. Yes.

16 Q. And you knew that those rules applied to staff just as

17 well as members of Congress, right?

18 A. Yes.

19 Q. You knew that using MRA funds for campaign purposes

20 could get you in trouble with the House Ethics Committee?

21 A. Yes.

22 Q. And you knew it could get you in trouble with the law,

23 right?

24 A. I guess, yes.

25 Q. You knew that the House resources that can't be used for

1    campaign, you knew it included things like goods and

2    services purchased with the MRA, right?

3    A.   I guess.

4    Q.   You knew that you couldn't buy, say, a copier for the

5    office and print campaign fliers on them, right?

6    A.   Exactly.

7    Q.   And you knew that official staff time is paid for with

8    the MRA, right?

9    A.   Yes.

10   Q.   And you knew that you can't use official staff time for

11   campaign purposes, right?

12   A.   Yes.

13   Q.   And you knew that you can't -- you knew that the House

14   offices, the buildings themselves --

15   A.   Yes.

16   Q.   -- are paid for with government official money, right?

17   A.   Yes.

18   Q.   And you knew that you can't do campaign work in those

19   government-paid-for buildings, right?

20   A.   Yes.

21   Q.   And you knew that that included meetings that were of a

22   campaign nature inside the office buildings, right?

23   A.   Yes.

24   Q.   And you knew all this when you worked for Congressman

25   Broun, right?

1    A.   Yes.

2    Q.   You knew that even meetings on campaign strategy, you

3    could not hold them in the House Office Buildings, right?

4    A.   Yes.

5    Q.   And you knew even you couldn't use any House equipment

6    for campaign purposes.  You knew that, right?

7    A.   Yes.

8    Q.   You knew that that includes House computers?

9    A.   And copiers, yes.

10   Q.   And House telephones?

11   A.   Yes.

12   Q.   And you knew there was a limited exception for

13   schedulers to this rule about no campaign activity, right?

14   A.   Yes.

15   Q.   You knew schedulers could make sure the Congressman had

16   a unified schedule, right?

17   A.   Yes.

18   Q.   And you knew that there was a limited exception for

19   press secretaries, right?

20   A.   Yes.

21   Q.   And you knew the limited exception for press secretaries

22   was to respond to incidental political questions that come

23   up in interviews focused on a member's official activities.

24   You knew that, right?

25   A.   Yes.

1    Q.  You knew that the press secretary can't set up a

2    campaign media call to occur in the congressional office.

3    You knew that, right?

4    A.  Yes.

5    Q.  And you knew that congressional staff have to volunteer

6    on their own time after they've completed their official

7    duties.  You knew that, right?

8    A.  It didn't have to be after, but yes.

9    Q.  Sorry?

10   A.  It didn't have to be after, but yes.

11   Q.  You knew they had to volunteer on their own time?

12   A.  Yes.

13   Q.  And you knew they still had to complete their official

14   duties?

15   A.  Yes.

16   Q.  You couldn't have a congressional staffer that had a no-

17   show job and they just did all campaign work.  You knew

18   that, right?

19   A.  Right, yes.

20   Q.  And you couldn't have a congressional staffer that you

21   were paying a salary commensurate with a full-time job and

22   they just showed up to work maybe once a week.  You knew

23   that was a problem, right?

24   A.  A staffer, yes.

25   Q.  And you knew that you can't make hiring contingent on a

1   willingness to volunteer on campaigns.  You knew that,

2   right?

3   A.  Yes.

4   Q.  And you knew that you can't ask in job interviews if

5   they'd be willing to volunteer on the Congressman's

6   campaign, right?

7   A.  Yes.

8   Q.  And you knew that you can -- that you can work around

9   some of these things by, for example, having a staffer go on

10  leave so that they work on a campaign, right?

11  A.  Possibly, yes.

12  Q.  Because if they're on leave, then they can work on a

13  campaign, right?

14  A.  Leave without pay or some part time.

15  Q.  Yes.  And you knew, for example, as we've just talked

16  about, that you can reduce a staffer to, say, part time so

17  that they can work on the campaign in their own time, right?

18  A.  Yes.

19  Q.  And you can do that whether the campaign's paying them

20  or not, right?

21  A.  Yes.

22  Q.  You could cut their salary in half, and then they can go

23  volunteer on the campaign, right?

24  A.  Yes.

25  Q.  Or you can cut their salary in half, and they can go

1    work and be paid on the campaign.  You knew they could do

2    that, right?

3    A.  Yes.

4    Q.  And as we saw with Jordan, you even recommended that

5    happening in 2012 for Jordan, right?

6    A.  Yes.

7    Q.  And you knew you can't coerce congressional staff to

8    volunteer.  You knew that, right?

9    A.  Yes.

10   Q.  And you knew that you can't direct congressional staff

11   to volunteer.  You knew that, right?

12   A.  What's direct?  You mean, order or --

13   Q.  You knew that you can't tell a congressional staffer to

14   volunteer to do something.  You knew that, right?

15   A.  Yes.

16   Q.  Yes.  You knew that the ethics manual said it forbids

17   members and senior staff from not only threatening or

18   attempting to intimidate employees regarding doing campaign

19   work, but also from directing or otherwise pressuring them

20   to do such work.  You knew that was prohibited, right?

21   A.  Yes.

22   Q.  And you knew that these rules about the use of House

23   resources, you knew that they applied to vendors or

24   consultants paid with House resources.  You knew that,

25   right?

```
 1    A.  Which rules?  All of those?

 2    Q.  About use of MRA funds for campaign purposes.  You knew

 3    you couldn't hire a consultant with MRA funds for campaign

 4    purposes, right?

 5    A.  Yes.

 6    Q.  And now, back in 2012, you would have been -- I'm sorry

 7    to ask you this, but you would have been about how old?

 8    A.  What year is this now?  Six years ago.  About 42.  42.

 9    Q.  And back in -- so you would have been 42/43 in 2013?

10    A.  41/42, sorry.

11    Q.  41/42.  You would have been in your early 40s --

12    A.  My early 40s.

13    Q.  -- in 2012/2013.  Fair to say?

14    A.  Yes.

15    Q.  Okay.  Now, Meredith Griffanti, this press secretary

16    that you had in 2012 -- and she also did a lot of work on

17    the campaign, right?

18    A.  Yes.

19    Q.  Meredith Griffanti was in her mid-20s when she worked

20    for you, right?

21    A.  Approximately, yes.

22    Q.  Christine Hardman, she was in her mid-20s when she

23    worked for you, right?

24    A.  Yes.

25    Q.  Austin Carson, he was in his 20s when he worked for you,
```

1    right?

2    A.  Yes.

3    Q.  The gentleman we met, Tim Reitz here, he was in his 20s

4    when he worked for you, wasn't he?

5    A.  Tim Reitz?

6    Q.  Yes.

7    A.  Yes.

8    Q.  And you knew that these 20-year-olds looked up to you

9    for advice on how to work on the Hill, right?

10   A.  I guess.

11   Q.  Well, you knew they looked --

12   A.  No one ever specifically told me they looked up to me

13   for advice.

14   Q.  You knew they looked up to you, right?

15   A.  I knew they asked me for advice.

16   Q.  You're in an office full of 20-year-olds, you knew they

17   looked up to you, right?

18   A.  I don't know if they looked up to me or -- I was their

19   superior so...

20   Q.  Well, you knew they took direction from you on how to do

21   their jobs on the Hill, right?

22   A.  They would seek advice on that, yes.

23   Q.  The staffers, would they just seek advice, or would you

24   direct them on how to do their jobs?

25   A.  A little of both.

1    Q.   Yes.   And you knew that these 20-year-olds, they

2    consulted with you about what they could do under the law

3    all the time, right?

4    A.   I don't know about under the law, and not all the time.

5    Q.   Well, you knew that these 20-year-olds relied on you for

6    ethics advice, right?

7    A.   No, not so much.

8    Q.   Were there occasions when your staffers would come to

9    you and ask you ethical questions?

10   A.   There may have been occasions, yes.

11   Q.   And you talked about, on your direct exam, how all this

12   campaign work, it just happened one day.   That was what you

13   said, right?

14   A.   Not one day.   Over a period.

15   Q.   You said it snowballed.   You said that, right?

16   A.   Yes.

17   Q.   And you said you didn't realize how much the other staff

18   were doing.   You found out later.   You said that, right?

19   A.   Yes.

20   Q.   And these 20-year-olds working for you, you knew they

21   were doing campaign work going all the way -- and these 20-

22   year-olds paid with MRA funds, you knew that they were doing

23   campaign work even before you hired Brett O'Donnell in the

24   campaign office, right?   I mean in the congressional office,

25   right?

1    A.  I can't recall any specific instance, no.  There may

2    have been.

3                MR. GEE:  I'm going to show you what's been

4    entered -- what's going to be marked as DB13.  No, sorry.

5    DB14.

6                MS. GORDON:  Your Honor, I'd ask to approach on

7    this one.

8                THE COURT:  I'm sorry?

9                MS. GORDON:  I'd ask to approach on this one.

10               THE COURT:  Which one?  13 or 14?

11               MS. GORDON:  I think it's going to be DB13.

12               MR. GEE:  This is 14 first.

13               MS. GORDON:  14.

14               THE COURT:  I'm sorry.

15               MS. GORDON:  Given the questions that counsel's

16   asked, I'd ask to approach.

17               THE COURT:  All right.  Sure.

18               (The following is a conference held at the

19                bench outside the hearing of the jury)

20               MS. GORDON:  So this is in the nature of the --

21               THE COURT:  Which exhibit is that?

22               MS. GORDON:  Oh, it hasn't been admitted or marked

23   yet.

24               THE COURT:  It's 14.

25               MS. GORDON:  It's DB14.

1              THE COURT:  14.

2              MS. GORDON:  DB14.  So it's sounding like this is

3     going to be about more 404(b) evidence that predates both

4     Mr. O'Donnell's hiring and any of the 404(b) evidence that

5     the government's presented.

6              THE COURT:  Can I see it for a second.

7              MS. GORDON:  It appears to me it predates the

8     events in the indictment.  I'm wondering how this is

9     relevant.

10             THE COURT:  Counsel.

11             MR. GEE:  Your Honor, it's an email in April 2012,

12    which is when the -- during the course of the scheme when

13    the hiring for the position that Brett O'Donnell was hired

14    for was occurring.  He's directing congressional staff to

15    prepare a press release on FEC fundraising reports.  It goes

16    to show that -- and it's also impeaching him.  He just said

17    "I don't remember," to which I'm entitled to impeach him.

18             MS. GORDON:  You can't impeach him with failed

19    remembrance.  You can refresh, but you can't impeach.

20             MR. GEE:  Your Honor, "I don't remember" I can

21    also impeach for.  That's also under the law.

22             And, Your Honor, it goes to show its relevance.

23    It goes to show that he has a motive, pattern, opportunity,

24    et cetera, of misusing MRA funds to have congressional staff

25    in campaign activity.

```
1              THE COURT:  I'll allow it over objection.

2              (This is the end of the bench conference)

3              THE COURT:  The objection's overruled.

4    BY MR. GEE:

5    Q.  Mr. Bowser, Exhibit DB14 --

6              MR. GEE:  It's not admitted yet.

7    Q.  This is an email that you sent on April 11, 2012; is

8    that right?

9    A.  Yes.

10             MR. GEE:  Move to admit DB14 subject to the

11   objections.

12             THE COURT:  Over objection, admitted.

13   Q.  This is an email, Mr. Bowser, that you sent to Jessica

14   Hayes at her mail.house.gov address, right?

15   A.  Yes.

16   Q.  And mail.house.gov emails, you can only check them from

17   a government computer or a government mobile device, right?

18   A.  Yes.

19   Q.  Meredith Griffanti, you sent this to her mail.house.gov

20   account, right?

21   A.  Yes.

22   Q.  And you also copied Mr. Bibee and Mr. Chinouth, right?

23   A.  Yes.

24   Q.  And it's entitled "FEC Report release," right?

25   A.  Yes.
```

1    Q.  And you're talking about the Congressman Broun's amount

2    of money that he's raised in the quarter that's coming up

3    for his FEC report, right?

4    A.  Yes.

5    Q.  And you're talking about donors, right?

6    A.  Yes.

7    Q.  And you're talking about Mr. Kilgore, the campaign

8    treasurer, right?

9    A.  Yes.

10   Q.  And then you say, "Can we get a draft for Meredith and

11   the CPB to look at before noon?"

12          "Meredith" is the press secretary for the

13   congressional office, right?

14   A.  Yes.

15   Q.  And "CPB" is Congressman Broun, right?

16   A.  Yes.

17   Q.  And so you are asking Ms. Hayes in this email to write

18   this campaign press release about fundraising, right?

19   A.  Yes.

20   Q.  And this is at 9:56 in the morning, right?

21   A.  Yes.

22   Q.  So fair to say Ms. Hayes is probably already in the

23   office at 9:56, right?

24   A.  I would expect, yes.

25   Q.  And you know that she's going to be reading this email

1     on her government device of some sort, right?

2     A.  Yes.

3     Q.  And so this would be an example of you having

4     congressional staff that are paid for with MRA do campaign

5     activity all the way back in April 2012, right?

6     A.  Yes.

7     Q.  And it didn't stop after April 2012, did it?

8     A.  No.

9     Q.  You kept on having people paid for with MRA money do

10    campaign work in the congressional office, didn't you?

11    A.   Later on down the road, yes.

12              MR. GEE:  Let's look at, for example, Exhibit 152.

13              MS. GORDON:  Government's Exhibit 152?

14              MR. GEE:  Oh, I'm sorry.  I apologize.

15              MS. GORDON:  I'm asking you if it's your exhibit

16    or mine.

17              MR. GEE:  Yes.  No, it's 106.

18              MS. GORDON:  But is it the government's exhibit?

19              MR. GEE:  We'll do 106 first.

20              Yes, Government's Exhibit 106.  All of these are

21    Government's Exhibit 106.

22    Q.  This is an email on February 4, 2013, right?

23    A.  Yes.

24    Q.  And scrolling up a little bit, we saw this email DURING

25    the trial, right, Mr. Bowser?

1    A.  It looks familiar, yes.

2    Q.  It's an email about Meredith Griffanti talking about how

3    Brett and I will be practicing with Dr. Broun during our

4    session tomorrow his announcement speech.  That's what it's

5    about, right?

6    A.  It appears to be, yes.

7    Q.  And Exhibit 100A.  That's the meeting in the Rayburn

8    Building, right?

9    A.  Yes.

10   Q.  And let's look at the actual announcement.  It's

11   Exhibit 206 -- I'm sorry, Exhibit 106.

12              MR. GEE:  No, I'm sorry.  Sorry, sorry.  108.

13   Q.  This is you talking about how Congressman Broun actually

14   announced, right?

15   A.  Yes.

16   Q.  And then at the bottom you talk about how, on a personal

17   note, you just had one of your babies, so you'd been MIA for

18   a couple of days, right?  You remember some of these

19   questions during the trial, right?

20   A.  Yes.

21   Q.  So let's look at Exhibit -- this is on February 6th, the

22   day of the announcement, right?

23   A.  Yes.

24   Q.  And Ms. Griffanti practicing the speech, that was on

25   February 4th in that email we just looked at, right?

 1   A.  Yes.

 2              MR. GEE:  Let's look at Exhibit 107.  Zooming in,

 3   please.

 4   Q.  This was in between there, right, Mr. Bowser, on

 5   February 5th?

 6   A.  Yes.

 7   Q.  You weren't so busy on paternity leave that you couldn't

 8   tell Brett and Meredith what their job was to do for that

 9   announcement speech, were you?

10   A.  No.

11   Q.  And that's you telling them to do their job to make sure

12   that Congressman Broun announces it well with a training

13   session in the congressional office the next day, right?

14   A.  I'm sorry.  It's a little fuzzy.

15              Yes.  To their personal emails, yes.

16   Q.  And we don't need to go through them all -- well, maybe

17   we will -- but fair to say that for Ms. Hardman, for

18   example, when she was interviewed -- being in the interview

19   process working on the campaign came up in the interview,

20   right?

21   A.  Not mine.

22   Q.  Okay.  Well, after you'd offered her the job you were

23   already emailing her for campaign work even before she

24   started, right?

25   A.  Yes.

1    Q.  And on the very day you announced her start you were

2    already emailing her campaign conference calls to be on,

3    right?

4    A.  If you -- yes, I'm sure.

5    Q.  And then after she started -- she started working on the

6    Senate campaign immediately after starting in Congressman

7    Broun's office, right?

8    A.  I guess.

9    Q.  And her salary was paid for with MRA funds, right?

10   A.  Yes.

11   Q.  And she started doing that work in the congressional

12   office right after she started, didn't she?

13   A.  I don't know.

14   Q.  You didn't know when she started doing the campaign work

15   in the congressional office?

16   A.  Right.

17   Q.  Eventually there were campaign conference calls that you

18   were on and Ms. Hardman was on, and you knew she was in the

19   office during those calls, right?

20   A.  I don't know.

21   Q.  Now, when you found out -- whenever it is you found out

22   that your congressional staff paid for with MRA funds were

23   doing campaign work in the office, you didn't stop it, did

24   you?

25   A.  No.

1    Q.  Because to you violating MRA funds rules is okay if it's

2    for the campaign, right?

3    A.  No.  It's not okay.

4    Q.  But you did it anyway, didn't you?

5    A.  Regretfully, I did.

6    Q.  Now, let's talk about this timeline for the 2012 race.

7    Now, Congressman Broun's district had just been redistricted

8    prior to the 2012 election, right?

9    A.  Yes.

10   Q.  So over half his voters were new voters, right?

11   A.  New territory.  I'm not sure about the number of voters,

12   yes.

13   Q.  And you'd agree with me Congressman Broun has a problem

14   staying on message.  That's something we can surely agree

15   on, right?

16   A.  Yes.

17   Q.  Right.  He was prone to gaffs that could sometimes get

18   bad press, right?

19   A.  Yes.

20   Q.  Bad national press even, right?

21   A.  Yes.

22   Q.  He said some things, for example, about evolution that

23   got a lot of bad national press, right?

24   A.  Yes.

25   Q.  And you were always worried that Congressman Broun could

1    make a gaff like that that could hurt any of his campaigns,

2    right?

3    A.  No.

4    Q.  Well, this is back in the 2012 era when other major

5    candidates had made gaffs that had sunk their campaigns,

6    right?

7    A.  Yes.

8    Q.  We even saw some emails where you compared Congressman

9    Broun to Todd Akins, right?

10   A.  I don't recall.  If you can show them.

11   Q.  You were worried that Congressman Broun could make a

12   gaff like what Todd Akins made, right?

13   A.  I don't know.  I'm sure I was.

14   Q.  You agree with me you were worried that he could make a

15   gaff that could hurt his campaigns, right?

16   A.  For 2012?

17   Q.  Sure.

18   A.  Not so much.  I mean, yes, I didn't want him to make

19   gaffs, but he had already made some significant gaffs that

20   really I don't think could have been topped.

21   Q.  You talked about how Congressman Broun won his first

22   election in 2007 because his opponent in 2007 made a gaff

23   that cost him the election.  You were just talking about

24   that yesterday, weren't you?

25   A.  Yes.

 1    Q.  Now, Mac Collins was a former Congressman from Georgia,

 2    right?

 3    A.  Yes.

 4    Q.  And Mac Collins got -- he's got some personal wealth,

 5    right?

 6    A.  A little bit.

 7    Q.  You were worried that Mac Collins could self-finance a

 8    campaign against Congressman Broun, weren't you?

 9    A.  Part of it, yes.

10    Q.  You were worried he could self-finance a campaign

11    against Congressman Broun, right?

12    A.  Well, part of the campaign, yes.

13    Q.  And if Mac -- you were worried he could self-finance the

14    primary race against Congressman Broun, right?

15    A.  Part of it, yes.

16            MR. GEE:  Let's call up Exhibit 31, please.

17            This is an April 27th email from you, right?

18    A.  Yes.

19    Q.  And you're emailing Brian Tringali, the pollster,

20    Congressman Broun, Mr. Bibee, and Mr. Chinouth, right?

21    A.  Yes.

22    Q.  And Mr. O'Donnell's not on this email because you

23    haven't even met him yet, right?

24    A.  Yes.

25    Q.  And you say, "The main thing that concerns me about Mac

1    getting in is that he won't have to file an FEC report until

2    July."  And then you go on and talk about the deadlines, and

3    then you say, "In his 2004 report his net worth was between

4    a little over $1 million and $2.3 million."

5            You talked about how Congressman Broun for this

6    race, he raised -- how much money did Congressman Broun

7    spend in this 2012 race?

8    A.  Was it 1.5?  Somewhere in that neighborhood.

9    Q.  And then you say that Mr. Collins had put $250,000 into

10   his Senate primary that he'd lost himself, right?

11   A.  Yes.

12   Q.  Right?

13           And you say, "If he gets in with just a ten-week-

14   or-so primary, he could be in a position to just

15   self-finance his whole campaign with $250,000 or $500,000

16   and be on financial parity with us."

17           I read that right, right?

18   A.  Yes.

19   Q.  So all the way up to April 27th you were worried about

20   Mac Collins self-financing his campaign and being on

21   financial parity with Congressman Broun, right?

22   A.  Yes.

23   Q.  And you talked yesterday about how important fundraising

24   is to congressional campaigns like Congressman Broun's,

25   right?

1    A.  Yes.

2    Q.  And you didn't actually find out for sure that Mac

3    Collins wasn't running until a couple of days before the

4    filing deadline, right?

5    A.  Probably a week before.

6          MR. GEE:  Let's call up Exhibit 33.

7    Q.  This is an email dated May 20, 2012; is that right?

8    A.  Yes.

9    Q.  And you'd agree with me the filing deadline was May 25,

10   2012, right?

11   A.  Yes.

12   Q.  So it went all the way up until five days before the

13   filing deadline before Mac Collins said he wouldn't run

14   against Paul Broun, didn't it?

15   A.  Publicly.  We saw an email earlier.  We had told

16   somebody he wasn't going to run a week before this.

17   Q.  Okay.  A week before this in May, right?

18   A.  Sometime.  Yes, sometime around a week.

19   Q.  So all the way up until May you were still worried that

20   he could still self-finance and be in financial parity with

21   Congressman Broun, right?

22   A.  Yes.

23   Q.  Now, leaving aside the primary, Congressman Broun, he'd

24   been wanting to run for the Senate for a long time, right?

25   A.  I guess, yes.

1   Q.  Even before his primary election in 2012 he talked with

2   you before about how he wanted to run for the Senate, right?

3   A.  He had thought about it, yes.

4   Q.  And even -- you'd even talked with Jason Miller some

5   before the primary about the prospect of retaining

6   Mr. Miller with the potential of looking towards a Senate

7   race, right?

8   A.  Yes.

9   Q.  And so you knew a Senate race was on the horizon also,

10  even before the 2012 primary, right?

11  A.  No.  There's a potential.  There was talk of it, but I

12  didn't know there was one.

13  Q.  Now, this messaging position that Brett O'Donnell

14  ultimately was hired for, right?  That messaging position,

15  it's the same position that Steve Allen interviewed for,

16  right?

17  A.  Yes.

18  Q.  And Steve Allen first comes into the picture way back in

19  March 2012, right?

20  A.  Yes.

21  Q.  And that's when Mac Collins was still thinking about

22  running, right?

23  A.  Yes.

24  Q.  You're still worried about Congressman Broun making

25  gaffs, right?

 1   A.   No.

 2   Q.   Oh, oh, March 2012 you weren't worried about him making

 3   gaffs in his campaigns?

 4   A.   Not as relates to the campaign.

 5   Q.   And in March 2012, when Steve Allen first comes into the

 6   picture, Congressman Broun's already talked with you before

 7   about how he might run for the Senate, right?

 8   A.   He said he was thinking about it, but he said that in

 9   2010, 2008.

10   Q.   And after Mac Collins finally announced he's not going

11   to run, and you all are just running against Mr. Simpson,

12   right?

13   A.   Yes.

14   Q.   The interview process for that messaging position went

15   on, right?

16   A.   It was still going on, yes.

17   Q.   In fact, you didn't finally reject Steve Allen until the

18   very day you hired Brett O'Donnell, right?

19   A.   I don't know.

20   Q.   Well, let's look at --

21   A.   Let's look.

22   Q.   -- Exhibit 49, please.  This is June 14, 2012.  An email

23   between you and Steve Allen to set up that final call where

24   you told him he didn't get the job, right?

25   A.   Yes.

```
 1   Q.  And let's look at Exhibit 50.  June 14th you're

 2   announcing Brett O'Donnell getting the job, right?

 3   A.  Yes.

 4   Q.  So the train that started Brett O'Donnell's hiring

 5   started way back in March when Mac Collins might still be

 6   running, right?

 7   A.  Earlier.

 8   Q.  Even earlier than that, right?

 9   A.  Yes, yes.

10   Q.  Now, after -- well, let's talk about Brett's hiring.

11           MR. GEE:  Let's call up that Exhibit 50 again.

12   Q.  This is you announcing his hiring at 12:21 p.m., right?

13   A.  Yes.

14           MR. GEE:  Exhibit 54.

15           Oh, sorry, Exhibit 51.

16   Q.  This is you, less than two hours later, emailing him

17   about a potential debate prep session you'd like him to

18   attend, right?

19   A.  I was inviting him to attend, yes.

20   Q.  Less than two hours after announcing his initial hiring

21   to the official office, you were inviting him to a campaign

22   debate prep session, correct?

23   A.  Yes, and he --

24   Q.  And then, Exhibit -- this is on June 14th.

25           MS. GORDON:  Objection.  I don't believe
```

1    Mr. Bowser had finished his answer.

2              MR. GEE:  Oh, I'm sorry.

3              THE COURT:  Had you finished your answer?

4              THE WITNESS:  No.

5    A.   The question on less than two hours later?

6    Q.   Yes, sir.

7    A.   What was the question again?

8    Q.   Less than two hours after announcing his hiring, you're

9    inviting him to this campaign debate prep session, right?

10   A.   Right, after he had offered to come and attend.

11   Q.   Sure.

12             MR. GEE:  And let's look at Exhibit 54.

13   Q.   This is after that debate prep session, he's sending you

14   his consulting agreement, and he says, "I wasn't sure you

15   settled on how I would be paid so I left the address blank."

16   He sends that after you invited him to that first debate

17   prep session?

18   A.   After the invite, but not after the session.

19   Q.   Oh, sorry.  After the invite, but not after the session,

20   right?

21   A.   Yes.

22   Q.   So he's actually sending you -- my bad.  He's actually

23   sending you his official consulting agreement before he even

24   performs the first campaign debate session?

25   A.   Attends the first debate, yes.

```
1    Q.   Now, after Congressman Broun won his re-election, you --

2    Mr. O'Donnell continued to be employed by Congressman

3    Broun's congressional office, correct?

4    A.   Yes.

5    Q.   You continued receiving his vouchers, correct?

6    A.   His vouchers or his invoices?

7    Q.   Invoices.

8    A.   Invoices, correct.

9    Q.   He would send them to you, right?

10   A.   Yes.

11   Q.   And you would forward them to the Anfinsons, correct?

12   A.   Yes.

13   Q.   And you knew that the Anfinsons would then prepare a

14   voucher that would then get signed, correct?

15   A.   Yes.

16   Q.   And you knew that these vouchers are not always signed

17   by the Congressman, right?

18   A.   I did not know that.

19   Q.   You would sign some of these vouchers yourself, correct,

20   sir?

21   A.   No.  I never signed a voucher.

22   Q.   Teddie Norton lied when she said you would sign some of

23   the vouchers?

24   A.   She never said that.

25   Q.   You knew that Teddie Norton would sign some of the
```

1    vouchers.  You knew that, right?

2    A.  I did not know that.

3    Q.  You thought Congressman Broun signed every single

4    voucher that went to the House finance office that came from

5    the Anfinsons?

6    A.  I never thought of it.

7    Q.  You're the chief of staff of this office, correct, sir?

8    A.  Yes.

9    Q.  And you didn't know how the vouchers were signed?

10   A.  How they were signed?  Yes, I did.  I'm sorry.  I must

11   have misunderstood your last question.

12   Q.  Oh, I'll give you a chance to clarify.

13   A.  Okay.

14   Q.  The vouchers, when they came back from the Anfinsons for

15   signature --

16   A.  Yes.

17   Q.  -- you would sign them sometimes, correct?

18   A.  No.

19   Q.  You knew Teddie Norton would sign them sometimes,

20   correct?

21   A.  Yes.

22   Q.  Okay.

23   A.  I'm sorry.  I thought -- I misheard you.  I'm sorry.

24   Q.  And Ms. Norton, she was in her 20s also back in 2012 to

25   2014, right?

1    A.  Yes.

2    Q.  And you told her Brett O'Donnell was working for the

3    office, right?

4    A.  Yes.

5    Q.  So you knew --

6          THE COURT:  Well, let me ask you a question.

7    Counsel asked you a question a few minutes ago that said,

8    "You knew that Teddie Norton would sign some of the

9    vouchers.  You knew that, right?"

10          And your answer was, "I did not know that."

11          Now you just said you did know that, so why is

12    there a difference in your answers?

13          THE WITNESS:  I misunderstood.  I thought he was

14    asking if I -- if I had seen her sign them or if I had

15    signed them.

16          THE COURT:  I mean, is there something unclear in

17    your question?  "You knew that Teddie Norton would sign some

18    of the vouchers."

19          THE WITNESS:  I was thinking --

20          THE COURT:  Just listen to me.

21          THE WITNESS:  I'm sorry.

22          THE COURT:  "You knew that, right?"

23          "I did not know that."  But then you said, oh,

24    yeah, I did know she signed them.  Why the change?

25          THE WITNESS:  I misheard the question.  I

1    apologize.

2              THE COURT:  You misheard it?

3              THE WITNESS:  Yes, I was thinking of my name.

4              THE COURT:  Well, what about that question would

5    make you think about your name when the question was, "You

6    knew that Teddie Norton would sign some of the vouchers.

7    You knew that, right?"  What is it about that question that

8    suggested to you that it was focusing on you and not Teddie

9    Norton?

10             THE WITNESS:  I was just still thinking of the

11   previous question where he was asking about me.

12             THE COURT:  All right.

13             THE WITNESS:  I apologize.

14             THE COURT:  I'm finished.

15   BY MR. GEE:

16   Q.  You knew that Mr. O'Donnell's vouchers would keep on

17   getting signed when he'd email them to you and you'd send

18   them to the Anfinsons until you put a stop to it.  You knew

19   that, right?

20   A.  Yes.

21   Q.  Now, after Congressman Broun won his campaign, and you

22   all kept employing Mr. O'Donnell, the talk of Congressman

23   Broun running against Saxby Chambliss, that started

24   occurring in that summer of 2012, correct?

25   A.  I believe so.

1    Q.  Well, it had actually occurred even earlier than that,

2    right?  Congressman Broun had thought about running against

3    Mr. Chambliss even earlier than before he'd won the 2012

4    primary, right?

5    A.  I believe so.

6    Q.  Because the other Georgia senator, he wasn't up for re-

7    election for a while, right?

8    A.  Right.

9    Q.  So the seat that would be the Senate seat would be

10   Mr. Chambliss's seat, right?

11   A.  Yes.

12   Q.  And once he won re-election, there was even more talk

13   about the potential that he would run against Mr. Chambliss,

14   right?

15   A.  Yes.

16   Q.  And you started putting together a political team in the

17   event that he did run against Mr. Chambliss, correct?

18   A.  At some point.

19   Q.  You had conversations with Brian Tringali about whether

20   he could be the pollster on the Senate race if he ran

21   against Mr. Chambliss, correct?

22   A.  Yes.  We had that conversation.

23   Q.  And Mr. Tringali's firm, they don't do races against

24   incumbents, do they?

25   A.  No, they do not.

1    Q.  And so, for example, you went out and you solicited Hans

2    Kaiser -- you negotiated with Hans Kaiser to be the pollster

3    since Mr. Tringali couldn't if Congressman Broun ran against

4    Senator Chambliss, correct?

5    A.  I'm sorry?  I negotiated?

6    Q.  I'm sorry.  Let me break that down.

7            You had discussions with Hans Kaiser about him

8    becoming the pollster for Congressman Broun's Senate race if

9    he ran against Saxby Chambliss, correct?

10   A.  Yes.

11   Q.  Okay.  And you negotiate -- it is you that worked out

12   the details of the pay arrangement with Hans Kaiser,

13   correct?

14   A.  There was really no working out.  He was, "This is how

15   much it is."

16   Q.  There were forms that were passed back and forth, right?

17   A.  Right.  The Congressman signed the contract.

18   Q.  And it was you that passed the forms back and forth with

19   Hans?

20   A.  Between the Congressman and Hans, yes.

21   Q.  And you also arranged for Nelson Warfield to get hired

22   as a media person in 2012 in the event that Congressman

23   Broun ran against Saxby Chambliss, right?

24   A.  That was actually Congressman Broun.  I, again, probably

25   passed the contract back and forth, but he found him.

1    Q.  And let's look at this Exhibit 90.  This is you actually

2    announcing that pollster, Hans Kaiser, joining Team Broun,

3    right?

4    A.  Yes.

5    Q.  And you --

6              MR. GEE:  Scroll down a little bit.

7    Q.  You give this list of people that are involved including

8    "Brett O'Donnell is Congressman Broun's messaging consultant

9    and media prep advisor," right?

10   A.  Yes.

11   Q.  Now --

12             MR. GEE:  Scroll back up, please.

13   Q.  Now, in your OCE interview you were shown this email,

14   right?

15   A.  I guess.

16   Q.  Do you need to get the transcript?

17   A.  If it says I did, I'm sure I was.

18   Q.  Okay.  And you know that in the OCE you told them that

19   this email was not describing Brett O'Donnell's role in the

20   campaign, right?

21   A.  Right.

22   Q.  So you know you've got to stick with that answer here

23   today, right?

24             MS. GORDON:  Objection.

25             THE COURT:  This is cross-examination.  Overruled.

```
 1   Q.  You know you've got to stick with that answer here

 2   today, right?

 3   A.  I'm sorry, the answer I gave the OCE?

 4   Q.  Yes.

 5   A.  I don't know what the answer was.  You just told me what

 6   it was.

 7            MR. GEE:  Let's go to Page 42.  We're going to

 8   look at Exhibit OCE 002A of the transcript.  42, Line 17.

 9   I'm sorry, Line 13.

10   Q.  You were asked:

11            "QUESTION:" -- starting on Line 13 -- "I want to

12   ask you about this email.

13            "ANSWER:  Yes, sir."

14            "These are 00234" -- those are the numbers at the

15   bottom corner of the email, right?

16   A.  Okay.

17   Q.  You say -- you said, "Uh-huh."

18            He said, "Email from you on December 19, 2012, to

19   a number of people, you write, 'Good afternoon, Team Broun.'

20            "ANSWER:  Uh-huh."

21            You said that, right?

22   A.  Yes.

23   Q.  "QUESTION:  Just wanted to do a quick intro.  Two new

24   additions brought on today by Dr. Broun to our political

25   efforts.
```

1          "ANSWER:  Uh-huh."

2          You said that, right?

3     A.  Yes.

4     Q.  "And you introduce, you know, Hans Kaiser and Guy

5     Short," right?

6     A.  Yes.

7     Q.  So you'd agree with me he's showing you the same email I

8     just showed you, right?

9     A.  Yes.

10    Q.  And then he goes on to ask you:  "You write 'Brett

11    O'Donnell is Congressman Broun's messaging consultant and

12    media prep advisor.'

13         "ANSWER:  Uh-huh.

14         "QUESTION:  Does that accurately describe his role

15    with the campaign with regards to Congressman Broun's

16    political efforts?

17         "ANSWER:  No.  This was about who he was on the

18    email, about --

19         "QUESTION:  Say that again.

20         "ANSWER:  This was -- I was describing to Hans and

21    Guy who everybody on the email were.

22         "QUESTION:  Uh-huh.

23         "ANSWER:  I mean, obviously there's a lot of

24    people on here who are not part of the campaign, but they

25    may be on emails.

```
 1                "QUESTION:  Who on here was not part of the

 2      campaign?

 3                "ANSWER:  Well, Teddie, of course, being our

 4      scheduler; Meredith, being our communications director; and

 5      Brett, being our media guy -- our messaging guy.

 6                "QUESTION:  Did --

 7                "ANSWER:  Let me see.

 8                "QUESTION:  -- Meredith volunteer on the campaign?

 9                "ANSWER:  Yes.

10                "QUESTION:  So this email is describing Brett

11      O'Donnell's role with the congressional office, not his role

12      with the campaign?

13                "ANSWER:  Correct."

14                Did I read all that right?

15      A.  Yes.

16                MR. GEE:  Let's call up Exhibit 90 again.

17      Q.  So in the OCE you told them that this email --

18                MR. GEE:  Exhibit 90, please.  Scrolling down.

19      Q.  -- was describing Mr. O'Donnell's role with the

20      congressional office.  That's what you told him, right?

21      A.  Yes.

22      Q.  And here in today's testimony you talked about how

23      Meredith Griffanti was the communications director on the

24      official side, right?

25      A.  Yes.
```

1    Q.  And you actually said today that back in December 2012,

2    when you sent this email, she wasn't doing anything for the

3    campaign.  You said that, didn't you?

4    A.  I said that when?

5    Q.  Today.

6    A.  I don't recall.

7                (Pause)

8                MR. GEE:  The Court's indulgence.

9                THE COURT:  Sure.

10               MR. GEE:  The Court's indulgence.

11   Q.  Sorry, Mr. Bowser.  I write things down, but I have

12   terrible handwriting.

13   A.  No, I understand.  I don't remember everything that's

14   been talked about today.  It's been a long day.

15               (Pause)

16               MR. GEE:  Well, we'll come back to it.  We'll call

17   up the transcript.

18               THE WITNESS:  Okay.

19   Q.  But Meredith, in December 2012, she was doing campaign

20   work, wasn't she?

21   A.  I don't believe so.  We didn't have a campaign yet.

22   Q.  Okay.  So --

23               MR. GEE:  We'll pull up the other part later, but

24   let's look at DB13.

25   Q.  I'm going to show you an exhibit to refresh your

1    recollection, Mr. Bowser.

2    A.  Okay.

3            MS. GORDON:  May I see it?

4            MR. GEE:  Oh, I'm sorry.

5            MS. GORDON:  Which one is this?

6    Q.  Take a look at Exhibit DB13 for a few minutes,

7    Mr. Bowser.  Just look up when you're ready, and I'll take

8    it back from you.

9    A.  Is it multipages?

10   Q.  It is.  Yes, sir.

11   A.  (Witness reviews document) Okay.

12   Q.  Does that refresh your recollection about some events

13   from December 2012?

14   A.  It's an article, yes.

15   Q.  Meredith Griffanti's forwarding you articles about Saxby

16   Chambliss being vulnerable in December 2012, right?

17   A.  Okay, yes.

18   Q.  And she's forwarding you articles about Saxby's troubles

19   in December 2012, right?

20   A.  Yes.

21   Q.  And she was even forwarding you some of those

22   articles --

23           MR. GEE:  Can we have the exhibit, please.

24   Q.  She even sent you those articles before this exhibit in

25   December, in the prior weeks in December, right?

1     A.   Yes.

2     Q.   And Meredith Griffanti's official job as communications

3     director is not to forward emails about vulnerable Senate

4     candidates that the Congressman's considering running

5     against, is it?

6     A.   I believe Dr. Broun was mentioned in one of those

7     articles, if not multiple.

8     Q.   Now, this email that you said describes Brett O'Donnell

9     on the campaign side -- on the official side, now you've

10    sent a couple of other emails that look a lot like this

11    announcing people joining Team Broun, haven't you?

12    A.   I guess.

13    Q.   Let's look at a couple.

14    A.   Okay.

15    Q.   So this one calls Brett O'Donnell messaging consultant

16    and media prep advisor.  This is the email you told OCE that

17    doesn't describe him in the campaign.

18             Let's look at Exhibit 275.  This one, you're

19    announcing Jason Miller replacing Nelson Warfield, right?

20    A.   Yes.

21    Q.   So he's replacing the very guy that the email we just

22    looked at was being announced for, right?

23    A.   No.  I thought it was Hans Kaiser and Guy Short.

24    Q.   Oh, I'm sorry, yes.

25             So in this one you're announcing another addition

1    to the team, right?

2    A.  Yes.

3    Q.  Along with Josh Findlay, right?

4    A.  Yes.

5    Q.  And this one's got a Senate contact list attached.

6    A.  Yes.

7            MR. GEE:  And why don't we pull up the Senate

8    contact list, the next page.

9            Can you flip it.

10   Q.  This one calls Brett O'Donnell on the Senate campaign

11   contact list "messaging and debate consultant," right?

12   A.  Yes.

13   Q.  And let's look at Exhibit 115.  This is you sending out

14   another contact sheet, right?

15   A.  Yes.

16   Q.  Team Broun contact sheet, right?

17   A.  Yes.

18           MR. GEE:  And can we go to the next page.

19   Q.  This one, for the campaign, calls Brett O'Donnell

20   messaging consultant, right?

21   A.  Yes.

22   Q.  Now, the OCE, they didn't confront you with these emails

23   in the interview, did they?

24   A.  I guess not.

25   Q.  Because you didn't provide these emails to the OCE, did

1   you?

2   A.  I guess not.

3   Q.  Sir, did you provide any of those three emails I just

4   showed you to the OCE?

5   A.  No.

6   Q.  Now, the meeting at Chateau Elan happens on February

7   21st, correct?

8   A.  Around that time.  I don't know the exact date, but yes.

9   Q.  The announcement was on February 6th of Congressman --

10  the public announcement of Congressman Broun running for the

11  Senate was February 6th, right?

12  A.  Yes.

13  Q.  And you'd already --

14          MR. GEE:  Can we call up 115.

15  Q.  Even before February 21st you'd already sent out that

16  email we were just looking at that lists Brett O'Donnell on

17  the Broun for Senate contact team list, right?

18  A.  Yes.

19  Q.  And you are actually who invited Brett O'Donnell to that

20  meeting, aren't you?

21  A.  Congressman Broun invited him, yes.

22          MR. GEE:  Let's call up Exhibit 112.

23  Q.  "Good morning," you write.  "I have spoken with each of

24  you individually, and it seems we are set for a meeting of

25  the Team Broun braintrust next Thursday, February 21st,

1    during the 9 a.m. through noontime frame in or near Chateau

2    Elan where our full staff retreat will follow that

3    afternoon.  Jordan's securing the location."

4         That's you sending Brett O'Donnell the invitation

5    to that, isn't it?

6    A.  I had actually spoken to him about it prior, and that's

7    when he was invited to become part of the campaign team, if

8    he liked.  Not back in December of 2012, but that other

9    email.

10   Q.  So you'd invited him to the Chateau Elan event by

11   telephone first?

12   A.  Yes.

13   Q.  The Chateau Elan political meeting?

14   A.  Yes.

15   Q.  And you remember that, right?

16   A.  Vaguely.

17   Q.  And you then send this email sending him the details,

18   right?

19   A.  Among others, yes.

20        MR. GEE:  Call up 116.

21   Q.  He even emails you back a couple of days later saying,

22   "I just wanted to make sure this meeting is locked in on

23   Thursday.  I'm getting a plane ticket."

24        And you tell him, "Yes, we just need to nail down

25   the location," right?

1    A.  Yes.

2                MR. GEE:  And then Exhibit 118.

3    Q.  You then follow up with the actual location copying

4    Mr. O'Donnell, right?

5    A.  Yes.

6    Q.  And the actual location that got secured was that it

7    would be in the boardroom at Chateau Elan, right?

8    A.  Yes.

9    Q.  And that's you sending all this in February 2013, right?

10   A.  These emails, yes.

11   Q.  And the political meeting, it actually occurred before

12   the official meeting, right?

13   A.  Yes.

14   Q.  In the same room, just like Ms. Norton talked about,

15   right?

16   A.  I don't believe it was in the same room, but yes.

17   Q.  Do you think she was wrong about having to wait for you

18   guys to finish out in the hallway?  That was just a memory

19   she got that didn't happen?

20   A.  I think she had to wait for us to finish so she could go

21   and start the other one.

22   Q.  All right.  And when you were asked in the OCE back in

23   2014, it was a lot closer in time to 2013 than now, right?

24   A.  Yes.

25   Q.  But when you were interviewed by the OCE, you didn't

1    tell them that you invited Brett O'Donnell to the meeting,

2    did you?

3    A.   I don't recall.

4    Q.   You didn't tell them that Brett O'Donnell was invited to

5    the political meeting, did you?

6    A.   I don't recall.

7    Q.   You told them he was there for the official meeting,

8    didn't you?

9    A.   I don't recall.

10   Q.   Yes.  Let's refresh your recollection because when

11   earlier in your direct exam they play -- you were shown Page

12   81, Line 20, of your transcript, right?

13   A.   I'm sorry?

14   Q.   You remember when you were testifying earlier you were

15   talking about this part of your OCE interview, right?

16   Remember that?

17   A.   Which part?  I'm sorry.

18   Q.   This part, Page 81, Line 20.

19           MS. GORDON:  I'm sorry, Counsel, what's the line?

20           MR. GEE:  81, Line 20.

21   Q.   You were asked about this part, "he attended the

22   meeting, though, at the restaurant with the campaign there."

23   Do you remember that just this afternoon --

24   A.   Yes.

25   Q.   -- when your counsel read that?

1    A.   Yes.

2    Q.   Let's go back a little bit further than Page 81.  Let's

3    go back to Page 79, Line 13, and we're going to play this

4    clip, which we will mark as Government's Exhibit OCE 1B.

5    Page 79, Line 13 starting -- one second, please.

6              MS. GORDON:  OCE 1E?

7              MR. GEE:  We'll mark the clip as OCE 1B.

8              MS. GORDON:  B.

9              MR. GEE:  And it starts on Page 79, Line 13, and

10   I'll just keep the transcript here on the screen as we play.

11             Can you press "play," please.

12             Never mind.  Forget about the screen.  Just play

13   it.

14             (Audio playing)

15   Q.   This is in a part of the interview where they're

16   asking you a lot of questions about the campaign work that

17   Mr. O'Donnell was doing, right?

18   A.   Part of it, yes.

19   Q.   And you didn't want to say that he was at this key team

20   braintrust meeting in Georgia, did you?

21   A.   No.  I said he was.

22   Q.   It was actually the only meeting of the campaign

23   consultants ever held in Georgia, wasn't it?

24   A.   To my recollection, yes.

25   Q.   And he didn't even go to the official office meeting,

1    did he?

2    A.   No, I don't believe so.

3    Q.   But you told the OCE that's what he was there for,

4    didn't you?

5    A.   Right.  As I mentioned earlier, I had confused my entire

6    timeline, but we had set up the staff retreat several months

7    earlier and had talked to Brett and had talked to Brian

8    Tringali about coming down and making presentations, and

9    that's something they regularly did.

10   Q.   Now, once Mr. O'Donnell was working for the campaign --

11   or doing work on the campaign.  We'll stick to neutral

12   verbiage.

13          Once Mr. O'Donnell was doing work on the campaign,

14   you'd agree with me that he became part of the multitude of

15   counsels, as Congressman Broun calls it, right?

16   A.   When it came to messaging, yes.

17   Q.   The multitude of counsels is the group of people that

18   Congressman Broun would consult for major issues in the

19   campaign, right?

20   A.   Yes.  Different multitudes, yes.

21   Q.   And you'd agree with me that he became part of the Team

22   Broun braintrust, right?

23   A.   Yes.  When it came to messaging, yes.

24   Q.   You're even inviting him to that Team Broun braintrust

25   meeting at Chateau Elan, right?

1    A.   Yes.

2    Q.   And you'd agree with me that during the campaign you

3    said -- well, you said earlier today that he said, quote, a

4    few times you would ask Mr. O'Donnell to do radio

5    interviews.  Do you remember saying that earlier today?

6    A.   I'm sorry, I didn't ask Mr. O'Donnell to do radio

7    interviews.

8    Q.   I'm sorry, you said that, quote, a few times you would

9    ask Mr. O'Donnell to prep Congressman Broun for radio

10   interviews.  Do you remember saying that?

11   A.   Over what period?

12   Q.   It was your answer, sir.

13   A.   Okay.

14   Q.   Do you remember Ms. Gordon, when she just asked you

15   a broad question about all the campaign work that

16   Mr. O'Donnell did, and you provided an answer?  Do you

17   remember that?

18   A.   I'm sure, yes.

19   Q.   And do you remember part of it saying a few times he

20   prepared Congressman Broun for radio events?  Do you

21   remember that?

22   A.   I do not actually.  I'm sorry.

23   Q.   Now, let's look at Exhibit 252.  This is about a

24   campaign radio interview regarding Kingston, your opponent,

25   right?

1    A.  Yes.

2              MR. GEE:  Scrolling up.

3    Q.  This is you asking Mr. O'Donnell to get on the phone

4    with Brett while he -- I'm sorry, with Congressman Broun

5    while he drives home to prepare him for that campaign radio

6    interview, right?

7    A.  Yes, at Paul Broun's request.

8              MR. GEE:  And let's look at 209.  The bottom of

9    it.

10   Q.  This is you asking Brett to prepare Congressman Broun

11   for a lot -- for several campaign events.  Let's just call

12   them several.  Would that be accurate?

13   A.  Yes, several 15-minute calls.

14   Q.  And it would be a 15-minute call for each of the events

15   or each of the days?

16   A.  Let's see.  It says, "Can we schedule the following

17   15-minute calls with PB?  I think these three times will

18   cover the week pretty well."

19              So three calls.

20   Q.  And this is an email on August 5th.  You send, for

21   example --

22              MR. GEE:  Exhibit 230.  Scroll down, please.  All

23   the way to the bottom, I'm sorry.

24   Q.  This is the next week, August 16th.  You're sending

25   Brett another list of campaign events you want him to get on

1    the phone and prep Congressman Broun for, right?

2    A.  I'm sorry, I'm just reading it.

3           Yes.

4    Q.  So this is just two emails over two weeks, and we've

5    already seen multiple events of him prepping Congressman

6    Broun for, right?

7    A.  Yes.

8    Q.  Campaign events, right?

9    A.  Yes.

10   Q.  And we don't need to go through them of all, but he

11   would do that on many occasions, correct?

12   A.  Sure, yes.

13          Your question's about radio.  I --

14   Q.  Just generally, he'd prepare him for numerous radio

15   interview -- I mean, numerous --

16   A.  Numerous interviews or appearances, yes.  I thought you

17   meant just radios.  That's what you said.

18   Q.  Yes.

19          Moving on to campaign appearances, he'd prepare

20   him for numerous campaign appearances, right?

21   A.  He would.  Especially over August.

22          MR. GEE:  And let's look at Exhibit 296 down at

23   the bottom.

24          No, second page.

25   Q.  This is Georgia Public Broadcasting wanting him for a

1    candidate get-to-know interview, right?

2    A.  Yes.

3    Q.  And you asked Brett to prepare him for this too, right?

4    A.  Sure.  I'm sure it says it in there somewhere, yes.

5         MR. GEE:  Let's scroll up.

6    A.  That would be something I would want him to prepare him

7    for, yes.

8         MR. GEE:  Scroll up, please.  Next page.  Next

9    page, please.

10   Q.  You actually said you want heavy Brett time beforehand,

11   didn't you?

12   A.  I did say that, yes.

13   Q.  Because for important campaign interviews, you want

14   heavy Brett time ahead of them, right?

15   A.  Yes.  Well, this would have been by phone.

16   Q.  And Mr. O'Donnell also helped prepare multiple speeches

17   for Congressman Broun right?

18   A.  Yes.

19   Q.  He helped prepare the announcement speech, as we've

20   already seen?

21   A.  Yes.

22   Q.  Helped draft it and prepare him to give it, right?

23   A.  Yes.

24   Q.  And you'd agree with me that Congressman Broun's Senate

25   announcement speech was important to the campaign?

```
1    A.  Yes.

2    Q.  He helped prepare his GOP convention speech, correct?

3    A.  Yes.

4    Q.  And you'd agree with me that that's important for the

5    campaign?

6    A.  Yes.

7    Q.  He even helped him prepare that GOP convention speech in

8    the congressional office with Ms. Griffanti, correct?

9    A.  I don't know.

10   Q.  Well, you heard them preparing him, didn't you?

11   A.  I'm sorry?  I don't understand the question.

12   Q.  You heard Ms. Griffanti and Mr. O'Donnell in the

13   congressional office preparing him for that GOP convention

14   speech, didn't you?

15   A.  I don't know.

16   Q.  You told them they did such a good job you thought you

17   were going to have to come in with a fire hose, didn't you?

18   A.  I don't know.

19        MR. GEE:  Let's look at Exhibit 152.  Can we go

20   down, please.  It's going to be the second page.

21   Q.  This is you on May 14th, and it's you sending an initial

22   draft of the draft convention speech, right?

23        It's not an initial draft.  You've consolidated a

24   bunch of other folks' drafts, right?

25   A.  It looks like it, yes.
```

1   Q.  Including Mr. O'Donnell.  He had some input into the

2   draft, right?

3   A.  Yes.

4   Q.  And so you're kind of playing the role as general to

5   kind of consolidate all the drafts, right?

6   A.  Trying, yes.

7   Q.  I understand.

8           MR. GEE:  And scroll up, please.  Scroll up,

9   please.

10  Q.  You actually say --

11          MR. GEE:  I'm sorry -- oh, I'm sorry, go down to

12  the bottom.  Last page, please.  Zoom in, please.

13  Q.  You even say when you send the draft, "Ideally he will

14  have a good grasp on it when he meets with Brett to practice

15  Thursday afternoon."  You say that, right?

16  A.  Yes.

17  Q.  And you send this on May 14th, right?

18  A.  Yes.

19          MR. GEE:  Let's call up Exhibit 153.

20  Q.  You sent that one on Tuesday, May 14th.  Now we're on

21  Thursday afternoon.  There's a meeting with Brett in the

22  congressional office, right?

23  A.  Yes.

24  Q.  And it's at 4:00 to 5:00 p.m., right?

25  A.  Yes.

1    Q.  And you're invited along with Ms. Griffanti and

2    Congressman Broun, right?

3    A.  Yes.

4              MR. GEE:  And then let's look at 154.

5    Q.  Ms. Griffanti, on May 16th, that Thursday, at 5:52 -- so

6    that would be after the meeting we just saw the calendar

7    entry for, right?

8    A.  Yes.

9    Q.  She sends a document that's called "Final Speech" to you

10   and Mr. O'Donnell, right?

11   A.  Yes.

12   Q.  And you say, "Good work today, you two.  I was worried I

13   was going to have to burst in with a fire hose at one

14   point."  You say that, right?

15   A.  Yes.

16   Q.  And that's because from your office you could hear them

17   preparing him for this campaign speech, correct?

18   A.  Right.

19   Q.  Because your office is right next to the Congressman's

20   office, right?

21   A.  Yes.

22   Q.  So this is Meredith Griffanti being paid with MRA funds

23   preparing him in the congressional office, correct?

24   A.  It appears so, yes.

25   Q.  And this is Brett O'Donnell being paid with MRA funds

1    preparing him in the congressional office for a campaign

2    speech, correct?

3    A.   It appears so, yes.

4    Q.   And Mr. O'Donnell --

5            MR. GEE:   We can take this down.

6    Q.   Mr. O'Donnell was in a lot of those campaign conference

7    calls.  You'd agree with me on that, right?

8    A.   I guess.

9    Q.   Well --

10   A.   I didn't take attendance.

11   Q.   Okay.  You're who ran the conference calls though,

12   right?

13   A.   Yes.

14   Q.   And you're who set them -- you're who asked Josh or

15   Jordan, depending on the campaign, to set up the phone call,

16   right?

17   A.   Yes.

18   Q.   But you would set the agenda for the conference calls?

19   A.   With input from everybody.

20   Q.   And Congressman Broun usually wasn't even on the weekly

21   conference calls, was he?

22   A.   No.

23   Q.   In fact, when you set up the very first campaign

24   conference call after he announced for the Senate, you

25   specifically said Congressman Broun won't be on this call,

1   right?

2   A.   Yes.   I remember that.

3   Q.   Now -- and you'd keep inviting Brett to those campaign

4   calls, right?

5   A.   Yes.   He was on the distribution list.

6   Q.   And we don't need to go through them all, but the agenda

7   item included things like campaign messaging, right?

8   A.   Yes.

9   Q.   Campaign debate, right?

10  A.   If they -- yes, if they were coming up.

11  Q.   And you'd agree with me that when Brett would

12  participate in the calls, he would talk with you and other

13  consultants about those kinds of issues, right?

14  A.   Yes.

15  Q.   And let's talk some about Mr. O'Donnell and these

16  debates.   Now, you wanted to make sure that Brett was

17  involved in the debate prep, correct?

18  A.   I'm sorry?

19  Q.   You wanted to make sure that Mr. O'Donnell was involved

20  in Congressman Broun's debate prep for the Senate race,

21  correct?

22  A.   Yes, to the extent he wanted to be.

23  Q.   Well, you wanted to make sure that he was looped in on

24  things having to do with the debates, correct?

25  A.   Oh, yes.   I'd loop him in.

1    Q.  Because you knew he was leading the debate prep,

2    correct?

3    A.  I knew he wanted to.

4    Q.  Well, you knew that on the campaign list that you

5    forwarded he was described as the debate consultant, right?

6    A.  Yes.

7    Q.  And when he had to go to Africa for charity work, you

8    described him as the debate consultant that abandoned us,

9    right?

10   A.  Yes.  It was a joke.

11   Q.  I understand that.

12   A.  Yes.

13   Q.  But you called -- you weren't joking when you called him

14   the debate consultant, were you?

15   A.  No.

16   Q.  And you weren't joking when you said that he was

17   abandoning -- well, you weren't joking about the part about

18   he was going somewhere where people don't pay him.  You knew

19   he was going to Africa where they don't pay him, right?

20   A.  Yes.

21   Q.  And you knew the people that did pay him when you wrote

22   that email was your office, right?

23   A.  Our official office, correct.

24   Q.  And as part of this debate prep, you knew that he was

25   preparing these briefing books, right?

1    A.   When he sent them to us, yes.

2    Q.   You knew that he -- even when he had to go to Africa, he

3    even solicited your permission and Congressman Broun's

4    permission to have Michael Hall substitute for him for that

5    last debate prep session he had to miss when he went to

6    Africa.  You knew that, right?

7    A.   They offered him up, yes.

8    Q.   Yes.  And you even informed Brett that it would be okay,

9    that the Congressman said that it would be okay, right?

10   A.   Yes.

11   Q.   So you knew that Brett was even having people stand in

12   for him on debate prep when he couldn't make it, right?

13   A.   Well, yes.  That's because he left at the last moment.

14   We already had debate prep set up.  He felt like he had to

15   send somebody.

16            That's what he told me, at least.

17   Q.   Because he wanted to make sure that the Congressman was

18   well prepared, right?

19   A.   Yes.

20   Q.   And you wanted to make sure the Congressman was well

21   prepared for that first debate, right?

22   A.   Yes.

23   Q.   You weren't happy that he had to go to Africa, were you?

24   I understand you were joking in that email.

25   A.   No.  I was indifferent.

1    Q.   You were okay with Brett O'Donnell missing the last

2    debate prep before the Congressman's first Senate debate?

3    A.   Yes.  It sounded like an emergency.  He told me it was

4    last minute.

5    Q.   You were so okay with it you almost sent Christine

6    Hardman to Adel, right?

7    A.   No.

8    Q.   You told her, "I might have to send you to Adel because

9    our debate consultant abandoned us, right?

10   A.   That was part of the joke.  I'm sorry.

11   Q.   You were joking?

12   A.   I did say that.  I did say that, yes.

13   Q.   Now, Brett O'Donnell, he continued preparing Congressman

14   Broun for the debates all the way into March 2014, didn't

15   he?

16   A.   For two months, yes.

17   Q.   All the way --

18   A.   Three months.  I'm sorry.

19   Q.   All the way to March 2014, correct?

20   A.   Yes.  From January to March, yes.

21   Q.   And even before that, as you'd said, there had been

22   candidate forums in 2013, right?

23   A.   Yes.

24   Q.   And Mr. O'Donnell had prepared him for candidate forums

25   as well even in 2013, right?

1    A.  Oh, yes.  For some of them, yes.

2    Q.  Now, let's talk a little bit about articles asking about

3    Mr. O'Donnell, okay?

4            So first there was this article in *USA Today* in

5    July 2013, correct?

6    A.  Yes.

7    Q.  That's the one we've seen where Mr. Singer emails and

8    says he wants to talk about Brett O'Donnell, right?

9    A.  Yes.

10   Q.  Mr. Singer -- we'll call it up, but Mr. Singer emails

11   and wants to speak about Brett O'Donnell's work for the

12   congressional office.  You know the email I'm talking about,

13   right?

14   A.  Yes.

15   Q.  And you guys decided not to respond, right?

16   A.  Yes.

17   Q.  Now, in between there you and Ms. Hardman got on the

18   phone with the House Administration Committee, right?

19   A.  Yes.  They called us.

20   Q.  Yes.  And you were talking with the House Administration

21   Committee about whether it was okay to have Brett O'Donnell

22   as an official consultant being paid for official services,

23   right?

24   A.  Yes.

25   Q.  And you'd agree with Ms. Hardman's testimony, you never

1    told House Administration that he'd been volunteering on the

2    campaign for a year before that July 2013 time frame, did

3    you?

4    A.  No.  That wasn't part of the question.

5    Q.  You didn't tell them that he'd been performing all this

6    campaign work already since the announcement of the Senate

7    race in February, did you?

8    A.  No.  That wasn't part of the question.

9    Q.  Well, you knew that Mr. Singer was asking about how this

10   nationally renowned campaign consultant was working for your

11   congressional office.  You knew that was what he was asking

12   about, right?

13   A.  Exactly.  Was he doing official work to earn his

14   official money.

15   Q.  Yes, and we're going to talk about this earn official

16   money thing, but you knew that he was asking about a

17   campaign consultant and what he was doing for the office,

18   right?

19   A.  Yes.

20   Q.  And when you were on the phone with House

21   Administration, you didn't share any information with them

22   about the campaign work Brett does for Congressman Broun,

23   did you?

24   A.  No.  They didn't ask.

25   Q.  You didn't -- I understand.  You didn't tell them --

1    when you were asking them about whether his official

2    services were okay for official money, you didn't tell them

3    about how you don't pay him for any of this campaign work,

4    did you?

5    A.   I didn't ask them that.  They called to ask if we were

6    going to respond to the article, and I said we were not.

7    Q.   You know that House Administration, one of their duties

8    is to make sure that MRA funds are spent properly, correct?

9    A.   Yes.

10   Q.   In addition to getting in trouble with the ethics

11   committee, you can also get in trouble with House

12   Administration for using MRA funds on campaign stuff, right?

13   A.   I guess.

14   Q.   And so you knew you were on the phone with them about

15   the proper purposes of MRA funds, correct?

16   A.   Yes.

17   Q.   And they told you that it's okay to have him doing

18   official consulting on the official side, right?

19   A.   Yes.

20   Q.   And the *USA Today* article comes out, and there was a

21   quote alone those same lines, "It's okay for him to do the

22   official work on the official side."  Right?

23   A.   Yes.

24   Q.   And that's the article that you're saying you relied on

25   here today, right?

1   A.  Well, the article and the advice from the House

2   Administration Committee.

3   Q.  Because House Administration never told you it's okay to

4   pay him MRA funds for campaign work, right?

5   A.  Right.

6   Q.  And you didn't tell them about all the campaign work he

7   was doing, did you?

8   A.  He wasn't doing campaign work when I asked them.

9   Q.  In July 2013 he wasn't doing campaign work?

10  A.  No, that's not when I asked them.  I asked them back in

11  May -- April or May of 2012 if we could hire somebody like

12  Brett.  We hadn't even hired him yet.

13          So I called down there.  Asked them.  They told me

14  it would be okay as long as he was providing services.

15          In July of 2013, if we're talking about 2013, the

16  question from the House Administration is, "Are we going to

17  answer the email or answer Mr. Singer?"

18  Q.  And you had that whole conversation with them again in

19  2013, after that *USA Today* article, about whether or not it

20  was okay to have him paid for official services, correct?

21  A.  I guess.  I don't.

22  Q.  Ms. Hardman wasn't working for you in 2012, right?

23  A.  No.

24  Q.  And you'd agree with me that she was on the phone for

25  that phone call, right?

1    A.  I assume so.

2    Q.  You heard that testimony.  You're not saying she's lying

3    about that, are you?

4    A.  I don't know.  No.

5    Q.  And so on that phone call in July 2013, you did not tell

6    them about the campaign work Brett was doing, correct?

7    A.  Correct.

8    Q.  Now, let's talk about March 2014, the articles that come

9    out then.  Now, there's this one, 451.  Let's look at this.

10           This article on March 17th, this is kind of the

11   article -- the first of the articles in March, right?

12   A.  Written articles, yes.

13   Q.  This is the first of the articles about Brett that kind

14   of starts the --

15   A.  Actually -- I'm sorry.

16   Q.  No, no, please.

17   A.  It was actually the airing on WSB-TV.  This is the first

18   written article.

19   Q.  I'm sorry, yes, sir.

20           First it's a TV report about the door slamming.

21   A.  Yes.

22   Q.  And that would have been around the same time as this

23   article that's about that TV report, right?

24   A.  Yes.

25   Q.  Now, this is the series of articles that results in

1   Brett O'Donnell, as you say, resigning, right?

2   A.  Yes.

3   Q.  And this is the series of articles that results in the

4   OCE investigation, right?

5   A.  Yes.

6   Q.  And this is the series of articles that you start

7   working with Ms. Hardman to put talking points out about

8   this once they start coming out, right?

9   A.  Yes.

10  Q.  So going all the way back to this first series of

11  articles, you're preparing talking points about what

12  happened with Brett O'Donnell's payment, right?

13  A.  Yes.

14          MR. GEE:  And let's look at Exhibit 453.

15  Q.  The very first talking point was, "Congressman Broun

16  does not have a debate coach."  You helped Ms. Hardman

17  prepare that talking point, right?

18  A.  I guess.

19  Q.  And you'd agree with me, sir, Brett O'Donnell was his

20  debate coach, wouldn't you?

21  A.  On the campaign side.

22  Q.  Now, let's talk about this idea that the reporters

23  didn't care about the campaign work, because that's what

24  you're saying, right?

25  A.  I'm sorry, saying when?

1          MR. GEE:  Let's call up 451 again.

2     Q.  So you know that if you admit that you knew these

3     reporters were interested in whether Brett O'Donnell was

4     paid from the campaign side -- I'm sorry, from the official

5     side for campaign work, you know that that would be a

6     problem because you said something different in the OCE

7     interview, right?

8          MS. GORDON:  Objection.

9          MR. GEE:  I'll rephrase.

10          THE COURT:  All right.

11    Q.  In other words, the story you give in the OCE, you start

12    telling that same story in March, right?

13    A.  There's no story here.  I'm not sure what you're asking

14    me.

15    Q.  Let's break it down.

16          So you say that you thought these reporters were

17    investigating whether Brett O'Donnell did any official work,

18    right?

19    A.  Yes.

20    Q.  And you say that when you start getting the OCE letters

21    yourself in June 2014, that you thought OCE was

22    investigating whether he earned his MRA salary for his

23    official work, right?

24    A.  Yes.

25    Q.  Same issue you thought both were looking into, right?

1    A.  Yes.

2    Q.  Now, you didn't think that these articles are about

3    whether Brett O'Donnell had a no-show job in the

4    congressional office, did you?

5    A.  I'm sorry, say that again.  I heard "no-show."

6    Q.  These reporters, they weren't asking about whether Brett

7    O'Donnell was being paid MRA funds for not doing any work,

8    were they?

9    A.  That's what I thought.

10   Q.  They weren't asking whether he was picking up

11   Congressman Broun's dry cleaning, were they?

12   A.  I don't know if anybody picks up Congressman Broun's dry

13   cleaning.

14   Q.  Reporters were asking about whether Brett O'Donnell was

15   being paid MRA funds for campaign activities.  You

16   understood that's what this was all about, right?

17   A.  No.  That's not what I thought.

18        MR. GEE:  Let's call up Exhibit 464A.

19   Q.  This is one of those inquiries that gets sent to you,

20   right?

21   A.  Sent to Brett O'Donnell.

22   Q.  And then forwarded to you?

23   A.  Forwarded to me, okay.

24        MR. GEE:  Scroll up, please.

25   Q.  He tells you he's not talking to him, right?

1   A.  Yes.

2   Q.  So you know that this is one of the reporters that's

3   snooping around in this March time frame, right?

4   A.  Yes.

5          MR. GEE:  Scrolling down.

6   Q.  And the reporter says he wants to talk to you about the

7   contract staff positions you have with members of Congress

8   from their office budgets.  "You advertise your services as

9   campaign consultation and campaign debate preparation.

10  Trying to understand how the work you do for these members

11  is not campaign related."

12         Mr. Gray does not ask, "I'm trying to understand

13  whether you do any official work at all," is he?

14  A.  He is.

15  Q.  He's asking are you doing any campaign-related work.

16  A.  No, he wants to know how they're not campaign related.

17  Q.  He wants to know how the work that Mr. O'Donnell does

18  for the official office is, quote, not campaign related.

19  You'd agree with me on that, right?

20  A.  Right.  What could he possibly be doing in an office to

21  earn official dollars?  What is the job that you do there?

22  Q.  What could you possibly be doing in the official office

23  to earn dollars that's not campaign related?  You understood

24  that was the inquiry, right?

25  A.  Yes.

1   Q.  So you knew that campaign relation was tied to the

2   questions about Brett O'Donnell's payments from the office

3   all the way back in March.

4   A.  I'm sorry, I understood what?

5   Q.  You knew that the question about whether his work was

6   campaign related was tied in with his payments by the office

7   going all the way back to when the article started in March.

8   A.  No, I thought more that they wanted to know what he

9   would do in the office that was official.

10  Q.  And wanted to know if it was campaign related, correct,

11  sir?

12  A.  No.  It says "not campaign related."  Sorry if I'm --

13  Q.  Kind of like what the meaning of "is" is, whether "not"

14  means "not"?

15          MS. GORDON:  Objection.

16  A.  I don't know what that means either.

17          THE COURT:  I'll disregard it.

18  Q.  Now, let's talk about the OCE process.  So after these

19  March articles lead to the OCE investigation, Congressman

20  Broun gets this first letter, 490B.

21          MR. GEE:  Can we call that up.

22  Q.  And this first letter wants to know that -- tells you --

23  and you received this, right?

24  A.  In the office, yes.

25  Q.  Yes.  You actually said in your testimony that you --

1      oh, that's the next line.  We'll come to that.

2              So this letter you read, right?

3      A.  Yes.

4      Q.  And it said one of the subjects was -- first they're

5      asking about his payments from the office.  You know that's

6      a subject of the inquiry, right?

7      A.  Yes.

8      Q.  And the second inquiry was if Representative Broun

9      misused funds from his Members' Representational Allowance,

10     then he may have violated House rules and federal law; is

11     that right?

12     A.  Yes.

13     Q.  So you're -- I want to make sure I understand this.  Are

14     you trying -- are you telling us today that you didn't

15     understand whether these two sentences meant that they were

16     looking into whether he was doing campaign work for

17     congressional MRA money?  I just want to understand your

18     testimony.

19     A.  I'm reading this right now.

20              (Witness reviews document) Correct, I believed

21     that they were looking for ghost employees.

22     Q.  They just want to know what official work he's doing?

23     A.  Yes.

24     Q.  Because you can be misusing funds doing official work,

25     but it's not --

1    A.  No.

2    Q.  -- about the campaign work?

3    A.  It's the lack of doing official work, if it was a ghost

4    employee.

5    Q.  So let's look at Exhibit 491 -- oh, I'm sorry, no, no.

6              This is 490B.  You then send Mr. O'Donnell this

7    email that is 490A.

8              MR. GEE:  Let's call up 490A.

9    Q.  You were talking in your testimony here today about how

10   you sent this email after you received that first letter we

11   just looked at, right?

12   A.  Yes.

13   Q.  And this letter -- this email to Mr. O'Donnell, you

14   described it today as being your rant about what was going

15   on?

16   A.  Well, that was the title, yes.

17   Q.  Yes.  Now, as we've talked about, you also know what

18   talking points are, correct, sir?

19   A.  Yes.

20   Q.  And this email -- you don't need to go through the whole

21   thing, but in part of it you say, "Any debate advice you

22   wanted to give him on your own time outside of the official

23   compound has no bearing on the fact that we hired you to

24   work in an official capacity."

25              Now, in this rant of yours, as you call it, it

1    would not be true to say that Brett O'Donnell did all his

2    campaign work outside the official compound, wouldn't it?

3    A.   It wouldn't, I'm sorry, not be true?  It's not true.

4    Q.   It is not true.  He did do campaign work on the official

5    compound, correct?

6    A.   Yes.

7    Q.   So your rant has an inaccurate false statement in it,

8    right?

9    A.   It appears so.

10   Q.   But we're supposed to believe the rest of it?

11   A.   What part?  The rest of the email?

12   Q.   Now, Exhibit --

13          THE COURT:  I think Mr. Bowser asked you a

14   question.  He asked you, "What part?  The rest of the

15   email?"

16          MR. GEE:  Your Honor, with the Court's permission,

17   he's testifying, not me.

18          THE WITNESS:  Oh, that's fine.  I just didn't

19   think --

20          MR. GEE:  I'm happy to move on.

21          Exhibit 491.

22          THE COURT:  All right.

23   Q.   This is the letter to the Congressman that you then

24   received next, right?

25   A.   Yes.

1    Q.  And in your testimony here today, you said that after

2    receiving it you were asked did you read it, and your answer

3    was, "I looked at it."  Do you remember saying that earlier

4    today?

5    A.  Yes.

6    Q.  And then you said you gave it to Congressman Broun?

7    A.  Yes.

8    Q.  Now, you are a chief of staff that got brought on

9    originally with Congressman Broun to fix a problem, correct?

10   A.  Yes.

11   Q.  When you get this detailed OCE inquiry, you look at it

12   and you just give it to Congressman Broun?

13   A.  Yes.  It was addressed to him.  That's all I was

14   checking.

15   Q.  Now, this inquiry, you'd agree with me, scrolling down,

16   it asks for information about his campaign, right?

17   A.  Yes.

18   Q.  It asks for --

19             MR. GEE:  Scroll down.

20   Q.  It asks for the names and contact information of any

21   current or former members of your congressional staff who

22   interacted with Brett O'Donnell, right?

23   A.  Yes.

24   Q.  It asks you for the names and contact information of any

25   of his campaign people that interacted with Brett O'Donnell,

1   right?

2   A.  Yes.

3   Q.  So you knew they were interested in campaign people as

4   part of this inquiry, right?

5   A.  Yes.

6   Q.  Now, when you received --

7           MR. GEE:  Let's look at Exhibit OCE 111.

8   Q.  This is the email -- the letter that you get on June

9   3rd, right?

10  A.  Yes.

11  Q.  The letter that you received after you've been blowing

12  off Bryson Morgan for two months, right?

13          MS. GORDON:  Objection.

14          MR. GEE:  I'll rephrase.

15          THE COURT:  All right.

16  Q.  This is the letter that you receive after for two months

17  Bryson Morgan had been asking you when the production would

18  arrive, and you had not supplied a production, correct?

19  A.  Congressman Broun had not supplied a production, yes.

20  Q.  You're his chief of staff, correct, sir?

21  A.  Correct.  I asked him what he wanted to do, and he said

22  he didn't want to deal with it.

23  Q.  Now, this letter that you receive, this is the letter

24  that, as you described on direct exam, now we're supposed to

25  understand -- this letter you understood -- you understood

1     that OCE --

2              MR. GEE:  Can we scroll down.

3     Q.  You thought from this letter that OCE was only

4     interested in Brett O'Donnell's official work; is that

5     right?

6     A.  That's what I thought.

7     Q.  So March articles that are about whether his official

8     work is campaign related.  We've already established that,

9     right?

10    A.  No, I did not.  You established that's what you thought.

11    Q.  There was a reporter asking about whether his work was

12    not campaign related, right?

13    A.  Correct.  Can he do official work and make official

14    money?

15    Q.  So then you get this letter, and you think they only

16    care about Brett O'Donnell's official work, right?

17    A.  Yes.

18    Q.  Because they can be mis -- Brett O'Donnell can somehow

19    be misusing congressional funds or -- I'm sorry, the office

20    can somehow be misusing congressional funds paying Brett

21    O'Donnell in some other improper way, but not campaign

22    activity?

23    A.  Right.  If there's a ghost employee.

24              MS. GORDON:  Objection.  Let him finish his

25    answer.

1    Q.  Yes.  Sorry.  Go ahead, please.

2         THE COURT:  Had you finished your answer?

3    A.  I said if he was a ghost employee, and that was all I

4    was saying, yes.

5    Q.  Yes.  You thought that they were looking into whether he

6    was a ghost employee not doing campaign activity?

7    A.  I thought they were looking to see if we had employed

8    Brett O'Donnell in an official capacity.

9    Q.  You thought they were looking to see if he was picking

10   up the Congressman's dry cleaning instead of doing other

11   proper official work?

12   A.  They didn't tell me.

13   Q.  Now, after receiving this email -- oh, I'm sorry, and

14   this letter that you thought was only about official work,

15   you knew that this same letter got sent to Josh Findlay,

16   didn't you?

17   A.  Eventually.

18   Q.  You knew it got sent to Josh Findlay before you provided

19   your production, didn't you?

20   A.  I'm not sure about the timeline, but I know a letter got

21   sent to Mr. Findlay.

22   Q.  And you knew it got sent to Mr. Findlay before your OCE

23   interview, right?

24   A.  Yes.  Bryson Morgan gave me the list of who received the

25   letters.

1   Q.  And you knew it got sent to Mr. Findlay before Bryson

2   Morgan told you they'd take a supplemental production from

3   you, right?

4   A.  Yes.

5   Q.  And you knew Josh Findlay had the title of campaign

6   manager in that Senate race, right?

7   A.  Yes.

8   Q.  Josh Findlay never worked for the congressional office

9   except for as an intern before you even were there, right?

10  A.  Right.

11  Q.  But you didn't think the OCE cared about Brett

12  O'Donnell's campaign work even though Josh Findlay got a

13  letter?

14  A.  I didn't think about that, no.  I --

15  Q.  You knew that Paul Kilgore got this letter also, right?

16  A.  Yes.

17  Q.  Paul Kilgore was the campaign treasurer, right?

18  A.  Yes.

19  Q.  He didn't do any work for the official office, right?

20  A.  No.

21  Q.  And even though you knew Paul Kilgore got this letter,

22  you thought OCE only cared about Brett O'Donnell's official

23  work?

24  A.  From me, yes.

25  Q.  And after receiving this letter, you didn't provide the

1    OCE any of your personal emails, did you?

2    A.  I don't believe so.

3    Q.  You don't believe so, or you didn't?

4    A.  I didn't.

5    Q.  And you'd agree with me that the vast majority of your

6    campaign-related emails with Brett O'Donnell are on the

7    official side?

8    A.  I'm sorry, the vast majority of my emails with Brett

9    O'Donnell are official?  Sure.

10   Q.  I'm sorry.  Let me rephrase.  Thank you.

11        You'd agree with me that the vast majority of your

12   emails with Brett O'Donnell about campaign activity were

13   sent and received on your Yahoo personal email account,

14   correct, sir?

15   A.  About campaign activity, yes.

16   Q.  And there was some testimony here today about when

17   Ms. Hardman came to see you about her own production, right?

18   A.  Yes.

19   Q.  Now, I understand that you say that she came to you and

20   asked if she should provide her personal, and you said, "Use

21   your own discretion."  You remember it differently than her,

22   right?

23   A.  That's how I recall it, yes.

24   Q.  You heard her testimony.  She actually remembers

25   gathering all her personal emails and gathering all her

1   official and starting to sort them and then asking you, and

2   you saying you only have to provide official for now.  You

3   heard all that testimony?

4   A.  I heard that testimony, yes.

5   Q.  She actually remembers sorting and everything, right?

6   A.  That's what she testified to, yes.

7   Q.  Yes.  And she remembers that you told her just the

8   official for now, right?

9   A.  That's what she said, yes.

10  Q.  But what you remember regardless is you remember

11  saying -- and you remember also that -- we'll go to this.

12          Ms. Hardman also remembers a second conversation

13  where she asked you whether she should provide the campaign

14  emails on her official account, and you said, "Use your

15  discretion."  You heard that testimony, right?

16  A.  I believe so, yes.

17  Q.  And now you don't remember it that same way, right?

18  A.  No.  I remember we had three conversations.

19  Q.  Okay.  Now, the part you do remember, the way you

20  remember it is that she asked you if she should provide her

21  personal, and you said, "Use your discretion."  That's the

22  way you remember it, right?

23  A.  Yes.

24  Q.  All right.  Let's take it the way you remember it.

25          THE COURT:  I think we're going to have to stop on

1    that note.  I promised Juror No. 9 -- 8 -- it's been a long

2    day -- Juror No. 9 we'd stop promptly at 5:15, and I want to

3    keep my word on that.

4              So we're not sitting tomorrow.  Enjoy your

5    weekend.  We'll start at 9:00 a.m. on Monday, and we're

6    making a lot of progress, all right?  Enjoy your weekend,

7    folks, and please do not discuss any aspect of the case with

8    anyone.

9              (Jury exits courtroom)

10             THE COURT:  Mr. Bowser, you can rejoin your

11   attorney.

12             All right.  Do we need to -- just inquiring about

13   time.  How much time do you think you may need to complete

14   your cross, Counsel?

15             MR. GEE:  Maybe another 20 minutes, Your Honor.

16             THE COURT:  Okay.  And I assume redirect.  And any

17   other witnesses?

18             MS. GORDON:  Yes, sir.  I have one technical

19   witness.  Very short.  20 minutes maybe.

20             THE COURT:  20 minutes?  All right.

21             MS. GORDON:  Put some documents in.

22             THE COURT:  All right.  Let me -- if you'd rather

23   speak at the bench, Counsel, you can.  I was going to

24   inquire about how much time you'd need for rebuttal, if any.

25             MS. GORDON:  Are you speaking to the government?

```
 1              THE COURT:  Yes.
 2              (The following is a conference held at the
 3               bench outside the hearing of the jury)
 4    ████████████████████████████████████████████████
 5   ███████████████████████████████████████████████████
 6   ██████████████████████████████████████
 7      ████████████████████████████████████
 8              (This is the end of the bench conference)
 9              THE COURT:  Okay.  So we have some time.  Let's
10    look forward, though, with, you know, the likelihood --
11    let's assume a couple of premises.
12              Actually, without assuming anything, how much time
13    for closing argument for the government, for your portion of
14    it, whenever we get to it?
15              MR. GEE:  I think it's -- not having written it
16    yet, Your Honor --
17              THE COURT:  I know.
18              MR. GEE:  -- I would estimate an hour and a half
19    to two hours.
20              THE COURT:  Okay.  And for defense counsel?
21              MS. GORDON:  I agree.  Same.  Two hours, maybe a
22    little less.
23              THE COURT:  About three hours.
24              And for rebuttal?  I don't know.  Were you
25    thinking of an hour and a half for everything?
```

1          MR. GEE:  I mean, I think my rebuttal would be

2     shorter than the closing, Your Honor, but probably 45

3     minutes to an hour, yes, sir.

4          THE COURT:  All right.  We've been working through

5     instructions.  I think we have a pretty strong draft of

6     proposed instructions.  I'm unavailable tomorrow probably in

7     the late afternoon, but what I'll probably do at some point,

8     probably late afternoon tomorrow, is post the most recent

9     version of the proposed instructions for responses.

10          Are there any other legal issues that the Court is

11     going to have to resolve before closing argument and

12     instructions with respect to any other witnesses you plan to

13     call?

14          MS. GORDON:  Not with respect to witnesses, I

15     don't believe.  The Court gave me until the end of the day

16     today to submit the defense theory-of-the-case instruction.

17          THE COURT:  Right.  Yes.  We need that.

18          MS. GORDON:  And my office is working on that.  I

19     expect to submit it sometime this evening.

20          THE COURT:  In that regard, the Court has taken a

21     look at recent instructions by this Court's colleagues, and

22     it seems like the only view recently is to have the theory-

23     of-the-case instruction include references to good faith

24     defense as opposed to giving a separate good faith defense.

25          But, you know, I'll note your objection, but

1   whatever instruction I give, it's going to be a fair one.

2   But yes, thank you for reminding me of that.

3           MS. GORDON:  I'm not objecting.  Your Honor, you

4   gave me to the end of the day to submit it, and my office is

5   working on it.

6           THE COURT:  All right.

7           MS. GORDON:  So I'm going to submit it sometime

8   this evening.

9           THE COURT:  I mean, I obviously don't need it

10  today.

11          MS. GORDON:  You ordered me to submit it by the

12  end of today.

13          THE COURT:  Oh, you know, what, look, Counsel,

14  it's Thursday.  We don't need it today.  I mean, if you

15  don't have it --

16          MS. GORDON:  Very well.

17          THE COURT:  I need to get it in, though, so let's

18  just say by tomorrow at noon --

19          MS. GORDON:  Very well.

20          THE COURT:  -- so we can finalize our proposed

21  instructions and post them again free of typos.

22          You know, we were looking at the typos.  What

23  are all these typos?  In an effort to accommodate

24  Mr. Bowser and eliminate the word "defendant" and change it

25  to "Mr. Bowser," that's the reason why we had all the typos.

1          MS. GORDON:  I appreciate that.

2          THE COURT:  I don't like instructions going

3     back with that.  The government's entitled to call him

4     whatever they -- well, not whatever they want to.  In the

5     instruction -- I try to humanize the instructions, so that's

6     why we had a lot of typos.  So we'll do a word for word

7     before sending it out again.  All right?

8              But thanks for catching those.  I appreciate that.

9              What else do we need to talk about?

10          MS. GORDON:  I mean, there's a little bit of

11     clean-up at the end.  We have a stipulation outstanding.

12     I've got some exhibits outstanding, but it's more

13     administrative/technical once we finish with Mr. Bowser.

14          THE COURT:  All right.  And no exhibits are going

15     to go back until you talk with Mark.

16          MS. GORDON:  Right.

17          THE COURT:  There's a form that in recent years,

18     because of recent cases -- not in this Court but in recent

19     cases that --

20          MS. GORDON:  I'm aware of that case.

21          THE COURT:  -- involved exhibits going back that

22     had not been admitted that caused all sorts of problems.

23              Everyone's going to have to review.  That's going

24     to take some time, to go over the exhibits with Mark, and

25     then sign that form.

1          Are you both familiar with that JERS system.  The

2     jury evidence recording system that we have.

3          MS. GORDON:  This is the first time I've used it,

4     Judge.

5          MR. GEE:  It's also the first time I've used it.

6          THE COURT:  Do you have any questions about it?  I

7     mean, I think it's been a while since we've had a trial.  I

8     think what happens is the evidence goes back on the

9     computer, right?

10          THE COURTROOM DEPUTY:  They get a computer copy.

11          THE COURT:  And they also get the paper, all

12     right.

13          The other question is how many copies of

14     instructions do you want to go back?  I always think one

15     copy is problematic, but should every juror have a copy?

16     You know, what are your thoughts?

17          MR. GEE:  I think we're fine with multiple copies.

18          THE COURT:  Multiple copies.

19          MS. GORDON:  Two or three for 12 people.  Two or

20     three for 12 people.

21          THE COURT:  All right.  We'll do that, two or

22     three copies.

23          All right.  Anything else we need to talk about?

24          MS. GORDON:  I don't believe so.

25          THE COURT:  All right.  Okay.  We'll be around

1    tomorrow.  I won't be around until probably 1:00 or 2:00 or

2    so, but, you know, we're certainly --

3              MS. GORDON:  May I have the Court's indulgence?

4    Mr. Bowser had a question for me.

5              THE COURT:  Sure.  Yes.

6              MS. GORDON:  Your Honor, there's obviously a long

7    time between now and Monday when Mr. Gee commences with his

8    cross-examination again, and I just wanted to make sure that

9    we were all on the same page that it's permissible for me to

10   speak to Mr. Bowser over the --

11             THE COURT:  You know, I just asked Milli -- when I

12   realized we were getting ready to break, I just asked Milli

13   to pull up the recent Circuit cases that address that topic.

14             I think it's probably error for the Court to

15   instruct Mr. Bowser not to communicate with his attorney.  I

16   mean, there were a couple of occasions that the Circuit --

17   Supreme Court's dealt with.  I do recall a case involving a

18   Michelle Roberts, and I think Judge Friedman told her that

19   she couldn't talk to him, her client, during a 15-minute

20   recess or so.

21             MS. GORDON:  As I understand the case law, on

22   short breaks --

23             THE COURT:  I think that -- I think that there's

24   no prohibition.  I think that your client can speak with

25   you, but let me hear from government counsel.  I mean, have

1     you talked about --

2              MR. GEE:  You Honor, we have no objection to them

3     talking.

4              THE COURT:  All right.  Okay.  I knew it was going

5     to come up, so I think that's correct as a matter of law as

6     well.

7              MS. GORDON:  Thank you, Judge.

8              THE COURT:  But thank you for asking.

9              Anything else we need to talk about?  You want to

10    leave your materials here, or do you want to take them with

11    you, or what?

12             MS. GORDON:  I think this weekend we're going to

13    take most of them.

14             THE COURT:  All right.  Let me just speak with

15    Milli for one second.

16             (Pause)

17             THE COURT:  All right.  Well, look, everyone, have

18    a wonderful weekend, all right?  Thank you.

19             MS. GORDON:  You as well, Judge.

20             THE COURT:  Thanks.

21             MR. MULRYNE:  Thank you, Your Honor.

22             THE COURT:  Thank you.

23                  (Whereupon the hearing was

24                   concluded at 5:22 p.m.)

25

1          <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3               I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this 15th day of March, 2018.

9

10                              <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
                                Washington, DC 20001

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$250,000** [2] - 97:9, 97:15
**$33,750** [2] - 16:17, 17:5
**$500,000** [1] - 97:15

## '

**'90s** [2] - 66:1, 66:2
**'As** [1] - 42:22
**'Brett** [1] - 111:10
**'Campaign** [2] - 8:9, 8:10
**'Good** [1] - 110:19
**'MRA'** [1] - 16:20
**'training'** [1] - 16:15

## /

**/s/Lisa** [1] - 163:10

## 0

**00234** [1] - 110:14
**002A** [1] - 110:8

## 1

**1** [6] - 12:17, 14:2, 17:21, 69:22, 70:2, 97:4
**1.5** [1] - 97:8
**10** [2] - 31:14, 40:11
**100A** [1] - 91:7
**106** [5] - 90:17, 90:19, 90:20, 90:21, 91:11
**107** [2] - 62:22, 92:2
**108** [1] - 91:12
**11** [3] - 1:8, 57:23, 88:7
**111** [1] - 149:7
**112** [1] - 117:22
**1140** [1] - 1:18
**115** [2] - 116:13, 117:14
**116** [1] - 118:20
**118** [1] - 119:2
**11:00** [1] - 39:25
**12** [4] - 23:14, 25:13, 160:19, 160:20
**12:21** [1] - 101:12
**12th** [1] - 25:22
**13** [7] - 23:2, 86:10, 110:9, 110:11, 121:3, 121:5, 121:9
**14** [9] - 23:2, 23:8, 40:11, 86:10, 86:12, 86:13, 86:24, 87:1, 100:22

**1400** [1] - 1:15
**149** [1] - 25:7
**14th** [5] - 101:1, 101:24, 127:21, 128:17, 128:20
**15** [6] - 1:4, 23:2, 23:9, 53:9, 54:2, 55:25
**15-minute** [5] - 59:10, 124:13, 124:14, 124:17, 161:19
**152** [3] - 90:12, 90:13, 127:19
**153** [1] - 128:19
**154** [1] - 129:4
**159** [1] - 15:8
**15th** [1] - 163:8
**16** [4] - 23:11, 23:20, 27:9, 74:15
**16-059** [1] - 1:4
**160** [1] - 20:4
**161** [1] - 21:11
**162** [1] - 29:9
**164** [1] - 12:7
**165** [1] - 27:17
**167** [1] - 31:10
**16th** [2] - 124:24, 129:5
**17** [4] - 42:13, 45:25, 49:3, 110:8
**17th** [2] - 23:18, 139:10
**18** [3] - 24:14, 49:3
**184** [1] - 41:7
**185** [1] - 53:1
**19** [5] - 7:5, 7:23, 24:17, 73:8, 110:18
**1990s** [1] - 63:14
**19th** [1] - 1:18
**1:00** [1] - 161:1
**1:37** [1] - 1:5
**1B** [2] - 121:4, 121:7
**1E** [1] - 121:6
**1st** [6] - 14:10, 15:18, 15:20, 19:7, 29:6, 30:10

## 2

**2** [1] - 57:8
**2.3** [1] - 97:4
**20** [15] - 24:25, 26:1, 29:2, 41:2, 42:20, 43:20, 55:14, 85:21, 98:7, 120:12, 120:18, 120:20, 155:15, 155:19, 155:20
**20-year-olds** [5] - 84:8, 84:16, 85:1, 85:5, 85:20

**20001** [2] - 1:23, 163:12
**20005** [1] - 1:15
**20036** [1] - 1:19
**2004** [1] - 97:3
**2007** [2] - 95:22
**2008** [1] - 100:9
**2010** [1] - 100:9
**2012** [39] - 16:13, 16:18, 69:4, 69:10, 69:22, 70:2, 82:5, 83:6, 83:16, 87:11, 88:7, 90:5, 90:7, 94:6, 94:8, 95:4, 95:16, 97:7, 98:7, 98:10, 99:1, 99:10, 99:19, 100:2, 100:5, 100:22, 104:24, 106:24, 107:3, 108:22, 110:18, 113:1, 113:17, 114:13, 114:16, 114:19, 118:8, 138:11, 138:22
**2012/2013** [1] - 83:13
**2013** [16] - 5:10, 16:13, 55:1, 83:9, 90:22, 119:9, 119:23, 134:22, 134:25, 135:5, 136:2, 138:9, 138:15, 138:19, 139:5
**2014** [37] - 5:7, 5:14, 7:5, 7:23, 12:17, 13:14, 14:2, 17:21, 25:13, 26:15, 26:21, 28:7, 28:25, 29:1, 29:2, 29:13, 31:14, 33:5, 39:18, 39:23, 41:10, 42:19, 53:9, 54:2, 54:19, 55:25, 57:8, 57:23, 69:4, 73:8, 74:15, 104:25, 119:23, 134:14, 134:19, 139:8, 141:21
**2015** [1] - 62:2
**2018** [2] - 1:4, 163:8
**202** [2] - 1:16, 1:19
**202-354-3187** [1] - 1:23
**206** [1] - 91:11
**209** [1] - 124:8
**20s** [3] - 83:25, 84:3, 104:24
**21** [2] - 24:25, 26:1
**212** [4] - 26:8
**21st** [3] - 117:7, 117:15, 117:25
**22** [2] - 24:25, 26:1

**222** [1] - 39:20
**224** [1] - 57:6
**226** [1] - 54:9
**227** [1] - 11:12
**23** [4] - 24:25, 26:1, 39:23, 40:17
**230** [2] - 19:16, 124:22
**23rd** [2] - 39:18, 40:3, 40:4
**24** [1] - 27:3
**24th** [1] - 39:4
**25** [3] - 29:2, 40:5, 98:9
**252** [1] - 123:23
**25th** [2] - 10:14, 28:25
**26** [2] - 40:10, 41:9
**27** [2] - 14:7, 40:24
**275** [1] - 115:18
**27th** [2] - 96:17, 97:19
**28** [2] - 14:7, 56:23
**28th** [1] - 56:17
**29** [1] - 54:19
**293-0534** [1] - 1:19
**296** [1] - 125:22
**2:00** [1] - 161:1
**2:18** [2] - 12:19, 18:1
**2:31** [2] - 15:1, 19:8

## 3

**3** [2] - 13:14, 29:13
**30** [1] - 49:6
**31** [2] - 56:21, 96:16
**32** [1] - 57:22
**33** [2] - 57:22, 98:6
**33,000-plus** [1] - 18:8
**333** [2] - 1:22, 163:12
**34** [1] - 57:22
**356** [1] - 61:14
**3:15** [1] - 59:12
**3:29** [2] - 17:23, 18:24
**3:45** [1] - 26:19
**3rd** [3] - 13:19, 29:12, 149:9

## 4

**4** [3] - 20:24, 69:20, 90:22
**40** [1] - 22:24
**404(b** [2] - 87:3, 87:4
**409A** [1] - 17:13
**40s** [2] - 83:11, 83:12
**41** [1] - 24:19
**41/42** [2] - 83:10, 83:11
**42** [4] - 83:8, 110:7, 110:8
**42/43** [1] - 83:9
**435** [1] - 61:1

**45** [1] - 157:2
**451** [2] - 139:9, 141:1
**453** [1] - 140:14
**464A** [2] - 7:2, 142:18
**49** [1] - 100:22
**490** [2] - 17:9, 17:11
**490A** [3] - 17:12, 146:7, 146:8
**490B** [2] - 144:20, 146:6
**491** [2] - 146:5, 147:21
**4:00** [1] - 128:24
**4th** [3] - 22:12, 22:19, 91:25

## 5

**5** [1] - 2:4
**50** [2] - 101:1, 101:11
**50-50** [3] - 70:10, 70:12, 70:13
**506** [1] - 32:24
**51** [2] - 22:22, 101:15
**514-9751** [1] - 1:16
**54** [2] - 101:14, 102:12
**59** [1] - 2:4
**5:00** [1] - 128:24
**5:15** [4] - 4:2, 4:23, 26:19, 155:2
**5:19** [1] - 18:22
**5:22** [1] - 162:24
**5:52** [1] - 129:5
**5th** [3] - 62:23, 92:5, 124:20

## 6

**6** [2] - 20:24, 28:7
**6718** [2] - 1:22, 163:11
**6:00** [1] - 28:7
**6th** [5] - 28:17, 50:13, 91:21, 117:9, 117:11

## 7

**7** [1] - 13:25
**79** [3] - 121:3, 121:5, 121:9
**7:19** [1] - 56:22
**7th** [2] - 29:5, 50:13

## 8

**8** [4] - 14:1, 26:15, 26:21, 155:1
**80** [1] - 43:19
**81** [5] - 43:20, 120:12, 120:18, 120:20, 121:2
**85** [1] - 42:13
**8:42** [1] - 40:8

**8:48** [1] - 39:23
**8th** [3] - 23:12, 26:24, 27:1

## 9

**9** [6] - 4:21, 14:15, 33:5, 118:1, 155:1, 155:2
**90** [3] - 109:1, 112:16, 112:18
**92** [1] - 45:25
**9:00** [1] - 155:5
**9:56** [2] - 89:20, 89:23
**9th** [2] - 27:6, 54:2

## A

**a.m** [3] - 39:25, 118:1, 155:5
**abandoned** [3] - 61:16, 132:8, 134:9
**abandoning** [1] - 132:17
**ability** [1] - 163:7
**able** [1] - 45:2
**absence** [1] - 66:13
**absentee** [2] - 74:21, 75:2
**absolutely** [1] - 54:4
**abysmal** [1] - 74:8
**accidentally** [1] - 23:8
**accommodate** [4] - 3:13, 3:22, 3:23, 158:23
**accommodation** [1] - 3:18
**accompanying** [1] - 32:10
**according** [1] - 56:12
**account** [4] - 62:2, 88:20, 153:13, 154:14
**accountant** [1] - 38:4
**accurate** [3] - 59:1, 124:12, 163:5
**accurately** [1] - 111:14
**acknowledgements** [1] - 13:6
**Action** [1] - 1:3
**activities** [2] - 79:23, 142:15
**activity** [13] - 6:1, 6:3, 50:25, 71:7, 72:8, 75:14, 79:13, 87:25, 90:5, 150:22, 151:6, 153:12, 153:15
**actual** [8] - 20:1, 23:15, 42:6, 45:19, 51:4, 91:10, 119:3,

119:6
**ad** [3] - 48:22, 72:19, 74:5
**add** [1] - 53:23
**addition** [2] - 115:25, 137:10
**additional** [2] - 33:21, 36:22
**additions** [1] - 110:24
**address** [6] - 30:21, 42:1, 57:10, 88:14, 102:15, 161:13
**addressed** [3] - 15:24, 53:24, 148:13
**Adel** [2] - 134:6, 134:8
**adhere** [1] - 4:22
**Administration** [10] - 42:22, 135:18, 135:20, 136:1, 136:21, 137:7, 137:12, 138:2, 138:3, 138:16
**administrative/technical** [1] - 159:13
**admit** [4] - 73:12, 74:22, 88:10, 141:2
**admitted** [6] - 73:18, 74:25, 86:22, 88:6, 88:12, 159:22
**ads** [3] - 61:6, 64:12, 67:20
**advance** [1] - 38:16
**advantage** [1] - 25:20
**advertise** [2] - 8:8, 143:8
**advertises** [1] - 9:4
**advice** [8] - 84:9, 84:13, 84:15, 84:22, 84:23, 85:6, 138:1, 146:21
**advisor** [3] - 109:9, 111:12, 115:16
**affairs** [2] - 68:4, 68:7
**Africa** [5] - 132:7, 132:19, 133:2, 133:6, 133:23
**AFTERNOON** [1] - 1:8
**afternoon** [13] - 5:4, 5:5, 24:16, 41:1, 41:10, 59:25, 110:19, 118:3, 120:23, 128:15, 128:21, 157:7, 157:8
**agenda** [2] - 130:18, 131:6
**ago** [2] - 83:8, 105:7
**agree** [21] - 15:2, 94:13, 94:14, 95:14, 98:9, 111:7, 122:14, 122:21, 123:2,

126:24, 127:4, 130:7, 131:11, 135:25, 138:24, 140:19, 143:19, 148:15, 153:5, 153:11, 156:21
**agreement** [2] - 102:14, 102:23
**ahead** [3] - 65:14, 126:14, 151:1
**aided** [1] - 1:25
**airing** [1] - 139:17
**Akins** [2] - 95:9, 95:12
**Allen** [5] - 99:15, 99:18, 100:5, 100:17, 100:23
**allow** [1] - 88:1
**Allowance** [2] - 16:20, 145:9
**almost** [3] - 18:24, 19:1, 134:5
**alone** [1] - 137:21
**AMERICA** [1] - 1:3
**amount** [1] - 89:1
**Anfinsons** [5] - 103:11, 103:13, 104:5, 104:14, 106:18
**announced** [8] - 44:12, 45:10, 45:20, 91:14, 93:1, 100:10, 115:22, 130:24
**announcement** [11] - 45:18, 45:21, 62:24, 62:25, 91:4, 91:10, 91:22, 92:9, 117:9, 117:10, 126:19, 126:25, 136:6
**announces** [1] - 92:12
**announcing** [8] - 101:2, 101:12, 101:20, 102:8, 109:2, 115:11, 115:19, 115:25
**answer** [23] - 25:23, 42:16, 43:25, 46:6, 46:15, 75:21, 76:3, 76:5, 102:1, 102:3, 105:10, 109:22, 110:1, 110:3, 110:5, 112:3, 123:12, 123:16, 138:17, 148:2, 150:25, 151:2
**ANSWER** [16] - 43:1, 43:4, 44:12, 46:9, 46:11, 46:17, 110:13, 110:20, 111:1, 111:13, 111:17, 111:20, 111:23, 112:7,

112:9, 112:13
**answered** [2] - 41:21, 74:8
**answers** [4] - 42:9, 45:6, 46:23, 105:12
**anticipate** [1] - 4:4
**anymore...still** [1] - 73:20
**anyway** [1] - 94:4
**apologize** [3] - 90:14, 106:1, 106:13
**apparent** [1] - 9:25
**appear** [1] - 26:25
**appearance** [2] - 64:25, 65:5
**appearances** [3] - 125:16, 125:19, 125:20
**APPEARANCES** [1] - 1:12
**appeared** [1] - 17:4
**appearing** [2] - 71:20, 71:21
**apple** [1] - 17:13
**applied** [3] - 35:13, 77:16, 82:23
**appreciate** [2] - 159:1, 159:8
**approach** [3] - 86:6, 86:9, 86:16
**approached** [1] - 71:6
**appropriate** [1] - 59:9
**April** [26] - 12:17, 13:14, 13:25, 14:2, 14:10, 15:20, 17:21, 21:23, 21:24, 22:1, 22:9, 22:12, 22:15, 22:16, 22:17, 23:12, 25:13, 30:10, 70:12, 87:11, 88:7, 90:5, 90:7, 96:17, 97:19, 138:11
**argument** [2] - 156:13, 157:11
**arranged** [1] - 108:21
**arrangement** [1] - 108:12
**arrive** [1] - 149:18
**arrived** [1] - 29:18
**article** [19] - 5:10, 43:1, 43:11, 43:15, 55:1, 55:3, 55:8, 114:14, 135:4, 137:6, 137:20, 137:24, 138:1, 138:19, 139:10, 139:11, 139:18, 139:23, 144:7
**articles** [17] - 114:15, 114:18, 114:22,

112:9, 112:13
**answered** [2] - 41:21, 74:8
**answers** [4] - 42:9, 45:6, 46:23, 105:12
**anticipate** [1] - 4:4
**anymore...still** [1] - 73:20
**anyway** [1] - 94:4
**apologize** [3] - 90:14, 106:1, 106:13
**apparent** [1] - 9:25
**appear** [1] - 26:25
**appearance** [2] - 64:25, 65:5
**appearances** [3] - 125:16, 125:19, 125:20
**APPEARANCES** [1] - 1:12
**appeared** [1] - 17:4
**appearing** [2] - 71:20, 71:21
**apple** [1] - 17:13
**applied** [3] - 35:13, 77:16, 82:23
**appreciate** [2] - 159:1, 159:8
**approach** [3] - 86:6, 86:9, 86:16
**approached** [1] - 71:6
**appropriate** [1] - 59:9
**April** [26] - 12:17, 13:14, 13:25, 14:2, 14:10, 15:20, 17:21, 21:23, 21:24, 22:1, 22:9, 22:12, 22:15, 22:16, 22:17, 23:12, 25:13, 30:10, 70:12, 87:11, 88:7, 90:5, 90:7, 96:17, 97:19, 138:11
**argument** [2] - 156:13, 157:11
**arranged** [1] - 108:21
**arrangement** [1] - 108:12
**arrive** [1] - 149:18
**arrived** [1] - 29:18
**article** [19] - 5:10, 43:1, 43:11, 43:15, 55:1, 55:3, 55:8, 114:14, 135:4, 137:6, 137:20, 137:24, 138:1, 138:19, 139:10, 139:11, 139:18, 139:23, 144:7
**articles** [17] - 114:15, 114:18, 114:22,

**114** :24, 115:7, 135:2, 139:8, 139:11, 139:12, 139:13, 139:25, 140:3, 140:6, 140:11, 142:2, 144:19, 150:7
**ascertain** [2] - 6:4, 31:5
**aside** [1] - 77:2, 98:23
**aspect** [1] - 155:7
**assist** [1] - 19:23
**ASSOCIATES** [1] - 1:18
**Associates** [2] - 16:14, 16:17
**assume** [1] - 139:1, 155:16, 156:11
**assumed** [1] - 36:1
**assuming** [1] - 156:12
**AT&T** [1] - 11:23
**Athens** [2] - 3:10, 3:11
**Atlanta** [2] - 3:8, 7:12
**attached** [1] - 116:5
**attachment** [1] - 21:21
**attack** [1] - 65:4
**attacking** [1] - 64:20
**attempt** [1] - 58:16
**attempting** [1] - 82:18
**attend** [3] - 101:18, 101:19, 102:10
**attendance** [1] - 130:10
**attended** [1] - 43:22, 120:21
**attends** [1] - 102:25
**attention** [4] - 5:12, 10:2, 12:25, 49:7
**attorney** [10] - 22:3, 22:4, 24:5, 24:8, 25:17, 25:21, 28:1, 155:11, 161:15
**audio** [1] - 121:14
**August** [3] - 124:20, 124:24, 125:21
**Austin** [1] - 83:25
**authority** [2] - 68:8, 72:9
**automatic** [1] - 6:10
**Avenue** [3] - 1:15, 1:22, 163:12
**aware** [2] - 57:17, 159:20

## B

**babies** [1] - 91:17
**bad** [6] - 69:6, 71:17, 94:18, 94:20, 94:23, 102:22

**banker's** [1] - 32:3
**base** [1] - 53:25
**batch** [1] - 44:25
**bearing** [1] - 146:23
**became** [3] - 9:25, 122:14, 122:21
**become** [2] - 10:18, 118:7
**becoming** [2] - 57:2, 108:8
**BEFORE** [1] - 1:10
**beforehand** [1] - 126:10
**beg** [1] - 28:11
**beginning** [1] - 63:10
**below** [2] - 15:14, 34:10
**bench** [5] - 86:19, 88:2, 155:23, 156:3, 156:8
**beneath** [1] - 34:7
**best** [1] - 163:6
**between** [14] - 11:17, 11:24, 13:23, 18:9, 21:23, 26:19, 27:21, 49:17, 92:4, 97:3, 100:23, 108:20, 135:17, 161:7
**Bibee** [3] - 69:23, 88:22, 96:20
**big** [3] - 32:3, 70:12, 72:19
**bit** [12] - 5:16, 28:2, 30:18, 33:23, 40:7, 72:23, 90:24, 96:6, 109:6, 121:2, 135:2, 159:10
**blank** [1] - 102:15
**blocks** [1] - 32:7
**blowing** [1] - 149:11
**board** [1] - 42:1
**boardroom** [1] - 119:7
**Bob** [1] - 75:9
**body** [1] - 35:16
**books** [1] - 132:25
**Boone** [2] - 75:10, 75:11
**born** [1] - 45:17
**boss** [1] - 52:20
**bottle** [1] - 59:17
**bottom** [14] - 7:6, 8:2, 17:16, 36:20, 53:4, 53:5, 73:19, 75:1, 91:16, 110:15, 124:8, 124:23, 125:23, 128:12
**Bowser** [27] - 5:4, 7:3, 12:10, 15:9, 26:11, 52:12, 53:2, 58:4, 59:25, 60:2, 73:5,

88:5, 88:13, 90:25, 92:4, 102:1, 113:11, 114:1, 114:7, 147:13, 155:10, 158:24, 158:25, 159:13, 161:4, 161:10, 161:15
**BOWSER** [4] - 1:6, 2:3, 3:10, 5:1
**box** [4] - 32:3, 32:4, 44:23, 50:11
**braintrust** [4] - 117:25, 121:20, 122:22, 122:24
**break** [3] - 108:6, 141:15, 161:12
**breaks** [1] - 161:22
**Brett** [88] - 7:14, 8:18, 10:13, 11:18, 17:1, 17:5, 17:19, 18:7, 18:9, 25:9, 26:15, 29:22, 30:11, 30:20, 31:6, 32:11, 32:18, 33:18, 34:19, 35:9, 38:1, 39:22, 41:1, 46:3, 46:18, 47:3, 47:18, 47:23, 52:7, 54:18, 54:22, 57:10, 58:2, 58:4, 58:8, 60:8, 61:5, 63:2, 63:4, 85:23, 87:13, 91:3, 92:8, 99:13, 100:18, 101:2, 101:4, 105:2, 109:8, 109:19, 112:5, 112:10, 115:8, 115:15, 116:10, 116:19, 117:16, 117:19, 118:4, 120:1, 120:4, 122:7, 124:4, 124:10, 124:25, 126:3, 126:10, 126:14, 128:14, 128:21, 129:25, 131:3, 131:11, 131:16, 133:8, 133:11, 134:1, 134:13, 135:8, 135:11, 135:21, 136:22, 138:12, 139:6, 139:13, 140:1, 140:12, 140:19, 141:3, 141:17, 142:3, 142:6, 142:14, 142:21, 144:2, 147:1, 148:22, 148:25, 150:4, 150:16, 150:18, 150:20,

151:8, 152:11, 152:22, 153:6, 153:8, 153:12
**Brett's** [1] - 101:10
**Brian** [3] - 96:19, 107:19, 122:7
**briefing** [1] - 132:25
**briefly** [1] - 18:18
**broad** [1] - 123:15
**Broadcasting** [1] - 125:25
**brought** [2] - 110:24, 148:8
**Broun** [99] - 3:19, 5:13, 9:20, 15:25, 16:3, 16:14, 16:19, 22:2, 24:7, 24:12, 35:15, 38:2, 38:21, 39:7, 44:6, 45:20, 46:12, 47:14, 47:18, 48:2, 57:14, 58:8, 58:13, 66:9, 66:14, 67:22, 68:2, 68:13, 68:18, 68:19, 68:23, 69:12, 69:15, 69:23, 72:24, 77:11, 78:25, 89:15, 91:3, 91:13, 92:12, 94:13, 94:25, 95:9, 95:11, 95:21, 96:8, 96:11, 96:14, 96:20, 97:5, 97:6, 97:21, 98:14, 98:21, 98:23, 99:24, 103:1, 104:3, 106:21, 106:23, 107:2, 108:3, 108:23, 108:24, 109:2, 110:19, 110:24, 115:6, 115:11, 116:16, 117:10, 117:17, 117:21, 117:25, 122:15, 122:18, 122:22, 122:24, 123:9, 123:20, 124:4, 124:10, 125:1, 125:6, 126:17, 129:2, 130:20, 130:25, 134:14, 136:22, 140:15, 144:20, 145:8, 148:6, 148:9, 148:12, 149:19
**Broun's** [24] - 9:12, 16:16, 58:5, 58:11, 62:24, 66:17, 67:6, 76:15, 89:1, 93:7, 94:7, 97:24, 100:6, 103:3, 108:8, 109:8, 111:11, 111:15,

124:7, 126:24, 131:20, 133:3, 142:11, 142:12
**Bryson** [12] - 12:13, 15:4, 30:2, 31:16, 31:21, 33:10, 41:9, 53:7, 149:12, 149:17, 151:24, 152:1
**budget** [1] - 48:9
**budgets** [2] - 8:8, 143:8
**Building** [1] - 91:8
**buildings** [3] - 78:14, 78:19, 78:22
**Buildings** [1] - 79:3
**bump** [1] - 70:11
**bunch** [1] - 127:24
**bundled** [1] - 32:4
**burst** [1] - 129:13
**busy** [1] - 92:7
**but..** [1] - 37:21
**buy** [3] - 72:17, 72:19, 78:4
**BY** [4] - 5:3, 59:24, 88:4, 106:15

---

# C

**calendar** [2] - 30:23, 129:6
**camera** [2] - 5:20, 6:12
**campaign** [205] - 8:11, 9:4, 9:7, 11:5, 18:11, 20:17, 20:19, 20:21, 36:5, 43:23, 44:3, 46:4, 46:5, 46:14, 47:3, 47:5, 47:15, 47:19, 47:24, 48:15, 48:25, 49:5, 50:25, 51:9, 58:5, 58:11, 60:9, 60:12, 60:14, 61:7, 62:6, 63:18, 63:20, 64:4, 64:17, 64:21, 64:25, 65:5, 65:7, 65:13, 65:16, 65:18, 69:3, 69:4, 69:7, 69:11, 70:2, 70:5, 70:9, 70:20, 70:22, 70:25, 71:3, 71:4, 71:7, 71:10, 71:13, 71:19, 71:20, 71:24, 72:1, 72:3, 72:7, 72:10, 74:5, 75:13, 77:10, 77:13, 77:19, 78:1, 78:5, 78:11, 78:18, 78:22, 79:2, 79:6, 79:13, 80:2, 80:17, 81:6, 81:10, 81:13, 81:17, 81:23, 82:1, 82:18,

83:2, 83:3, 83:17, 85:12, 85:21, 85:23, 85:24, 87:25, 89:7, 89:18, 90:4, 90:10, 92:19, 92:23, 93:2, 93:6, 93:14, 93:17, 93:23, 94:2, 96:8, 96:10, 96:12, 97:15, 97:20, 100:4, 101:21, 102:9, 102:24, 106:21, 109:20, 111:15, 111:24, 112:2, 112:8, 112:12, 113:3, 113:19, 113:21, 115:9, 115:17, 116:10, 116:19, 118:7, 120:22, 121:16, 121:22, 122:10, 122:11, 122:13, 122:19, 123:2, 123:15, 123:24, 124:5, 124:11, 124:25, 125:8, 125:19, 125:20, 126:13, 126:25, 127:5, 129:17, 130:1, 130:6, 130:15, 130:23, 131:3, 131:7, 131:9, 132:4, 136:2, 136:6, 136:10, 136:17, 136:22, 137:3, 137:12, 138:4, 138:6, 138:8, 138:9, 139:6, 140:21, 140:23, 141:4, 141:5, 142:15, 143:9, 143:11, 143:15, 143:16, 143:18, 143:23, 144:1, 144:6, 144:10, 144:12, 145:16, 146:2, 147:2, 147:4, 148:16, 148:25, 149:3, 150:8, 150:12, 150:21, 151:6, 152:5, 152:12, 152:17, 153:6, 153:12, 153:15, 154:13
**campaign's** [1] - 81:19
**campaign-related** [2] - 143:15, 153:6
**campaigns** [8] - 63:12, 63:14, 81:1, 95:1, 95:5, 95:15, 97:24, 100:3
**campus** [1] - 32:7

**can..** [1] - 4:19
**candidate** [5] - 61:5, 64:24, 126:1, 134:22, 134:24
**candidates** [3] - 65:22, 95:5, 115:4
**cannot** [1] - 77:9
**capacity** [2] - 146:24, 151:8
**card** [1] - 48:19
**care** [4] - 4:1, 62:25, 140:23, 150:16
**cared** [2] - 152:11, 152:22
**Carson** [1] - 83:25
**case** [11] - 6:20, 17:2, 35:10, 52:19, 155:7, 156:6, 157:16, 157:23, 159:20, 161:17, 161:21
**cases** [3] - 159:18, 159:19, 161:13
**catching** [1] - 159:8
**category** [1] - 65:18
**caused** [1] - 159:22
**celebrity** [1] - 75:11
**cell** [1] - 11:17
**certain** [1] - 51:22
**certainly** [2] - 4:22, 161:2
**CERTIFICATE** [1] - 163:1
**certification** [3] - 58:20, 58:22, 59:1
**certified** [1] - 58:22
**certify** [1] - 163:4
**cetera** [1] - 87:24
**chain** [3] - 34:9, 75:1, 75:5
**Chambliss** [11] - 45:8, 45:9, 106:23, 107:3, 107:13, 107:17, 107:21, 108:4, 108:9, 108:23, 114:16
**Chambliss's** [1] - 107:10
**chance** [4] - 72:24, 75:24, 76:4, 104:12
**change** [6] - 4:7, 28:16, 75:21, 76:3, 105:24, 158:24
**changed** [1] - 28:22
**changes** [1] - 156:4
**charity** [1] - 132:7
**chart** [1] - 17:11
**Chateau** [8] - 45:11, 45:22, 117:6, 118:1, 118:10, 118:13, 119:7, 122:25

**check** [2] - 24:12, 88:16
**checked** [1] - 29:23
**checking** [1] - 148:14
**chief** [6] - 49:7, 66:8, 69:7, 104:7, 148:8, 149:20
**child** [1] - 4:1
**Chinouth** [10] - 32:20, 36:16, 36:19, 39:10, 69:10, 71:15, 74:15, 75:1, 88:22, 96:20
**Christine** [11] - 6:18, 7:21, 9:14, 32:3, 39:6, 42:21, 50:14, 52:3, 55:13, 83:22, 134:5
**Circuit** [2] - 161:13, 161:16
**clarify** [1] - 104:12
**clean** [1] - 159:11
**clean-up** [1] - 159:11
**cleaning** [3] - 142:11, 142:13, 151:10
**clear** [1] - 41:23
**client** [2] - 161:19, 161:24
**clip** [2] - 121:4, 121:7
**closed** [1] - 6:11
**closer** [1] - 119:23
**closing** [3] - 156:13, 157:2, 157:11
**Club** [2] - 71:25
**club** [1] - 72:2
**coach** [4] - 61:5, 64:14, 140:16, 140:20
**coalesced** [1] - 50:10
**coerce** [1] - 82:7
**colleagues** [1] - 157:21
**Collins** [9] - 96:1, 96:4, 96:7, 97:20, 98:3, 98:13, 99:21, 100:10, 101:5
**collins** [1] - 97:9
**COLUMBIA** [1] - 1:1
**combined** [1] - 17:3
**coming** [4] - 89:2, 122:8, 131:10, 140:8
**commences** [1] - 161:7
**commensurate** [1] - 80:21
**comment** [2] - 7:16, 55:15
**Committee** [6] - 42:22, 76:21, 77:20, 135:18, 135:21, 138:2

**committee** [3] - 42:25, 57:18, 137:11
**communicate** [2] - 27:24, 161:15
**communicating** [2] - 28:9, 75:6
**communication** [5] - 15:3, 17:24, 27:21, 34:25, 37:18
**communications** [9] - 6:17, 25:3, 30:14, 30:15, 42:23, 49:16, 112:4, 112:23, 115:2
**compared** [1] - 95:8
**complete** [3] - 80:13, 155:13, 163:6
**completed** [2] - 13:8, 13:9, 80:6
**compliance** [2] - 42:23, 43:5
**compound** [3] - 146:23, 147:2, 147:5
**computer** [4] - 1:25, 88:17, 160:9, 160:10
**computer-aided** [1] - 1:25
**computers** [1] - 79:8
**concern** [1] - 51:8
**concerning** [3] - 5:22, 5:23, 9:6
**concerns** [1] - 96:25
**concluded** [2] - 54:10, 162:24
**conference** [11] - 86:18, 88:2, 93:2, 93:17, 130:6, 130:11, 130:18, 130:21, 130:24, 156:2, 156:8
**confirm** [1] - 17:10
**confirming** [1] - 13:17
**confront** [1] - 116:22
**confused** [1] - 122:5
**Congress** [3] - 8:8, 77:17, 143:7
**Congressional** [4] - 12:14, 15:10, 33:7, 54:25
**congressional** [39] - 7:17, 16:15, 16:16, 29:4, 67:4, 80:2, 80:5, 80:16, 80:20, 82:7, 82:10, 82:13, 85:24, 87:14, 87:24, 89:13, 90:4, 90:10, 92:13, 93:11, 93:15, 93:22, 97:24, 103:3, 112:11, 112:20, 127:8, 127:13, 128:22, 129:23,

130:1, 135:12, 136:11, 142:4, 145:17, 148:21, 150:19, 150:20, 152:8
**Congressman** [138] - 3:19, 3:23, 5:13, 5:18, 6:7, 6:18, 9:12, 10:2, 10:8, 15:25, 16:3, 16:8, 19:19, 19:20, 19:23, 20:1, 20:5, 20:11, 20:16, 22:2, 22:6, 24:7, 24:12, 24:20, 27:11, 28:4, 28:17, 28:21, 35:15, 35:17, 35:18, 38:2, 38:11, 38:21, 39:7, 41:14, 41:15, 42:1, 42:3, 45:20, 47:20, 48:9, 48:10, 48:12, 49:6, 58:5, 58:8, 58:11, 58:13, 62:24, 67:6, 67:22, 68:1, 68:13, 68:18, 68:19, 68:23, 69:12, 69:15, 69:23, 72:24, 74:3, 76:15, 77:11, 78:24, 79:15, 89:1, 89:15, 91:13, 92:12, 93:6, 94:7, 94:13, 94:25, 95:8, 95:11, 95:21, 96:1, 96:8, 96:11, 96:14, 96:20, 97:5, 97:6, 97:21, 97:24, 98:21, 98:23, 99:24, 100:6, 103:1, 103:2, 103:17, 104:3, 106:21, 106:22, 107:2, 108:3, 108:8, 108:17, 108:20, 108:22, 108:24, 109:8, 111:11, 111:15, 117:9, 117:10, 117:21, 122:15, 122:18, 123:9, 123:20, 124:4, 124:10, 125:1, 125:5, 126:17, 126:24, 129:2, 130:20, 130:25, 131:20, 133:3, 133:9, 133:17, 133:20, 134:13, 136:22, 140:15, 142:11, 142:12, 144:19, 147:23, 148:6, 148:9, 148:12, 149:19
**congressman** [1] -

66:8
**Congressman's** [11] - 10:17, 10:25, 13:19, 28:13, 52:2, 69:7, 81:5, 115:4, 129:19, 134:2, 151:10
**connect** [1] - 58:3
**connected** [1] - 38:4
**consequence** [1] - 9:18
**considering** [1] - 115:4
**consolidate** [1] - 128:5
**consolidated** [1] - 127:23
**constitutes** [1] - 163:4
**Constitution** [2] - 1:22, 163:12
**consult** [2] - 68:13, 122:18
**consultant** [16] - 9:4, 61:16, 64:4, 83:3, 109:8, 111:11, 115:15, 116:11, 116:20, 132:5, 132:8, 132:14, 134:9, 135:22, 136:10, 136:17
**consultants** [4] - 49:5, 82:24, 121:23, 131:13
**consultation** [1] - 143:9
**consultation'** [1] - 8:9
**consulted** [1] - 85:2
**consulting** [3] - 102:14, 102:23, 137:18
**contact** [14] - 22:2, 22:10, 28:15, 70:5, 71:8, 71:9, 116:5, 116:8, 116:11, 116:14, 116:16, 117:17, 148:20, 148:24
**contacted** [1] - 29:19
**contemplate** [1] - 44:10
**contemplated** [1] - 45:20
**content** [1] - 43:11
**context** [1] - 51:5
**contingent** [1] - 80:25
**continued** [4] - 9:24, 103:2, 103:5, 134:13
**Continued** [1] - 5:2
**continuity** [1] - 70:13
**contract** [4] - 8:7, 108:17, 108:25,

143:7
**contractor** [1] - 16:15
**convention** [4] -
127:2, 127:7,
127:13, 127:22
**conversation** [23] -
14:21, 19:5, 19:6,
33:11, 33:14, 34:13,
40:16, 46:2, 46:10,
46:16, 46:18, 47:2,
47:7, 47:13, 47:21,
47:22, 49:24, 50:22,
57:1, 72:3, 107:22,
138:18, 154:12
**conversations** [4] -
11:17, 35:8, 107:19,
154:18
**convey** [1] - 37:4
**coordinating** [1] -
25:20
**copied** [1] - 88:22
**copier** [1] - 78:4
**copiers** [1] - 79:9
**copies** [4] - 160:13,
160:17, 160:18,
160:22
**copy** [8] - 21:7, 21:8,
45:1, 56:5, 76:19,
160:10, 160:15
**copying** [1] - 119:3
**corner** [1] - 110:15
**Correct** [1] - 145:20
**correct** [85] - 8:5, 13:8,
13:23, 13:24, 14:16,
16:12, 18:20, 19:24,
23:4, 23:6, 23:19,
25:2, 26:3, 26:23,
27:5, 27:23, 28:1,
28:16, 29:5, 32:21,
32:22, 33:8, 35:7,
36:10, 36:12, 36:17,
36:23, 37:12, 37:17,
47:9, 49:18, 49:20,
56:18, 58:21, 58:24,
58:25, 60:3, 61:24,
74:20, 101:22,
103:3, 103:5, 103:8,
103:11, 103:14,
103:19, 104:7,
104:17, 104:20,
106:24, 107:17,
107:21, 108:4,
108:9, 108:13,
112:13, 117:7,
125:11, 127:2,
127:8, 129:17,
129:23, 130:2,
131:17, 131:21,
131:24, 132:2,
132:23, 134:19,

135:5, 137:8,
137:15, 138:20,
139:6, 139:7,
144:10, 146:18,
147:5, 148:9,
149:18, 149:20,
149:21, 150:13,
153:14, 162:5
**corresponding** [1] -
70:1
**cost** [2] - 22:4, 95:23
**counsel** [11] - 3:22,
28:5, 33:7, 43:19,
45:25, 59:21, 87:10,
105:7, 120:25,
156:20, 161:25
**Counsel** [5] - 3:4,
120:19, 155:14,
155:23, 158:13
**counsel's** [1] - 86:15
**counsels** [2] - 122:15,
122:17
**couple** [8] - 36:8,
91:18, 98:3, 115:10,
115:13, 118:21,
156:11, 161:16
**course** [3] - 72:12,
87:12, 112:3
**COURT** [90] - 1:1, 3:2,
3:7, 3:12, 3:17, 3:21,
4:1, 4:9, 4:12, 4:15,
4:18, 4:21, 17:14,
59:9, 59:15, 59:20,
73:13, 73:15, 73:18,
74:23, 74:25, 76:2,
76:7, 86:8, 86:10,
86:14, 86:17, 86:21,
86:24, 87:1, 87:6,
87:10, 88:1, 88:3,
88:12, 102:3, 105:6,
105:16, 105:20,
105:22, 106:2,
106:4, 106:12,
106:14, 109:25,
113:9, 141:10,
144:17, 147:13,
147:22, 149:15,
151:2, 154:25,
155:10, 155:16,
155:20, 155:22,
156:1, 156:7, 156:9,
156:17, 156:20,
156:23, 157:4,
157:17, 157:20,
158:6, 158:9,
158:13, 158:17,
158:20, 159:2,
159:14, 159:17,
159:21, 160:6,
160:11, 160:18,

160:21, 160:25,
161:5, 161:11,
161:23, 162:4,
162:8, 162:14,
162:17, 162:20,
162:22, 163:1
**Court** [8] - 1:21, 1:21,
157:10, 157:15,
157:20, 159:18,
161:14, 163:10
**court** [1] - 3:5
**Court's** [6] - 113:8,
113:10, 147:16,
157:21, 161:3,
161:17
**Courthouse** [2] - 1:22,
163:11
**courthouse** [1] - 3:12
**courtroom** [4] - 4:20,
59:14, 59:19, 155:9
**COURTROOM** [1] -
160:10
**cover** [1] - 124:18
**covered** [1] - 41:4
**CPB** [2] - 89:11, 89:15
**CQ** [1] - 54:25
**crappy** [1] - 18:15
**create** [2] - 6:20, 33:22
**Criminal** [1] - 1:3
**cross** [5] - 59:10,
59:20, 109:25,
155:14, 161:8
**CROSS** [1] - 59:23
**cross-examination** [2]
- 109:25, 161:8
**CROSS-**
**EXAMINATION** [1] -
59:23
**CRR** [3] - 1:21, 163:3,
163:10
**current** [1] - 148:21
**cut** [2] - 81:22, 81:25
**cutting** [2] - 4:6, 70:9
**cycle** [1] - 75:10

---

# D

**D.C** [7] - 1:6, 1:15,
1:19, 6:21, 9:17,
29:20, 36:12
**Dammit** [1] - 75:8
**dammit** [1] - 75:16
**date** [22] - 7:3, 7:22,
11:18, 12:16, 14:1,
14:15, 17:20, 18:1,
25:12, 26:20, 28:6,
28:8, 28:17, 28:24,
29:1, 29:12, 31:13,
40:2, 54:16, 57:7,
57:22, 117:8

**Dated** [1] - 163:8
**dated** [4] - 13:13,
15:20, 54:1, 98:7
**dates** [2] - 11:19, 19:3
**daughter** [1] - 45:17
**DAVID** [3] - 1:6, 2:3,
5:1
**David** [4] - 33:3, 34:21,
53:8, 53:24
**DAY** [1] - 1:8
**day-to-day** [2] - 68:4,
68:7
**days** [14] - 9:25, 10:13,
24:24, 34:20, 35:24,
38:23, 38:25, 45:17,
75:19, 91:18, 98:3,
98:12, 118:21,
124:15
**DB1** [2] - 73:2, 73:12
**DB11** [2] - 74:12,
74:22
**DB13** [4] - 86:4, 86:11,
113:24, 114:6
**DB14** [5] - 86:5, 86:25,
87:2, 88:5, 88:10
**DC** [2] - 1:23, 163:12
**deadline** [3] - 98:4,
98:9, 98:13
**deadlines** [1] - 97:2
**deal** [3] - 6:16, 54:6,
149:22
**dealings** [1] - 52:16
**dealt** [1] - 161:17
**debate** [34] - 8:10,
46:5, 46:8, 47:5,
61:16, 61:17, 65:16,
101:17, 101:22,
102:9, 102:13,
102:16, 102:24,
102:25, 116:11,
131:9, 131:17,
131:20, 132:1,
132:5, 132:8,
132:14, 132:24,
133:5, 133:12,
133:14, 133:21,
134:2, 134:9,
140:16, 140:20,
143:9, 146:21
**debates** [5] - 64:2,
64:14, 131:16,
131:24, 134:14
**debt** [1] - 73:21
**December** [11] - 57:8,
57:23, 110:18,
113:1, 113:19,
114:13, 114:16,
114:19, 114:25,
118:8
**decided** [3] - 28:4,

45:21, 135:15
**decision** [12] - 11:1,
24:10, 38:19, 42:2,
44:5, 45:10, 48:5,
48:7, 50:17, 68:1,
69:13, 69:16
**decision-maker** [1] -
48:5
**decision-making** [2] -
48:7, 50:17
**decisions** [4] - 48:6,
68:10, 68:25, 72:13
**Defendant** [2] - 1:7,
1:17
**defendant** [1] - 158:24
**Defendant's** [3] -
11:12, 19:16, 29:9
**defense** [6] - 3:22,
26:9, 156:20,
157:16, 157:24
**Defense** [13] - 12:7,
15:8, 20:4, 21:11,
25:7, 26:7, 27:16,
31:9, 39:20, 41:6,
53:1, 54:8, 57:5
**DeLacy** [1] - 27:25
**delivered** [1] - 63:1
**DEPARTMENT** [1] -
1:14
**depended** [1] - 48:7
**DEPUTY** [1] - 160:10
**describe** [2] - 111:14,
115:17
**described** [4] - 132:5,
132:8, 146:14,
149:24
**describes** [1] - 115:8
**describing** [4] -
109:19, 111:20,
112:10, 112:19
**designing** [1] - 48:19
**desk** [1] - 50:11
**detailed** [1] - 148:11
**details** [2] - 108:12,
118:17
**device** [2] - 88:17,
90:1
**dialed** [1] - 23:8
**dictate** [1] - 37:1
**difference** [4] - 11:24,
12:4, 18:9, 105:12
**different** [5] - 23:10,
63:20, 66:4, 122:20,
141:6
**differently** [1] - 153:21
**direct** [8] - 4:5, 35:8,
82:10, 82:12, 84:24,
85:11, 120:11,
149:24
**DIRECT** [1] - 5:2

6

**directed** [2] - 30:1, 30:6
**directing** [2] - 82:19, 87:14
**direction** [1] - 84:20
**directly** [2] - 11:10, 20:6
**director** [4] - 6:18, 112:4, 112:23, 115:3
**disconnects** [1] - 14:9
**discretion** [4] - 50:16, 153:21, 154:15, 154:21
**discuss** [2] - 44:8, 155:7
**discussed** [1] - 50:6
**discussion** [6] - 38:13, 39:1, 47:20, 51:3, 51:4, 69:25
**discussions** [2] - 41:24, 108:7
**disregard** [1] - 144:17
**distribution** [1] - 131:5
**DISTRICT** [3] - 1:1, 1:1, 1:10
**district** [5] - 6:21, 35:16, 35:18, 36:5, 94:7
**document** [11] - 11:11, 19:10, 20:14, 21:17, 21:18, 34:10, 51:13, 73:16, 114:11, 129:9, 145:20
**documents** [36] - 12:15, 13:5, 14:24, 17:25, 19:18, 19:19, 19:25, 21:25, 28:18, 31:22, 32:1, 33:17, 33:24, 33:25, 36:15, 37:14, 38:7, 38:12, 38:16, 40:20, 40:22, 49:24, 50:3, 50:4, 50:7, 50:9, 50:13, 50:15, 50:24, 51:16, 53:15, 58:19, 58:23, 59:6, 155:21
**DOJ** [2] - 57:13
**dollars** [4] - 30:12, 31:6, 143:21, 143:23
**done** [7] - 17:1, 25:18, 31:7, 40:21, 41:3, 41:22, 50:12
**donors** [1] - 89:5
**door** [7] - 5:19, 6:10, 6:11, 6:12, 6:13, 67:7, 139:20
**doorway** [1] - 52:2
**down** [34] - 3:8, 4:6, 12:2, 20:20, 27:17, 29:20, 34:1, 37:7,

39:9, 39:10, 44:2, 44:6, 47:19, 59:15, 61:2, 71:18, 90:11, 108:6, 109:6, 112:18, 113:11, 118:24, 122:8, 124:22, 125:22, 127:20, 128:11, 130:5, 138:13, 141:15, 143:5, 148:15, 148:19, 150:2
**dozen** [1] - 49:5
**Dr** [11] - 9:20, 38:21, 44:6, 46:12, 47:14, 47:18, 48:2, 57:14, 91:3, 110:24, 115:6
**draft** [8] - 89:10, 126:22, 127:22, 127:23, 128:2, 128:13, 157:5
**drafts** [2] - 127:24, 128:5
**driver** [1] - 35:16
**drives** [1] - 124:5
**dry** [3] - 142:11, 142:12, 151:10
**duration** [5] - 14:15, 14:17, 22:21, 23:13, 57:24
**during** [11] - 22:9, 25:4, 37:20, 49:19, 87:12, 91:3, 91:19, 93:19, 118:1, 123:2, 161:19
**DURING** [1] - 90:24
**duties** [4] - 67:23, 80:7, 80:14, 137:7

**E**

**early** [4] - 21:23, 21:24, 83:11, 83:12
**earn** [5] - 41:22, 136:13, 136:15, 143:21, 143:23
**earned** [3] - 30:12, 31:6, 141:22
**ebb** [1] - 48:16
**edited** [1] - 75:10
**effect** [1] - 50:19
**effort** [2] - 6:4, 158:23
**efforts** [2] - 110:25, 111:16
**eight** [5] - 34:5, 34:7, 34:10, 40:17
**either** [10] - 4:17, 6:21, 11:4, 14:9, 27:13, 32:17, 33:17, 34:18, 36:16, 144:16

**Elan** [8] - 45:11, 45:22, 117:6, 118:2, 118:10, 118:13, 119:7, 122:25
**elected** [3] - 64:23, 65:9, 65:10
**election** [11] - 65:10, 69:10, 74:1, 74:17, 94:8, 95:22, 95:23, 99:1, 103:1, 107:7, 107:12
**elements** [1] - 63:20
**eliminate** [1] - 158:24
**ELMO** [2] - 26:10, 73:4
**Email** [1] - 110:18
**email** [105] - 7:3, 7:7, 7:13, 7:21, 8:19, 12:8, 12:13, 13:12, 13:17, 15:3, 17:18, 17:19, 19:11, 23:23, 25:5, 25:8, 26:12, 26:14, 27:21, 28:8, 30:21, 31:1, 31:2, 31:3, 31:11, 31:19, 33:2, 33:5, 33:6, 34:4, 34:11, 34:22, 35:11, 36:9, 39:22, 40:7, 41:8, 53:7, 53:12, 53:24, 54:1, 54:18, 54:21, 55:5, 56:19, 57:7, 57:10, 61:4, 61:15, 61:18, 61:22, 61:24, 62:1, 62:4, 62:14, 62:23, 69:21, 73:7, 73:19, 74:14, 87:11, 88:7, 88:13, 89:17, 89:25, 90:22, 90:24, 91:2, 91:25, 96:17, 96:22, 98:7, 98:15, 100:22, 106:17, 109:13, 109:19, 110:12, 110:15, 111:7, 111:18, 111:21, 112:10, 112:17, 113:2, 115:8, 115:16, 115:21, 117:16, 118:9, 118:17, 124:20, 132:22, 133:24, 135:12, 138:17, 146:7, 146:10, 146:13, 146:20, 147:11, 147:15, 149:8, 151:13, 153:13
**emailing** [7] - 26:15, 53:14, 69:22, 92:23, 93:2, 96:19, 101:16
**emails** [31] - 29:23,

30:17, 32:17, 34:2, 34:19, 36:19, 37:21, 41:23, 44:19, 51:8, 61:21, 88:16, 92:15, 95:8, 111:25, 115:3, 115:10, 116:22, 116:25, 117:3, 118:21, 119:10, 125:4, 135:7, 135:10, 153:1, 153:6, 153:8, 153:12, 153:25, 154:14
**emergency** [1] - 134:3
**EMMET** [1] - 1:10
**employed** [2] - 103:2, 151:7
**employee** [4] - 146:4, 150:23, 151:3, 151:6
**employees** [3] - 49:5, 82:18, 145:21
**employing** [1] - 106:22
**employment** [1] - 30:11
**encounter** [1] - 51:6
**end** [12] - 42:22, 57:22, 60:23, 72:25, 75:24, 76:4, 88:2, 156:8, 157:15, 158:4, 158:12, 159:11
**engage** [1] - 71:7
**engages** [1] - 72:3
**engaging** [1] - 72:7
**enjoy** [2] - 155:4, 155:6
**entered** [1] - 86:4
**enters** [2] - 4:20, 59:19
**entire** [1] - 122:5
**entirely** [1] - 56:4
**entitled** [3] - 87:17, 88:24, 159:3
**entranceway** [1] - 52:1
**entry** [1] - 129:7
**envelopes** [1] - 67:9
**equipment** [1] - 79:5
**era** [1] - 95:4
**Erika** [2] - 32:11, 36:12
**error** [1] - 161:14
**especially** [2] - 48:24, 125:21
**ESQ** [3] - 1:13, 1:13, 1:17
**essentially** [1] - 70:18
**established** [2] - 150:8, 150:10
**estimate** [1] - 156:18
**et** [1] - 87:24
**ethical** [1] - 85:9

**ethics** [12] - 57:17, 76:12, 76:14, 76:17, 76:24, 77:2, 77:5, 77:6, 82:16, 85:6, 137:10
**Ethics** [5] - 12:14, 15:10, 33:7, 76:21, 77:20
**evening** [3] - 56:22, 157:19, 158:8
**event** [8] - 65:9, 70:7, 71:11, 71:15, 74:3, 107:17, 108:22, 118:10
**events** [13] - 65:7, 65:13, 71:20, 71:24, 71:25, 87:8, 114:12, 123:20, 124:11, 124:14, 124:25, 125:5, 125:8
**eventually** [3] - 22:8, 93:17, 151:17
**evidence** [5] - 17:11, 87:3, 87:4, 160:2, 160:8
**evolution** [1] - 94:22
**evolved** [1] - 46:19
**exact** [1] - 117:8
**exactly** [6] - 6:4, 54:15, 78:6, 136:13
**exam** [3] - 85:11, 120:11, 149:24
**EXAMINATION** [2] - 5:2, 59:23
**examination** [4] - 59:11, 59:21, 109:25, 161:8
**example** [7] - 72:9, 81:9, 81:15, 90:3, 90:12, 92:18, 94:22, 108:1, 124:21
**except** [1] - 152:9
**exception** [2] - 79:12, 79:18, 79:21
**exchange** [2] - 73:7, 74:14
**excluded** [1] - 4:17
**excuse** [1] - 15:6
**exhibit** [9] - 11:25, 12:1, 86:21, 90:15, 90:18, 113:25, 114:23, 114:24
**Exhibit** [66] - 7:2, 12:7, 15:8, 17:9, 19:16, 20:4, 21:11, 25:7, 26:7, 27:16, 29:9, 31:10, 32:24, 39:20, 41:6, 53:1, 54:8, 57:5, 61:1, 61:14, 62:22, 69:20, 73:2,

73:12, 88:5, 90:12, 90:13, 90:20, 90:21, 91:7, 91:11, 91:21, 92:2, 96:16, 98:6, 100:22, 101:1, 101:11, 101:14, 101:15, 101:24, 102:12, 109:1, 110:8, 112:16, 112:18, 114:6, 115:18, 116:13, 117:22, 119:2, 121:4, 123:23, 124:22, 125:22, 127:19, 128:19, 140:14, 142:18, 146:5, 147:12, 147:21, 149:7

**exhibits** [6] - 4:16, 26:9, 159:12, 159:14, 159:21, 159:24

**exits** [2] - 59:14, 155:9

**expect** [2] - 89:24, 157:19

**expectation** [2] - 46:2, 47:2

**expected** [1] - 70:3

**experience** [1] - 63:12

**explained** [1] - 33:20

**expressed** [1] - 51:7

**extend** [1] - 3:17

**extent** [1] - 131:22

**extra** [3] - 65:18, 76:14, 76:16

## F

**face** [1] - 6:14

**fact** [4] - 52:7, 100:17, 130:23, 146:23

**failed** [1] - 87:18

**fair** [10] - 3:7, 3:13, 3:17, 68:8, 83:13, 89:22, 92:17, 158:1

**faith** [2] - 157:23, 157:24

**fall** [1] - 54:15

**false** [1] - 147:7

**familiar** [2] - 91:1, 160:1

**far** [4] - 14:6, 33:24, 41:20, 47:16

**FBI** [2] - 11:20, 23:9

**February** [13] - 45:16, 62:23, 90:22, 91:21, 91:25, 92:5, 117:6, 117:9, 117:11, 117:15, 117:25, 119:9, 136:7

**FEC** [7] - 73:20, 73:25, 74:4, 87:15, 88:24, 89:3, 97:1

**federal** [3] - 3:12, 16:21, 145:10

**fees** [1] - 25:18

**felt** [1] - 133:14

**fervor** [1] - 17:3

**few** [10] - 10:13, 24:24, 42:5, 48:3, 49:10, 105:7, 114:6, 123:4, 123:8, 123:19

**fielding** [2] - 6:22, 9:15

**fieldwork** [1] - 35:20

**fiercely** [1] - 37:7

**fight** [1] - 10:24

**figure** [1] - 6:19

**figuring** [1] - 48:19

**file** [1] - 97:1

**files** [1] - 38:5

**filing** [3] - 98:4, 98:9, 98:13

**Final** [1] - 129:9

**final** [5] - 34:6, 34:9, 38:25, 48:9, 100:23

**finalize** [1] - 158:20

**finally** [2] - 100:10, 100:17

**finance** [6] - 96:7, 96:10, 96:13, 97:15, 98:20, 104:4

**financial** [3] - 97:16, 97:21, 98:20

**financing** [1] - 97:20

**Findlay** [16] - 32:20, 33:4, 34:22, 34:24, 36:3, 39:11, 72:16, 116:3, 151:15, 151:18, 151:21, 151:22, 152:1, 152:5, 152:8, 152:12

**fine** [5] - 3:5, 4:2, 147:18, 156:7, 160:17

**finish** [4] - 119:18, 119:20, 150:24, 159:13

**finished** [5] - 41:14, 102:1, 102:3, 106:14, 151:2

**fire** [2] - 127:17, 129:13

**fired** [1] - 48:8

**firm** [1] - 107:23

**first** [47] - 7:6, 10:2, 11:11, 12:20, 12:23, 19:11, 19:12, 19:13, 35:20, 36:7, 37:11, 37:14, 37:20, 38:12,

47:1, 53:4, 53:5, 57:16, 61:16, 63:2, 72:23, 73:23, 86:12, 90:19, 95:21, 99:18, 100:5, 102:16, 102:24, 102:25, 118:11, 130:23, 133:21, 134:2, 135:4, 139:11, 139:13, 139:17, 139:20, 140:10, 140:15, 144:20, 144:22, 145:4, 146:10, 160:3, 160:5

**five** [5] - 14:18, 34:15, 34:16, 57:25, 98:12

**fix** [3] - 66:21, 67:2, 148:9

**fixed** [1] - 66:18

**fliers** [1] - 78:5

**flip** [1] - 116:9

**flow** [2] - 4:7, 48:17

**flurry** [1] - 6:1, 9:19

**flustered** [1] - 52:3

**focused** [2] - 24:21, 79:23

**focusing** [1] - 8:22, 73:6, 106:8

**folks** [4] - 34:11, 34:15, 75:2, 155:7

**folks'** [1] - 127:24

**follow** [5] - 6:22, 6:24, 41:15, 118:2, 119:3

**follow-up** [2] - 6:22, 6:24

**following** [4] - 43:17, 86:18, 124:16, 156:2

**follows** [1] - 42:20

**FOR** [1] - 1:1

**forbids** [1] - 82:16

**foregoing** [1] - 163:4

**forget** [1] - 121:12

**form** [2] - 159:17, 159:25

**formal** [1] - 9:13

**format** [1] - 11:3

**former** [2] - 96:1, 148:21

**forms** [10] - 13:8, 31:23, 32:5, 32:9, 33:20, 36:15, 48:11, 53:25, 108:16, 108:18

**forth** [7] - 4:14, 13:7, 34:12, 37:16, 108:16, 108:18, 108:25

**forums** [1] - 65:19, 134:22, 134:24

**forward** [4] - 11:1,

103:11, 115:3, 156:10

**forwarded** [5] - 7:21, 8:20, 132:5, 142:22, 142:23

**forwarding** [3] - 114:15, 114:18, 114:21

**four** [2] - 24:2, 75:19

**frame** [4] - 42:18, 118:1, 136:2, 143:3

**frames** [1] - 45:15

**free** [1] - 158:21

**frequently** [1] - 65:13

**Friedman** [1] - 161:18

**from..** [1] - 17:18

**front** [2] - 5:20, 52:1

**frustration** [1] - 18:4

**full** [5] - 44:24, 80:21, 84:16, 118:2, 163:5

**full-time** [1] - 80:21

**functions** [1] - 71:21, 71:23

**funding** [2] - 46:4, 47:4

**fundraising** [3] - 87:15, 89:18, 97:23

**funds** [25] - 8:25, 9:2, 16:19, 58:10, 77:13, 77:19, 83:2, 83:3, 85:22, 87:24, 93:9, 93:22, 94:1, 129:22, 129:25, 137:8, 137:12, 137:15, 138:4, 142:7, 142:15, 145:9, 145:24, 150:19, 150:20

**funnel** [5] - 49:1, 49:8, 67:23, 68:1

**fuzzy** [1] - 92:14

## G

**gaff** [4] - 95:1, 95:12, 95:15, 95:22

**gaffs** [6] - 94:17, 95:5, 95:19, 99:25, 100:3

**gather** [1] - 37:14

**gathering** [5] - 50:8, 50:9, 153:25

**GEE** [87] - 1:13, 3:19, 42:12, 59:22, 59:24, 61:1, 61:14, 62:22, 69:20, 73:3, 73:12, 74:12, 74:22, 76:9, 86:3, 86:12, 87:11, 87:20, 88:6, 88:10, 90:12, 90:14, 90:17, 90:19, 91:12, 92:2,

96:16, 98:6, 101:11, 101:14, 102:2, 102:12, 106:15, 109:6, 109:12, 110:7, 112:16, 112:18, 113:8, 113:10, 113:16, 113:23, 114:4, 114:23, 116:7, 116:18, 117:14, 117:22, 118:20, 119:2, 120:20, 121:7, 121:9, 124:2, 124:8, 124:22, 125:22, 126:5, 126:8, 127:19, 128:8, 128:11, 128:19, 129:4, 130:5, 140:14, 141:1, 141:9, 142:18, 142:24, 143:5, 144:21, 146:8, 147:16, 147:20, 148:19, 149:7, 149:14, 150:2, 155:15, 156:4, 156:15, 156:18, 157:1, 160:5, 160:17, 162:2

**gee** [2] - 88:4, 161:7

**Gee)..........................
.......... [1] - 2:4

**general** [2] - 55:9, 74:1, 128:4

**generally** [1] - 125:14

**generate** [1] - 9:24

**generated** [1] - 11:8

**gentleman** [2] - 7:8, 84:3

**Georgia** [9] - 9:17, 29:20, 39:9, 39:10, 71:18, 96:1, 107:6, 121:20, 121:23, 125:25

**get-to-know** [1] - 126:1

**ghost** [5] - 145:21, 146:3, 150:23, 151:3, 151:6

**given** [7] - 49:4, 49:6, 59:5, 59:6, 70:6, 71:10, 86:15

**goods** [1] - 78:1

**GOP** [3] - 127:2, 127:7, 127:13

**GORDON** [100] - 1:17, 1:18, 3:6, 3:11, 3:15, 4:6, 4:11, 4:13, 4:16, 4:19, 5:3, 7:1, 7:19, 8:1, 12:7, 13:3,

13:11, 13:21, 15:7,
15:13, 15:23, 17:8,
17:15, 18:18, 19:10,
19:15, 20:3, 20:23,
21:11, 25:7, 25:25,
26:7, 27:16, 29:9,
31:9, 32:23, 39:20,
41:6, 42:13, 43:19,
45:25, 53:1, 53:3,
53:20, 54:8, 57:5,
59:8, 73:16, 74:24,
75:23, 75:25, 86:6,
86:9, 86:11, 86:13,
86:15, 86:20, 86:22,
86:25, 87:2, 87:7,
87:18, 90:13, 90:15,
90:18, 101:25,
109:24, 114:3,
114:5, 120:19,
121:6, 121:8, 141:8,
144:15, 149:13,
150:24, 155:18,
155:21, 155:25,
156:21, 157:14,
157:18, 158:3,
158:7, 158:11,
158:16, 158:19,
159:1, 159:10,
159:16, 159:20,
160:3, 160:19,
160:24, 161:3,
161:6, 161:21,
162:7, 162:12,
162:19
**Gordon** [1] - 123:14
**Gordon)**.....................
.............. [1] - 2:4
**government** [9] - 3:14,
78:16, 78:19, 88:17,
90:1, 155:25,
156:13, 161:25
**Government's** [11] -
7:1, 15:8, 17:8, 20:4,
32:24, 61:1, 73:12,
90:13, 90:20, 90:21,
121:4
**government's** [4] -
11:25, 87:5, 90:18,
159:3
**government-paid-for**
[1] - 78:19
**grasp** [1] - 128:14
**Gray** [1] - 7:8
**gray** [3] - 7:9, 7:13,
143:12
**Griffanti** [11] - 83:15,
83:19, 88:19, 91:2,
91:24, 112:23,
127:8, 127:12,
129:1, 129:5, 129:22

**Griffanti's** [2] - 114:15,
115:2
**ground** [1] - 69:11
**group** [4] - 34:2, 34:4,
35:11, 122:17
**guess** [19] - 61:10,
62:8, 62:9, 62:10,
62:14, 63:8, 77:24,
78:3, 84:10, 93:8,
98:25, 109:15,
115:12, 116:24,
117:2, 130:8,
137:13, 138:21,
140:18
**guy** [4] - 7:24, 112:5,
115:21
**Guy** [3] - 111:4,
111:21, 115:23
**guys** [2] - 75:5,
119:18, 135:15

# H

**half** [13] - 4:8, 8:2,
18:24, 37:20, 44:5,
45:11, 55:23, 76:13,
81:22, 81:25, 94:10,
156:18, 156:25
**Hall** [1] - 133:4
**hallway** [1] - 119:18
**hand** [3] - 12:2, 12:3,
14:6
**handled** [1] - 33:19
**handwriting** [1] -
113:12
**hang** [1] - 47:10
**Hans** [10] - 108:1,
108:2, 108:7,
108:12, 108:19,
108:20, 109:2,
111:4, 111:20,
115:23
**happy** [3] - 10:24,
133:23, 147:20
**hard** [1] - 19:3
**Hardman** [22] - 6:18,
7:21, 9:14, 39:6,
49:10, 49:24, 50:1,
50:6, 50:18, 50:23,
51:21, 55:13, 83:22,
92:17, 93:18, 134:6,
135:17, 138:22,
140:7, 140:16,
153:17, 154:12
**Hardman's** [2] - 51:13,
135:25
**Hayes** [5] - 33:3,
34:18, 88:14, 89:17,
89:22
**head** [1] - 45:15

**hear** [6] - 18:14, 21:14,
38:8, 44:9, 129:16,
161:25
**heard** [18] - 5:9, 11:7,
34:21, 35:23, 57:16,
57:19, 58:2, 60:5,
60:11, 67:18,
127:10, 127:12,
139:2, 142:5,
153:24, 154:3,
154:4, 154:15
**hearing** [4] - 5:19,
86:19, 156:3, 162:23
**heavily** [1] - 48:18
**heavy** [2] - 126:10,
126:14
**hectic** [1] - 45:16
**Heenan** [9] - 32:21,
33:3, 34:21, 35:13,
53:8, 53:16, 53:24,
54:3
**held** [3] - 86:18,
121:23, 156:2
**HELD** [1] - 1:10
**hello** [1] - 60:1
**help** [4] - 22:6, 58:9,
66:17, 66:21
**helped** [6] - 126:16,
126:19, 126:22,
127:2, 127:7, 140:16
**helpful** [1] - 10:5
**helping** [1] - 35:19
**hereby** [1] - 163:3
**high** [2] - 31:18, 33:5
**highlighted** [1] - 16:9
**Hill** [7] - 66:3, 66:23,
66:25, 67:2, 76:11,
84:9, 84:21
**himself** [2] - 9:4, 97:10
**hinge** [1] - 6:10
**hire** [4] - 58:4, 58:7,
83:3, 138:11
**hired** [15] - 46:13,
47:15, 48:8, 58:8,
58:13, 60:21, 61:5,
61:8, 85:23, 87:13,
99:14, 100:18,
108:21, 138:12,
146:23
**hiring** [8] - 80:25,
87:4, 87:13, 101:4,
101:10, 101:12,
101:20, 102:8
**hit** [2] - 30:21, 30:22
**hold** [1] - 79:3
**home** [2] - 45:17,
124:5
**honestly** [1] - 46:18
**Honor** [15] - 59:22,
76:9, 86:6, 87:11,

87:20, 87:22,
147:16, 155:15,
156:4, 156:16,
157:2, 158:3, 161:6,
162:2, 162:21
**HONORABLE** [1] -
1:10
**horizon** [1] - 99:9
**hose** [2] - 127:17,
129:13
**hour** [9] - 4:8, 18:2,
18:24, 60:3, 76:16,
156:18, 156:25,
157:3
**hours** [8] - 19:1,
101:16, 101:20,
102:5, 102:8,
156:19, 156:21,
156:23
**House** [33] - 16:21,
32:8, 42:22, 42:24,
43:5, 66:4, 76:21,
76:25, 77:3, 77:4,
77:7, 77:9, 77:20,
77:25, 78:13, 79:3,
79:5, 79:8, 79:10,
82:22, 82:24, 104:4,
135:18, 135:20,
136:1, 136:20,
137:7, 137:11,
138:1, 138:3,
138:16, 145:10
**humanize** [1] - 159:5
**hung** [1] - 23:17
**hurt** [2] - 95:1, 95:15

# I

**idea** [5] - 18:14, 51:20,
58:1, 75:13, 140:22
**Ideally** [1] - 128:13
**ignoring** [5] - 10:3,
28:21, 36:1, 54:5,
55:16
**immediately** [1] - 93:6
**impeach** [4] - 87:17,
87:18, 87:19, 87:21
**impeaching** [1] -
87:16
**importance** [4] -
31:17, 33:5, 49:8,
67:24
**important** [4] - 97:23,
126:13, 126:25,
127:4
**impression** [2] -
35:20, 36:7
**impromptu** [2] - 37:3,
44:2
**improper** [1] - 150:21

**improve** [1] - 58:9
**IN** [1] - 1:1
**inaccurate** [1] - 147:7
**incidental** [1] - 79:22
**include** [5] - 36:3,
36:8, 36:13, 36:18,
157:23
**included** [4] - 34:22,
78:1, 78:21, 131:7
**includes** [1] - 79:8
**including** [2] - 109:7,
128:1
**increase** [1] - 4:9
**incumbents** [1] -
107:24
**indeed** [1] - 35:10
**indicated** [3] - 14:12,
31:24, 51:8
**indictment** [1] - 87:8
**indifferent** [1] - 133:25
**individually** [2] -
68:21, 117:24
**indulgence** [3] -
113:8, 113:10, 161:3
**information** [20] -
11:23, 13:16, 20:1,
21:2, 27:14, 28:10,
29:21, 32:14, 32:20,
35:11, 35:25, 36:2,
36:14, 37:4, 38:20,
38:22, 136:21,
148:16, 148:20,
148:24
**informed** [3] - 33:15,
40:21, 133:8
**informing** [1] - 31:21
**initial** [7] - 5:25, 15:3,
37:23, 38:20,
101:20, 127:21,
127:23
**initiation** [1] - 15:11
**input** [2] - 128:1,
130:19
**inquire** [1] - 155:24
**inquiries** [5] - 9:9,
9:13, 9:15, 11:9,
142:19
**inquiring** [1] - 155:12
**inquiry** [10] - 8:3, 8:23,
8:24, 9:6, 143:24,
145:6, 145:8,
148:11, 148:15,
149:4
**inside** [1] - 78:22
**instance** [1] - 86:1
**instead** [2] - 3:15,
151:10
**instruct** [1] - 161:15
**instruction** [4] -
157:16, 157:23,

158:1, 159:5
**instructions** [9] -
157:5, 157:6, 157:9,
157:12, 157:21,
158:21, 159:2,
159:5, 160:14
**INTEGRITY** [1] - 1:14
**intentionally** [1] -
58:23
**interacted** [2] -
148:22, 148:25
**interaction** [3] - 32:10,
32:15, 35:21
**interactions** [1] - 35:9
**interest** [1] - 48:16
**interested** [5] - 42:2,
42:3, 141:3, 149:3,
150:4
**intern** [1] - 152:9
**interrupted** [1] - 46:7
**Interview** [1] - 41:11
**interview** [44] - 6:7,
7:16, 35:12, 39:16,
39:17, 40:19, 41:3,
41:10, 41:23, 42:6,
43:7, 43:16, 44:14,
44:16, 45:24, 46:24,
49:9, 49:19, 51:7,
51:22, 55:20, 60:2,
60:5, 60:23, 61:3,
61:11, 62:5, 62:12,
62:19, 64:16, 64:21,
92:18, 92:19,
100:14, 109:13,
116:23, 120:15,
121:15, 123:24,
124:6, 125:15,
126:1, 141:7, 151:23
**interviewed** [12] -
39:2, 39:5, 39:7,
39:8, 39:10, 39:12,
40:13, 49:12, 51:21,
92:18, 99:15, 119:25
**interviewing** [1] -
41:14
**interviews** [11] -
38:17, 39:1, 40:23,
53:11, 79:23, 81:4,
123:5, 123:7,
123:10, 125:16,
126:13
**intimidate** [1] - 82:18
**intro** [1] - 110:23
**introduce** [1] - 111:4
**introduced** [2] - 73:3,
74:13
**investigating** [5] -
16:25, 18:17, 30:9,
141:17, 141:22
**investigation** [12] -

11:8, 12:21, 16:2,
22:11, 41:19, 52:18,
54:10, 57:14, 57:18,
58:17, 140:4, 144:19
**investigations** [1] -
18:16
**investigators** [1] -
47:12
**invitation** [2] - 61:3,
118:4
**invite** [2] - 102:18,
102:19
**invited** [12] - 60:23,
61:11, 62:6, 62:20,
102:16, 117:19,
117:21, 118:7,
118:10, 120:1,
120:4, 129:1
**inviting** [1] - 101:19,
101:21, 102:9,
122:24, 131:3
**invoices** [5] - 38:1,
38:5, 103:6, 103:7,
103:8
**involve** [1] - 50:17
**involved** [10] - 42:11,
42:14, 46:21, 48:18,
48:24, 50:25, 109:7,
131:17, 131:19,
159:21
**involving** [1] - 161:17
**is..** [1] - 28:6
**issue** [3] - 4:1, 22:3,
141:25
**issues** [4] - 66:17,
122:18, 131:13,
157:10
**item** [5] - 12:25, 43:14,
45:23, 70:1, 131:7
**items** [4] - 9:16, 14:12,
30:23, 35:19
**itself** [2] - 20:13, 57:18

**J**

**January** [1] - 134:20
**January/early** [1] -
45:16
**Jason** [3] - 72:19,
99:4, 115:19
**Jessica** [2] - 33:3,
88:13
**job** [14] - 49:7, 63:3,
80:17, 80:21, 81:4,
92:8, 92:11, 92:22,
100:24, 101:2,
115:2, 127:16,
142:3, 143:21
**jobs** [2] - 84:21, 84:24
**joining** [2] - 109:2,

115:11
**joke** [2] - 132:10,
134:10
**joking** [5] - 132:13,
132:16, 132:17,
133:24, 134:11
**Jordan** [12] - 39:10,
69:10, 69:14, 69:16,
70:1, 70:8, 70:18,
71:6, 72:3, 82:4,
82:5, 130:15
**Jordan's** [2] - 72:4,
118:3
**Josh** [11] - 33:4,
34:22, 39:11, 72:16,
116:3, 130:14,
151:15, 151:18,
152:5, 152:8, 152:12
**JUDGE** [1] - 1:10
**Judge** [5] - 73:16,
160:4, 161:18,
162:7, 162:19
**July** [10] - 5:10, 28:25,
53:8, 54:2, 97:2,
135:5, 136:2, 138:9,
138:15, 139:5
**June** [23] - 29:5,
29:12, 29:13, 31:14,
33:5, 37:11, 37:14,
37:20, 39:3, 39:18,
39:23, 40:2, 41:9,
50:13, 54:2, 55:18,
100:22, 101:1,
101:24, 141:21,
149:8
**juror** [2] - 4:1, 160:15
**Juror** [3] - 4:21, 155:1,
155:2
**JURY** [1] - 1:9
**jury** [8] - 4:20, 59:14,
59:19, 86:19, 155:9,
156:3, 160:1, 160:2
**JUSTICE** [1] - 1:14
**Justin** [1] - 7:8

**K**

**Kaiser** [7] - 108:2,
108:7, 108:12,
109:2, 111:4, 115:23
**keep** [7] - 4:23, 19:3,
27:18, 106:16,
121:10, 131:3, 155:3
**kept** [2] - 90:9, 106:22
**key** [1] - 121:19
**Kilgore** [9] - 32:12,
33:4, 34:17, 73:7,
73:19, 89:7, 152:15,
152:17, 152:21
**kind** [7] - 5:19, 5:24,

128:4, 128:5,
139:10, 139:13,
144:13
**kinds** [4] - 63:16,
68:23, 72:9, 131:13
**Kingston** [1] - 123:24
**knowledge** [1] - 35:9
**known** [1] - 65:25

**L**

**lack** [1] - 146:3
**language** [4] - 15:13,
15:14, 16:24, 36:25
**last** [13] - 9:23, 28:8,
55:18, 56:19, 57:21,
75:10, 75:13,
104:11, 128:12,
133:5, 133:13,
134:1, 134:4
**last-minute** [1] - 75:13
**late** [6] - 4:2, 6:7,
41:10, 45:16, 157:7,
157:8
**latter** [2] - 50:8, 76:13
**law** [8] - 16:21, 77:22,
85:2, 85:4, 87:21,
145:10, 161:21,
162:5
**lawyer** [6] - 19:23,
22:6, 25:23, 27:25,
28:14, 43:21
**lawyers** [1] - 42:9
**lead** [1] - 144:19
**leadership** [1] - 66:16
**leading** [1] - 132:1
**learn** [1] - 39:15
**learned** [3] - 12:20,
12:23, 65:18
**least** [3] - 16:17,
73:21, 133:16
**leave** [8] - 32:1, 40:9,
66:13, 81:10, 81:12,
81:14, 92:7, 162:10
**leaving** [2] - 77:2,
98:23
**left** [6] - 4:7, 5:6, 12:2,
12:3, 102:15, 133:13
**left-hand** [2] - 12:2,
12:3
**legal** [5] - 25:18,
25:20, 27:11, 27:13,
157:10
**legs** [1] - 9:22
**lESLIE** [1] - 1:17
**leslie.mcadoo@**
**mcadoolaw.com** [1]
- 1:20
**less** [5] - 101:16,
101:20, 102:5,

102:8, 156:22
**letter** [30] - 15:24,
16:4, 20:5, 32:10,
33:6, 33:21, 34:20,
36:22, 37:4, 144:20,
144:22, 145:2,
146:10, 146:13,
147:23, 149:8,
149:11, 149:16,
149:23, 149:25,
150:3, 150:15,
151:14, 151:15,
151:20, 152:13,
152:15, 152:21,
152:25
**letter's** [1] - 15:20
**letters** [4] - 31:24,
37:10, 141:20,
151:25
**letting** [1] - 28:13,
39:24, 41:3, 54:24
**level** [4] - 31:17,
47:17, 48:7, 48:16
**levels** [1] - 63:16
**lie** [4] - 51:11, 54:3,
58:13
**lied** [2] - 52:4, 103:22
**likelihood** [1] - 156:10
**likely** [1] - 156:6
**limited** [3] - 79:12,
79:18, 79:21
**Line** [25] - 13:25,
14:15, 23:11, 23:20,
24:14, 24:17, 27:3,
40:5, 40:10, 40:24,
42:13, 42:20, 43:20,
45:25, 56:21, 110:8,
110:9, 110:11,
120:12, 120:18,
120:20, 121:3,
121:5, 121:9
**line** [6] - 24:14, 32:9,
40:10, 42:12,
120:19, 145:1
**lines** [1] - 137:21
**Lines** [4] - 23:2, 24:25,
26:1, 57:22
**Lions** [1] - 71:25
**LISA** [1] - 163:3
**Lisa** [1] - 1:21
**list** [9] - 109:7, 116:5,
116:8, 116:11,
117:17, 124:25,
131:5, 132:4, 151:24
**listen** [1] - 105:20
**lists** [1] - 117:16
**literally** [2] - 44:4,
47:17
**location** [4] - 118:3,
118:25, 119:3, 119:6

**locked** [1] - 118:22
**log** [10] - 13:22, 19:2, 22:14, 25:25, 26:25, 37:9, 40:1, 55:17, 57:20
**look** [89] - 7:1, 7:6, 7:19, 8:1, 11:13, 12:7, 12:9, 13:3, 13:11, 13:25, 14:5, 15:7, 15:13, 15:22, 15:23, 17:8, 17:15, 18:18, 19:2, 19:5, 19:15, 19:17, 20:3, 21:9, 21:11, 21:15, 25:6, 26:7, 27:3, 27:16, 27:20, 29:7, 30:3, 31:9, 32:23, 36:20, 37:9, 39:20, 40:1, 40:5, 41:6, 41:7, 53:1, 53:3, 53:4, 53:5, 53:20, 54:8, 57:5, 65:21, 66:22, 69:6, 69:19, 70:8, 71:17, 74:12, 89:11, 90:12, 91:10, 91:21, 92:2, 100:20, 100:21, 101:1, 102:12, 109:1, 110:8, 113:24, 114:6, 114:7, 115:10, 115:13, 115:18, 116:13, 123:23, 124:8, 125:22, 127:19, 129:4, 139:9, 140:14, 146:5, 148:11, 149:7, 156:10, 157:21, 158:13, 162:17
**looked** [18] - 17:24, 20:9, 20:15, 28:10, 30:2, 55:18, 56:19, 69:21, 84:8, 84:11, 84:12, 84:14, 84:17, 84:18, 91:25, 115:22, 146:11, 148:3
**looking** [20] - 11:16, 15:9, 17:17, 26:11, 31:5, 39:21, 53:2, 53:6, 54:17, 59:6, 73:16, 99:6, 117:16, 141:25, 145:16, 145:21, 151:5, 151:7, 151:9, 158:22
**looks** [4] - 63:1, 64:16, 91:1, 127:25
**loop** [1] - 131:25
**looped** [1] - 131:23
**lost** [1] - 97:10

**love** [1] - 3:19
**lower** [1] - 57:7
**LTD** [2] - 16:14, 16:17
**lying** [1] - 139:2

**M**

**Mac** [11] - 96:1, 96:4, 96:7, 96:13, 96:25, 97:20, 98:2, 98:13, 99:21, 100:10, 101:5
**mail** [4] - 23:17, 23:20, 40:8, 61:6
**mail.house.gov** [3] - 88:14, 88:16, 88:19
**mails** [2] - 14:9, 23:21
**main** [2] - 63:2, 96:25
**maintained** [1] - 38:4
**major** [2] - 95:4, 122:18
**majority** [3] - 153:5, 153:8, 153:11
**maker** [1] - 48:5
**man** [2] - 3:4, 35:16
**manage** [1] - 61:6
**manager** [6] - 69:4, 69:8, 69:11, 70:6, 71:10, 152:6
**mandatory** [1] - 76:11
**manual** [4] - 76:17, 76:24, 77:2, 82:16
**March** [26] - 1:4, 5:6, 5:13, 7:5, 7:23, 10:14, 42:19, 69:22, 70:2, 99:19, 100:2, 100:5, 101:5, 134:14, 134:19, 134:20, 139:8, 139:10, 139:11, 141:12, 143:3, 144:3, 144:7, 144:19, 150:7, 163:8
**Mark** [2] - 159:15, 159:24
**mark** [2] - 121:4, 121:7
**marked** [1] - 11:12, 73:2, 86:4, 86:22
**materials** [1] - 162:10
**matter** [2] - 12:14, 162:5
**McADOO** [2] - 1:17, 1:18
**mean** [18] - 3:13, 29:6, 35:3, 43:25, 46:17, 82:12, 85:24, 95:18, 105:16, 111:23, 125:15, 157:1, 158:9, 158:14, 159:10, 160:7, 161:16, 161:25

**meaning** [2] - 57:17, 144:13
**means** [3] - 60:13, 144:14, 144:16
**meant** [3] - 72:7, 125:17, 145:15
**mechanical** [1] - 1:24
**media** [22] - 5:12, 5:24, 6:2, 6:22, 6:24, 9:9, 9:13, 9:19, 9:23, 11:8, 17:3, 42:18, 64:16, 64:21, 64:25, 65:5, 80:2, 108:22, 109:9, 111:12, 112:5, 115:16
**meeting** [26] - 5:18, 6:8, 10:14, 38:11, 43:22, 44:2, 44:8, 45:4, 91:7, 117:6, 117:20, 117:24, 118:13, 118:22, 119:11, 119:12, 120:1, 120:5, 120:7, 120:22, 121:20, 121:22, 121:25, 122:25, 128:21, 129:6
**meetings** [2] - 78:21, 79:2
**meets** [1] - 128:14
**member's** [1] - 79:23
**members** [12] - 8:7, 8:11, 10:6, 31:8, 31:22, 31:23, 37:13, 77:17, 82:17, 143:7, 143:10, 148:21
**Members'** [2] - 16:20, 145:9
**memory** [1] - 119:18
**mention** [2] - 20:17, 20:21, 60:13
**mentioned** [5] - 18:6, 23:9, 48:1, 115:6, 122:5
**mentions** [1] - 20:19
**Meredith** [14] - 83:15, 83:19, 88:19, 89:10, 89:12, 91:2, 92:8, 112:4, 112:8, 112:23, 113:19, 114:15, 115:2, 129:22
**Meredith's** [1] - 63:3
**message** [4] - 10:17, 21:20, 40:9, 94:14
**messaging** [15] - 58:9, 63:23, 64:8, 99:13, 99:14, 100:14, 109:8, 111:11, 112:5, 115:15,

116:11, 116:20, 122:16, 122:23, 131:7
**met** [3] - 36:6, 84:3, 96:23
**MIA** [1] - 91:17
**Michael** [1] - 133:4
**Michelle** [1] - 161:18
**micromanaging** [1] - 48:16
**mid** [1] - 42:19
**mid-20s** [2] - 83:19, 83:22
**mid-March** [1] - 42:19
**middle** [1] - 27:17
**might** [6] - 19:23, 22:4, 56:4, 100:7, 101:5, 134:8
**Miller** [7] - 32:11, 36:11, 36:12, 72:19, 99:4, 99:6, 115:19
**Milli** [3] - 161:11, 161:12, 162:15
**million** [1] - 97:4
**mind** [3] - 19:3, 48:17, 121:12
**mine** [2] - 90:16, 92:21
**minute** [4] - 26:17, 75:13, 76:2, 134:4
**minutes** [19] - 14:18, 22:22, 22:24, 24:2, 24:19, 27:9, 40:11, 40:17, 41:2, 49:10, 56:2, 56:23, 105:7, 114:6, 155:15, 155:19, 155:20, 157:3
**mis** [1] - 150:18
**misheard** [3] - 104:23, 105:25, 106:2
**miss** [1] - 133:5
**missed** [2] - 23:22, 40:11
**missing** [1] - 134:1
**misunderstood** [2] - 104:11, 105:13
**misused** [2] - 16:19, 145:9
**mixed** [1] - 45:15
**mobile** [1] - 88:17
**moment** [1] - 133:13
**Monday** [4] - 33:5, 39:22, 155:5, 161:7
**money** [20] - 17:4, 41:22, 63:21, 64:10, 67:13, 72:14, 73:20, 73:25, 74:2, 74:4,

78:16, 89:2, 90:9, 97:6, 136:14, 136:16, 137:2, 145:17, 150:14
**month** [4] - 22:1, 22:9, 48:11, 70:11
**months** [6] - 55:23, 122:6, 134:16, 134:18, 149:12, 149:16
**MOREIRA** [1] - 163:3
**Moreira** [2] - 1:21, 163:10
**Morgan** [40] - 12:13, 13:6, 13:9, 13:15, 15:6, 15:17, 17:25, 19:18, 27:22, 28:9, 30:2, 31:16, 32:2, 32:19, 33:10, 33:12, 33:15, 34:13, 35:3, 36:21, 37:22, 38:9, 38:14, 38:24, 39:9, 41:9, 41:12, 41:14, 44:19, 53:7, 53:10, 53:12, 53:22, 53:23, 53:25, 149:12, 149:17, 151:24, 152:2
**morning** [10] - 39:17, 39:23, 39:25, 40:8, 40:14, 41:15, 52:8, 55:20, 89:20, 117:23
**most** [3] - 23:21, 157:8, 162:13
**mostly** [1] - 9:21
**motive** [1] - 87:23
**move** [5] - 11:1, 73:12, 74:22, 88:10, 147:20
**moving** [1] - 125:19
**MR** [89] - 3:10, 3:19, 42:12, 59:22, 59:24, 61:1, 61:14, 62:22, 69:20, 73:3, 73:12, 74:12, 74:22, 76:9, 86:3, 86:12, 87:11, 87:20, 88:4, 88:6, 88:10, 90:12, 90:14, 90:17, 90:19, 91:12, 92:2, 96:16, 98:6, 101:11, 101:14, 102:2, 102:12, 106:15, 109:6, 109:12, 110:7, 112:16, 112:18, 113:8, 113:10, 113:16, 113:23, 114:4, 114:23, 116:7, 116:18, 117:14, 117:22, 118:20, 119:2,

120:20, 121:7,
121:9, 124:2, 124:8,
124:22, 125:22,
126:5, 126:8,
127:19, 128:8,
128:11, 128:19,
129:4, 130:5,
140:14, 141:1,
141:9, 142:18,
142:24, 143:5,
144:21, 146:8,
147:16, 147:20,
148:19, 149:7,
149:14, 150:2,
155:15, 156:4,
156:15, 156:18,
157:1, 160:5,
160:17, 162:2,
162:21
**MRA** [25] - 8:25, 58:10,
77:13, 77:19, 78:2,
78:8, 83:2, 83:3,
85:22, 87:24, 90:4,
90:9, 93:9, 93:22,
94:1, 129:22,
129:25, 137:8,
137:12, 137:15,
138:4, 141:22,
142:7, 142:15,
145:17
**MS** [98] - 3:6, 3:11,
3:15, 4:6, 4:11, 4:13,
4:16, 4:19, 5:3, 7:1,
7:19, 8:1, 12:7, 13:3,
13:11, 13:21, 15:7,
15:13, 15:23, 17:8,
17:15, 18:18, 19:10,
19:15, 20:3, 20:23,
21:11, 25:7, 25:25,
26:7, 27:16, 29:9,
31:9, 32:23, 39:20,
41:6, 42:13, 43:19,
45:25, 53:1, 53:3,
53:20, 54:8, 57:5,
59:8, 73:16, 74:24,
75:23, 75:25, 86:6,
86:9, 86:11, 86:13,
86:15, 86:20, 86:22,
86:25, 87:2, 87:7,
87:18, 90:13, 90:15,
90:18, 101:25,
109:24, 114:3,
114:5, 120:19,
121:6, 121:8, 141:8,
144:15, 149:13,
150:24, 155:18,
155:21, 155:25,
156:21, 157:14,
157:18, 158:3,
158:7, 158:11,
158:16, 158:19,

159:1, 159:10,
159:16, 159:20,
160:3, 160:19,
160:24, 161:3,
161:6, 161:21,
162:7, 162:12,
162:19
**MULRYNE** [2] - 1:13,
162:21
**Mulryne** [1] - 17:10
**multipages** [1] - 114:9
**multiple** [5] - 115:7,
125:5, 126:16,
160:17, 160:18
**multitude** [2] - 122:14,
122:17
**multitudes** [1] -
122:20
**must** [2] - 40:8, 104:10

# N

**nail** [1] - 118:24
**name** [6] - 30:21, 67:9,
67:12, 67:20, 106:3,
106:5
**name's** [2] - 67:7,
67:16, 67:17
**named** [1] - 7:8
**names** [2] - 148:20,
148:24
**narrow** [1] - 74:9
**national** [2] - 94:20,
94:23
**nationally** [1] - 136:10
**nature** [5] - 15:15,
16:10, 51:17, 78:22,
86:20
**near** [3] - 3:12, 42:21,
118:1
**nearly** [2] - 70:7, 71:11
**necessarily** [1] - 52:17
**need** [19] - 35:10,
35:12, 62:14, 92:16,
109:16, 118:24,
125:10, 131:6,
146:20, 155:12,
155:13, 155:24,
157:17, 158:9,
158:14, 158:17,
159:9, 160:23, 162:9
**needed** [2] - 41:16,
74:2
**needing** [1] - 72:16
**needs** [2] - 25:18, 37:4
**negotiate** [1] - 108:11
**negotiated** [2] - 108:2,
108:5
**neighborhood** [1] -
97:8

**Nelson** [2] - 108:21,
115:19
**net** [1] - 97:3
**neutral** [1] - 122:11
**never** [14] - 6:6, 36:6,
46:10, 46:11, 46:17,
48:8, 69:3, 103:21,
103:24, 104:6,
121:12, 135:25,
138:3, 152:8
**new** [3] - 94:10, 94:11,
110:23
**New** [1] - 1:15
**news** [1] - 43:1
**newspaper** [1] - 5:9
**next** [25] - 10:7, 13:4,
23:18, 23:24, 24:14,
27:7, 29:24, 39:7,
40:10, 40:23, 44:25,
53:13, 55:22, 55:24,
92:13, 116:8,
116:18, 117:25,
124:24, 126:8,
129:19, 145:1,
147:24
**nice** [1] - 74:6
**nine** [3] - 23:5, 56:2
**no-show** [2] - 142:3,
142:5
**nobody** [1] - 48:8
**none** [1] - 35:5
**nonstaff** [1] - 31:23
**noon** [2] - 89:11,
158:18
**noontime** [1] - 118:1
**Norton** [12] - 39:6,
50:1, 52:2, 103:22,
103:25, 104:19,
104:24, 105:8,
105:17, 106:6,
106:9, 119:14
**Norton's** [1] - 50:10
**note** [3] - 91:17, 155:1,
157:25
**notes** [1] - 163:5
**nothing** [2] - 44:18,
59:8
**NRCC** [1] - 66:14
**number** [3] - 66:11,
94:11, 110:19
**numbers** [6] - 12:1,
12:2, 74:20, 75:2,
75:6, 110:14
**numerous** [4] -
125:14, 125:15,
125:16, 125:20
**NW** [4] - 1:15, 1:18,
1:22, 163:12

# O

**O'Donnell** [146] - 5:10,
5:22, 5:23, 7:14,
7:16, 7:17, 7:20,
8:18, 8:20, 8:24, 9:3,
9:7, 10:8, 10:13,
11:4, 11:18, 13:23,
14:3, 14:20, 16:14,
16:17, 17:1, 17:5,
17:19, 18:3, 18:7,
18:10, 18:13, 19:6,
21:2, 21:12, 22:10,
22:18, 22:24, 23:12,
24:4, 24:11, 24:16,
25:1, 25:4, 25:9,
25:16, 26:15, 26:18,
26:22, 27:4, 27:12,
29:22, 30:11, 31:6,
32:11, 32:15, 32:18,
33:18, 34:19, 35:9,
35:21, 36:7, 37:18,
38:1, 39:12, 39:16,
39:22, 40:5, 41:1,
41:21, 43:23, 47:7,
47:18, 47:23, 54:19,
54:22, 55:5, 55:11,
55:19, 56:22, 57:10,
58:4, 58:7, 58:8,
58:10, 58:14, 61:5,
85:23, 87:13, 99:13,
100:18, 101:2,
103:2, 105:2,
106:22, 109:8,
111:11, 115:8,
115:15, 116:10,
116:19, 117:16,
117:19, 118:4,
119:4, 120:1, 120:4,
121:17, 122:10,
122:13, 123:4,
123:6, 123:9,
123:16, 124:3,
126:16, 127:12,
128:1, 129:10,
129:25, 130:4,
130:6, 131:15,
131:19, 134:1,
134:13, 134:24,
135:3, 135:8,
135:21, 140:1,
140:19, 141:3,
141:17, 142:3,
142:7, 142:14,
142:21, 143:17,
146:6, 146:13,
147:1, 148:22,
148:25, 150:18,
150:21, 151:8,
153:6, 153:9, 153:12
**O'Donnell's** [20] -

5:13, 26:4, 30:20,
39:24, 42:23, 60:9,
87:4, 96:22, 101:4,
106:16, 109:19,
112:11, 112:19,
135:11, 140:12,
144:2, 150:4,
150:16, 152:12,
152:22
**objecting** [1] - 158:3
**objection** [7] - 3:3,
73:13, 73:15, 73:17,
74:23, 74:24, 75:25,
88:1, 88:12, 101:25,
109:24, 141:8,
144:15, 149:13,
150:24, 157:25,
162:2
**Objection** [1] - 75:23
**objection's** [1] - 88:3
**objections** [1] - 88:11
**obstruct** [1] - 58:16
**obtain** [1] - 37:22
**obviously** [3] - 111:23,
158:9, 161:6
**occasions** [4] - 85:8,
85:10, 125:11,
161:16
**occur** [1] - 80:2
**occurred** [4] - 47:21,
47:22, 107:1, 119:11
**occurring** [3] - 71:19,
87:14, 106:24
**OCE** [90] - 11:8, 12:14,
12:21, 12:24, 14:11,
14:23, 16:1, 16:4,
16:10, 16:25, 21:3,
21:25, 27:22, 28:18,
29:3, 30:9, 32:6,
34:25, 35:3, 37:11,
38:19, 39:9, 39:24,
39:25, 40:19, 41:19,
42:6, 42:9, 43:9,
43:13, 43:16, 43:21,
44:13, 44:16, 45:4,
45:7, 45:23, 46:24,
47:12, 49:10, 49:12,
49:19, 49:23, 51:7,
51:14, 51:21, 52:13,
52:19, 53:7, 54:10,
55:10, 55:20, 56:5,
57:2, 58:13, 58:19,
60:2, 62:4, 109:13,
109:18, 110:3,
110:8, 112:17,
115:16, 116:22,
116:25, 117:4,
119:22, 119:25,
120:15, 121:4,
121:6, 121:7, 122:3,

140:4, 141:6,
141:11, 141:20,
141:21, 144:18,
144:19, 148:11,
149:7, 150:1, 150:3,
151:22, 152:11,
152:22, 153:1
**OCE's** [3] - 22:10,
49:17, 58:16
**October** [2] - 54:19,
56:17
**OF** [5] - 1:1, 1:3, 1:9,
1:14, 163:1
**of-the-case** [1] -
157:23
**offer** [1] - 46:20
**offered** [5] - 3:13,
46:19, 92:22,
102:10, 133:7
**office** [85] - 5:19, 6:2,
6:9, 6:11, 6:16, 6:21,
8:8, 9:12, 10:4,
10:15, 11:5, 12:24,
16:16, 21:24, 29:14,
29:17, 29:20, 30:11,
32:2, 35:19, 36:12,
38:2, 48:5, 50:25,
51:9, 52:1, 66:17,
66:20, 67:6, 68:5,
68:8, 76:15, 76:19,
78:5, 78:22, 80:2,
84:16, 85:24, 89:13,
89:23, 90:10, 92:13,
93:7, 93:12, 93:15,
93:19, 93:23,
101:21, 103:3,
104:4, 104:7, 105:3,
112:11, 112:20,
121:25, 127:8,
127:13, 128:22,
129:16, 129:19,
129:20, 129:23,
130:1, 132:22,
132:23, 135:12,
136:11, 136:17,
142:4, 143:8,
143:18, 143:20,
143:22, 144:2,
144:6, 144:9,
144:24, 145:5,
150:19, 152:8,
152:19, 157:18,
158:4
**Office** [4] - 12:13,
15:10, 33:7, 79:3
**office's** [1] - 42:15
**offices** [4] - 7:17, 66:4,
67:4, 78:14
**OFFICIAL** [1] - 163:1
**Official** [1] - 1:21

**official** [87] - 8:25, 9:2,
11:5, 17:1, 17:6,
18:8, 18:10, 18:11,
30:11, 30:12, 31:1,
31:3, 31:6, 35:19,
41:22, 45:22, 48:14,
49:4, 50:14, 50:18,
51:9, 64:24, 65:9,
70:9, 70:19, 71:18,
72:4, 78:7, 78:10,
78:16, 79:23, 80:6,
80:13, 101:21,
102:23, 112:24,
115:2, 115:9,
119:12, 120:7,
121:25, 132:23,
135:22, 136:13,
136:14, 136:15,
137:1, 137:2,
137:18, 137:22,
138:20, 141:4,
141:17, 141:23,
143:13, 143:18,
143:21, 143:22,
144:9, 145:22,
145:24, 146:3,
146:22, 146:24,
147:2, 147:4, 150:4,
150:7, 150:13,
150:16, 151:8,
151:11, 151:14,
152:19, 152:22,
153:7, 153:9, 154:1,
154:2, 154:8,
154:14, 163:10
**often** [1] - 68:18
**old** [1] - 83:7
**olds** [1] - 85:22
**on-the-ground** [1] -
69:11
**once** [10] - 38:22,
48:11, 56:12, 67:6,
80:22, 107:12,
122:10, 122:13,
140:8, 159:13
**one** [56] - 10:5, 10:6,
14:18, 15:17, 17:10,
19:25, 20:16, 20:19,
20:23, 23:18, 27:18,
30:1, 30:6, 30:10,
31:2, 32:25, 35:14,
39:6, 42:9, 45:23,
46:20, 54:2, 55:9,
55:18, 63:8, 73:10,
74:9, 84:12, 85:12,
85:14, 86:7, 86:9,
86:10, 91:17, 99:12,
114:5, 115:6,
115:15, 115:18,
115:25, 116:10,

116:19, 119:21,
121:5, 128:20,
129:13, 135:7,
137:7, 139:9,
142:19, 143:2,
145:4, 155:18,
158:1, 160:14,
162:15
**one's** [1] - 116:5
**ones** [2] - 55:18, 65:21
**online** [1] - 61:6
**open** [1] - 21:21
**opinion** [2] - 70:8,
71:12
**opponent** [7] - 64:20,
65:4, 70:2, 70:3,
72:1, 95:22, 123:24
**opportunity** [3] -
10:20, 42:1, 87:23
**opposed** [1] - 157:24
**opted** [1] - 27:11
**or-so** [1] - 97:14
**order** [4] - 48:20, 49:8,
67:24, 82:12
**ordered** [1] - 158:11
**organize** [1] - 44:22
**original** [2] - 30:10,
54:21
**originally** [2] - 22:2,
148:9
**otherwise** [1] - 82:19
**Outlook** [1] - 30:20
**outside** [5] - 28:4,
86:19, 146:22,
147:2, 156:3
**outstanding** [2] -
159:11, 159:12
**overnight** [1] - 10:1
**overruled** [3] - 76:2,
88:3, 109:25
**own** [9] - 9:21, 30:14,
30:15, 80:6, 80:11,
81:17, 146:22,
153:17, 153:21

**P**

**p.m** [13] - 1:5, 12:19,
15:1, 17:23, 18:1,
18:22, 18:24, 19:8,
26:19, 28:7, 101:12,
128:24, 162:24
**pace** [1] - 4:10
**PAGE** [1] - 2:2
**Page** [11] - 42:13,
43:19, 43:20, 45:25,
110:7, 120:11,
120:18, 121:2,
121:3, 121:5, 121:9
**page** [13] - 13:4,

20:20, 27:18, 36:20,
43:18, 116:8,
116:18, 125:24,
126:8, 126:9,
127:20, 128:12,
161:9
**pages** [1] - 27:18
**paid** [35] - 8:24, 16:17,
17:5, 18:9, 31:7,
46:5, 47:4, 47:8,
47:24, 60:18, 62:6,
69:14, 69:17, 70:19,
71:17, 72:4, 72:11,
78:7, 78:16, 78:19,
82:1, 82:24, 85:22,
90:4, 90:9, 93:9,
93:22, 102:15,
129:22, 129:25,
135:22, 138:20,
141:4, 142:7, 142:15
**palm** [1] - 48:19
**paper** [3] - 32:4, 44:24,
160:11
**pardon** [1] - 28:11
**parity** [3] - 97:16,
97:21, 98:20
**part** [51] - 7:7, 7:19,
8:2, 12:9, 13:11,
13:12, 15:23, 16:9,
16:10, 17:16, 21:14,
21:23, 21:24, 27:20,
36:20, 37:11, 37:14,
41:7, 53:4, 53:20,
57:7, 68:7, 74:7,
81:14, 81:16, 96:9,
96:12, 96:15,
111:24, 112:1,
113:23, 118:7,
120:15, 120:17,
120:18, 120:21,
121:15, 121:18,
122:14, 122:21,
123:19, 132:17,
132:24, 134:10,
136:4, 136:8,
146:21, 147:11,
147:14, 149:4,
154:19
**participate** [1] -
131:12
**particular** [1] - 11:18
**passed** [3] - 108:16,
108:18, 108:25
**passing** [1] - 27:13
**past** [2] - 4:23, 55:14
**Pat** [2] - 75:10, 75:11
**paternity** [1] - 92:7
**path** [1] - 74:9
**pattern** [1] - 87:23
**Paul** [17] - 15:25, 16:3,

16:14, 32:11, 33:4,
38:2, 39:7, 43:2,
66:9, 66:14, 66:17,
73:7, 98:14, 124:7,
152:15, 152:17,
152:21
**pause** [1] - 42:17
**Pause** [4] - 3:25,
113:7, 113:15,
162:16
**pay** [9] - 58:10, 61:17,
81:14, 108:12,
132:18, 132:19,
132:21, 137:3, 138:4
**paying** [5] - 10:2,
27:12, 80:21, 81:19,
150:20
**payment** [1] - 140:12
**payments** [3] - 144:2,
144:6, 145:5
**payroll** [3] - 48:11,
70:9, 71:13
**PB** [1] - 124:17
**people** [5] - 6:21,
23:21, 29:19, 29:20,
32:16, 33:16, 34:4,
35:5, 36:8, 49:7,
61:17, 64:6, 64:8,
64:10, 64:12, 64:14,
71:18, 74:3, 90:9,
109:7, 110:19,
111:24, 115:11,
122:17, 132:18,
132:21, 133:11,
148:25, 149:3,
160:19, 160:20
**performance** [1] -
68:15
**performing** [1] - 136:5
**performs** [1] - 102:24
**perhaps** [1] - 56:12
**period** [3] - 11:18,
85:14, 123:11
**permissible** [1] -
161:9
**permission** [4] -
72:17, 133:3, 133:4,
147:16
**person** [2] - 53:15,
108:22
**personal** [10] - 31:2,
50:15, 91:16, 92:15,
96:4, 153:1, 153:13,
153:20, 153:25,
154:21
**personally** [2] - 36:14,
48:13
**phone** [26] - 3:16,
11:17, 13:22, 14:5,
19:2, 22:14, 22:18,

23:15, 25:25, 27:8, 37:9, 37:19, 37:21, 40:1, 55:17, 57:20, 124:3, 125:1, 126:15, 130:15, 135:18, 136:20, 137:14, 138:24, 138:25, 139:5
**physically** [3] - 32:1, 32:5, 36:6
**picking** [3] - 59:16, 142:10, 151:9
**picks** [1] - 142:12
**picture** [2] - 99:18, 100:6
**pieces** [1] - 61:6
**pile** [1] - 44:24
**pint** [1] - 28:21
**Plaintiff** [1] - 1:4
**plan** [1] - 157:12
**plane** [1] - 118:23
**planned** [1] - 65:14
**play** [6] - 61:7, 120:11, 121:3, 121:10, 121:11, 121:12
**playing** [2] - 121:14, 128:4
**point** [34] - 9:25, 13:16, 19:22, 24:4, 24:19, 25:5, 28:14, 28:22, 34:3, 34:20, 34:22, 40:15, 41:18, 44:7, 46:9, 46:11, 46:20, 49:4, 49:6, 50:12, 51:10, 51:22, 54:4, 58:3, 70:5, 71:6, 71:7, 71:8, 71:9, 107:18, 129:14, 140:15, 140:17, 157:7
**pointing** [1] - 9:3
**points** [4] - 6:20, 140:7, 140:11, 146:18
**political** [7] - 79:22, 107:16, 110:24, 111:16, 118:13, 119:11, 120:5
**poll** [1] - 48:20
**polls** [2] - 63:25, 64:6
**pollster** [5] - 96:19, 107:20, 108:2, 108:8, 109:2
**portion** [4] - 43:6, 43:12, 44:13, 156:13
**position** [9] - 35:15, 70:5, 71:9, 87:13, 97:14, 99:13, 99:14, 99:15, 100:14
**positions** [2] - 8:7,

143:7
**possibility** [1] - 24:9
**possible** [2] - 25:19, 33:22
**possibly** [4] - 39:11, 81:11, 143:20, 143:22
**post** [2] - 157:8, 158:21
**potential** [4] - 99:6, 99:11, 101:17, 107:13
**practice** [1] - 128:14
**practicing** [2] - 91:3, 91:24
**precedes** [1] - 22:23
**predates** [2] - 87:3, 87:7
**prefer** [1] - 27:24
**preliminary** [1] - 15:11
**premises** [1] - 156:11
**prep** [21] - 46:5, 46:8, 47:5, 101:17, 101:22, 102:9, 102:13, 102:17, 109:9, 111:12, 115:16, 123:9, 125:1, 131:17, 131:20, 132:1, 132:24, 133:5, 133:12, 133:14, 134:2
**preparation** [1] - 143:9
**preparation'** [1] - 8:10
**prepare** [15] - 44:17, 87:15, 103:13, 124:5, 124:10, 125:14, 125:19, 126:3, 126:6, 126:16, 126:19, 126:22, 127:2, 127:7, 140:17
**prepared** [4] - 123:20, 133:18, 133:21, 134:24
**preparing** [9] - 52:2, 127:10, 127:13, 129:17, 129:23, 130:1, 132:25, 134:13, 140:11
**prepping** [1] - 125:5
**present** [1] - 68:18
**presentations** [1] - 122:8
**presented** [2] - 48:10, 87:5
**presidential** [1] - 65:21
**press** [18] - 6:15, 6:16, 8:22, 9:16, 38:14,

55:13, 57:3, 79:19, 79:21, 80:1, 83:15, 87:15, 89:12, 89:18, 94:18, 94:20, 94:23, 121:11
**pressuring** [1] - 82:19
**pretty** [6] - 41:23, 48:15, 48:24, 50:12, 124:18, 157:5
**previous** [4] - 21:17, 52:16, 52:19, 106:11
**previously** [1] - 5:9
**primarily** [1] - 14:23
**primary** [16] - 28:23, 28:24, 29:1, 46:13, 47:14, 73:10, 74:2, 75:19, 96:14, 97:10, 97:14, 98:23, 99:1, 99:5, 99:10, 107:4
**print** [1] - 78:5
**printed** [3] - 50:14, 50:15, 63:2
**printer** [1] - 44:23
**printing** [3] - 30:24, 50:4, 50:9
**problem** [9] - 66:23, 66:25, 72:5, 73:21, 74:4, 80:23, 94:13, 141:6, 148:9
**problem-solver** [2] - 66:23, 66:25
**problematic** [1] - 160:15
**problems** [3] - 66:21, 67:2, 159:22
**proceed** [1] - 59:20
**Proceedings** [1] - 1:24
**proceedings** [1] - 163:6
**process** [8] - 30:18, 41:17, 50:17, 52:13, 53:14, 92:19, 100:14, 144:18
**produce** [1] - 54:11
**produced** [2] - 1:25, 38:24
**producing** [3] - 33:25, 50:13
**production** [16] - 37:23, 50:6, 50:25, 51:13, 60:24, 61:4, 61:12, 62:7, 62:11, 62:21, 149:17, 149:18, 149:19, 151:19, 152:2, 153:17
**profile** [1] - 64:25
**program** [1] - 61:7
**progress** [1] - 155:6
**prohibited** [1] - 82:20

**prohibition** [1] - 161:24
**promised** [1] - 155:1
**promptly** [1] - 155:2
**prone** [1] - 94:17
**proper** [2] - 137:15, 151:11
**properly** [1] - 137:8
**proposed** [3] - 157:6, 157:9, 158:20
**prospect** [1] - 99:5
**provide** [21] - 16:15, 24:5, 24:7, 30:4, 61:3, 61:4, 61:9, 61:13, 61:15, 61:18, 61:21, 62:4, 62:9, 63:3, 116:25, 117:3, 152:25, 153:20, 154:2, 154:13, 154:20
**provided** [7] - 25:17, 28:17, 38:6, 38:7, 62:14, 123:16, 151:18
**providing** [3] - 32:19, 40:19, 138:14
**PUBLIC** [1] - 1:14
**public** [5] - 45:21, 56:6, 57:2, 58:9, 117:10
**Public** [1] - 125:25
**publicly** [1] - 98:15
**pull** [3] - 113:23, 116:7, 161:13
**pulled** [2] - 30:23, 50:24
**pulling** [2] - 30:24, 46:22
**purchased** [1] - 78:2
**purposes** [8] - 77:10, 77:14, 77:19, 78:11, 79:6, 83:2, 83:4, 137:15
**put** [10] - 6:19, 12:2, 26:10, 31:17, 32:4, 44:24, 97:9, 106:18, 140:7, 155:21
**putting** [3] - 42:15, 50:11, 107:16

## Q

**quarter** [1] - 89:2
**Quarterly** [1] - 54:25
**QUESTION** [13] - 43:3, 46:10, 46:12, 46:16, 110:11, 110:23, 111:14, 111:19, 111:22, 112:1, 112:6, 112:8, 112:10

**question's** [1] - 125:13
**questions** [21] - 41:21, 42:5, 43:17, 46:23, 48:3, 49:21, 60:8, 60:18, 60:20, 62:5, 62:20, 63:4, 64:19, 76:22, 79:22, 85:9, 86:15, 91:19, 121:16, 144:2, 160:6
**quick** [1] - 110:23
**quite** [2] - 6:1, 46:18
**quote** [5] - 67:23, 123:3, 123:8, 137:21, 143:18

## R

**race** [14] - 72:22, 72:23, 94:6, 96:14, 97:6, 97:7, 99:7, 99:9, 107:20, 108:8, 131:20, 136:7, 152:6
**races** [1] - 107:23
**radio** [8] - 123:4, 123:6, 123:9, 123:20, 123:24, 124:5, 125:13, 125:14
**radios** [1] - 125:17
**raise** [4] - 24:20, 64:10, 68:11, 74:2
**raised** [5] - 74:1, 89:2, 97:6
**raising** [1] - 63:21
**ran** [5] - 107:20, 108:3, 108:9, 108:23, 130:11
**rant** [3] - 146:14, 146:25, 147:7
**rather** [1] - 155:22
**ratio** [2] - 70:10, 70:11
**Rayburn** [1] - 91:7
**RDR** [3] - 1:21, 163:3, 163:10
**re** [3] - 103:1, 107:6, 107:12
**re-election** [2] - 103:1, 107:12
**reached** [3] - 14:11, 47:17, 55:15
**reaching** [1] - 72:19
**reaction** [1] - 74:19
**read** [15] - 8:19, 16:4, 16:24, 20:8, 21:21, 30:2, 30:5, 30:6, 44:20, 55:3, 97:17, 112:14, 120:25, 145:2, 148:2
**reading** [3] - 89:25, 125:2, 145:19

**ready** [2] - 114:7, 161:12
**realize** [1] - 85:17
**realized** [1] - 161:12
**really** [7] - 6:6, 18:9, 35:8, 44:21, 45:12, 95:20, 108:14
**reason** [4] - 35:22, 35:23, 36:4, 158:25
**reasons** [2] - 35:14, 35:22
**rebuttal** [4] - 155:24, 156:6, 156:24, 157:1
**receive** [3] - 25:3, 149:16, 149:23
**received** [18] - 13:17, 16:24, 20:6, 21:2, 21:25, 29:21, 34:25, 37:23, 38:22, 50:2, 53:15, 144:23, 146:10, 147:24, 149:6, 149:11, 151:24, 153:13
**receiving** [5] - 31:24, 103:5, 148:2, 151:13, 152:25
**recent** [6] - 157:8, 157:21, 159:17, 159:18, 161:13
**recently** [2] - 52:7, 157:22
**Recess** [1] - 59:18
**recess** [3] - 59:10, 70:12, 161:20
**recognize** [2] - 11:14, 12:9
**recollection** [4] - 114:1, 114:12, 120:10, 121:24
**recommendation** [1] - 72:12
**recommendations** [2] - 68:22, 72:10
**recommended** [2] - 71:5, 82:4
**recommending** [3] - 70:19, 71:2, 71:3
**record** [3] - 3:21, 11:17, 17:13
**recorded** [1] - 1:24
**recording** [1] - 160:2
**records** [1] - 11:23
**records/relevant** [1] - 32:10
**redirect** [2] - 155:16, 156:5
**redistricted** [1] - 94:7
**reduce** [1] - 81:16
**references** [1] - 157:23

**referring** [3] - 42:24, 43:12, 43:14
**reflect** [1] - 3:22
**refresh** [4] - 87:19, 113:25, 114:12, 120:10
**refund** [1] - 74:2
**regard** [1] - 157:20
**regarding** [5] - 12:14, 34:1, 41:10, 82:18, 123:24
**regardless** [1] - 154:10
**regards** [1] - 111:15
**regretfully** [1] - 94:5
**regular** [3] - 10:14, 71:21, 71:23
**regularly** [1] - 122:9
**Reitz** [5] - 32:11, 33:3, 34:17, 84:3, 84:5
**reject** [1] - 107:17
**rejoin** [1] - 155:10
**related** [13] - 8:11, 64:17, 143:11, 143:15, 143:16, 143:18, 143:23, 144:6, 144:10, 144:12, 150:8, 150:12, 153:6
**relates** [1] - 100:4
**relation** [1] - 144:1
**relationship** [2] - 5:13, 10:9
**release** [3] - 87:15, 88:24, 89:18
**released** [1] - 56:6
**relevance** [1] - 87:22
**relevant** [2] - 35:8, 87:9
**relied** [2] - 85:5, 137:24
**remaining** [1] - 4:5
**remember** [51] - 11:20, 14:21, 24:3, 27:10, 31:11, 33:11, 33:14, 39:2, 39:3, 40:16, 40:17, 40:18, 42:8, 43:6, 44:13, 46:23, 50:19, 50:21, 51:1, 51:2, 51:3, 51:4, 54:13, 56:3, 56:24, 87:17, 87:20, 91:18, 113:13, 118:15, 120:14, 120:16, 120:23, 123:5, 123:10, 123:14, 123:17, 123:19, 123:21, 131:2, 148:3, 153:21, 154:10, 154:11,

154:17, 154:18, 154:19, 154:20, 154:22, 154:24
**remembers** [4] - 153:24, 154:5, 154:7, 154:12
**remembrance** [1] - 87:19
**reminding** [1] - 158:2
**remove** [1] - 10:19
**renounced** [2] - 44:4, 44:5
**renowned** [1] - 136:10
**repeatedly** [1] - 54:3
**rephrase** [3] - 141:9, 149:14, 153:10
**replacing** [2] - 115:19, 115:21
**replies** [1] - 26:18
**Report** [1] - 88:24
**report** [10] - 5:25, 54:11, 55:10, 56:5, 56:6, 57:2, 89:3, 97:1, 97:3, 139:20, 139:23
**REPORTER** [1] - 163:1
**reporter** [7] - 5:20, 7:10, 8:3, 8:6, 8:15, 143:6, 150:11
**Reporter** [3] - 1:21, 1:21, 163:10
**reporter's** [1] - 9:3
**reporters** [9] - 64:19, 64:23, 65:3, 140:22, 141:3, 141:16, 142:6, 142:14, 143:2
**reports** [1] - 87:15
**representation** [3] - 25:20, 27:12, 27:13
**Representational** [2] - 16:20, 145:9
**representative** [1] - 16:13
**Representative** [3] - 16:16, 16:19, 145:8
**Representatives** [1] - 66:4
**request** [14] - 10:22, 13:15, 20:1, 20:12, 21:2, 21:12, 28:10, 38:3, 38:20, 38:22, 49:23, 49:25, 55:16, 124:7
**requesting** [1] - 24:4
**requests** [7] - 6:22, 6:24, 20:16, 29:21, 49:17, 50:2, 55:14
**resign** [1] - 10:21
**resignation** [2] -

10:23, 11:2
**resigned** [1] - 10:19
**resigning** [1] - 140:1
**resolve** [1] - 157:11
**resources** [7] - 76:25, 77:3, 77:7, 77:9, 77:25, 82:23, 82:24
**respect** [7] - 20:12, 30:13, 30:15, 31:8, 32:14, 157:12, 157:14
**respond** [9] - 9:12, 30:16, 38:19, 49:25, 53:23, 57:15, 79:22, 135:15, 137:6
**responded** [3] - 38:23, 38:24, 54:7
**responding** [3] - 22:1, 49:17, 54:18
**response** [13] - 5:24, 6:2, 6:19, 10:22, 29:25, 34:7, 38:3, 42:15, 43:14, 47:13, 63:3, 70:6, 71:10
**responses** [2] - 34:5, 34:6, 157:9
**rest** [4] - 75:5, 147:10, 147:11, 147:14
**restaurant** [2] - 43:23, 120:22
**result** [3] - 6:15, 9:18, 11:8
**results** [3] - 38:25, 139:25, 140:3
**Resumed** [2] - 2:3, 5:1
**retain** [1] - 22:6
**retained** [1] - 16:14
**retaining** [1] - 28:4, 99:5
**retired** [1] - 45:19
**retirement** [1] - 45:20
**retreat** [3] - 45:22, 118:2, 122:6
**returned** [3] - 24:18, 40:12, 55:19
**returning** [1] - 22:25
**review** [7] - 15:11, 15:15, 16:11, 45:3, 48:12, 51:13, 159:23
**reviewed** [1] - 68:21
**reviews** [3] - 68:15, 114:11, 145:20
**RFI** [4] - 13:18, 13:19, 19:25, 29:10
**RFIs** [2] - 29:3, 37:11
**right-hand** [1] - 14:6
**road** [1] - 90:11
**Roberts** [1] - 161:18
**role** [10] - 46:18, 47:23, 47:25, 49:1,

109:19, 111:14, 112:11, 112:19, 128:4
**roles** [1] - 61:8
**Room** [2] - 1:22, 163:11
**room** [3] - 51:22, 119:14, 119:16
**rotary** [2] - 71:25, 72:1
**rule** [1] - 79:13
**rules** [14] - 16:21, 42:24, 43:5, 76:25, 77:3, 77:4, 77:5, 77:6, 77:16, 82:22, 83:1, 94:1, 145:10
**run** [14] - 44:7, 44:10, 45:21, 48:2, 67:4, 68:4, 98:13, 98:16, 98:24, 99:2, 100:7, 100:11, 107:13, 107:17
**running** [9] - 68:7, 98:3, 99:22, 100:11, 101:6, 106:23, 107:2, 115:4, 117:10
**runoff** [2] - 74:1, 74:4
**rush** [1] - 33:23

## S

**sake** [1] - 70:13
**salary** [6] - 70:9, 80:21, 81:22, 81:25, 93:9, 141:22
**sarcastically** [1] - 74:11
**sat** [1] - 60:2
**Saturday** [1] - 25:13
**save** [1] - 45:1
**saw** [5] - 82:4, 90:24, 95:8, 98:15, 129:6
**Saxby** [7] - 44:4, 45:7, 45:19, 106:23, 108:9, 108:23, 114:15
**Saxby's** [1] - 114:18
**scanned** [1] - 26:10
**schedule** [3] - 38:11, 79:16, 124:16
**scheduled** [1] - 40:22
**scheduler** [1] - 112:4
**schedulers** [2] - 79:13, 79:15
**scheduling** [1] - 35:19
**scheme** [1] - 87:12
**screen** [3] - 73:5, 121:10, 121:12
**scroll** [12] - 20:20, 61:2, 109:6, 109:12, 124:22, 126:5,

126:8, 128:8, 142:24, 148:19, 150:2
**scrolling** [5] - 90:24, 112:18, 124:2, 143:5, 148:15
**SEAN** [1] - 1:13
**search** [3] - 30:21, 30:22, 31:1
**searching** [1] - 30:17
**seat** [3] - 107:9, 107:10
**second** [13] - 14:18, 20:19, 35:2, 35:22, 35:23, 47:11, 87:6, 121:5, 125:24, 127:20, 145:8, 154:12, 162:15
**seconds** [15] - 14:7, 22:22, 23:5, 23:14, 24:2, 24:19, 27:9, 40:17, 41:2, 56:2, 56:23, 57:25
**secretaries** [2] - 79:19, 79:21
**secretary** [4] - 55:14, 80:1, 83:15, 89:12
**SECTION** [1] - 1:14
**secured** [1] - 119:6
**securing** [1] - 118:3
**see** [29] - 3:19, 8:13, 9:22, 13:25, 15:14, 16:22, 18:9, 20:14, 21:7, 22:18, 23:2, 23:22, 24:22, 24:25, 32:9, 32:12, 32:19, 40:11, 41:16, 71:4, 71:18, 73:5, 87:6, 112:7, 114:3, 124:16, 151:7, 151:9, 153:17
**seeing** [1] - 71:14
**seek** [2] - 84:22, 84:23
**sees** [3] - 70:6, 71:11, 72:5
**self** [6] - 96:7, 96:10, 96:13, 97:15, 97:20, 98:20
**self-finance** [5] - 96:7, 96:10, 96:13, 97:15, 98:20
**self-financing** [1] - 97:20
**Senate** [26] - 46:3, 47:3, 72:22, 72:23, 93:6, 97:10, 98:24, 99:2, 99:6, 99:9, 100:7, 107:9, 107:20, 108:8, 115:3, 116:5, 116:7,

116:10, 117:11, 117:17, 126:24, 130:24, 131:20, 134:2, 136:6, 152:6
**Senator** [2] - 45:8, 108:4
**senator** [2] - 45:9, 107:6
**send** [12] - 12:25, 13:15, 14:12, 103:9, 106:17, 118:17, 124:20, 128:13, 128:17, 133:15, 134:8, 146:6
**sending** [16] - 12:15, 13:5, 14:23, 15:18, 31:21, 33:25, 102:13, 102:22, 102:23, 116:13, 118:4, 118:17, 119:9, 124:24, 127:21, 159:7
**sends** [3] - 40:7, 102:16, 129:9
**senior** [2] - 76:14, 82:17
**sensationalism** [1] - 6:6
**sensationalized** [1] - 9:21
**sense** [1] - 22:3
**sent** [32] - 13:6, 13:9, 19:18, 19:25, 21:8, 21:19, 25:5, 29:3, 33:22, 34:15, 53:12, 56:5, 61:24, 88:7, 88:13, 88:19, 113:2, 114:24, 115:10, 117:15, 128:20, 133:1, 134:5, 142:19, 142:21, 146:10, 151:15, 151:18, 151:21, 151:22, 152:1, 153:13
**sentence** [1] - 35:2
**sentences** [1] - 145:15
**separate** [2] - 10:8, 157:24
**separately** [1] - 34:6
**September** [1] - 55:25
**series** [4] - 139:25, 140:3, 140:6, 140:10
**serviced** [1] - 8:9
**services** [10] - 16:18, 46:8, 47:5, 78:2, 135:22, 137:2, 138:14, 138:20, 143:8
**session** [11] - 91:4,

92:13, 101:17, 101:22, 102:9, 102:13, 102:17, 102:18, 102:19, 102:24, 133:5
**SESSION** [1] - 1:8
**set** [13] - 34:12, 69:10, 69:12, 80:1, 100:23, 117:24, 122:6, 130:14, 130:15, 130:18, 130:23, 133:14
**settled** [1] - 102:15
**seven** [1] - 56:2
**several** [11] - 9:25, 20:21, 31:22, 32:7, 33:16, 48:1, 53:11, 122:6, 124:11, 124:12, 124:13
**share** [1] - 136:21
**sheet** [2] - 116:14, 116:16
**shitload** [1] - 73:21
**Short** [2] - 111:5, 115:23
**short** [4] - 23:3, 23:5, 155:19, 161:22
**shorter** [1] - 157:2
**shortly** [4] - 11:10, 15:3, 29:3, 34:1
**shot** [5] - 74:7, 75:9, 75:16, 75:18, 76:10
**show** [12] - 11:11, 17:12, 73:2, 80:17, 86:3, 87:16, 87:22, 87:23, 95:10, 113:25, 142:3, 142:5
**showed** [4] - 34:10, 80:22, 111:8, 117:4
**showing** [1] - 111:7
**shown** [3] - 53:13, 109:13, 120:11
**shows** [2] - 71:23, 72:1
**side** [25] - 12:1, 12:2, 12:3, 14:6, 18:10, 18:11, 36:5, 48:14, 48:15, 48:25, 49:4, 49:5, 67:9, 70:20, 71:18, 72:5, 112:24, 115:9, 137:18, 137:22, 140:21, 141:4, 141:5, 153:7
**sides** [1] - 18:12
**sign** [12] - 48:12, 48:13, 103:19, 103:22, 103:25, 104:17, 104:19, 105:8, 105:14, 105:17, 106:6,

159:25
**signature** [1] - 104:15
**Signed** [1] - 32:9
**signed** [17] - 13:8, 33:21, 48:10, 53:25, 58:19, 59:1, 67:17, 103:14, 103:16, 103:21, 104:3, 104:9, 104:10, 105:15, 105:24, 106:17, 108:17
**significant** [1] - 95:19
**signing** [1] - 48:9
**signs** [3] - 48:19, 67:12, 72:17
**simplicity's** [1] - 70:13
**Simpson** [11] - 70:1, 70:2, 70:6, 71:4, 71:6, 71:11, 71:14, 71:21, 71:23, 72:5, 100:11
**Singer** [1] - 43:2
**singer** [1] - 43:2
**single** [1] - 104:3
**singled** [1] - 18:15
**sit** [1] - 47:19
**sitting** [1] - 155:4
**situation** [3] - 33:16, 37:3, 50:24
**situations** [1] - 10:18
**six** [10] - 24:2, 27:9, 34:4, 34:20, 35:24, 38:24, 38:25, 41:2, 56:9, 83:8
**skills** [1] - 58:9
**slammed** [1] - 6:13
**slamming** [1] - 139:20
**sliding** [2] - 70:8, 71:12
**small** [1] - 14:9
**snooping** [1] - 143:3
**snowballed** [1] - 85:15
**so..** [1] - 84:19
**solicited** [2] - 108:1, 133:3
**Solis** [3] - 43:21, 44:11, 45:7
**solver** [2] - 66:23, 66:25
**someone** [1] - 68:10
**sometime** [5] - 26:17, 98:18, 157:19, 158:7
**sometimes** [4] - 48:17, 94:17, 104:17, 104:19
**somewhere** [5] - 3:9, 29:2, 97:8, 126:4, 132:18

**soon** [2] - 25:18, 33:22
**sorry** [68] - 13:22, 15:8, 24:7, 29:2, 29:5, 41:20, 53:3, 53:5, 63:6, 66:6, 67:15, 73:14, 77:4, 80:9, 83:6, 83:10, 86:4, 86:8, 86:14, 90:14, 91:11, 91:12, 92:14, 101:15, 102:2, 102:19, 104:10, 104:23, 105:21, 108:5, 108:6, 110:3, 110:9, 113:11, 114:4, 115:24, 120:13, 120:17, 120:19, 123:6, 123:8, 123:22, 124:4, 124:23, 125:2, 127:11, 128:11, 131:18, 134:10, 134:18, 139:15, 139:19, 140:25, 141:4, 142:5, 144:4, 144:12, 146:5, 147:3, 150:19, 151:1, 151:13, 153:8, 153:10
**sort** [13] - 4:7, 10:3, 37:3, 44:1, 44:8, 44:9, 46:19, 46:21, 48:16, 50:10, 51:6, 90:1, 154:1
**sorting** [1] - 154:5
**sorts** [1] - 159:22
**sound** [1] - 6:13
**sounded** [2] - 60:25, 134:3
**sounding** [1] - 87:2
**sounds** [1] - 63:16
**speaking** [5] - 35:17, 42:10, 43:22, 58:9, 155:25
**specific** [2] - 47:24, 86:1
**specifically** [6] - 32:16, 44:1, 47:22, 55:16, 84:12, 130:25
**specifics** [1] - 47:17
**Speech** [1] - 129:9
**speech** [12] - 62:24, 91:4, 91:24, 92:9, 126:19, 126:25, 127:2, 127:7, 127:14, 127:22, 129:17, 130:2
**speeches** [1] - 126:16
**spend** [5] - 48:21, 48:22, 67:13, 72:14,

97:7
**spent** [3] - 63:11, 73:25, 137:8
**spoken** [2] - 117:23, 118:6
**spring** [1] - 5:6
**stacks** [1] - 32:4
**staff** [28] - 6:20, 8:7, 29:4, 31:8, 31:22, 37:13, 49:7, 66:8, 69:7, 77:16, 78:7, 78:10, 80:5, 82:7, 82:10, 82:17, 85:17, 87:14, 87:24, 90:4, 93:22, 104:7, 118:2, 122:6, 143:7, 148:8, 148:21, 149:20
**staffer** [7] - 76:14, 80:16, 80:20, 80:24, 81:9, 81:16, 82:13
**staffers** [7] - 32:14, 38:8, 49:3, 49:4, 68:16, 84:23, 85:8
**staffing** [1] - 66:17
**stage** [2] - 50:8, 65:22
**stand** [1] - 133:11
**standing** [1] - 52:1
**stands** [1] - 54:25
**start** [14] - 6:22, 26:12, 50:4, 59:10, 59:12, 70:10, 72:7, 93:1, 119:21, 140:6, 140:8, 141:11, 141:20, 155:5
**started** [15] - 29:19, 30:17, 30:24, 67:6, 92:24, 93:5, 93:11, 93:12, 93:14, 101:4, 101:5, 106:23, 107:16, 144:7
**starting** [7] - 46:22, 57:3, 70:10, 93:6, 110:11, 121:5, 154:1
**starts** [2] - 121:9, 139:14
**statement** [3] - 15:14, 42:25, 147:7
**STATES** [3] - 1:1, 1:3, 1:10
**States** [2] - 1:13, 163:11
**station** [1] - 7:12
**status** [2] - 41:19, 41:20
**stay** [1] - 4:2
**staying** [1] - 94:14
**stenographic** [1] - 163:5
**stenography** [1] - 1:24
**step** [3] - 29:24, 53:13,

59:15
**stepped** [1] - 5:20
**steps** [4] - 6:15, 6:17, 29:25, 30:16
**Steve** [5] - 99:15, 99:18, 100:5, 100:17, 100:23
**stick** [3] - 109:22, 110:1, 122:11
**still** [16] - 19:10, 26:1, 26:4, 44:6, 47:18, 57:18, 62:1, 65:22, 80:13, 98:19, 98:20, 99:21, 99:24, 100:16, 101:5, 106:10
**stipulation** [1] - 159:11
**stop** [6] - 27:20, 90:7, 93:23, 106:18, 154:25, 155:2
**stories** [5] - 9:21, 9:24, 10:3, 10:4, 10:15
**story** [14] - 9:17, 9:22, 9:24, 10:1, 10:18, 42:15, 42:18, 48:16, 54:24, 63:1, 141:11, 141:12, 141:13
**straighten** [1] - 52:9
**stranger** [1] - 9:20
**strategy** [1] - 79:2
**Street** [1] - 1:18
**strong** [1] - 157:5
**stuff** [1] - 137:12
**subject** [9] - 16:1, 25:14, 39:23, 41:11, 52:23, 52:24, 53:8, 88:10, 145:6
**subjects** [1] - 145:4
**submit** [6] - 48:13, 157:16, 157:19, 158:4, 158:7, 158:11
**substance** [2] - 15:22, 52:17
**substantially** [1] - 34:12
**substantive** [1] - 19:19
**substitute** [1] - 133:4
**suggested** [2] - 10:4, 106:8
**SULLIVAN** [1] - 1:10
**summer** [1] - 106:24
**sunk** [1] - 95:5
**superior** [1] - 84:19
**supplemental** [7] - 60:24, 61:4, 61:12, 62:7, 62:11, 62:20, 152:2
**supplied** [2] - 149:18,

149:19
**supposed** [2] - 147:10, 149:24
**Supreme** [1] - 161:17
**surely** [1] - 94:14
**surprised** [1] - 54:6
**sustain** [1] - 3:2
**switch** [2] - 13:21, 57:20
**system** [2] - 160:1, 160:2

## T

**tape** [2] - 60:5, 60:11
**team** [6] - 10:6, 107:16, 116:1, 117:17, 118:7, 121:19
**Team** [7] - 109:2, 110:19, 115:11, 116:16, 117:25, 122:21, 122:24
**tech** [3] - 11:21, 23:9, 56:13
**technical** [1] - 155:18
**technically** [1] - 58:8
**Teddie** [11] - 32:3, 39:6, 50:10, 103:22, 103:25, 104:19, 105:8, 105:17, 106:6, 106:8, 112:3
**telephone** [1] - 118:11
**telephones** [1] - 79:10
**television** [2] - 7:12, 48:22
**ten** [5] - 45:17, 60:15, 60:17, 60:20, 97:13
**ten-week** [1] - 97:13
**tender** [1] - 11:2
**terms** [3] - 21:25, 48:5, 55:9
**terrible** [1] - 113:12
**territory** [1] - 94:11
**testified** [5] - 11:21, 49:14, 50:18, 50:23, 154:6
**testify** [2] - 3:4, 3:23
**testifying** [3] - 39:25, 120:14, 147:17
**testimony** [19] - 11:20, 43:12, 49:16, 50:20, 50:21, 51:1, 51:2, 112:22, 135:25, 139:2, 144:25, 145:18, 146:9, 148:1, 153:16, 153:24, 154:3, 154:4, 154:15
**text** [1] - 23:23

**THE** [104] - 1:1, 1:1, 1:10, 3:2, 3:7, 3:12, 3:17, 3:21, 4:1, 4:9, 4:12, 4:15, 4:18, 4:21, 17:14, 59:9, 59:15, 59:16, 59:20, 63:6, 73:13, 73:15, 73:18, 74:23, 74:25, 76:2, 76:7, 86:8, 86:10, 86:14, 86:17, 86:21, 86:24, 87:1, 87:6, 87:10, 88:1, 88:3, 88:12, 102:3, 102:4, 105:6, 105:13, 105:16, 105:19, 105:20, 105:21, 105:22, 105:25, 106:2, 106:3, 106:4, 106:10, 106:12, 106:13, 106:14, 109:25, 113:9, 113:18, 141:10, 144:17, 147:13, 147:18, 147:22, 149:15, 151:2, 154:25, 155:10, 155:16, 155:20, 155:22, 156:1, 156:7, 156:9, 156:17, 156:20, 156:23, 157:4, 157:17, 157:20, 158:6, 158:9, 158:13, 158:17, 158:20, 159:2, 159:14, 159:17, 159:21, 160:6, 160:10, 160:11, 160:18, 160:21, 160:25, 161:5, 161:11, 161:23, 162:4, 162:8, 162:14, 162:17, 162:20, 162:22
**theme** [1] - 63:2
**themselves** [1] - 78:14
**theory** [2] - 157:16, 157:22
**theory-of-the-case** [1] - 157:16
**thereafter** [2] - 11:10, 29:3
**they've** [2] - 13:18, 80:6
**thinking** [6] - 99:21, 100:8, 105:19, 106:3, 106:10, 156:25
**thinks** [1] - 52:4

**third** [3] - 20:20, 50:23, 51:6
**thoughts** [2] - 70:16, 160:16
**threatening** [1] - 82:17
**three** [18] - 12:15, 13:5, 32:14, 32:16, 34:17, 34:18, 57:21, 66:5, 66:6, 117:3, 124:17, 124:19, 134:18, 154:18, 156:23, 160:19, 160:20, 160:22
**throughout** [1] - 75:5
**throwing** [1] - 69:25
**Thursday** [9] - 13:14, 26:21, 41:9, 117:25, 118:23, 128:15, 128:21, 129:5, 158:14
**ticket** [1] - 118:23
**tied** [2] - 144:1, 144:6
**Tim** [5] - 32:11, 33:3, 84:3, 84:5
**timeline** [4] - 45:19, 94:6, 122:6, 151:20
**timelines** [1] - 13:7
**title** [5] - 57:13, 69:3, 69:7, 146:16, 152:5
**today** [23] - 8:6, 26:17, 70:10, 109:23, 110:2, 110:24, 113:1, 113:5, 113:14, 123:3, 123:5, 129:12, 137:25, 145:14, 146:9, 146:14, 148:1, 148:4, 153:16, 157:16, 158:10, 158:12, 158:14
**Today** [9] - 41:11, 43:2, 43:11, 54:20, 54:24, 55:1, 135:4, 137:20, 138:19
**today's** [1] - 112:22
**Todd** [2] - 95:9, 95:12
**TODD** [1] - 1:13
**todd.gee2@usdoj.gov** [1] - 1:16
**together** [7] - 4:7, 6:20, 30:25, 42:15, 50:10, 65:23, 107:16
**tomorrow** [7] - 74:7, 91:4, 155:4, 157:6, 157:8, 158:18, 161:1
**took** [3] - 46:20, 69:3, 84:20
**top** [7] - 7:19, 13:11, 19:17, 26:11, 53:20,

66:3, 75:8
**topic** [6] - 6:5, 9:9, 24:20, 41:11, 54:19, 161:13
**topics** [2] - 4:7, 41:4
**topped** [1] - 95:20
**total** [1] - 66:5
**totally** [1] - 66:19
**touch** [1] - 53:25
**towards** [5] - 49:1, 49:8, 50:8, 67:24, 99:6
**towers** [1] - 23:10
**train** [1] - 101:4
**training** [4] - 42:23, 76:12, 76:14, 92:12
**TRANSCRIPT** [1] - 1:9
**transcript** [8] - 1:24, 109:16, 110:8, 113:17, 120:12, 121:10, 163:5, 163:6
**transcription** [1] - 1:25
**transported** [2] - 32:6, 50:11
**treasurer** [2] - 89:8, 152:17
**trial** [4] - 49:14, 90:25, 91:19, 160:7
**TRIAL** [1] - 1:9
**tried** [1] - 71:7
**Tringali** [4] - 96:19, 107:19, 108:3, 122:8
**Tringali's** [1] - 107:23
**trip** [1] - 45:11
**trouble** [6] - 73:20, 73:25, 77:20, 77:22, 137:10, 137:11
**troubles** [1] - 114:18
**true** [6] - 147:1, 147:3, 147:4, 163:4, 163:6
**trust** [1] - 61:7
**trusts** [1] - 68:4
**truth** [1] - 52:10
**try** [2] - 6:16, 159:5
**trying** [5] - 8:10, 128:6, 143:10, 143:12, 145:14
**Tuesday** [5] - 12:17, 28:7, 31:14, 53:8, 128:20
**turn** [3] - 35:10, 37:14, 39:1
**turned** [6] - 40:22, 44:19, 51:8, 51:14, 51:16, 58:19
**turnout** [2] - 74:8, 74:19
**turns** [1] - 50:14
**TV** [6] - 3:20, 64:12,

67:20, 139:17, 139:20, 139:23
**twice** [1] - 56:10
**two** [28] - 19:1, 22:22, 24:18, 27:18, 35:14, 35:22, 55:23, 56:23, 62:25, 66:3, 70:12, 101:16, 101:20, 102:5, 102:8, 110:23, 125:4, 129:12, 134:16, 145:15, 149:12, 149:16, 156:19, 156:21, 160:19, 160:21
**two-week** [1] - 70:12
**type** [2] - 37:3, 71:25
**typed** [3] - 30:20, 30:21, 37:8
**typical** [2] - 6:17, 10:17
**typically** [1] - 9:21
**typos** [5] - 158:21, 158:22, 158:23, 158:25, 159:6

## U

**u.S** [1] - 1:14
**U.S** [1] - 1:22
**ultimately** [3] - 9:12, 19:18, 99:14
**unable** [1] - 24:20
**unavailable** [1] - 157:6
**unbroken** [2] - 34:8, 34:9
**unclear** [1] - 105:16
**under** [4] - 38:14, 85:2, 85:4, 87:21
**understandable** [2] - 4:3, 4:22
**understood** [6] - 34:12, 142:16, 143:23, 144:4, 149:25
**unfamiliar** [1] - 57:10
**unified** [1] - 79:16
**UNITED** [3] - 1:1, 1:3, 1:10
**United** [2] - 1:13, 163:11
**unless** [1] - 156:4
**unofficially** [2] - 46:13, 47:15
**up** [79] - 6:22, 6:24, 19:10, 23:17, 27:18, 28:2, 28:21, 30:23, 32:4, 41:15, 45:15, 46:20, 48:20, 59:16, 61:1, 61:14, 64:23,

65:3, 69:10, 69:12, 70:11, 71:23, 72:1, 72:25, 79:23, 80:1, 80:22, 84:8, 84:12, 84:14, 84:17, 84:18, 89:2, 90:24, 92:19, 96:16, 97:19, 98:6, 98:12, 98:19, 100:23, 101:11, 107:6, 109:12, 112:16, 113:17, 113:23, 114:7, 116:7, 117:14, 117:22, 118:20, 119:3, 122:6, 124:2, 126:5, 126:8, 128:8, 128:19, 130:15, 130:23, 131:10, 133:7, 133:14, 135:10, 141:1, 142:10, 142:12, 142:18, 142:24, 144:21, 146:8, 151:10, 159:11, 161:13, 162:5
**upcoming** [1] - 65:10
**update** [1] - 31:25
**urgency** [1] - 38:14
**USA** [8] - 43:2, 43:11, 54:19, 54:24, 55:1, 135:4, 137:20, 138:19

## V

**vaguely** [2] - 33:13, 118:16
**vast** [3] - 153:5, 153:8, 153:11
**vendor** [1] - 73:21
**vendors** [2] - 18:11, 82:23
**venting** [1] - 18:4
**verbiage** [1] - 122:12
**version** [1] - 157:9
**video** [1] - 3:15
**videotaped** [1] - 35:16
**view** [1] - 157:22
**violated** [2] - 16:21, 145:10
**violating** [1] - 94:1
**visit** [1] - 61:17
**voice** [5] - 14:9, 23:17, 23:20, 23:21, 40:8
**volumes** [1] - 36:19
**voluntary** [2] - 52:13, 52:14
**volunteer** [10] - 46:20, 80:5, 80:11, 81:1, 81:5, 81:23, 82:8,

82:11, 82:14, 112:8
**volunteering** [1] - 136:1
**voted** [1] - 75:2
**voters** [3] - 94:10, 94:11
**voucher** [3] - 103:14, 103:21, 104:4
**vouchers** [15] - 67:12, 67:16, 67:17, 103:5, 103:6, 103:16, 103:19, 103:23, 104:1, 104:9, 104:14, 105:9, 105:18, 106:6, 106:16
**vs** [1] - 1:5
**vulnerable** [2] - 114:16, 115:3
**vying** [1] - 49:7

## W

**wait** [3] - 44:25, 119:17, 119:20
**walked** [2] - 6:8, 6:10
**walking** [1] - 5:18
**wants** [9] - 7:16, 76:7, 76:9, 135:8, 135:11, 143:6, 143:16, 143:17, 144:22
**Warfield** [2] - 108:21, 115:19
**Washington** [7] - 1:6, 1:15, 1:19, 1:23, 9:16, 29:20, 163:12
**water** [1] - 59:17
**wealth** [1] - 96:4
**website** [1] - 8:9
**Wednesday** [3] - 7:5, 7:23, 54:19
**weeds** [1] - 48:18
**week** [11] - 44:5, 45:11, 70:12, 80:22, 97:13, 98:5, 98:16, 98:17, 98:18, 124:18, 124:24
**weekend** [4] - 155:5, 155:6, 162:12, 162:18
**weekly** [2] - 10:14, 130:20
**weeks** [4] - 53:11, 56:9, 114:25, 125:4
**weird** [1] - 156:5
**whole** [3] - 97:15, 138:18, 146:20
**whoops** [1] - 13:22
**willfully** [1] - 58:23
**WILLIAM** [1] - 1:13

**willing** [2] - 3:22, 81:5
**willingness** [1] - 81:1
**win** [3] - 72:25, 75:24, 76:4
**withdrew** [1] - 11:21
**withheld** [1] - 58:23
**witness** [1] - 155:19
**Witness** [2] - 114:11, 145:20
**WITNESS** [13] - 2:2, 59:16, 63:6, 102:4, 105:13, 105:19, 105:21, 105:25, 106:3, 106:10, 106:13, 113:18, 147:18
**witnesses** [4] - 3:14, 155:17, 157:12, 157:14
**WNB** [2] - 7:10, 7:11
**won** [5] - 95:21, 103:1, 106:21, 107:3, 107:12
**wonderful** [1] - 162:18
**wondering** [2] - 17:4, 87:8
**word** [9] - 37:1, 37:2, 74:7, 155:3, 158:24, 159:6
**words** [5] - 46:19, 50:19, 141:11
**worried** [11] - 94:25, 95:11, 95:14, 96:7, 96:10, 96:13, 97:19, 98:19, 99:24, 100:2, 129:12
**worth** [1] - 97:3
**write** [13] - 18:13, 18:23, 53:21, 53:22, 55:11, 61:6, 73:19, 73:23, 89:17, 110:19, 110:10, 113:11, 117:23
**writes** [1] - 8:6
**writing** [6] - 7:13, 18:3, 35:5, 37:7, 41:12, 53:10
**written** [4] - 11:3, 139:12, 139:18, 156:15
**wrote** [4] - 18:21, 34:11, 61:5, 132:21
**WSB** [2] - 7:10, 139:17
**WSB-TV** [1] - 139:17
**WSB/TV** [1] - 42:15

## Y

**Yahoo** [2] - 62:1, 153:13

**year** [5] - 62:2, 76:16, 83:8, 85:22, 136:2
**year-olds** [1] - 85:22
**years** [3] - 66:11, 83:8, 159:17
**yesterday** [5] - 20:15, 23:9, 63:11, 95:24, 97:23
**York** [1] - 1:15
**yourself** [7] - 10:19, 29:4, 45:1, 68:25, 72:13, 103:19, 141:21

## Z

**zero** [1] - 57:25
**zoom** [1] - 128:12
**zooming** [1] - 92:2