**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                )
UNITED STATES OF AMERICA,        )
                                )
           v.                    )        Criminal No. 16-59 (EGS)
                                )
DAVID G. BOWSER,                 )
                                )
               Defendant.        )
_____)

## MEMORANDUM OPINION

This case stems from the government's allegations that
David Bowser, who was then Chief of Staff for former
Representative Paul Broun in the United States House of
Representatives, unlawfully used congressional funds to pay a
consultant for campaign services. Following a four-week trial,
the jury returned guilty verdicts on five counts. Pending before
the Court are the following motions: (1) Mr. Bowser's motion for
a judgment of acquittal following the close of the government's
evidence; (2) Mr. Bowser's motion for a judgment of acquittal at
the close of all evidence; Mr. Bowser's motion for a judgment of
acquittal notwithstanding the verdict; and (4) the government's
motion to dismiss Count Two of the Indictment. Based on the
evidence in the record, the applicable law, and the parties'
arguments, and for the reasons explained below, the Court **GRANTS
IN PART AND DENIES IN PART** Mr. Bowser's motions and **GRANTS** the
government's motion.

## I. BACKGROUND

On April 6, 2016, David Bowser was charged with one count of obstruction of proceedings in violation of 18 U.S.C. §§ 1505 (Count One); one count of theft of government property in violation of 18 U.S.C. § 641 (Count Two); one count of concealment of material facts in violation of 18 U.S.C. §§ 1001(a)(1) and (c)(2) (Count Three); and five counts of making false statements in violation of 18 U.S.C. §§ 1001(a)(2) and (c)(2) (Counts Four through Eight). *See generally* Indict., ECF No. 1.[1] These charges were based on allegations that Mr. Bowser, who was the Chief of Staff to Representative Paul Broun from 2008 until 2015, used his position to misappropriate federal funds to pay a campaign consultant, Brett O'Donnell, and then obstructed the Office of Congressional Ethics' investigation of that misappropriation.

Jury selection commenced on February 23, 2018. The government completed its case-in-chief on March 13, 2018. Pursuant to Federal Rule of Criminal Procedure 29, Mr. Bowser orally moved for a judgment of acquittal as to Counts One through Seven at the close of the government's case. Mr. Bowser subsequently filed a written motion, *see* ECF No. 72, which was

---

[1] For the eight counts charged in the indictment, the government also alleges that Mr. Bowser is liable as an aider or abettor under 18 U.S.C. § 2.

fully briefed by March 18, 2018, *see* ECF Nos. 82 and 85. The Court reserved judgment on the motion, and Mr. Bowser presented his defense. The defense completed its case-in-chief on March 19, 2018. The government did not present rebuttal evidence. Mr. Bowser orally renewed his motion for a judgment of acquittal and filed a second written motion. *See* ECF No. 86. The Court reserved judgment on that motion until after the jury's verdict.

On March 23, 2018, the jury returned guilty verdicts on Counts One, Three, Four, Seven, and Eight. *See* Jury Verdict, ECF No. 100. The jury acquitted Mr. Bowser on Counts Five and Six, and it was unable to reach a unanimous verdict on Count Two. *Id.; see also* Jury Note, ECF No. 94. The Court received the jury's verdict as to the unanimous counts and instructed the jury to continue deliberations as to Count Two. After continued deliberations, the jury informed the Court that it was unable to reach a verdict with respect to Count Two. *See* Jury Note, ECF No. 96. The Court again instructed the jury to continue deliberating. *See* 3/23/18 Trial Tr., ECF No. 116 at 8-12 (providing anti-deadlock instruction pursuant to *United States v. Thomas*, 449 F.2d 1171 (D.C. Cir. 1971)). After further deliberations, the jury informed the Court that it was still "hopelessly deadlocked" as to Count Two. *See* Jury Note, ECF No. 98. At that point, the government stated that "it would be appropriate to declare a mistrial." *Id.* at 12. The Court agreed

and, over Mr. Bowser's objection, determined that it was
"manifestly necessary" to declare a mistrial as the Count Two.
*Id.* at 12-13; *see also* Minute Order of March 25, 2018
(explaining that it was necessary to declare a mistrial given
the "jury's continued inability to reach a verdict" and the
"significant risk that a verdict may result from pressures
inherent in the situation rather than the considered judgment of
all the jurors").

On April 13, 2018, Mr. Bowser filed a motion for a judgment
of acquittal notwithstanding the verdict as to Counts One, Two,
Three, Four, and Seven. *See* ECF No. 117. On that same day, the
government filed a notice of its intention not to seek retrial
on Count Two and asked that Count Two be dismissed without
prejudice pursuant to Federal Rule of Civil Procedure 48(a). *See*
ECF Nos. 118 and 119. Mr. Bowser requested the Court to reserve
its ruling on the government's request to dismiss Count Two
until after it had ruled on his motions for acquittal. *See* ECF
No. 120. The Court subsequently ordered the government to show
cause why Count Two should not be dismissed with prejudice in
view of the government's decision not to seek retrial on that
count. *See* Minute Order of June 15, 2018 (citing *United States
v. Karake*, No. 2-256, 2007 WL 8045732, at *3 (D.D.C. Feb. 7,
2007)). On June 20, 2018, in response to the Court's order to
show cause, the government stated that it had no objection to

dismissing Count Two with prejudice. *See* ECF No. 124. Mr. Bowser nonetheless maintains that a judgment of acquittal is appropriate. *See* ECF No. 125.

In his motions, Mr. Bowser argues that Counts One, Two, Three, Four and Seven fail for the following reasons:

- Count One, obstruction of proceedings, fails because the Office of Congressional Ethics does not fall within the scope of 18 U.S.C. § 1505, which only applies to the "House" or a "committee" of the House.

- Count Two, theft of government funds, is non-justiciable pursuant to *United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995).

- Count Three, concealment of a material fact, fails because there was no legal duty for Mr. Bowser to disclose any information to the Office of Congressional Ethics, as cooperation with that office's investigations is voluntary.

- Counts Four and Seven, making a false statement, fail because they are non-justiciable like Count Two and for the additional reason that the evidence was insufficient to establish that Mr. Bowser had the requisite *mens rea*.

## II.  LEGAL STANDARD

### A. Motion for a Judgment of Acquittal at the Close of Evidence

Federal Rule of Criminal Procedure 29(a) provides that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." In

5

considering a Rule 29 motion, "'the trial court must view the evidence in the light most favorable to the Government giving full play to the right of the jury to determine credibility, weigh evidence and draw justifiable inferences of fact.'" *United States v. Treadwell*, 760 F.2d 327, 333 (D.C. Cir. 1985) (quoting *United States v. Davis*, 562 F.2d 681, 683 (D.C. Cir. 1977)). In other words, "the Court must decide whether a reasonable jury could conclude that the government met its burden of proving each element of the offense beyond a reasonable doubt." *United States v. Quinn*, 403 F. Supp. 2d 57, 60 (D.D.C. 2005). "The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).

**B.  Motion for a Judgement of Acquittal After the Verdict**

Under Rule 29(c), a defendant may renew a motion for a judgment of acquittal within fourteen days after a guilty verdict. Because a court owes "tremendous deference to a jury verdict," *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990), the court "must view the evidence in the light most

favorable to the verdict, and must presume that the jury has properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences," *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983). A conviction in a criminal trial should be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The standard for "clear[ing] the bar for [a] sufficiency of evidence challenge" is "very high," and the evidence to support a conviction does "not need to be overwhelming." *United States v. Pasha*, 797 F.3d 1122, 1135 n.9 (D.C. Cir. 2015). "Thus a judgment of acquittal is appropriate only when there is ***no*** evidence upon which a reasonable juror might fairly conclude guilt beyond a reasonable doubt." *United States v. Weisz*, 718 F.2d 413, 438 (D.C. Cir. 1983) (emphasis added).

## III. ANALYSIS

### A.    Count One: Obstruction of Proceedings

Count One charges Mr. Bowser with obstruction of proceedings in violation of 18 U.S.C. § 1505, which prohibits an individual from corruptly obstructing or endeavoring to obstruct "the due and proper exercise of the power of inquiry . . . by either House, or any committee of either House or any joint

committee of the Congress." Indict., ECF No. 1 ¶¶ 64-80.

Specifically, the government charged Mr. Bowser with obstructing

an official investigation that was conducted by the Office of

Congressional Ethics ("OCE") regarding the use of federal funds

by Congressman Broun's office to pay for consultant Brett

O'Donnell's services to Congressman Broun's House reelection and

Senate campaigns. *Id.* ¶ 65. For Mr. Bowser to have been found

guilty of violating section 1505, the government was required to

prove the following elements beyond a reasonable doubt:

> (1) that, from in or about March 2014
> through in or about June 2014, there was
> an inquiry or investigation being had by
> the U.S. House of Representatives or any
> committee of the House;
>
> (2) that Mr. Bowser knew that the inquiry or
> investigation was being had by the U.S.
> House of Representatives or any
> committee of the House; and
>
> (3) that Mr. Bowser did corruptly endeavor
> to influence, obstruct or impede the due
> and proper exercise of the power of
> inquiry under which the investigation or
> inquiry was being had by the U.S. House
> of Representatives or any committee of
> the House.

*See* Jury Instructions, ECF No. 87 at 11; *see also* 18 U.S.C. §

1505 (explaining that an individual may be found guilty of

violating the section if he "corruptly . . . influences,

obstructs, or impedes or endeavors to influence, obstruct, or

impede . . . the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress"). Mr. Bowser argues that he could not have obstructed a proceeding within the meaning of section 1505 because the OCE is not the "House" or "any committee" the House. Def.'s Mot. for J. of Acquittal ("Def.'s MJOA"), ECF No. 72 at 1.

The issue here is one of pure statutory interpretation: does the phrase "House, or any committee of either House or any joint committee of the Congress" as used in section 1505 include the OCE? The first step "'in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" *United States v. Wilson*, 290 F.3d 347, 352 (D.C. Cir. 2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). In determining whether a statutory term is plain or ambiguous, the court examines "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* In so doing, "the court must avoid an interpretation that undermines congressional purpose considered as a whole when alternative interpretations consistent with the legislative purpose are available." *United*

*States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352 (D.C. Cir. 2002).

If, after considering "everything from which aid can be derived," a court "can make no more than a guess as to what Congress intended," then a court should apply the rule of lenity. *United States v. Muscarello*, 524 U.S. 125, 138-39 (1998); *see also United States v. Moore*, 619 F.2d 1029 (D.C. Cir. 1979) (explaining that criminal statutes "are to be strictly construed" and "uncertainty regarding their ambit is to be resolved in favor of lenity"). The rule of lenity counsels in favor of reading ambiguous criminal statutes "to ensure both that there is fair warning of the boundaries of criminal conduct and that legislatures, not courts, define criminal liability." *Crandon v. United States*, 494 U.S. 152, 158 (1990); *see also United States v. Poindexter*, 951 F.2d 369, 378 (D.C. Cir. 1991) ("a penal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct it prohibits, and do so in a manner that does not invite arbitrary and discriminatory enforcement by which policemen, prosecutors, and juries . . . pursue their personal predilections"). Notably, "[t]he simple existence of some statutory ambiguity . . . is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree." *Muscarello*, 524 U.S. at 138. Rather, to invoke the

rule of lenity, the court "must conclude that there is a
grievous ambiguity or uncertainty in the statute." *Id.* at 138-39
(citation and internal quotation marks omitted).

Whether an OCE investigation falls within the scope of 18
U.S.C. § 1505 appears to be a matter of first impression. The
Court finds that a plain-text reading of the statute compels the
conclusion that the OCE does not fall within the scope of the
statute. Section 1505 prohibits an individual from corruptly
obstructing or endeavoring to obstruct "the due and proper
exercise of the power of inquiry . . . **by either House, or any
committee of either House or any joint committee of the
Congress**." The government relies on House Resolution 895 to
argue that the OCE is "in the House" and therefore subject to
section 1505. Gov't Opp'n to Def.'s Mot. for J. of Acquittal
("Gov't MJOA Opp'n"), ECF No. 82 at 6. The relevant provision of
House Resolution 895 reads as follows:

> For the purpose of assisting the House in
> carrying out its responsibilities under
> article I, section 5, clause 2 of the
> Constitution (commonly referred to as the
> "Discipline Clause"), there is established **in
> the House** an independent office to be known as
> the Office of Congressional Ethics.

H. Res. 895 § 1(a) (emphasis added). The report published by the
Special Task Force on Ethics Enforcement in the House of
Representatives — which was created in January 2007 by House
Speaker Nancy Pelosi and then Minority Leader John Boehner to

determine whether the House should create an "outside" ethics enforcement entity — uses similar language in describing the OCE, noting that the OCE was designed to be "an independent office *of the House* of Representatives." *See* Rep. of the Democratic Members of the Special Task Force on Ethics Enforcement ("Task Force Rep."), 110th Cong., 1st sess., H. Prt. 110-1 at 6 (emphasis added); *see also id.* (recommending that the OCE be "established as an independent office *within the House* of Representatives") (emphasis added). Indeed, the Task Force considered and expressly rejected the idea of creating the OCE as an "outside" entity that would be "separate from the House." *Id.* at 7. Instead, the Task Force concluded that establishing the OCE as "an office within the Legislative Branch," much like independent offices such as "the Office of the Inspector General or the Office of the Chief Administrative Officer," made the most sense from both a constitutional and practical perspective. *Id.*

The government also argues that the evidence at trial established that the OCE is "part of the House in all meaningful ways." Gov't MJOA Opp'n, ECF No. 82 at 7. For example, at trial, the government introduced the testimony of Bryson Morgan, a lawyer who served as investigative counsel for the OCE between September 2013 and July 2015. *See* 3/8/18 p.m. Trial Tr., ECF No. 110 at 47-49. Mr. Morgan testified that the OCE is designed to

assist the House in carrying out its constitutional obligation to punish its own members, *id.* at 50; the OCE's governing board is composed of individuals appointed by the Speaker of the House and the House Minority Leader, *id.;* the OCE board reports to the House Committee on Ethics, *id.* at 53, 55, 65-68; the OCE staff are House employees, *id.* at 56-57; the OCE's investigative authority "is quite broad" and includes investigations into alleged violations "by a member of the House, employee of the House, officer of the House in the conduct of their official duties, *id.* at 57; and the OCE's authority to promulgate its own rules comes from the House, 3/13/18 a.m. Trial Tr. at 93.[2]

The government's arguments on this point are not persuasive. Although the government is correct that the OCE was created to operate *within* the House, it is not the "House" itself. Article 1, section 2 of the Constitution makes clear that the House "shall be composed of Members chosen every second Year by the People of the several States." The OCE is indisputably not composed of "members elected by the people," and therefore it cannot be "the House" as defined by the Constitution. To the contrary, a member of Congress is expressly ineligible to be on the board of the OCE. *See* H. Res. 895 §

---

[2]     To the extent transcripts of the proceedings are not on the docket, the Court relies on copies of rough transcripts it has received.

1(b)(4)(B)(i)(V). Moreover, a member of the OCE board is not "considered to be an officer or employee of the House." *Id.* § 1(b)(7).

Nor is the OCE a "committee of either House or any joint committee of the Congress" within the meaning of section 1505. Rule X of the Rules of the House of Representatives establishes a number of standing committees and sets forth their jurisdiction. *See* Rules of the House of Representatives, available at http://clerk.house.gov/legislative/house-rules.pdf (last visited July 5, 2018). Although the House Committee on Ethics is established through those Rules as having jurisdiction over matters covered by the Code of Official Conduct, *see* Rule X § 1(g), the OCE is not established as a separate committee. Indeed, the OCE was designed to "advise" the Committee on Ethics regarding purported ethical violations, but it was never intended to supplant the work of that committee. Task Force Rep. at 10 (further explaining that the OCE would "enhance and supplement the House ethics process"). Moreover, at trial, Mr. Morgan squarely testified that the OCE is not a "committee" or a "joint committee":

> Q: [T]he OCE is not a committee of the House?
>
> A. That is correct.
>
> Q. Okay. And it is not a joint committee of the Congress?

A. Correct.

3/12/18 p.m. Trial Tr., ECF No. 111 at 126. Thus, there is no
evidence in the record to support the conclusion that the OCE is
a committee or a joint committee of Congress.

        The government strains to analogize the OCE to a
congressional subcommittee that has been established by a House
committee to conduct a specific investigation. Gov't MJOA Opp'n,
ECF No. 82 at 8 n.6. The government posits that the OCE serves
"as an extension of the House Ethics Committee" by conducting
"preliminary investigations" of matters that are then referred
to the Ethics Committee. *Id.*

        To be sure, if the OCE were, in fact, a subcommittee, it
would likely fall into the scope of section 1505. The Fifth
Circuit's decision in *United States v. Rainey*, 757 F.3d 234 (5th
Cir. 2014), is instructive on this point. In that case, the
defendant moved to dismiss a section 1505 charge arguing, *inter
alia*, that the section did not apply to investigations being
conducted by subcommittees. *Id.* at 238. In support of his
contention that the term "committee" in section 1505 excludes
"subcommittees," the defendant argued that the court should look
to the "technical" reading of the statute because it operates in
the "congressional context." *Id.* at 241-42. Because the term
"committee" in the congressional context meant "a group of
legislators, formally created by and reporting to the House on

particular matters, in accordance with the Rules of the House,"
the defendant argued that a subcommittee could not fall within
that definition because it only "reports to the committee of
which it is a part and not the entire House." *Id.* at 242.

The district court granted the defendant's motion to
dismiss the section 1505 count. *United States v. Rainey*, 946 F.
Supp. 2d 518, 537-42 (E.D. La. 2013). According to the district
court, the "crux of the issue" presented by the defendant's
motion was "whether the word 'committee' in section 1505 should
be read in its generic sense or should be understood in its more
technical sense, as the term is used in the United States
Congress." *Id.* at 541. As the district court explained, the
"generic connotation" of the word committee would encompass
subcommittees, but committees and subcommittees "have distinct
meanings" if defined in the "narrow congressional sense." *Id.* at
541-42. Given these competing interpretations, the district
court found that section 1505 was "ambiguous" and therefore
invoked the rule of lenity to dismiss the count. *Id.* at 542.

On appeal, the Fifth Circuit reversed, holding that under
the plain meaning of section 1505, a congressional subcommittee
is "any committee of either House." 757 F.3d 234, 236. In so
doing, the Fifth Circuit rejected the defendant's narrow reading
of section 1505, explaining that nothing in the statute
"reflect[ed] congressional intention to import a technical

meaning to the phrase 'any committee.'" *Id.* at 242. For example, the Court noted that "[s]ection 1505 does not prohibit obstructing any committee that '*reports to* either House,' . . . but instead protects 'any committee *of* either House.'" *Id.* Moreover, although the defendant relied on internal House rules to support his proposed definition of "committee," the defendant nowhere explained "why the phrase 'of either House' cross-references Congress' internal regulations into section 1505." *Id.* Rather, according to the Fifth Circuit, the plain text of section 1505 suggested that Congress intended a broader definition:

> If Congress intended "committee" as a term of art, which under [the defendant]'s proposed interpretation excludes other committee types, "a committee of either House" would perfectly define the class intended. The modifier "any," by contrast, suggests inclusion rather than exclusion.

*Id.*

The D.C. Circuit's decision in *Barenblatt v. United States*, 240 F.2d 875 (D.C. Cir. 1957), *vacated*, 354 U.S. 930, lends some support to the Fifth Circuit's broad reading of the phrase "committee." *Barenblatt* involved a prosecution under the congressional contempt statute, 2 U.S.C. § 192, which uses nearly identical language in criminalizing a witness's refusal to answer questions pertinent to "any matter under inquiry before either House, or any joint committee established by a

17

joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress." *Id.* at 877, n.1. The defendant in that case argued that "Congress did not intend to make it a crime to refuse to answer questions of a subcommittee." *Id.* at 878. The D.C. Circuit disagreed:

> Nothing has been shown which reflects that Congress has indicated such belief. We can only construe the statute in the light of the obvious purpose for its enactment. That purpose was to discourage the impairment of the vital investigative function of Congress. The function Congress sought to protect is as often committed to subcommittees as it is to full committees of Congress, as indeed it must be. Construing the statute in a manner consistent with its obvious purpose, we hold that Congress intended the word 'committee' in its generic sense, which would include subcommittees.

*Id.* Here, too, the government stresses that its broad interpretation of section 1505 to include the OCE is supported by the statute's purpose, which is to "deter[] and punish[] obstructions of all congressional inquiries," and that "the statute is construed broadly by the courts so as to properly encompass the types of obstruction envisioned by Congress." Gov't MJOA Opp, ECF No. 82. at 5-6 (citing, *inter alia*, *United States v. Cisneros*, 26 F. Supp. 2d 24, 38-39 (D.D.C. 1998)).

The Court concludes that the interpretation advanced by Mr. Bowser hews closer to the statutory text. Unlike the subcommittees at issue in *Rainey* and *Barenblatt*, the OCE is not

composed of members of Congress; in fact, members of Congress

are expressly precluded from serving on the OCE's board.

Moreover, the OCE's investigations are not directly undertaken

on behalf of the Committee on Ethics, and indeed, the connection

between the OCE and the Ethics Committee is more tenuous than

that between a subcommittee and a committee. For example, as Mr.

Morgan explained:

> So one of the things that distinguishes the
> OCE from the House Ethics Committee is that
> the OCE can receive allegations from any
> source, and that was — it was intended, when
> the OCE was created, that there would be
> more avenues for allegations to be reviewed.
> And so it could come from a complaint.
> Someone could come to the OCE with evidence
> that misconduct occurred. It could be — it
> could be news reports of misconduct that
> come forward. It could be any source. It
> could be something that the board or staff
> discover upon reviewing information on their
> own.

3/8/18 p.m. Trial Tr., ECF No. 110 at 60. Thus, the OCE is

permitted to undertake investigations not requested or

authorized by the House Committee on Ethics.

Even assuming that the House Ethics Committee had authority

to delegate its functions to the OCE and intended to do so — the

scenario presented in both *Rainey* and *Barenblatt* — some showing

that the Ethics Committee did, in fact, authorize the

investigation into the particular subject matter is critical for

a criminal sanction to attach. As the Supreme Court has

cautioned, "[t]he jurisdiction of the courts cannot be invoked to impose criminal sanctions in aid of a roving commission." *Gojack v. United States*, 384 U.S. 702, 715 (1966). Instead, it is "necessary to link the inquiry conducted by the subcommittee to the grant of authority dispensed to its parent committee." *Id.* As the *Gojack* court noted, this requirement stems from the fact that it is "the investigatory power of the House that is vindicated" by the congressional contempt statute. *Id.* at 716.

Here, section 1505 aims to protect investigations undertaken by "by either House, or any committee of either House or any joint committee of the Congress" from obstruction. There is no evidence, however, that the OCE's investigation was undertaken at the behest of the House, the House Committee on Ethics, or any other congressional committee of the House or joint committee of the Congress. This conclusion is further buttressed by the fact that the Committee on Ethics did not take any final action in response to the OCE's investigation of Congressman Broun. On July 25, 2014, the OCE board issued its report recommending that the Committee on Ethics "further review" the allegations because there was a "substantial reason" to believe that House rules and federal laws were violated. *See* OCE Report, Review No. 14-2533, available at https://ethics.house.gov/sites/ethics.house.gov /files/Rep.%20Broun%20OCE%20Report%20%26%20Findings.pdf (last

visited July 5, 2018). Although the Committee on Ethics released the OCE's report and noted that the Committee was continuing to review the allegations, it did not take any action before January 3, 2015. At that point Representative Broun was no longer a member of the House and therefore was not subject to the Committee's jurisdiction. *See* Press Release, Committee on Ethics, Statement of the Chairman and Ranking Member of the Committee on Ethics Regarding Representative Paul Broun (Oct. 29, 2014), https://ethics.house.gov/press-release/statement-chairman-and-ranking-member-committee-ethics-regarding-representative-paul-0 (last accessed July 5, 2018). As such, there is no evidence to suggest that Mr. Bowser's obstructive actions somehow directly impeded the Committee on Ethics' investigation into a matter within its jurisdiction. *Cf. United States v. Aguilar*, 515 U.S. 593, 600-02 (1995) ("We do not believe that uttering false statements to an investigating agent . . . who might or might not testify before a grand jury is sufficient to make out a violation of the catchall provision of § 1503.").

In short, because the OCE is not the "House, or any committee of either House or any joint committee of the Congress," the Court finds that section 1505 should not be read to protect the OCE's investigatory power. Alternatively, the Court concludes that it cannot say with certainty that Congress

intended to criminalize obstruction of proceedings being conducted by the OCE. Accordingly, the Court will apply the rule of lenity in favor of Mr. Bowser and grant his motion for a judgement of acquittal on Count One. *See United States v. Granderson*, 511 U.S. 39, 54 (1994) (where the "text, structure, and history fail to establish that the Government's [reading of a statute] is unambiguously correct . . . we apply the rule of lenity and resolve the ambiguity in [defendant's] favor").

**B.   Count Two: Theft of Government Funds**

Count Two charges Mr. Bowser with theft of government funds in violation of 18 U.S.C. § 641. Indict., ECF No. 1 ¶¶ 81-82. For Mr. Bowser to have been found guilty of violating section 641, the government was required to prove the following elements beyond a reasonable doubt:

> (1) the money described in the Indictment belonged to the United States;
>
> (2) Mr. Bowser stole or knowingly converted the money to someone else's use;
>
> (3) Mr. Bowser knowingly and willfully intended to deprive the United States of the use or benefit of the money; and
>
> (4) the money had a value greater than $1,000.

*See* Jury Instructions, ECF No. 87 at 12; *see also* 18 U.S.C. § 641 (explaining that an individual may be found guilty of violating the section if he embezzles, steals, purloins, or

knowingly converts to his use or the use of another . . . any record, voucher, money, or thing of value of the United States").

The jury could not reach a unanimous verdict on Count Two, and the Court declared a mistrial at the government's request after the jury indicated that it was "hopelessly deadlocked." *See* Minute Order of March 25, 2018. The government subsequently notified the Court that it does not intend to seek retrial on Count Two and consents to dismissal of that count with prejudice. *See* Gov't Notice, ECF 118; Gov't Resp., ECF No. 124. Mr. Bowser nonetheless requested that the Court reserve ruling on the government's motion to dismiss Count Two "until after it has ruled on the Defendant's motions for Judgment of Acquittal." *See* Def.'s Resp. to Gov't Mot., ECF No. 120 at 1. Mr. Bowser makes this request because he believes that the government's evidence was "insufficient to sustain a conviction" and therefore, an "acquittal is warranted." *Id.*

Federal Rule of Criminal Procedure 48(a) provides that "[t]he government may, with leave of court, dismiss an indictment, information, or complaint. The government may not dismiss the prosecution during trial without the defendant's consent." Mr. Bowser argues that "the trial in this case is still pending until the Court rules on his timely Motions for Judgment of Acquittal," and therefore the Court may not dismiss

Count Two without his consent. Def.'s Reply to Gov't Resp., ECF No. 125. Rule 48, however, only requires the government to obtain the defendant's consent "during trial," and Mr. Bowser has not cited any authority requiring the government to seek the defendant's consent after trial. *See United States v. Williams*, 720 F.3d 674, 703 (8th Cir. 2013) (holding that the government only needed leave of the court and not the defendant's consent to obtain dismissal after trial). The "principal object of the 'leave of court' requirement is apparently to protect a defendant against prosecutorial harassment, e. g., charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection." *Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977). Here, given that the government consents to dismissal *with* prejudice, any concern regarding prosecutorial harassment is not present. Accordingly, the Court grants the government's motion and dismisses Count Two with prejudice.

### C.   Count Three: Concealment of Material Facts

Count Three charges Mr. Bowser with falsifying, concealing, or covering up a material fact in a matter within the jurisdiction of the legislative branch of the United States government in violation of 18 U.S.C. §1001(a)(1) and (c)(2). Indict., ECF No. 1 ¶¶ 83–84. For Mr. Bowser to have been found guilty of concealing a material fact, the government was

required to prove the following elements beyond a reasonable doubt:

> (1) Mr. Bowser falsified, concealed, or covered up a fact for which there was a legal duty to disclose imposed by statute, regulation, or government form;
>
> (2) the fact was material;
>
> (3) Mr. Bowser falsified, concealed, or covered up the fact by using a trick, scheme or device;
>
> (4) Mr. Bowser acted knowingly and willfully; and
>
> (5) Mr. Bowser falsified, concealed, or covered up the material fact in a matter within the jurisdiction of the legislative branch of the government of the United States.

*See* Jury Instructions, ECF No. 87 at 13. The government charged Mr. Bowser with concealing information in four ways: (1) lying to the OCE, (2) withholding documents from OCE investigators, (3) attempting to influence the testimony of other witnesses before the OCE, and (4) attempting to prevent other witnesses from providing their documents to OCE investigators. Indict., ECF No. 1 ¶¶ 84(a)-(d).

Relying on *United States v. Safavian*, 528 F.3d 957 (D.C. Cir. 2008), Mr. Bowser argues that he cannot be guilty of Count Three because he had no specific duty to disclose any information to the OCE. *See* Def.'s MJOA, ECF No. 72 at 8-11. He

points out that compliance with the OCE's investigative demands is entirely voluntary, and that there was no requirement that Mr. Bowser or other members of Congressman Broun's staff submit to OCE interviews or provide documents to the OCE in the first instance. *Id.* at 9. Mr. Bowser further argues that his decision to participate in the OCE's investigation did not impose upon him any new duty to disclose because section 1001 does not demand "that individuals choose between saying everything and saying nothing." *Id.* at 10 (citing *Safavian*, 528 F.3d at 965).

A section 1001 violation predicated on concealment, as opposed to a false representation, requires the government to prove that the defendant had a legal duty to disclose the concealed information. *See United States v. Safavian*, 528 F.3d 957, 964 (D.C. Cir. 2008) ("Concealment cases in this circuit and others have found a duty to disclose material facts on the basis of specific requirements for disclosure of specific information."); *United States v. Calhoon*, 97 F.3d 518, 526 (11th Cir. 1996) ("Falsity through concealment exists where disclosure of the concealed information is required by a statute, government regulation, or form.").

In *Safavian*, a jury found the defendant guilty of concealing relevant information from (1) an ethics officer in the course of seeking an ethics opinion and (2) the General Services Administration in the course of that agency's

investigation. 528 F.3d at 963. Specifically, the defendant had
requested advice from the ethics officer but purportedly failed
to provide all the information that would have been relevant to
the officer in rendering his opinion. *Id.* at 964. Likewise, the
defendant purportedly failed to provide complete information to
the agency's investigator with whom he voluntarily met. *Id.* On
appeal, the D.C. Circuit reversed the defendant's convictions on
these concealment counts, holding that the government had failed
to identify a duty to disclose. With respect to the defendant's
failure to provide complete information to the ethics officer,
the D.C. Circuit noted that it was not clear "how th[e]
voluntary system" of seeking ethical advice — which the
defendant was ultimately free to follow or disregard —
"impose[d] a duty on those seeking ethical advise to disclose .
. . 'all relevant information' upon pain of prosecution for
violating § 1001(a)(1)." *Id.* Instead, any duty to disclose must
arise from "specific requirements for disclosure of specific
information" so that the a defendant has "fair notice . . . of
what conduct is forbidden." *Id.* The Circuit also rejected the
government's argument that "once one begins speaking when
seeking government action or in response to questioning, one
must disclose all relevant facts." *Id.* at 965. Noting that there
was no "regulation or form or statute" that contained such a
requirement, the court found that nothing in section 1001

"demands that individuals choose between saying everything and saying nothing." *Id.*

This case is inapposite. The government argued in *Safavian* that the defendant's duty to disclose information was imposed upon him not by statute, regulation, or government form, but by "standards of conduct for government employees," which provided fourteen "general principles" of behavior. *Id.* at 964. The D.C. Circuit concluded that these standards were "vague" and that the "ethical principles" embodied in them did not impose a clear duty on an executive employee to disclose information. *Id.* at 964–65. Here, Mr. Bowser's duty to disclose information to the OCE is not the result of vague "general principles." Rather, Mr. Bowser's legal duties were far clearer. One June 3, 2014, Mr. Bowser received a letter from the OCE requesting all documents relating to Brett O'Donnell. *See* Gov't Trial Ex. 503. The letter stated as follows: "If you are not providing a requested document or piece of information, then please identify the document or information withheld and the reason why it is being withheld." *Id.* Even more, the certification form accompanying the letter read as follows:

> I certify that I have not knowingly and willfully withheld, redacted or otherwise altered any information requested in the Office of Congressional Ethics' ("OCE") Request for Information, dated 6/9/14, or if I have withheld, redacted or otherwise altered any requested information, then I have

> identified the information and why it was
> withheld, redacted, or otherwise altered. ***This
> certification is given subject to 18 U.S.C. §
> 1001 (commonly known as the False Statements
> Act)*** and OCE Rule 4(A)(2).

Gov't Trial Ex. 507 (emphasis added). Mr. Bowser signed and

dated this certification form and submitted it to the OCE along

with his document production. 3/12/18 a.m. Trial Tr. 8:4-12:6.

Likewise, prior to his interview with OCE investigators on

June 24, 2014, Mr. Bowser received and executed an 18 U.S.C. §

1001 Acknowledgment Form. The form stated: "I have been provided

with a copy of the text of section 1001 of title 18, United

States Code (popularly known as the False Statements Act) and

hereby acknowledge that it applies to any testimony or documents

I provide to the Office of Congressional Ethics." Gov't Trial

Ex. 516. Mr. Bowser signed this certification before the

beginning of his interview with the OCE. 3/12/18 a.m. Trial Tr.

41:1-42:8.

Mr. Bowser contends that he cannot be found guilty of

concealment "based on [his] alleged false statements to OCE"

because "[a] false statement alone cannot constitute a 'trick,

scheme, or device' proscribed by the concealment offense."

Def.'s Reply, ECF No. 85 at 6-7. Thus, he argues, his false

certifications "simply exposed" him to criminal prosecution

pursuant to the false statement portion of the statute. *Id.* at

7.

Although Mr. Bowser is correct that an affirmative act by which a material fact is concealed is necessary to prove a violation of the concealment prong of 18 U.S.C. § 1001, *see United States v. London*, 550 F.2d 206, 213 (5th Cir. 1977), the government has alleged, and a reasonable jury could have found, an affirmative act here. Specifically, based on the evidence adduced in the government's case-in-chief, a reasonable jury could conclude that Mr. Bowser's decision not to produce his personal emails discussing Mr. O'Donnell's work on Congressman Broun's campaign and his false statements to the OCE investigators in the course of his interview in the face of his express duty to provide full disclosure, were "affirmative" acts constituting a "trick, scheme or device" by which facts were concealed. *See, e.g.*, *United States v. Dale*, 782 F. Supp. 615, 626 (D.D.C. 1991) ("The case law is clear that the deliberate failure to disclose material facts in the face of a specific duty to disclose such information constitutes a violation of the concealment provision of § 1001."). As another court explained, "[w]hile the concealment of a fact that no one has a legal duty to disclose may not be a violation of [section 1001], such is not the case where a regulation or form requires disclosure." *United States v. Perlmutter*, 656 F. Supp. 782, 789 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 1430 (2d Cir. 1987). A defendant's nondisclosure in such a circumstance is "distinguishable from a

'passive failure to disclose' or 'mere silence in the face of an unasked question.'" *Dale*, 782 F. Supp. at 627.

Here, although Mr. Bowser may not have had any preexisting duty to disclose documents or information to the OCE, a duty was imposed upon him after he signed forms agreeing that he would not "falsif[y], coneal[], or cover[] up by any trick, scheme, or device" a "material fact" within the purview of the OCE's investigation. *See* Gov't Trial Exs. 507 and 516. The purpose of these certifications is to provide the OCE a "tool" by which it can "protect the veracity of the information" that it receives. 3/12/18 a.m. Trial Tr. 11:2-7. As Mr. Morgan explained during the trial, the OCE "require[s] people to submit this certification and represent to our office that they have provided us with the complete production of documents, and they do that under penalty of the False Statements Act as a method of protecting or providing some credibility to that assertion." *Id.* 11:8-12. Because these forms advised Mr. Bowser that he was required to fully disclose material facts relevant to the OCE's inquiries, Mr. Bowser's failure to disclose in these circumstances constituted an affirmative act sufficient to form the basis of a concealment charge. Accordingly, the evidence adduced in the government's case-in-chief is sufficient to support Mr. Bowser's concealment conviction.

### D.    Counts Four and Seven: False Statements

Counts Four and Seven charge Mr. Bowser with making a false statement in a matter within the jurisdiction of the legislative branch of the United States government in violation of 18 U.S.C. § 1001. Indict., ECF No. 1 ¶¶ 85-86, 91-92. For Mr. Bowser to have been found guilty of making a false statement, the government was required to prove the following elements beyond a reasonable doubt:

> (1) Mr. Bowser made the statement, as charged in Counts Four through Eight;[3]
>
> (2) the statement was false, fictitious, or fraudulent;
>
> (3) the statement was material;
>
> (4) Mr. Bowser acted knowingly and willfully; and
>
> (5) the false statement pertained to a matter within the jurisdiction of the legislative branch of the government of the United States.

---

[3]    Counts Five, Six and Eight also charged Mr. Bowser with making false statements. *See* Indict., ECF No. 1 ¶¶ 87-90, 93-94. The jury returned a verdict of not guilty on Counts Five and Six, so the Court need not consider Mr. Bowser's arguments with respect to those counts. In addition, Mr. Bowser does not challenge the government's case or his conviction on Count Eight, which charged him with making a false statement when he signed the Request for Information Certification verifying he had not withheld any information during the course of the OCE investigation.

*See* Jury Instructions, ECF No. 87 at 14. Count Four charged Mr.

Bowser of making the following false statement:

> . . . at no point did we ever entertain the
> idea this [O'Donnell's services] would be a
> political adventure. This was purely on the
> official side.

Indict., ECF No. 1 ¶ 86. Count Seven charged Mr. Bowser of

making the following false statement:

> I mean, bottom line is this was done because
> Congressman Broun significantly needed help in
> his communicating ability and that's the only
> reason why it was done and, you know, we had
> no intention at all of doing anything on the
> political side with this.

*Id.* ¶ 92.

Mr. Bowser argues in his motions that Counts Four and Seven

are non-justiciable under *United States v. Rostenkowski*, 59 F.3d

1291 (D.C. Cir. 1995). He also argues that the evidence

presented at trial was insufficient to establish that he had the

requisite mens rea. The Court addresses each argument in turn.

### 1.    Counts Four and Seven are Justiciable

Mr. Bowser argues that Counts Four and Seven must be

dismissed as non-justiciable because there is no "judicially

discoverable or manageable standard" to apply to determine

whether Mr. Bowser's statements are true or false. Def.'s MJOA,

ECF No. 72 at 11. Specifically, he points to House rules that

provide that certain expenditures may be paid from congressional

funds so long as the "primary purpose" of the expenditure is

"representational" and not "campaign-related." *Id.* at 12.[4] He argues that a jury would be required to interpret these House rules and determine the "primary purpose" of Mr. O'Donnell's work for Congressman Broun in order to resolve these counts. *Id.* Because the Constitution reserves to each House the authority to make its own rules, Mr. Bowser asserts that judicial or juror interpretation of the meaning of the "primary purpose" rule would intrude on the sphere of the legislative branch because "the court would effectively be making the Rules." *Id.* at 13; *see also id.* ("The jury cannot be permitted to second guess whether this was the 'primary purpose' for hiring O'Donnell because 'there is too great a chance that it will interpret the Rule differently than would the Congress itself[.]").

To support his arguments, Mr. Bowser relies on *United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995). In that

---

[4]     The parties stipulated to the following at trial: "The House rules do not permit [Members' Representational Allowance] funds to be used to pay for campaign expenses or campaign-related political party expenses. In other words, these rules require that official resources of the House must be used for the performance of official business of the House, and those resources may not be used for campaign or political purposes. . . . MRA funds may be spent to perform what are primarily official duties that are not campaign related but that have a side effect that has political or campaign-related benefits. For example, a congressional employee, whose salary is paid for with MRA funds, can write a bill that the Member introduces and then the Member can later talk about that bill at a campaign event as a reason why he or she should be elected." Tr. Stip. No. 6, 2/27/18 Trial Tr. p.m., ECF No. 103 at 116-117.

case, a congressman was charged with, among other things, using his congressional allowance to purchase "a variety of valuable consumer goods and gift merchandise . . . including armchairs, luggage, sets of china, and crystal sculptures of the U.S. Capitol . . . to be paid for as supplies necessary for the official use, when in fact the goods he obtained were for the personal use of himself, his family, or his friends." *Id.* at 1311. The congressman argued that, to resolve the charge, the court would be required to draw a line between "official use" and "personal use" by reference to ambiguous House rules. *Id.* The "question" before the court was whether those terms were "sufficiently clear, either inherently or as interpreted by the House itself," such that they could be applied to the facts alleged in the indictment. *Id.* at 1309. The D.C. Circuit found that, "while the House Rules certainly contemplate a line between the 'official' and the 'personal,' they do little to indicate where that boundary lies." *Id.* at 1311. The Circuit explained that its justiciability analysis turned on whether it could determine "that the facts set out in a particular allegation could not be authorized under ***any*** reasonable interpretation of the House Rules." *Id.* at 1310 (emphasis added). Thus, for example, because purchase of gifts with official funds was clearly prohibited by the relevant House rule, allegations that the congressman purchased items for the

use of "family, or his friends" were justiciable. *Id.* at 1311.
To the extent the government's case depended on a showing that
the congressman had purchased the items for "personal use,"
however, the case was non-justiciable because "without
explanation in the Rules," the term "personal use" was "too
ambiguous to support the prosecution of a Member of Congress."
*Id.*

Mr. Bowser's arguments are a red herring, and his case can
be distinguished from *Rostenkowski*. With respect to Counts Four
and Seven, the government was required to show beyond a
reasonable doubt that the following statements made by Mr.
Bowser were false:

- " . . . at no point did we ever entertain
  the idea this [O'Donnell's services] would
  be a political adventure. This was purely
  on the official side."

- "I mean, bottom line is this was done
  because Congressman Broun significantly
  needed help in his communicating ability
  and that's the only reason why it was done
  and, you know, we had no intention at all
  of doing anything on the political side with
  this."

Indict., ECF No. 1 ¶¶ 86, 92. Mr. Bowser attempts to analogize
this case to *Rostenkowski* by pointing to the "primary purpose"
rule, which requires a member of Congress to determine whether
the primary purpose of a particular expense is "official and
representational" or "campaign-related," and only allows

reimbursement for "expenses the primary purpose of which are official and representational." Def.'s MJOA, ECF No. 72 at 12. Mr. Bowser asserts that the jury cannot decide whether he lied as alleged in Counts Four and Seven without first determining whether the "primary purpose" of Mr. O'Donnell's employment was "official" or "campaign-related." Def.'s Mot. for J. Notwithstanding the Verdict, ECF No. 117 at 9-10. Because the line between "official work" and "campaign work" is ambiguous, he concludes that these counts are non-justiciable. *Id.* at 10.

As Mr. Bowser acknowledges, however, the "primary purpose" rule relates to whether certain ***expenditures*** are ***reimbursable*** from congressional funds. Def.'s MJOA, ECF No. 72 at 12 (emphasis added). Conviction for the false statement counts, however, turns on Mr. Bowser's intent in employing Brett O'Donnell between 2012 and 2014. For the government to succeed on these counts, it needed to prove, among other things, that the statements made by Mr. Bowser to the OCE were materially false. In particular, the government needed to show that Mr. Bowser's statement that he never entertained the idea that Mr. O'Donnell's services would be "political" was false. Likewise, the government needed to show that Mr. Bowser's statement that he and Congressman Broun never intended for Mr. O'Donnell to provide services "on the political side" was false. Such a showing in no way depends on whether Mr. O'Donnell's salary was

reimbursable from congressional funds or any other interpretation of the "primary purpose" rule. To the contrary, even if the government conceded that the primary purpose of Mr. O'Donnell's work was official, Mr. Bowser could still be found to have lied to the OCE if a jury concluded that Mr. Bowser intended for some portion of Mr. O'Donnell's work to be "political" or "on the political side." Accordingly, the Court declines to dismiss Counts Four and Seven as non-justiciable.

### 2. There Is Sufficient Evidence Of Mens Rea To Sustain A Conviction On Counts Four And Seven

Mr. Bowser also argues that his convictions on Counts Four and Seven fail because there is insufficient evidence of mens rea to sustain his conviction. Specifically, he argues that if he believed in good faith that Mr. O'Donnell was employed to provide official, rather than campaign, services to Congressman Broun, he lacked the necessary mens rea to make a false statement within the scope of section 1001. Def.'s Mot. for J. of Acquittal Notwithstanding the Verdict, ECF No. 117 at 10-16. In support of these arguments, Mr. Bowser reiterates the same arguments he advanced at trial, namely:

- Congressman Broun did not need campaign assistance when he hired Mr. O'Donnell in 2012 because Congressman Broun was the overwhelming favorite to win the primary and faced no opposition in the general election.

- Mr. O'Donnell was hired "as a communications and messaging consultant" for the "official side" of Congressman Broun's office, and Mr. O'Donnell's contract reflected this fact.

- Mr. O'Donnell volunteered his services to Congressman Broun's campaigns, as was "commonplace" among staff in the House.

- Mr. O'Donnell complained about not being paid for his services to Congressman Broun's Senate campaign and requested to be reimbursed from the campaign, which suggests that Mr. O'Donnell was not, in fact, being paid for his campaign work.

*Id.* Mr. Bowser argues that, based on the facts adduced at trial, no reasonable jury could conclude that "Mr. Bowser knew from the outset that the employment arrangement with O'Donnell was impermissible and that he deliberately lied to OCE about that arrangement." *Id.* at 16.

In considering a defendant's motion for a judgment of acquittal at the close of evidence, the Court "must view the evidence in the light ***most favorable*** to the Government, giving full play to the right of the jury to determine credibility, weigh evidence and draw justifiable inferences of fact." *United States v. Treadwell*, 760 F.2d 327, 333 (D.C. Cir. 1985) (citation and internal quotation marks omitted, emphasis added). Once a jury returns a verdict, the Court's standard of review is even more deferential: a court owes "tremendous deference" to the verdict, *United States v. Long*, 905 F.2d 1572, 1576 (D.C.

Cir. 1990), and his convictions must be upheld if "**any rational trier of fact** could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002) (emphasis added).

The evidence at trial, viewed in the light most favorable to the government, was sufficient to establish that Mr. Bowser "knowingly and willfully" made false statements to the OCE when he stated that "at no point did we ever entertain the idea this [O'Donnell's services] would be a political adventure" and that "we had no intention at all of doing anything on the political side with this." Although the Court will not summarize the entire, voluminous record adduced in the government's case-in-chief on this issue, the Court outlines some of the evidence that supports the mens rea element of the government's false statement counts.

On the first day of trial, the government elicited testimony from Stephen Allen, a messaging consultant who had also interviewed for the role for which Mr. O'Donnell was eventually hired. Mr. Allen testified that, based on his meeting with Mr. Bowser and Congressman Broun, it was initially his understanding that they were seeking a consultant who would be able to provide "campaign services." 2/27/18 Trial Tr. p.m., ECF No. 103 at 32-33. Mr. Allen further testified that, after a subsequent meeting with Congressman Broun, it was his

understanding that the Congressman "was on a crusade and wanted to go around the country talking about conservative causes." *Id.* at 113. Mr. Allen agreed with the government that the crusade was a "political venture" to the extent Congressman Broun intended to "advocate[e] conservative principles and causes." *Id.* at 114.

Brett O'Donnell also testified at trial and explained the nature of his work for Congressman Broun. He stated that, although it was his understanding that he would primarily be providing official services to the congressman, he was also asked to assist the congressman in preparing for campaign activities within days of being hired. Trial Tr. 3/1/18 a.m. 132-139. As he continued to work for Congressman Broun, Mr. O'Donnell testified that he routinely consulted with the congressman on campaign messaging and strategy. *See, e.g.*, 3/5/18 Trial Tr. a.m. 34, 36-37, 39-40. For example, in the course of discussing an email regarding Mr. O'Donnell's availability to prepare Congressman Broun for a campaign interview, Mr. O'Donnell confirmed that he prepared the congressman for a number of campaign events:

> Q. Other than this particular example, were there other occasions where you would meet or speak with the Congressman to prepare him for upcoming campaign events?
>
> A. There are.

> Q. Okay. And we're going to talk about
> debates in a moment, but what other —
> what are campaign
>
> A. Speeches, media interviews that might be
> focused on the campaign, those kinds of
> events.

3/5/18 Trial Tr. a.m. 81-82. Mr. O'Donnell even spoke with

Congressman Broun's wife on a number of occasions about

"direction on messaging for the campaign" and "how to stay on

message." 3/5/18 Trial Tr. a.m. 31. Furthermore, Mr. O'Donnell

testified that he spent an increasing proportion of his time

providing services to Congressman Broun's campaign over the

course of 2013 and into 2014.

> A. In early 2013, I would say I was doing 60
> percent official work, 40 percent
> campaign work. By the end of 2013, that
> was easily 80 percent campaign work, 20
> percent official work.
>
> Q. During the same period — and, again,
> we're referring to December of '13 to
> March of '14 — were you in communication
> with the defendant?
>
> A. I was.
>
> Q. Approximately how often?
>
> A. Maybe even daily via e-mail, at least a
> couple of times by phone, and then in and
> out of the office a time or two a week.
>
> . . .
>
> Q. And how is it that you would describe the
> substance of your conversations with the
> defendant during this period?

A. Most of them centered around campaign messaging, strategy, debates, things that were happening on the campaign side.

Q. Could you give the jury some examples or a sampling of what kind of discussions you were having with the defendant during that time?

A. Yes. We might have been discussing an upcoming debate and what needed to be done to prepare the candidate for that debate, what our overall message in the debate would be, logistics for the debate, the format of the debate, so we might talk about a range of things relative to that one particular event or we could be talking about how the campaign was going, generally. Particularly on the messaging side we might talk about specific media interviews that he had done or was going to do. So there were a variety of discussions that could have occurred.

Q. How about your communications with Congressman Broun during this period?

A. Mostly centered on the campaign. There would be some time for official work, if there was a press release going out from the office or things that were happening on the official side that we would message to, but mainly relative to the campaign; meetings in and out of the office, whether they were in the official office or down at Jamestown Associates when we were preparing for debates, would center around the campaign and what was happening relative to him or his competitors in the race.

> Q. I asked you earlier about who it was that
> set the agenda for the work that you were
> doing, whether it be official or
> campaign. You had mentioned Mr. Bowser;
> is that right?
>
> A. Correct.
>
> Q. Same true during this period, or someone
> else?
>
> A. Absolutely, Mr. Bowser, with input from
> Christine in terms of some of the
> tactical considerations that we needed to
> review. But primarily David Bowser would
> set the agenda for what I should be
> working with on Dr. Broun.

3/5/18 Trial Tr. a.m. 101-103. Based on this testimony, the

Court concludes that a reasonable jury could conclude that the

government met its burden of proving mens rea sufficient to

support a conviction under 18 U.S.C. § 1001. Furthermore, to the

extent that Mr. Bowser offered contrary testimony, it was the

jury's role to "resolve conflicts in the testimony, to weigh the

evidence, and to draw reasonable inferences." *Jackson v.*

*Virginia*, 443 U.S. 307, 319 (1979).

Moreover, the Court specifically and clearly instructed the

jury on Mr. Bowser's theory of the case:

> Mr. Bowser asserts that the four statements he
> made to the OCE which are charged as alleged
> false statements in Counts IV, V, VI and VII
> were, in fact, truthful statements and also
> were based on opinions or beliefs he honestly
> held in good faith at the time he made them.
> . . . Good faith is a complete defense to all
> of the charges in this case. A statement made

44

> with good faith belief in its accuracy does
> not amount to a false statement and is not a
> crime. The burden of establishing lack of good
> faith and criminal intent rests on the
> government. A defendant is under no burden to
> prove his good faith; rather, the government
> must prove bad faith or knowledge of falsity
> beyond a reasonable doubt.

Jury Instructions, ECF No. 87 at 16. After receiving the evidence and hearing this instructions, a reasonable jury could find that, both at the time of the hiring decision and continuing through 2014, Mr. Bowser contemplated that Mr. O'Donnell would provide some services on the "political side" in his work for Congressman Broun. Accordingly, the Court denies Mr. Bowser's motions as to Counts Four and Seven.

## IV.   CONCLUSION

For the reasons set forth above, the Court **GRANTS** Mr. Bowser's motion for a judgment of acquittal as to Count One. The Court also **GRANTS** the government's motion to dismiss Count Two and dismisses that count with prejudice. Finally, the Court **DENIES** Mr. Bowser's motions with respect to Counts Two, Three, Four, Five, Six, and Seven. An Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**SIGNED:**   **Emmet G. Sullivan**
**United States District Court Judge**
**July 17, 2018**